# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ELIAS JORGE "GEORGE" ICTECH-BENDECK, **Plaintiff** | CIVIL ACTION<br><br>NO. 18-7889<br>c/w 18-8071,<br>18-8218, 18-9312 |
| VERSUS | |
| WASTE CONNECTIONS BAYOU, INC., ET AL., **Defendants** | SECTION: "E" (5) |
| *Related Case:* | CIVIL ACTION<br><br>NO. 19-11133, c/w 19-14512 |
| FREDERICK ADDISON, ET AL., **Plaintiffs** | SECTION: "E" (5) |
| VERSUS | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |
| LOUISIANA REGIONAL LANDFILL COMPANY, ET AL., **Defendants** | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF DR. SUSAN SCHIFFMAN PURSUANT TO F.R.E. 702

Consolidated Class Plaintiffs and the Addison Plaintiffs (collectively "Plaintiffs") file this Memorandum in Opposition to Defendants' Joint Motion to Exclude Certain Opinion Testimony of Dr. Susan Schiffman Pursuant to Federal Rule of Evidence 702 (Record Docs. 167 Ictech-Bendeck and 207 Addison).

Defendants' Motion mischaracterizes Dr. Schiffman's testimony as being offered to determine medical causation, which is apparently part of a strategy to discredit her opinion and limit her testimony. Dr. Schiffman has not opined in this case on medical causation, physical injury or toxicological impacts, and does not intend to. Dr. Schiffman is one of the leading

authorities on the issue of malodors in communities, with several decades of experience measuring, studying, teaching and writing about the human response to landfill odors and the negative effects resulting from extended exposures. She does not exceed her remit, any more than the opinion of Defendant's psychologist, Dr. Pamela Dalton. In layman's terms, both witnesses are staying well within their lanes. Notably, citing Dr. Schiffman multiple times as a reference, Dr. Dalton has opined:

Malodors have been shown to elicit somatic symptoms. Somatic symptoms that have been reported with malodor exposure include vomiting, nausea, dizziness, headache, loss of appetite, sleep disorders and irritation of eyes, throat and nose [2, 63]. Malodors can also cause somatic symptoms via "odor-worry" and stress [46]. Asthmatics, for example, may experience exacerbation of symptoms from non-irritating odors that are perceived as harmful [51]. Others may experience the stress effects of malodors because of "environmental worry" [46], an association with the odor as socially taboo or perceiving possible property devaluation resulting from the odor [39]. Exposure to certain malodors has also been shown to affect the immune system, an effect probably mediated by perceived stress.[1]

Dr. Schiffman will be offering opinions relating to these "somatic symptoms" and Defendants do not challenge her ability to do so. The "somatic symptoms" to which Dr. Dalton refers (vomiting, nausea, dizziness, headache, loss of appetite, sleep disorders, and irritation of the eyes, throat and nose) are the exact injuries claimed by the Addison Plaintiffs (see 19-11133, ECF 109 ¶¶1, 21). A number of the Addison Plaintiffs complain that the odors "exacerbated" their pre-existing asthma (and in a few cases COPD or chronic bronchitis), as Dr. Dalton opined that the malodors could do. See id., ¶21 (a) through (w). In contrast, none of the Plaintiffs contend that the malodors caused asthma or COPD or chronic bronchitis.

Defendants' pleading creates a problem where there was none, as it seeks to exclude opinions that will not be offered. Although Dr. Schiffman is a licensed clinician in the State of North Carolina, and was on the faculty at the Duke University Medical Center for more than 30 years as a Professor of Medical Psychology as well as Professor in the Department of

---

[1] See Ex. 211, P.Dalton, Atmosphere 2020, 11, 126 at page 6 (footnotes omitted).

2

Psychological and Brain Sciences, she will not in this case render opinions regarding the medical causation of "physical" injuries caused by exposure to high levels of chemicals because the Plaintiffs are not advancing such claims.

Even if such opinions were needed here, Dr. Schiffman would be fully qualified to render them. While on the faculty at the Duke University Medical Center, Dr. Schiffman spent her career evaluating patients with smell and taste disorders resulting from injuries including those from exposure to chemicals and harmful odors. She assessed patients coming into the Department of Neurology with complaints related to the first cranial nerve (olfactory), fifth cranial nerve (trigeminal), and nerves VII, IX, and X that are also involved in chemical sensing. She has made diagnoses based on her findings that were entered into the patients' medical charts, and physicians reviewed her findings and developed appropriate treatment plans. Therefore, her work and firsthand observations of the physiological / biological / psychological impacts of malodors is critical to developing reliable expert opinions. She has published hundreds of papers, including papers on this topic in The New England Journal of Medicine and The Journal of American Medical Association (JAMA), two most prestigious medical journals.[2] Dr. Schiffman completed a postdoctoral position in the Center for Aging and Human Development at Duke University Medical Center during which she was trained in medical issues with a specialty in chemical senses. This postdoctoral was an academic training program in the Medical School for the practice of Medical Psychology. She performed her sabbatical at the University of Oxford in the United Kingdom to obtain a background in biochemistry and toxicology. Today, Dr. Schiffman maintains a position as Adjunct Professor in the Department

---

[2] For a list of some of Dr. Schiffman's publications, see https://scholar.google.com/citations?user=T1buWJgAAAAJ&hl=enl. Note that her h-index is 70. The h index is a quantitative metric to provide "an estimate of the importance, significance, and broad impact of a scientist's cumulative research contributions." See https://beckerguides.wustl.edu/authors/hindex.

3

of Electrical and Computer Engineering, at North Carolina State University, Raleigh, North Carolina.

With a lifetime of experience, her investigations have spanned the range from psychological to molecular investigations of malodorous emissions as well as instrumentation for measuring signals from odorous compounds at confined swine facilities and landfills.

Defendants continue, arguing that her opinions must be excluded under FRE 702 because "She does not have the necessary qualifications or experience to render any opinion to a reasonable degree of *medical or toxicological certainty*, and she does not offer any scientific basis for her opinions concerning Plaintiffs' alleged injuries." (Record Docs. 165-8 Ictech and 206-8 Addison, ¶6 of 22) Moreover, Defendants argue that Dr. Schiffman should be disqualified as an expert in this case because she acknowledged in her deposition testimony that "she is not a toxicologist, Medical Doctor, or Epidemiologist." The inquiry should have ended there but did not. Plaintiffs now find it necessary to state the obvious: Dr. Schiffman possesses all of the necessary qualifications, training and experience to render the opinions expressed in her expert reports and her expertise is well suited to assist the trier of fact to understand facts at issue in this case. The significant portion of this claim is the essence of Plaintiffs' well-founded complaints, namely, how "malodor exposures" can cause their health and psychological complaints. An ephemeral, persistent, nauseating, uninvited, unwanted, and nasty smell invaded Plaintiffs' homes, yards, kitchens, fabrics, noses, biking and walking plans, and interrupted events such as barbecuing or talking with neighbors on the porch – among other treasured activities. Some people refused to leave their homes, barricading the doors and windows closed; others left and stayed gone until the smell moved with the wind. The experiences were vile, varied, and ultimately unnecessary if Defendants had controlled their odors, as they should have. A "smell

4

expert" like Dr. Schiffman is well qualified to testify about the physical mechanism response to these traumas.

Out of an abundance of caution, Plaintiffs note that Dr. Schiffman's CV reflects that her experience is sufficient to qualify her as an expert notwithstanding her lack of a Medical License, pursuant to F.R.E. 702 (a witness may be "qualified as an expert by knowledge, skill, experience, training, or education").

Defendants have relied upon an Order rendered last year by Illinois State trial Court in a case involving the Congress Landfill. (Record Docs. 165-9 Ictech and 206-9 in Addison) However, that Order does not really help the Defendants. The Court found that Dr. Schiffman did not have the required qualifications "to qualify as an expert in toxicology." Order at 4. That part of the order has no application here, because Dr. Schiffman is not being offered as an expert in toxicology.

The Court went on to say that "Dr. Schiffman is qualified to opine on the response the individuals like the plaintiffs would have to odors such as those generated from the Congress Landfill." Id. at 4. The Court explained that Dr. Schiffman "has expertise in olfactory matters, including the toxic effects of chemical combinations found in the Congress Landfill to the physiological symptoms and effects on individuals." Id. at 4. As a result, the Court concluded that Dr. Schiffman "can opine on the direct physiological response to the toxic compounds in the Congress Landfill, specifically including ... hydrogen sulfide." The Court quoted her deposition testimony:

There is a psychological response on behalf of people who have been exposed to odors that then produces an independent physiological response that is not directly related to the physical exposure. This has to do with the fact that the olfactory system, when the odorant

activates the nasal—in the nasal mucosa, it activates the olfactory bulbs. It goes into what's called the limbic area of the brain, which is the emotional area of the brain, and that's the amygdala, hippocampus, hypothalamus. Emotional response is programmed into the body. It says avoid. Id. at 4. The Court found that "[o]lfaction is within Dr. Schiffman's experience and expertise" and that "[s]he is competent to testify on the response that the plaintiffs would have to odors emanated from the Congress Landfill, causing various physical responses such as headaches and nausea." Id. at 5. The Court found that she was fully competent to "opine on the human reactions to the chemicals found in the Congress Landfill and that various physical responses are caused by exposure to certain odor levels." Id. at 5.

The opinions that the Court permitted in *Amber* are similar to the opinions that Dr. Schiffman will be giving in this case. Just as in *Amber*, Dr. Schiffman is competent to assist the Court in evaluating "somatic" physical symptoms related to an intermittent and noxious smell over a period of time. Her testimony will prove that H2S gases and odors, at concentrations, activate a *sensory* response that is capable of causing the Plaintiffs' injuries. In fact, Dr. Schiffman's opinions detail the specific sensory mechanism that is activated showing a direct causal relation from the JPLF malodors to all of the Plaintiffs' injuries in this case.

To determine nuisance, using the frequency, duration and intensity of H2S exposures from the JPLF in the communities, Dr. Schiffman asked Plaintiffs' air modeling expert, Mr. Jim Lape, to model for hydrogen sulfide at the detectable concentration of one microgram per meter cubed (1µg/m$^3$) or 0.0007 parts per million (PPM) at 25 degrees centigrade.[3] Hydrogen sulfide (H2S), well-known for its most unpleasant rotten egg smell, can be detected at that modeled

---

[3] The volume of air depends on the temperature. The formula for conversion is µg/m$^3$ = (ppb)*(12.187)*(M) / (273.15 + °C) where M is the molecular weight of H2S and C is degrees centigrade. At 25 degrees centigrade, 1 ppb is equivalent to 1.4 µg/m$^3$.

6

concentration.[4] The facts and data are unimpeachable regarding emissions at levels modeled by Plaintiffs' expert and the resulting health complaints.

Based on the results of Plaintiffs' expert's model, the complaints from the surrounding communities, the Plaintiffs' fact sheets, relevant scientific literature, measured samples of H2S, media coverage, odor samples, and her experience in this field, Dr. Schiffman provides the following opinions, none of which exceed the scope of what she knows:

**Opinion 1:** Malodor perception. The most salient odor quality of the emissions reported by neighbors of JPL was "rotten eggs" that is the characteristic description of the aversive odor of H2S. Qualities of "garbage" and "decay" were salient as well. Aversive and noxious odors have been shown to impair mood.

**Opinion 2:** Malodor FIDO and Daily Activities. The exposure to aversive odors from JPL was frequent, temporally unpredictable, uncontrollable, altered the daily activity of the plaintiffs, and profoundly interfered with their quality of life.

**Opinion 3:** Malodor source-JPL. The maximum hourly average of H2S emitted to River Ridge/Harahan from JPL as modeled by CALPUFF exceeds the hourly average of H2S measured by LDEQ in that area. The maximum hourly average of H2S emitted to Waggaman/Avondale from JPL as modeled by CALPUFF is significantly above the hourly average of H2S measured by LDEQ in Waggaman. Although LDEQ clearly documented H2S in the community, their measurements over short discrete intervals significantly underestimated the magnitude of H2S emissions during the years 2017-2019. Volatile organic compounds (VOCs)

---

[4] The Agency for Toxic Disease Registry ("ATSDR"), Public Health Statement Hydrogen Sulfide, 2016, states "People usually can smell hydrogen sulfide at low concentrations in air, ranging from 0.0005 to 0.3 parts hydrogen sulfide per million parts of air (ppm)", and The World Health Organization ("WHO") Chapter 6.6, hydrogen sulfide Air Quality Guidelines – Second Edition, states "hydrogen sulfide is an odorant, which in pure form has an odor detection threshold of 0.2 - 2.0 µg/m³." The threshold concentration 1µg/m³ modeled by Plaintiffs is more than the low end of the ATSDR and in the middle of the range promulgated by the WHO as guidelines for H2S detection.

7

detected in the community where the plaintiffs reside are consistent with VOCs emitted by JPL. These findings indicate that JPL is the main source of the malodors experienced by the plaintiffs.

**Opinion 4:** Malodor health effects. The malodorous emissions from JPL are the major contributor to the health complaints reported by the plaintiffs.

**Opinion 5:** Malodor lasting impact. Learned odor aversions likely resulted from pairing of adverse biological effects with noxious emissions and odor; these conditioned odor aversions will likely persist for the plaintiffs over time.

**The defense is mainly attacking Opinion 4**

Dr. Schiffman's initial sentence in the body of Opinion 4 is, "The health complaints reported by the Plaintiffs are characteristic of symptoms that typically occur from repeated exposure to malodorous air pollution of the type generated by municipal solid waste landfills and, in particular, sulfur based compounds." First, through experiments with H2S, Dr. Schiffman has personally observed physical reactions to H2S exposure at specific concentrations giving her specialized, firsthand knowledge. Her opinion is further supported by her synthesis of relevant scientific literature (testing H2S exposure) applicable to this case. Dr. Schiffman presented the cohesive findings of the literature, and applied those cohesive findings to the complaints made by Plaintiffs. She then checked for consistency. After combining multiple relevant sources of scientific literature, she then opines that the Plaintiffs' complaints are consistent with H2S exposures, as similarly published in the relevant scientific literature. Dr. Schiffman is not merely reciting facts. Quite to the contrary, she is synthesizing relevant scientific literature, buttressed by her personal experience, applied to the undisputable facts of this case. Her CV shows that she possesses the appropriate knowledge, training, and experience to do so as she has previously presented symposia papers on the health effects of exposure to hydrogen sulfide. She has

8

unquestionable experience in synthesizing relevant information to determine whether H2S malodors have an impact on populations. (Record Docs. 206-2 Ictech and 165-2 Addison, ¶ 3)

The Schiffman Report, Opinion 4, at 20, states, "The symptoms of headaches, nausea or vomiting, irritation to eyes, nose or throat, coughing, dizziness, trouble breathing, sleep disruption, loss of appetite, fatigue, skin irritation, burning lungs, nosebleeds, and asthma are interrelated health effects that can occur from activation of sensory nerves by airborne chemicals. Activation of cranial nerves I, V, IX, and X by H2S and/or VOCs account for the symptoms reported by the plaintiffs." (Record Docs. 206-2 Ictech and 165-2 Addison, ¶ 20)

Here, Dr. Schiffman opines that the health effects complained of in this case can occur by the activation of sensory nerves at the modeled H2S concentrations – a topic in which she has received extensive training and had extensive experience. Dr. Schiffman also makes clear in that same opinion that the cause of Plaintiff's symptoms is H2S and/or VOC's. The use of and/or conjunction merely opines that VOCs are likely additive to the fugitive, odorous combination. H2S alone is capable of causing the Plaintiffs' symptoms. The fact that VOCs were detected, but not singled out and measured does not change the fact that VOCs also bring toxic odors. This fact is not a reason to exclude Dr. Schiffman's expert opinion about VOCs, rather, it elevates her relevant opinion to determine a fact in issue.

Defendants specifically argue, "Dr. Schiffman did not determine the specific compounds in the mixture or the concentration, duration, or frequency of exposure – key findings on which a qualified expert would base a causation opinion." Importantly, volatile organic compounds (VOCs) and H2S are mutually exclusive, however, they are both odorous substances that often travel together.

Separating the individual components of VOCs and measuring detection at any specific concentration is not required to conclude that the odors and gases emitted by JPLF are responsible for causing the nuisance complaints and concomitant health effects. H2S from spent lime accepted at JPLF is more than capable of that alone. The Defendants frame this question as "either or" causation. There is no logic to this interpretation. Dr. Schiffman's comment about detected VOCs is additive to the H2S from spent lime, as is any other additional background concentration from any other potential source. Dr. Schiffman has personal experience and knowledge about VOCs generated at MSW landfills like the JPLF, as well as an understanding that H2S is not emitted from the JPLF in isolation, but rather combined with other gases as it escapes the landfill surface. VOCs are well within Dr. Schiffman's knowledge, and her extensive experience with landfill odors is more than enough to express the opinions in her report.

**LAW**

Federal Rule of Evidence 702

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and,

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 of the Federal Rules of Evidence notes that "the premise of receiving expert testimony is that it 'will assist the trier of fact to understand the evidence or to determine a fact in

issue[.]' " In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir. 1986) (quoting F.R.E. 702). Thus, expert testimony that has personally performed experiments exposing people to H2S, interprets scientific literature about H2S exposure and applies the cohesive findings of her experiments and that literature to the Plaintiffs injuries would likely assist the trier of fact to determine whether the odors emitted from JPLF are capable of causing the injuries complained of in this case.

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore §1918. Here, Dr. Schiffman's qualifications, training and experience will assist the trier of fact in understanding an issue in controversy, and for this reason, the Defense Motion to exclude Dr. Schiffman's opinion should be denied.

**ARGUMENT**

Assuming arguendo that Defendant's position is not absurd, it is not even necessary for this Court to delve into Dr. Schiffman's vast experience and training in medicine and toxicology to make a judgment of reliability and reasonableness in this case. Dr. Schiffman does not offer any opinions on the physical injury or the toxicological impact of chemical mixtures on human tissue, which Defendants want excluded. Instead, her opinions focus on the human perception of landfill odors and the negative biological, physiological, and psychological effects resulting from

11

the extended exposure to malodors, a topic which Dr. Schiffman is eminently qualified and has a lifetime of experience. In fact, she has published archival journal articles on this topic and was asked to organize a workshop on this topic by the EPA.

**CONCLUSION**

For the above stated reasons, Dr. Schiffman is qualified to assist the trier of fact to understand the evidence and to determine facts in issue, and she did not express opinions outside of her expertise, therefore, the Defense motion should be denied.

Respectfully submitted,

    S. Eliza James
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSEY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com
    /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Erik D. Bolog (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com

    /s/ Bruce C. Betzer
Bruce C. Betzer (Bar No. 26800)
Jennifer S. Avallone (Bar No. 35613)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, Iii (#27402)
ljc@mbfirm.com

12

ebolog@wtplaw.com
mchilders@wtplaw.com

*Counsel For Addison Plaintiffs*

Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE


Val Patrick Exnicios, Ta (#19563)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
vpexnicios@exnicioslaw.com

Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com
*Counsel for Ictech-Bendeck Plaintiffs*

13

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served this 25th day of October, 2021, by filing the same with the Clerk of Court using he CM/ECF system that provides electronic notice to all counsel of record.

/s/ Bruce C. Betzer
Bruce C. Betzer