## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** Plaintiff | **CIVIL ACTION** |
| | **NO. 18-7889** |
| **VERSUS** | **c/w 18-8071,** |
| | **18-8218, 18-9312** |
| **PROGRESSIVE WASTE SOLUTIONS OF LA, INC., ET AL.,** Defendants | |
| | **SECTION: "E" (5)** |
| | |
| | **JUDGE: Morgan** |
| *Applies to: All Cases* | **MAGISTRATE JUDGE: North** |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION TO CERTIFY CLASS

**NOW INTO COURT**, through undersigned counsel, come the named Putative Class Plaintiffs and Class Representatives, Elias Jorge "George" Ictech-Bendeck, Savannah Thompson, Nicole M. Landry-Boudreaux, and Larry Bernard, Sr. and Mona Bernard, and the additionally identified Class Representatives, Deborah Cuccia, Robyn Crossman, Kayla Anne Steele, Tara Caro, Ann Williams, and Ophelia Walker, individually and on behalf of similarly situated individuals (hereinafter "Plaintiffs" and/or "Class Representative(s)"), who file this Memorandum in Support of their initial Motion to Certify Class,[1] to wit:

**MAY IT PLEASE THE COURT:**

Class certification is proper and should be granted in this case. The requirements set forth in Rule 23 of the Federal Rules of Civil Procedure are met. This case involves common issues of

---

[1] Plaintiffs reserve the right to amend and/or supplement their memoranda in support of class certification, including but not limited to issues addressed herein as well as addressing issues clarified through discovery and with material gained through such discovery, prior to submission of the motion for determination by this Honorable Court. See Doc. 362.

fact and law in that for nearly two and a half years the emissions of hydrogen sulfide gas and other noxious odors from the Jefferson Parish Landfill ("Landfill") impacted an entire community for which Defendants are responsible under the same theories of recovery based upon the same evidence. The claims of the persons to be named as Class Representatives are typical of the claims of members of the putative class in that their claims are based on the same source of emissions and they assert the same legal theories for recovery. The claims of the members of the putative class are so numerous as to make mass joinder an ineffective tool.   And the proposed Class Representatives will fairly and adequately protect the interests of absent class members.

Moreover, common complex issues – namely (1) Defendants' liability for the Landfill's noxious emissions from July 1, 2017 until December 31, 2019, (2) the corresponding allocation of fault among the Defendants, and (3) the geographic scope (including frequency and concentrations) of the Landfill's noxious emissions – predominate over any individual issues that may exist and certification is the superior procedural device to handle these cases.

In this context, certification is clearly the superior procedural device to handle these cases. Class certification would result in a single trial on the predominant complex issues concerning Defendants' liability, allocation of fault, and the geographic scope, frequency and concentration of the Landfill's noxious emissions over the course of thirty (30) months. The determination of specific causation and the quantum of damages caused by Defendants' liability can be addressed in Phase Two of the proposed bifurcated trial plan discussed below. Moreover, this litigation has been before this Honorable Court for more than five years, and the proposed class action's bifurcated trial plan affords the Court the mechanism needed to bring this case to resolution.

In the interest of justice, efficiency, and judicial economy, this proposed class action should be certified pursuant to Rule 23(b)(3) and/or Rule 23(c)(4).

## I.   **FACTS**

This consolidated class action seeks nuisance damages arising out of the emissions of hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019.

For all pertinent times, the Landfill has been owned by Jefferson Parish. Between May 2013 to December 2020, pursuant to contracts with the Parish, the Landfill was operated by Louisiana Regional Landfill Company, Inc. (f/k/a IESI LA Landfill Corporation), Waste Connections Bayou, Inc. (f/k/a Progressive Waste Solutions of LA, Inc.), and Waste Connections US, Inc. (collectively, "Waste Connections Defendants"). Aptim Corporation managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019.[2]

Plaintiffs, individually and on behalf of all other similarly situated individuals, have asserted claims for violations of the obligations of neighborhood (i.e., nuisance) under Louisiana Civil Code articles 667-669 arising from the emission of noxious odors from the Landfill caused by Defendants' failure to properly maintain and operate the Landfill. Defendants' (in)actions created the complained of conditions – pervasive and persistent emissions of noxious odors and subsequent hovering stench that caused Plaintiffs' annoyance and inconvenience that decreased their quality of life and interfered with and deprived them of the use and enjoyment of their properties from July 1, 2017 through December 31, 2019. Only nuisance claims are at issue.

On November 29, 2022, this Honorable Court issued its Findings of Fact and Conclusions of Law as to general causation, determining odors and gases were emitted by the Landfill,[3] the emissions of gases and odors from the Landfill occurred during the relevant time period,[4] and

---

[2] Doc. 285 at p. 2.
[3] Doc. 285 at p. 5.
[4] Doc. 285 at p. 26.

exposure to the odors and gases emitted by the Landfill at a level of five ppb for thirty minutes

was capable of producing the injuries claimed by any one or more of the plaintiffs,[5] and specifically

the interference and decrease in the quality of daily life (i.e., annoyance and inconvenience) and

loss of use and enjoyment of their properties.[6]

## II.    PROPOSED CLASS DEFINITION

Putative Class Representatives seek the certification of the following class:

(1) All natural persons who, at any time from July 1, 2017 through
December 31, 2019, lived and/or resided within the following enclosed
geographical boundary within the Parish of Jefferson, State of
Louisiana, starting at the intersection of 18th St. and Jerome S. Glazer
Airport Access Rd. then proceeding eastward along West Metairie
Avenue until its intersection with North Causeway Boulevard, then
proceeding south along Causeway Boulevard until its intersection with
River Road, then proceeding south across the Mississippi River until the
intersection of Lapalco Boulevard and Bayou Segnette, then proceeding
west until the southernmost end of S. Jamie Boulevard, then proceeding
west until the southernmost end of Ruth Drive, then proceeding
west/northwest to the intersection of Hwy 90 and the St. Charles
Parish/Jefferson Parish line, then proceeding north along the St. Charles
Parish/Jefferson Parish line to River Road, then proceeding north along
the St. Charles Parish/Jefferson Parish line from River Road to Airline
Hwy, then proceeding east along Airline Hwy until its intersection with
Jerome S. Glazer Airport Access Rd., then proceeding north until the
intersection of 18th St. and Jerome S. Glazer Airport Access Rd.

(2) who have sustained legally cognizable damages in the form of nuisance
and interference with the enjoyment of their properties as a result of the
emission of noxious odors from the Jefferson Parish Landfill into and/or
onto their persons and/or properties.

(3) This class expressly excludes all named plaintiffs in *Addison, et al. v.
Louisiana Regional Landfill Company, et al.*, No. 19-11133 c/w 19-
14512, as well as Defendants' employees and relevant court personnel.

A class definition with geographic boundaries is appropriate. As this Court concluded,

"[t]here is no doubt there were hydrogen sulfide emissions at the Landfill during the relevant time

---

[5] Doc. 285 at p. 27.
[6] Doc. 285 at p. 40-41.

period" and "[i]t is also clear emissions from the Landfill migrated off the Landfill site and into surrounding areas,"[7] including on the East Bank.[8]

The enclosed geographic boundary proposed above reasonably mirrors the geographic boundary drawn by the Parish's own expert, Pivotal Engineering, when recommending the creation of an odor monitoring station network in May 2019 to cover the relevant areas of Jefferson Parish surrounding the Landfill, including expressly Waggaman, River Ridge, and Harahan. See General Causation Trial Exhibit 78 at Page 38 of 48, Figure 17 (red polygon), excerpts of which are attached hereto as **Exhibit 1**.

The proposed geographic boundary is also reasonably similar to the geographic spread of the 1,997 residential complaints collected by the LDEQ between April 25, 2018 and July 20, 2018 which were mapped by Defendant Jefferson Parish's air modeling expert, Dr. Paolo Zannetti. See General Causation Trial Exhibit 30 at p. 29-34, including Fig. 21, Fig. 22, excerpts of which are attached hereto as **Exhibit 2**. As Dr. Zannetti explained, he conducted an analysis of those 1,997 residential complaints "based upon the degree of alignment of the wind direction with the trajectory from JPL Phase 4A to the location of the complaint: a deviation up to 10 degrees was coded red; a deviation between 10 and 20 degrees was coded yellow; and a deviation greater than 20 degrees was coded green." **Exhibit 2** at p. 29 under 5.1 Set 1. For the Court's convenience, Figure 22 is set forth below.

---

[7] Doc. 285 at p. 20.
[8] Doc. 285 at p. 20-25 (discussing MAML confirmation of exposures in Waggaman and River Ridge).



Figure 22.   Location of complaints (Set 1) and estimate of wind direction compatibility with JPL as source. Color indicates deviation of source-receptor direction from wind direction (red: 0°-10°; yellow: 10°-20°; green > 20°).

A review of Figure 22, with a focus upon those more than 650 residential complaints coded red, reveals a reasonable basis upon which to conclude that the Landfill's emissions traveled to these areas during the Relevant Time Period thereby impacting residents with noxious odors. The same conclusion is supported by the Parish's mapping of approximately 1,000 odor complaints received by the Jefferson Parish Landfill between July 28, 2018 and September 7, 2019. **Exhibit 2** at p. 35-36, Figure 26.



Figure 26.   Location of complaints received by JPL (Set 3) and geolocated by
PPM.

While the expert testimony and air modeling of Plaintiffs' expert air modeler, Jim Lape,

will further demonstrate where the Landfill's noxious emissions traveled, in what concentrations,

and when, the purpose for such a proposed geographic boundary is to ensure that the claims of all

persons reasonably anticipated to be asserted, arising from the noxious and preventable hydrogen

sulfide and landfill gas emissions that emanated from the Landfill, are brought before this Court

in one manageable proceeding so as to avoid needless repetitive litigation of common issues of

law and fact. It is anticipated that the Defendants will argue that Plaintiffs' geographic boundaries

are too broad. However, another purpose of the geographic boundary is to give potential class

members enough information to ascertain whether they are in the class definition and to enable

them to decide whether to opt out. Those that do not choose exclusion will be bound, under

principles of *res judicata*, by those decisions to be made on a class-wide basis.

7

Ultimately, the finder of fact will determine the geographic scope of where (and how often) the Landfill's noxious emissions travelled in concentrations above the Court's determined threshold for nuisance exposures during Phase One of the proposed trial plan (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb). *See Slocum v. Int'l Paper Co.*, No. CV 16-12563, 2019 WL 2192099, at *10 (E.D. La. May 21, 2019). However, solely for purposes of determining whether the Plaintiffs have satisfied their burden to show that the requirements of Rule 23 are met, the Plaintiffs direct the Court to the "Class Area" defined *supra*.

Putative Class Plaintiffs and Class Representatives pray that the requested class be certified, and class representatives and class counsel be appointed.

## III.  LAW

Judicial efficiency and economy of litigation is a principal purpose of class action procedure.[9] The purpose is to conserve resources of both the courts and the parties by economically litigating issues that potentially affect every class member.[10] The class action device is designed to conserve the resources of both courts and parties by permitting issues potentially affecting numerous claimants to be litigated in an economical fashion.[11] A district court has great discretion in certifying and managing a class action.[12] This broad discretion allows "district courts [] to bifurcate a trial, trying some issues on a class basis and others individually."[13]

---

[9] *American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766 38 L.Ed.2d 713 (1974).
[10] *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982).
[11] *General Telephone Co. of Southwest v Falcon*, 457 U.S. at 155.
[12] *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Circ. 1999).
[13] *Mullen*, 186 F.3d at 631.

"The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment."[14]   A district court's decision is essentially a factual inquiry.[15] The court's analysis and decision "should not reach the merits of the plaintiffs' claims."[16] In some cases, however, "it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision."[17] In the end, the court "must make specific findings regarding how the case satisfies or fails to satisfy the requirements of Rule 23[.]"[18]

In addition to certification under Rule 23(b)(3), Rule 23(c)(4) permits a litigant to seek class certification on particular issues such as liability.[19] The proponents of such a class must nevertheless meet their burden to show that the six requirements of Rule 23(a) and 23(b)(3)— numerosity, commonality, typicality, adequacy, predominance, and superiority—are satisfied.[20]

## IV.   **ARGUMENT**

Plaintiffs move this Honorable Court for Class Certification of these nuisance claims pursuant to Federal Rule of Civil Procedure Rule 23(b)(3). In the alternative, Plaintiffs move this Honorable Court for Class Certification of common class-wide issues pursuant to Federal Rule of Civil Procedure Rule 23(c)(4) on behalf of all putative class members.

---

[14] *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 603 (E.D. La. 2006) citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n. 4 (5th Cir.2001).
[15] *Slocum*, 2019 WL 2192099, at *2 (citing *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502-03 (5th Cir. 2004); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)).
[16] *Turner, supra* (citing *Castano, supra*).
[17] *Id.*
[18] *Slocum, supra* (citing *Vizena*, 360 F.3d at 503).
[19] See Fed. R. Civ. P. 23(c)(4); *Mullen*, 186 F.3d at 631; *Slocum*, 2019 WL 2192099, at *2-11. The proponents of such a class must nevertheless meet their burden to show that the six requirements of Rule 23(a) and 23(b)(3)—numerosity, commonality, typicality, adequacy, predominance, and superiority—are satisfied.  See *Slocum*, 2019 WL 2192099, at *3.
[20] See *Slocum*, 2019 WL 2192099, at *3.

Whether certification is proper under Rule 23(b)(3) or Rule 23(c)(4), Plaintiffs propose bifurcation of the complex class-wide issues of Defendants' conduct (liability) for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the geographic scope, frequency, and concentration of the Landfill's emissions at or above the Court's determined nuisance odor threshold from the simpler issues of specific causation and compensatory damages.

The issues of Defendants' liability for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the geographic scope, frequency, and concentration of those noxious emissions are appropriate for class-wide adjudication under Rule 23(b)(3) as they are common substantive issues that not only control the outcome of these nuisance claims but are also complex issues which predominate over any potential individualized issues.

The issues of specific causation as to these nuisance claims and the corresponding compensatory damages are also appropriate for class-wide adjudication under Rule 23(b)(3) given the similar nature of the complained of injuries (nuisance damages including annoyance and loss of use and enjoyment of property) and the consistency of emissions impacts upon the Class Representatives and individuals within their respective geographic sub-locations. Nevertheless, to the extent specific causation and compensatory damages could be deemed as issues only affecting individual class members, an issues class would be appropriate under Rule 23(c)(4) as those issues do not predominate over the common, more complex issues regarding Defendants' conduct (liability) for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the geographic scope, frequency, and concentration of those noxious emissions.

The adjudication of the issues of specific causation and compensatory damages could be handled through orderly "waves" or "flights" of trials based on the geographic sub-locations of the Class Representatives and nearby class members, as guided by the findings in Phase One as to

where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined nuisance odor threshold during the liability phase of the litigation (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb).

The issue of specific causation of the nuisance injuries will be relatively straightforward given this Honorable Court's ruling as to the nuisance odor threshold (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb) and the Phase One findings as to where the emissions travelled, when, and in what concentrations for the 30-month period at issue. Simply stated, these nuisance claims do not present complex questions regarding medical causation for personal injuries caused by temporary transitory exposures over the course of one or a few days typically present in mass toxic tort actions. The claims here do not involve symptoms of medical illness but rather symptoms of annoyance and inconvenience based upon up to 30 months of exposures to noxious odors at the Class Representatives' and class members' respective homes.

As this Court found, "[t]he citizens uniformly experienced a bad odor, and the odors reported were consistent with hydrogen sulfide emitted by a landfill."[21] Important to the nuisance claims at issue, "[e]ffects from malodors occur at levels much lower than the level required to experience effects from toxic chemicals."[22] In making its determination as to the nuisance odor threshold of five ppb over a thirty-minute period, this Court found, "[t]he scientific literature and Dr. Schiffman's own studies have shown such a level of exposures 'always is a nuisance' to the individuals exposed."[23] Thus, specific causation of the nuisance injuries because of the Landfill's noxious emissions cannot be said to be an overly complex, highly individualized inquiry.

---

[21] Doc. 285 at p. 29.
[22] Doc. 285 at p. 29.
[23] Doc. 285 at p. 31.

Nor is the compensatory damages determination for these nuisance damages the pinnacle of complexity. Given the Court's findings discussed immediately above, the Class Representatives and putative class members had similar experiences as to the decrease in qualify of daily life (i.e., annoyance and inconvenience) and loss of use and enjoyment of their properties.

This Honorable Court should certify the proposed class because, not only are the prerequisites of Rule 23(a) met, but proceeding as a class with respect to Phase One for the determination of Defendants' liability and respective fault for the Landfill's noxious emissions that emanated from the Landfill during the relevant time period and moving on to Phase Two for the adjudications of specific causation and damages, whether on a class-wide or individualized basis, "achieve[s] economies of time, effort, and expense, and promote[s]... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results," thereby satisfying Rule 23(b)(3).[24]

As Defendants previously agreed, the bifurcation of the complex issues involved in the determinations of liability, allocation of fault, and the geographic mapping of the Landfill's emissions from the simpler "basic" issues of specific causation and damages promotes judicial efficiency and is ultimately the superior method of managing this litigation. Ultimately, Plaintiffs agree with Defendants that the issues related to liability and allocation should be tried once by a single jury in order to promote judicial efficiency, fundamental fairness, and avoid the risk of inconsistent verdicts on those complex issues common to all plaintiffs.[25]

---

[24] See *Slocum v. Int'l Paper Co.* 2019 WL 2192099, at *10 citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).
[25] See, generally, Doc. 303-1 (Memorandum in Support of Motion to Bifurcate) and Doc. 306-1 (Supplemental Memorandum in Support of Motion to Bifurcate).

### A. Numerosity is Satisfied Because There Are Thousands of Class Members.

Rule 23(a)(1) simply requires that the class be so large that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiffs must merely demonstrate some evidence or reasonable estimate of the number of purported class members.[26] Generally, a potential class of over one hundred members is sufficient for purposes of numerosity and some courts have noted that any class consisting of more than forty members should raise a presumption that joinder is impracticable.[27] Additionally, the Fifth Circuit has recognized that a putative class of 100 to 150 members "is within the range that generally satisfies the numerosity requirement."[28]

In the instant case, the requirements of numerosity are unquestionably met. As noted by this Honorable Court, Jefferson Parish received so many odor complaints during the relevant time period that it set up a dedicated hotline for Parish residents.[29] Moreover, the total number of complaints made to the Landfill's hotline and to the LDEQ in 2018 was 2,620, and residents in Harahan/River Ridge established an Air Quality Facebook group for the reporting of odor complaints.[30] The Parish's air modeling expert, Dr. Paolo Zannetti, mapped 1,997 of the odor complaints collected by the LDEQ between April 25, 2018 and July 20, 2018 as well as nearly 1,000 odor complaints made to the Landfill between July 28, 2018 and September 7, 2019. Dr. Zannetti's mapping reveals odor complaints on the East Bank throughout River Ridge and

---

[26] *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).

[27] *Street v. Diamond Offshore Drilling*, 2001 WL 568111 (E.D.La. May 25, 2001, Duval, J.); see also *Mullen v. Treasure Chest Casino LLC,* 186 F.3d 620, 624 (5th Cir. 1999); *Slocum*, 2019 WL 2192099, at *3.

[28] See *Mullen*, *supra*.

[29] Doc. 285 at p.26.

[30] See Doc. 285 at p. 26. See also Doc. 52-3, p. 4, Exhibit 3 to Defendants' Motion to Dismiss, Compliance Order (Enforcement Tracking No. SE-C-18-00372, Agency Interest No. 6961), dated June 22, 2018 ("Since April 2018, a group of residents in Harahan/River Ridge has gathered more than 1,800 complaints about the stench.")

Harahan, and on the West Bank throughout Waggaman and extending to Avondale and Bridge City. See **Exhibit 2** at pp. 29-32 and Figure 22 and pp. 35-36 and Figure 26.

The odor complaints were so ubiquitous that the Parish retained an engineering expert, Pivotal Engineering, who in May 2019 recommended the creation of an odor monitoring station network to cover the relevant areas of Jefferson Parish surrounding the Landfill, including expressly, Waggaman, River Ridge, and Harahan. See **Exhibit 1** at Page 38 of 48, Figure 17 (red polygon).

During the relevant time period, the proposed Class Representatives each resided in the areas surrounding the Landfill. Elias Jorge Ictech-Bendeck and Deborah Cuccia in River Ridge; Savannah Thompson, Larry Bernard, Sr., Mona Bernard, Kayla Anne Steele, and Tara Caro in Harahan; Nicole Landry-Boudreaux, Robyn Crossman in Waggaman (northeast of the Landfill); and Anne Williams and Ophelia Walker in Waggaman/Avondale (southeast of the Landfill).

According to the United States Census Bureau, as of April 1, 2020, the areas where the named Plaintiffs resided had the following population estimates: Waggaman (9,835), Harahan (9,116), and River Ridge (13,591).[31] Considering this census data, as well as taking into account the other areas surrounding the Landfill, such as South Kenner (to the west of River Ridge) and Avondale (just east of the easternmost boundary of Waggaman), the size of the putative class likely exceeds 30,000 individuals. The size of this population makes joinder impracticable.

---

[31] See **Exhibit 3**, Table of Population Estimates of Waggaman, Harahan, and River Ridge, Jefferson Parish, based on United States Census Bureau data, https://www.census.gov/quickfacts/fact/table/jeffersonparishlouisiana,riverridgecdplouisiana,harahancitylouisiana,waggamancdplouisiana, last accessed August 24, 2023; see also **Exhibit 4**, United States Census Bureau Map, Population, Census, April 1, 2020, showing geographic boundaries of Waggaman, River Ridge, and Harahan,  available at https://www.census.gov/quickfacts/fact/map/riverridgecdplouisiana,jeffersonparishlouisiana,harahancitylouisiana,waggamancdplouisiana/POP010220, last accessed August 24, 2023.

Moreover, individual litigation on the common issues as to these nuisance claims would impose a substantial burden on Plaintiffs, Defendants, and the Courts. As such, the number of impacted Plaintiffs meets the numerosity requirement.

**B.  *The Common Questions of Liability, Allocation of Fault, and the Determination of the Geographic Scope, Frequency, and Concentrations of the Landfill's Noxious Emissions Meet the Commonality Requirement.***

FRCP 23(a)(2) requires that a question or questions of law and/or fact common to the class exist. Rule 23(a)(2) merely requires that one issue's resolution will affect all or most of the potential class members. The Courts have noted that "the threshold of commonality is not high."[32] Not only is there a low threshold for commonality, but the fact that plaintiffs' claims require some individualized analysis does not defeat commonality.[33]

A common question is one that, when answered as to one class member, "will affect all or a significant number of the putative class members."[34] When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more elements of that cause of action will be common to all of the persons affected.[35]

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court held that class claims "must depend upon a common contention," and that this common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[36] "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the

---

[32] *Bertulli v. Indep. Ass'n of Continental Pilots*, 242 F.2d 290, 296-97 (5th Cir. 2001) citing *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986); see also *Mullen*, 186 F.2d at 625.
[33] *James v. City of Dallas*, 254 F.3d at 570.
[34] *Forbush v. J C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *James v. City of Dallas*, 254 F.3d at 570.
[35] Hebert B. Newberg, *Newberg on Class Actions § 310 at 3-49* (4th ed. 2002).
[36] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."[37]   In short, there must be some "glue" holding the class claims together that will produce a common answer to the proposed common contention.[38]

As the Fifth Circuit interprets *Wal–Mart*, "[t]o satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims."[39] "[T]he principal requirement of Wal–Mart is merely a single common contention that enables the class action 'to generate common answers apt to drive the resolution of the litigation.'"[40] "These 'common answers' may indeed relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct."[41] Thus, "the legal requirement that class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse."[42]

Further, "district courts do not err by failing to ascertain at the Rule 23 stage whether the class members include persons and entities who have suffered 'no injury at all.'"[43] Rather, a mere "'contention' regarding the class members' injury is sufficient to satisfy Rule 23, so long as the party seeking certification can show that this contention is 'common' to all the class members, is 'central' to the validity of their claims, and is 'capable' of classwide resolution."[44]

---

[37] *Id.* (citation omitted; emphasis in original).
[38] *Wal-Mart*, 564 U.S. at 352.
[39] *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014) (emphasis added).
[40] *Id.* at 811.
[41] *Id.*
[42] *Id.* at 810–11.
[43] *Deepwater Horizon*, 739 F.3d at 811.
[44] *Deepwater Horizon*, 739 F.3d at 811.

Here, commonality is clearly satisfied based on the common issues of law and fact surrounding Defendants' liability (and respective fault) as it relates to the noxious emissions emanating from the Landfill during the relevant time period. The issues pertaining to the geographic scope, frequency, and concentrations of the Landfill's noxious emissions, the conduct of Defendants in creating these noxious emissions and/or failing to prevent these noxious emissions from leaving the Landfill, and the apportionment of their respective fault affect all of the potential class members.

Once the common liability questions are determined as to the Landfill's noxious emissions, including who was responsible for causing approximately 23,000 tons of sulfate-containing spent lime to be buried in Phase 4A, who was responsible for the leachate collection system failures, who was responsible for the gas collection system failures, and who was responsible for landfill cover issues, those common issues will be decided for all class members. The claims of all class members will hinge on common questions regarding the geographic scope, frequency, and concentrations of the Landfill's noxious emissions over the 30-month period at issue, the Defendants' liability for same, and the apportionment of fault among the Defendants.

These questions clearly contain the "glue" necessary for the Plaintiffs to meet their burden to show commonality under Rule 23 since the claims of all putative class members hinge on these common questions regarding Defendants' liability for the emissions that emanated from the Landfill for the 30-month period at issue.

Accordingly, the commonality requirement has been met.

## C. The Class Representatives Are Typical of The Class.

Rule 23(a)(3) requires that the claims of the class representatives are typical of the class's claims or defenses as a whole. Fed. R. Civ. P. 23(a)(3). Typicality does not require a complete

identity of claims but simply requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like commonality, the test for typicality is not demanding. It exists when the claims of the named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories.[45] Here, the claims of the proposed class representatives and the putative class members arise from the same set of facts and they both seek the same relief through the same legal theories.

Plaintiffs have identified Class Representatives in various nearby geographic locations who allege to have been harmed by the Landfill's noxious emissions. The Class Representatives' claims and alleged damages are fairly similar, if not identical, to the claims of other plaintiffs and potential class members. Further, the theories of liability among the Class Representatives and potential class members are alike: they are suing Defendants for their violations of the obligations of neighborhood (i.e., nuisance) under Louisiana Civil Code articles 667-669 arising from the emission of noxious odors from the Landfill. In addition, the claims of the class representatives are based upon the same source of emissions (pervasive and persistent emissions of noxious odors coming from the Landfill) caused by the same course of conduct (Defendants' actions/inactions in maintaining and operating the Landfill) over the same 30-month time period for which they seek relief under the same theories of liability. Thus, typicality is satisfied.

The Class Representatives acknowledge that there may be differences as to the dollar amount of compensatory damages; however, these differences do not relate to Plaintiffs' legal theories regarding liability and causation. Because the Class Representatives share the same legal

---

[45] *Mullen v. Treasure Chest Casino*, 186 F.2d at 625; *Turner*, 234 F.R.D. at 605 ("Typicality does not require that the claims of the class are identical, but rather that they share the same essential characteristics—a similar course of conduct, or the same legal theory.").

theories and the same course of conduct with other potential class members, it should be clear that these Class Representatives and potential class members meet the typicality requirement.

### D. The Adequacy of Representation Requirement is Satisfied.

Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members. Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, the class representatives' interests must be aligned with, and not antagonistic to, unnamed class members.[46] Differences between the named plaintiffs and class members will render the named plaintiffs inadequate representatives "only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." [47]

The Supreme Court has recognized that the "adequacy-of-representation" requirement "tends to merge" with the commonality and typicality requirements, all of which "serve as guideposts for determining whether the maintenance of the class is economical and whether the named plaintiffs and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence."[48] The adequacy inquiry under Fed. R. Civ. P. 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.[49] A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.[50]

In this case, the claims of the proposed class representatives are interrelated with the claims of the absent class members to such a degree that it is certain that the interests of the absent class

---

[46] *Mullen v. Treasure Chest Casino*, 186 F.2d at 625-626.
[47] *Id.*
[48] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).
[49] *Id.* at 625.
[50] *Id.* at 625-626.

members will be adequately and fairly protected. All claims of the proposed Class Representatives are based on exposures to the Landfill's noxious emissions due to Defendants' fault.

Likewise, Class Representatives and their counsel are aware of no conflicts of interest between the Class Representatives and absent class members and assert that no such conflicts of interest could be said to exist given that the Class Representatives and the absent class members all advance the same legal theories and pursue the same legal relief. Moreover, the Class Representatives are knowledgeable concerning the subject matter of this action, possess strong personal interests in the subject matter of the lawsuit, and will assist counsel in the prosecution of this litigation.

Further, the proposed Class Representatives have retained counsel who are familiar with these types of cases. Proposed Class Counsel represent that they satisfy the criteria set forth in Rule 23(g), having extensive experience in the prosecution of class action, having the resources to ensure the adequate prosecution of same, and that they will adequately represent the interests of the class.

## E. PREDOMINANCE AND SUPERIORITY

In order for a class to be certified, two requirements beyond and in addition to Rule 23(a) must be met: Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).

### i.    Predominance.

The proposed bifurcated trial plan solves any potential issues surrounding predominance. Plaintiffs, as discussed below, propose a two-phase trial plan with Phase One deciding class-wide issues concerning the Defendants' conduct and liability as it relates to the Landfill's noxious emissions that emanated therefrom, allocation of fault among Defendants for same, as well as drawing the geographic boundaries of where the Landfill's emissions went during the relevant

time period, when, and in what concentrations above the Court's determined threshold for nuisance exposures during Phase One of the proposed trial plan (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb).[51] These broad and specific issues are common to all class members. Phase Two would then decide specific causation and the compensatory damages for nuisance for the Class Representatives and putative class members.

The Court should only have to try the Defendants' liability for the Landfill's noxious emissions and percentages of fault amongst the Defendants one time. Once the class is certified, the results on fault of the one and only liability trial will apply to the entire class. Common liability issues can and should be tried in a single class action trial with any individual issues of specific causation and damages reserved for Phase Two.[52]

Importantly, it cannot be reasonably disputed that the issue of liability predominates in the context of nuisance claims under Louisiana law.[53]

Of course, the predominance analysis requires a court to examine each of the plaintiffs' claims individually since the court must determine how the claims will be tried.[54] The Plaintiffs undertake this analysis to demonstrate the appropriateness of class treatment.

### a. Predominance of Overlapping Fact Issues

Plaintiffs' claims share large areas of common fact that predominate, such as a common source of the noxious emissions (i.e. the Landfill), the cause of the release of the noxious emissions from the Landfill (i.e. Defendants' conduct in owning, operating, and/or maintaining the Landfill),

---

[51] *See Slocum* 2019 WL 2192099, at *10.
[52] See *Slocum*, 2019 WL 2192099, at *9-10; *Turner*, 234 F.R.D. at 606.
[53] See *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 608-609 (E.D. La. 2006); *Slocum v. Int'l Paper Co.*, No. CV 16-12563, 2019 WL 2192099, at *7 (E.D. La. May 21, 2019) (finding Louisiana nuisance claims supported predominance requirement for liability class for explosion at facility that released alleged hazardous waste into the atmosphere and surrounding community).
[54] *Turner*, 234 F.R.D. at 606.

and the geographic scope (including frequency and concentrations) of the noxious emissions that emanated from the Landfill between July 1, 2017 and December 31, 2019.[55]

Notably, the fact that the noxious emissions at issue may not have spread uniformly throughout the area and different geographic areas may have received differing degrees of noxious emissions is of no moment.[56] The "central factual basis for all of Plaintiffs' claims" is the release of noxious emissions from the Landfill, including how much was emitted, how those emissions occurred, and where those emissions went, when, and in what concentrations.[57] Thus, "[t]here is a large area of factual overlap in the Plaintiffs' causes of action" that supports predominance.[58]

There are also numerous issues that predominate concerning the Defendants' liability with respect to the legal theories asserted by the Plaintiffs.

### b. Predominance of Nuisance

A party with an interest in immovable property may assert a nuisance claim against his neighbor who deprives him of the use or enjoyment of his property or causes him damage.[59]

The term "neighbor" is determined on a case-by-case basis.[60] While there is no rule of law compelling a certain physical adjacency or proximity, there must be "some degree of propinquity,

---

[55] See Turner, supra ("Plaintiffs' claims all have in common the circumstances surrounding the [crude oil] leak in Tank 250–2—how the leak physically occurred, what steps Murphy took or might have taken to contain the oil, and what steps Murphy took or might have taken to prevent the leak.").

[56] See Turner, 234 F.R.D. at 606.

[57] Id.

[58] Id.

[59] See La. C.C. art. 667; Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc., No. CV 18-7889, 2019 WL 4111681, at *3 (E.D. La. Aug. 29, 2019) ("[A] plaintiff's interest in neighboring property can be an ownership interest, leasehold interest, third-party interest, or more generally the interest of 'a person whose right derives from the owner.'") (quoting Yokum v. 615 Bourbon St., L.L.C., 2007-1785 (La. 2/26/08), 977 So. 2d 859, 874); Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C., 753 F. App'x 191, 198 (5th Cir. 2018).

[60] Ictech-Bendeck, supra.

so as to substantiate the allegation that activity on one property has caused damage on another."[61]
"What qualifies as 'some propinquity,' however, is fact specific and may change based on the
harm alleged (for example, the radius of neighbors surrounding a loud manufacturing plant may
be much smaller than the radius of neighbors surrounding a nuclear waste facility)."[62]

Additionally, "[a] nuisance claim requires a showing that the neighbor [Defendants] (1)
'knew or, in the exercise of reasonable care, should have known that his works would cause
damage,' (2) 'the damage could have been prevented by the exercise of reasonable care,' and (3)
'he failed to exercise such reasonable care.'"[63]

Finally, a plaintiff must show that the neighbor's use caused damage to him or "'interfere[s]
substantially with the enjoyment of [his] property.'"[64] With respect to the element requiring proof
of actual damages, this issue can be addressed in the proposed Phase Two of the bifurcated trial
plan where representative and/or individual trials on specific causation and damages will proceed
in "waves" or "flights" of homogenous groups of Plaintiffs/ putative class members.[65]

The majority of the elements for a nuisance claim centers on Defendants' conduct,
including their knowledge/constructive knowledge that their Landfill operations and maintenance
activities would result in the noxious emissions at issue (i.e., burying (co-disposal) of sulfate-
containing spent lime and solidification of liquid wastes using sulfate-containing spent lime that
had the obvious potential for creating excessive amounts of hydrogen sulfide gas and other odorous

---

[61] *Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 731 (5th Cir. 2017).
[62] *Ictech-Bendeck, supra.*
[63] *Cedar Lodge*, 753 F. App'x at 198 (quoting La. C.C. art. 667); *Ictech-Bendeck, supra.* (same).
[64] *See Cedar Lodge*, 753 F. App'x at 198 (quoting *Badke v. USA Speedway, LLC*, 49,060 (La. App. 2 Cir. 5/14/14), 139 So.3d 1117, 1126); *Ictech-Bendeck, supra* (quoting La. C.C. art. 667).
[65] *See Slocum*, 2019 WL 2192099, at *6, *10 (approving class on issue of liability while permitting the damages element to be "resolved by individual trials" in a subsequent phase of the litigation "to determine specific causation and to award damages, if any.").

compounds), their knowledge/constructive knowledge that the noxious emissions could have been prevented by exercising reasonable care (i.e., by not burying sulfate-containing spent lime into a municipal solid waste landfill, by not solidifying liquid wastes using sulfate-containing spent lime and burying that combined waste into a municipal solid waste landfill, by constructing, repairing, and/or adequately maintaining the leachate collection system, gas collection system, and landfill cover system), and Defendants' failures to do so.

Likewise, the issue concerning whether the Class Representatives and the proposed class members are "neighbors" for purposes of nuisance can be addressed in the Phase One liability phase since the fact-finder will determine the scope of the geographic area impacted by the noxious emissions that emanated from the Landfill during the relevant 30-month period as discussed *infra*. Thus, these issues predominate and can therefore be handled in the Phase One liability trial. The issue of damages would be addressed in Phase Two of the bifurcated trial plan as discussed *infra*.

     c.  *Predominance of Common, Complex Issues Over Any Individualized Issues.*

Under these facts and circumstances, the common complex issues as to Defendants' liability, apportionment of fault, and the determination of the Landfill's noxious emissions and the geographic extent thereof (including frequency and duration) for the 30-month period predominate over any individualized issues.

As demonstrated by the trial on General Causation, the determinations as to how much hydrogen sulfide gas was generated by the Landfill (including via degradation of the sulfate-containing spent lime buried in Phase 4A), how much hydrogen sulfide gas escaped from the Landfill, and where those noxious emissions traveled, when, and in what concentrations during the 30-month period at issue are complex issues which involve the consideration of detailed scientific evidence and the testimony and opinions of numerous experts. It cannot be reasonably

disputed that these common and complex issues constitute a significant part of the individual claims. The same cannot be said for any issues that this Court may deem to be individualized, namely specific causation for the nuisance injuries and related compensatory damages.

In fact, Defendants' prior statements betray any arguments to the contrary. Defendants previously asserted that liability and allocation of fault "involve highly technical fact and expert evidence" on numerous complex sub-issues and that "[c]ombining these complex issues of liability in a trial with causation and damages risks significant juror confusion."[66] Highlighting the efficiency Plaintiffs' proposed trial plan would promote here, Defendants confirmed that the bifurcation of these issues "would result in little duplication of evidence or testimony between the two trials because the evidence and witnesses for causation and damages are distinct from those related to liability, which focus on internal landfill operations."[67]

Further supporting the conclusion that the proposed bifurcated trial plan best manages the complexities of this litigation and promotes judicial efficiency, Defendants also previously contended that the liability question posed here is so complex that Defendants consider it to be a "trial within a trial" among these Defendants "requiring many more witnesses, trial time, and another set of technical and business issues that will overwhelm a jury."[68] Defendants provided a detailed description of the complex issues that must be considered when determining allocation of fault for Plaintiffs' nuisance claims, including evidence on landfill operations, the scope of responsibility for each Defendant, contractual obligations, each Defendant's decisions and actions,

---

[66] Doc. 303-1 at p. 2 (Page 6 of 19).
[67] Doc. 303-1 at p. 2-3 (Page 6-7 of 19).
[68] Doc. 303-1 at p. 7 (Page 11 of 19); see also Doc. 303-1 at p. 11 (Page 16 of 19) (acknowledging liability and allocation of fault are "multiple complex issues" that must be tried).

industry and regulatory standards, and breaches of the relevant standards of care, all of which Defendants assert require multiple fact and expert witnesses.[69]

Defendants have already admitted that the issues of specific causation and damages are the simpler issues associated with these nuisance claims by asserting that bifurcating these issues from liability and allocation "will promote efficiency, convenience, and clarity by simplifying the evidence for the jury."[70]

These nuisance claims do not present complex questions regarding medical causation for personal injuries typically present in mass toxic tort actions involving temporary transitory exposures over the course of a few hours or days. The nuisance claims at issue herein do not involve symptoms of serious medical illness alleged to have occurred due to a temporally limited exposure event. Rather, the nuisance claims asserted herein involve symptoms of annoyance and inconvenience associated with up to 30 months of exposure to the Landfill's noxious emissions. As Defendants previously admitted, the emissions mapping adjudicated in Phase One will drive the determinations of specific causation and damages,[71] which Defendants have previously described as "basic issues."[72]

---

[69] Doc. 303-1 at p. 8 (Page 12 of 19).

[70] Doc. 303-1 at p. 9 (Page 13 of 19) ("Reverse bifurcation would facilitate, not frustrate, the Court's goals as it will promote efficiency, convenience, and clarity by simplifying the evidence for the jury to focus on the discrete issues of causation and damages. The issues of causation and damages are sufficiently distinct that a separate trial on liability would not result in undue duplication of witnesses or evidence."); see also Doc. 303-1 at p. 11, fn. 14 (Page 16 of 19) (arguing that proceeding with specific causation and damages separately "will make the issues before the jury considerably less complex, enhancing Defendants' Seventh Amendment right-to-jury.")

[71] See Doc. 303-1 at p. 2 (Page 6 of 19) ("Causation and damages will require fact and expert evidence on air dispersion, calculations of hydrogen sulfide emission rates…").

[72] See Doc. 303-1, Defendants' Memorandum in Support of Motion to Bifurcate, at p. 1 (Page 5 of 19) (describing specific causation and damages as "basic issues").

Any complexities associated with the determination of specific causation pales in comparison to the complexities presented by the common liability, allocation of fault, and emissions mapping issues discussed above. Considering this Honorable Court's ruling as to the nuisance odor threshold (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb) and the Phase One findings as to where the Landfill's noxious emissions travelled, when, and in what concentrations at or above the Court's nuisance odor threshold for the 30-month period at issue, the issue of specific causation of the nuisance injuries will be relatively simple whether done through representative or individual trials as the proof of specific causation of the nuisance injuries will not vary greatly within each corresponding geographic sub-location. The fact-finder's determination of specific causation will be the product of a straightforward consideration of the testimonial evidence regarding the Class Representative's or individual's odor experience along with the mapping of the Landfill's noxious emissions above the nuisance odor threshold that impacted his or her geographic sub-location, which will have already been proven during Phase One.

### ii.     Superiority.

FRCP 23(b)(3) requires that the class action be superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

In mass nuisance actions such as this one, the legal and factual issues involving the Defendants' liability for the Landfill's noxious emissions do not differ at all from one plaintiff to the next and should be decided one time for judicial efficiency. A class action is the superior method of adjudicating the common issues of liability for the Landfill's noxious emissions for over 30,000 potential plaintiffs. As the Fifth Circuit stated in *Jenkins*, a bifurcated plan "is clearly superior to the alternative of repeating, hundreds of times over, the litigation of [the same issues]

with ... days of the same witnesses, exhibits and issues from trial to trial."[73] Not only will it relieve the court of having to try thousands of individual cases, but it will also limit the number of issues to be litigated once Phase One of the proposed trial plan has been completed.

The factors to be considered under Rule 23(b)(3)(A)-(D) also support this conclusion. Class treatment of the issue of liability is a superior method to litigating these claims given the judicial efficiency to be gained in not having to try this issue thousands of times. Further, this litigation has been before the Court for five (5) years. An issues class on liability, allocation of fault, and the determination of the geographic extent of the Landfill's noxious emissions for the 30-month period at issue affords the Court the mechanism needed to bring these cases to resolution. Should any of the potential class members decide to go it alone, they can opt out. However, any such opt-outs would be unlikely given the difficulty inherent in finding attorneys to prosecute solely nuisance claims and the indisputable prohibitive costs associated with retaining experts to adjudicate the common, complex issues as to the Landfill's emissions, the mapping of same, and Defendants' liability.

## V.    PROPOSED TRIAL PLAN

### A. BIFURCATION

Plaintiffs propose a Two-Phase bifurcated Trial Plan for resolution of this litigation on a class-wide basis. Rule 42(b) of the Federal Rules of Civil Procedure permits a court to order separate trials of separate claims or issues, when separate trials would further convenience, avoid prejudice, or expedite resolution of the dispute. See FRCP 42(b).

Plaintiffs propose that a Phase One trial related to Defendants' (in)actions be conducted which would promote judicial efficiency and expedite resolution of the dispute. Defendants'

---

[73] *Jenkins*, 782 F.2d at 473.

conduct to be tried in Phase One would include complex issues related to their liability for nuisance and apportionment of fault to be tried commonly. Phase One would also include common issues related to the Landfill's emissions including not only the amount of noxious emissions released from the Landfill during the relevant time period but also drawing the geographic boundaries of where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined nuisance odor threshold during Phase One.[74]

Plaintiffs' proposed Phase Two trial would include representative and/or individual trials on specific plaintiff causation and compensatory damages with Plaintiffs divided into "waves" or "flights" of homogenous groups based on geographic sub-locations.[75]

The model being proposed by Plaintiffs is similar to that approved by the U.S. Fifth Circuit in *Watson* and the Honorable Eldon E. Fallon in *Turner v. Murphy Oil* and *Slocum*.[76]

In *Turner v. Murphy Oil*, for example, the court implemented a three-phase trial plan for a case involving an oil spill from a common source where Phase One concerned issues of liability for compensatory damages and the amount of damages for trial plaintiffs, Phase Two addressed common issues regarding punitive damages, and Phase Three involved separate trials for the remaining members of the class.[77]

In *Slocum*, the court implemented a two-phase trial plan for a case involving a single source of environmental contamination where Phase One was a trial addressing all common issues related

---

[74] See *Slocum*, 2019 WL 2192099, at *10.
[75] See *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.")
[76] See *Watson v. Shell Oil Company*, 979 F.2d 1014, 1017-18 (5th Cir. 1992); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 601 (E.D. La. 2006); *Slocum*, 2019 WL 2192099, at *10.
[77] *Turner*, 234 F.R.D. at 606.

to the defendants' liability and determining the geographic scope of the plume radius, and Phase Two involved various flights of trials in groups of five plaintiffs with like claims to determine specific causation and to award damages, if any.[78]

As noted in *Turner v. Murphy Oil*, the U.S. Fifth Circuit has approved of the bifurcation of mass tort claims when individual issues such as specific causation and damages are left for a second trial.[79] Plaintiffs submit that similar to *Turner v. Murphy Oil*, a "Trial Plan can be fashioned in such a manner that a second jury will not be asked to re-examine the factual findings of the first jury. The efficiency of a bifurcated proceeding greatly outweighs the potential risk that such a proceeding would violate the Seventh Amendment. As the Fifth Circuit stated in *Jenkins*, a bifurcated plan 'is clearly superior to the alternative of repeating, hundreds of times over, the litigation of [the same issues] with ... days of the same witnesses, exhibits and issues from trial to trial.' 782 F.2d at 473."

Such approval was again recently expressed by the U.S. Fifth Circuit in *Deepwater Horizon*.[80] The *Deepwater Horizon* court cited its decision in *Madison v. Chalmette Refining, LLC.*, 637 F.3d 551, 556 (5th Cir. 2011), reiterating that this has been accomplished successfully in many circuits "by means of multi-phase trials under Rule 23(c)(4), which permits district courts

---

[78] *Slocum*, 2019 WL 2192099, at *9-10; see also, *Watson v. Shell Oil Company*, 979 F.2d 1014, 1017-18 (5th Cir. 1992) (implementing four-phase trial plan where common issues for liability and liability for punitive damages were addressed in Phases 1 and 2 in a jury trial, and quantum of damages was addressed in Phases 3 and 4 in separate jury trials in "waves of five" plaintiffs).

[79] *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) ("[T]he Court believes that the existence of a trial plan, and the potential for bifurcation of the issues of liability and damages, will address the Defendant's concern that individualized inquiries will be needed to determine damage amounts in these cases. The Fifth Circuit has repeatedly upheld the decisions of district courts to bifurcate class action trials into liability and damages phases. See *Mullen*, 186 F.3d at 628 (affirming a bifurcated plan and citing other instances of bifurcated class action trials).")

[80] *In re Deepwater Horizon*, 739 F.3d 790, 806-807, fn. 65 (5th Cir. 2014) (noting prior approval of bifurcation of class wide liability issues and issues of individual damages).

to limit class treatment to 'particular issues' and reserve other issues for individual determination."[81]

Plaintiffs' proposal herein is also consistent with Defendants' prior arguments in support of bifurcating the issues of liability and allocations from specific causation and damages for the *Addison* initial trials. As Defendants made clear just a few months ago, adjudicating these distinct issues in separate phases promotes judicial efficiency, and is necessary to "ensure the manageability of the complex issues being presented to the jury…"[82] In fact, Defendants argued that "[f]undamental fairness and Seventh Amendment concerns dictate that liability underlying the 547 *Addison* Plaintiffs' claims be tried in a single trial."[83] Defendants then expressly admitted that "the Seventh Amendment prohibits[] multiple juries [from deciding] the same factual and legal arguments concerning liability and allocation of liability in the consolidated *Addison* action–with the potential to produce anomalous results."[84] Defendants expressly proposed that the Court may want to try liability and allocation for all *Addison* plaintiffs in one "dedicated trial" rather than re-trying liability at each successive trial "because of the potential it would yield inconsistent verdicts."[85] "The bifurcation of liability avoids these issues by focusing the individual trials on Plaintiff-specific inquiries of specific causation and damages, and then having a single jury determine the common issues of liability and allocation among Defendants and third parties."[86]

---

[81] *In re Deepwater Horizon*, 739 F.3d at 816 citing *Madison*, supra.

[82] Doc. 306-1 at p. 4.

[83] Doc. 306-1 at p. 1-2.

[84] Doc. 306-1 at p. 2.

[85] Doc. 303-1 at p. 9 (Page 13 of 19); see also Doc. 303-1 at p. 10 (Page 14 of 19) (highlighting the importance of trying liability and allocation one time to avoid "the possibility of divergent verdicts" on the same issues); see also Doc. 303-1 at p. 11, fn. 12 (Page 15 of 19) ("Even if the liability finding is not preclusive, the risk of divergent jury findings on the same issues further violates the Seventh Amendment.").

[86] Doc. 306-1 at p. 3.

The same reasoning holds true here in this nuisance class action.

## B. PHASE ONE: COMMON ISSUES OF LIABILITY, APPORTIONMENT OF FAULT, AND GEOGRAPHIC SCOPE OF LANDFILL'S EMISSIONS

The decisions of the jury in Phase One as to Defendants' respective liability, and subsequent apportionment of fault, for the noxious emissions that emanated from the Landfill during the relevant time period, and where those noxious emissions travelled and how often at levels at or above the determined nuisance odor threshold, shall be binding upon all plaintiff class members and trial Defendants.

The particular common issues related to Defendants' liability and the apportionment of fault for the noxious emissions from the Landfill during the relevant time period include:

i.  What amount of emissions of hydrogen sulfide gas and other noxious odors emanated from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

ii.  Where the Landfill's emissions of hydrogen sulfide gas and other noxious odors that emanated from the Landfill went during the relevant time period, when, and in what concentrations above the Court's determined threshold for nuisance exposures (i.e., the Class Area);

iii.  Defendants' respective liability and apportionment of fault;

iv.  Whether Defendants knew, or in the exercise of reasonable care, should have known that their works would cause legally cognizable damages to the Class Representatives and the proposed Class they seek to represent

v.  Whether the claimed damages could have been prevented by the exercise of reasonable care;

vi.  Whether Defendants failed to take reasonable care or take measures to prevent or otherwise minimize and contain the emission of noxious odors from the Landfill;

vii.  Whether the Class Representatives and proposed class members are "neighbors" of Defendants;

viii.  Whether Defendants collectively and/or individually owed a duty to the proposed Class Representatives and the Class they seek to represent to maintain the Landfill

and operate the Landfill in a prudent manner so as to prevent the release/emission of noxious odors in and around the areas neighboring the Landfill;

ix.    Whether Defendants breached their respective duties owed to the proposed Class Representatives and the Class they seek to represent;

x.    Whether Defendants are strictly liable and/or at fault for the Landfill's noxious emissions that emanated from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xi.    Which Defendants are responsible for the elevated emissions of hydrogen sulfide gas and other noxious odors that emanated from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xii.    What proportion of fault should be assigned to each Defendant, if any, for the elevated emissions of hydrogen sulfide gas and other noxious odors that emanated from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xiii.    Which Defendants were responsible for the decision to bury (co-dispose) approximately 23,000 tons of sulfate-containing spent lime in Phase 4A;

xiv.    What knowledge Defendants had or should have had regarding potential odor issues created by burying (co-disposing) sulfate-containing spent lime in a municipal solid waste landfill;

xv.    When did Defendants acquire knowledge of the potential odor issues created by burying sulfate-containing spent lime in a municipal solid waste landfill and what they did after acquiring such knowledge;

xvi.    When did Defendants acquire knowledge of the potential odor issues created by solidifying liquid wastes with sulfate-containing spent lime in a municipal solid waste landfill and what they did after acquiring such knowledge;

xvii.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish regarding the composition of the Rain Carbon spent lime;

xviii.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish regarding the potential odor issues posed by burying (co-disposing) sulfate-containing spent lime in a municipal solid waste landfill;

xix.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish

regarding the potential odor issues posed by solidifying liquid wastes with sulfate-containing spent lime in a municipal solid waste landfill;

xx.   What knowledge Defendants had regarding elevated emissions of hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xxi.   When Defendants acquired knowledge regarding elevated emissions of hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xxii.   What knowledge Defendants had regarding deficiencies in the leachate collection system;

xxiii.   When did Defendants acquire knowledge of the deficiencies in the leachate collection system;

xxiv.   What knowledge Defendants had regarding deficiencies in the gas collection system;

xxv.   When did Defendants acquire knowledge of the deficiencies in the gas collection system;

xxvi.   What knowledge Defendants had regarding deficiencies in the landfill cover system;

xxvii.   When did Defendants acquire knowledge of the deficiencies in the landfill cover system;

xxviii.   Whether comparative fault for the hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019 is attributable to Plaintiffs;

xxix.   Whether comparative fault for the hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019 is attributable to any third party.

## C. PHASE TWO: SUCCESSIVE TRIALS ON SPECIFIC CAUSATION AND COMPENSATORY DAMAGES BASED UPON THE SPECIFIC ISSUES OF DEFENDANTS' CONDUCT AND EMISSIONS RESOLVED IN PHASE ONE.

The proposed Class Representatives, Elias Jorge "George" Ictech-Bendeck, Savannah Thompson, Nicole M. Landry-Boudreaux, Larry Bernard, Sr., Mona Bernard, Deborah Cuccia, Robyn Crossman, Kayla Anne Steele, Tara Caro, Ann Williams, and Ophelia Walker are

representative of the nuisance injuries sustained by individuals in their respective neighborhoods within the class area, such that trials on their individual claims can adequately adjudicate specific causation for the nuisance injuries sustained by individual putative class members within each Class Representative's respective geographic sub-area and the quantum thereof. Nevertheless, to the extent this Honorable Court concludes that the issues of specific causation and nuisance injuries are individualized, the Class Representatives' initial trials can serve as bellwether trials for individual putative class members within each Class Representative's respective geographic sub-area to assist with resolution of this action. Moreover, certain individual putative class members could be added as class representatives for the Trial in Phase Two to represent any geographic areas that Defendants contend are not represented.

All remaining issues shall be tried during Phase Two, including specific causation, the nature and extent of nuisance injuries suffered (i.e., annoyance, decrease in quality of life, and interference with use and enjoyment of property) as a result of the Landfill's noxious emissions, and the amount of compensatory damages owed to the Class Representatives and putative class members. Plaintiffs may present evidence in Phase Two regarding class-wide valuation of nuisance damages.

This Honorable Court would issue any and all orders necessary for the orderly "waves" or "flights" of trials to proceed on issues to be formulated by the Court. Judge Fallon in *Slocum* describes the practical application of such a bifurcated trial plan as follows:

> Assuming the finder of fact finds in favor of Plaintiffs in Phase One, the Court would then proceed to Phase Two. Phase Two shall consist of various trial flights of groups of five Plaintiffs with like claims to determine specific causation and to award damages, if any. *See Mullen*, 186 F.3d at 623; *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1018 (5th Cir. 1992). Many of the findings made in Phase One will likely limit the number of Plaintiffs' claims to be adjudicated in Phase Two—for example, some Plaintiffs may fall

outside of the geographic scope established by the fact finder in Phase One.[87]

Plaintiffs submit that any such orderly "waves" or "flights" of trials be based on geographic location, as guided by the findings in Phase One as to where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined threshold for nuisance exposures during the liability phase of the litigation (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb). Proceeding in this geographically driven manner would allow for the streamlined adjudication of the issues of specific causation for the alleged nuisance injuries and compensatory damages for those with like claims.

## VI.   PROPOSED CLASS COUNSEL

Proposed Class Counsel are Scott R. Bickford, Lawrence J. Centola, III, and Jason Z. Landry of Martzell, Bickford & Centola, APC, Bruce C. Betzer of the Law Office of Bruce C. Betzer, Douglas S. Hammel of Hammel Law Firm, LLC, Anthony D. Irpino, Louise C. Higgins, Pearl Robertson, and Kacie F. Gray of Irpino, Avin & Hawkins, and John D. Sileo of the Law Office of John D. Sileo.

Proposed Class Counsel represent that they satisfy the criteria set forth in FRCP 42(g), having extensive experience in class action litigation.

Further, proposed Class Counsel represent that they have and will continue to invest significant time and resources in this case, including reviewing documents, meeting with clients, drafting pleadings, engaging in discovery, and participating in court hearings.

---

[87] *Slocum*, 2019 WL 2192099, at *10.

Proposed Class Counsel are also qualified based upon extensive experience litigating major class actions and multi-district litigation cases.

## VII.   PROPOSED CLASS REPRESENTATIVES

The proposed Class Representatives are Elias Jorge "George" Ictech-Bendeck, Savannah Thompson, Nicole M. Landry-Boudreaux, Larry Bernard, Sr., Mona Bernard, Deborah Cuccia, Robyn Crossman, Kayla Anne Steele, Tara Caro, Ann Williams, and Ophelia Walker. The proposed Class Representatives have been involved in fact development in this putative class action, provided relevant information, answered discovery, have been kept apprised of the litigation, are knowledgeable of the facts of this case, are willing to give deposition testimony, and are willing to testify at trial. The proposed Class Representatives understand their role as class representatives and have the desire and motivation to see this litigation through to the end on behalf of all others similarly situated.

## VIII.   CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Putative Class Representatives respectfully request that this Honorable Court enter an Order:

A. Certifying for litigation purposes only the following class of persons:

(1) All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within the following enclosed geographical boundary within the Parish of Jefferson, State of Louisiana, starting at the intersection of 18th St. and Jerome S. Glazer Airport Access Rd. then proceeding eastward along West Metairie Avenue until its intersection with North Causeway Boulevard, then proceeding south along Causeway Boulevard until its intersection with River Road, then proceeding south across the Mississippi River until the intersection of Lapalco Boulevard and Bayou Segnette, then proceeding west until the southernmost end of S. Jamie Boulevard, then proceeding west until the southernmost end of Ruth Drive, then proceeding west/northwest to the intersection of Hwy 90 and the St. Charles Parish/Jefferson Parish line, then proceeding north along the St. Charles Parish/Jefferson Parish line to River Road, then proceeding north along

the St. Charles Parish/Jefferson Parish line from River Road to Airline Hwy, then proceeding east along Airline Hwy until its intersection with Jerome S. Glazer Airport Access Rd., then proceeding north until the intersection of 18th St. and Jerome S. Glazer Airport Access Rd.

(2) who have sustained legally cognizable damages in the form of nuisance and interference with the enjoyment of their properties as a result of the emission of noxious odors from the Jefferson Parish Landfill into and/or onto their persons and/or properties.

(3) This class expressly excludes all named plaintiffs in *Addison, et al. v. Louisiana Regional Landfill Company, et al.*, No. 19-11133 c/w 19-14512, as well as Defendants' employees and relevant court personnel.

B. Appointing Scott R. Bickford, Lawrence J. Centola, III, and Jason Z. Landry of Martzell, Bickford & Centola, APC, Bruce C. Betzer of the Law Office of Bruce C. Betzer, Douglas S. Hammel of Hammel Law Firm, LLC, Anthony D. Irpino, Louise C. Higgins, Pearl Robertson, and Kacie F. Gray of Irpino, Avin & Hawkins, and John D. Sileo of the Law Office of John D. Sileo as Class Counsel pursuant to FRCP 23(g) for purposes of representing the Class and Class Members in this litigation; and,

C. Appointing Elias Jorge "George" Ictech-Bendeck, Savannah Thompson, Nicole M. Landry-Boudreaux, Larry Bernard, Sr., Mona Bernard, Deborah Cuccia, Robyn Crossman, Kayla Anne Steele, Tara Caro, Ann Williams, and Ophelia Walker. as Class Representatives.

Date: August 25, 2023

Respectfully Submitted:

*/s/ Jason Z. Landry*
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, Iii (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130

(504) 581-9065
(504)581-7635 – FACSIMILE

*/s/ Bruce C. Betzer*
Bruce C. Betzer (Bar No. 26800)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

*/s/ Douglas S. Hammel*
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

*/s/ Kacie F. Gray*
Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

*/s/ John D. Sileo*
John D. Sileo (La Bar No. 17797)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com
*Counsel for Ictech-Bendeck Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

.

*/s/ Jason Z. Landry_____*