UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** <br>     Plaintiff <br><br> **VERSUS** <br><br> **WASTE CONNECTIONS BAYOU, INC., ET AL.,** <br>     Defendants <br><br> *Related Case:* <br><br> **FREDERICK ADDISON, ET AL.,** <br>     Plaintiffs <br><br> **VERSUS** <br><br> **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** <br>     Defendants <br><br> *Applies to: Both Cases* | **CIVIL ACTION** <br><br> **NO. 18-7889** <br> **c/w 18-8071,** <br> **18-8218, 18-9312** <br><br><br> **SECTION: "E" (5)** <br><br><br><br> **CIVIL ACTION** <br><br> **NO. 19-11133, c/w 19-14512** <br><br> **SECTION: "E" (5)** <br><br><br><br> **JUDGE: Morgan** <br> **MAGISTRATE JUDGE: North** |

**PLAINTIFFS' OBJECTIONS TO THE WASTE CONNECTIONS DEFENDANTS' PRIVILEGE LOG DATED NOVEMBER 13, 2023**

Plaintiffs make the objections set forth herein to the privilege log served by the Waste Connections Defendants on November 13, 2023 ("November 13 Privilege Log").

The November 13 Privilege Log relates only to documents regarding SCS that Waste Connections had in its own files, and does not involve documents sought under the subpoena issued to SCS Engineers on March 1, 2023.

**I.     INTRODUCTION.**

In general, Waste Connections has asserted that SCS Engineers was a consulting expert under Rule 26(b)(4)(D) (i.e., an "expert employed only for trial preparation"), so that documents involving SCS Engineers are immune from discovery. And, in general, Plaintiffs have responded

1

that SCS's work for Waste Connections was not *only* for trial preparation, which is required for the rule to apply and, even if it was, any privilege that might have attached to the documents sought by Plaintiffs has been waived through disclosure or abuse of the privilege. And further, Plaintiffs respond that the documents fall within the exception to Rule 26(b)(4)(D) because exceptional circumstances exist under which it is impracticable for Plaintiffs to obtain facts or opinions on the same subject by other means.[1]

Waste Connections, not the Plaintiffs, has the burden to show that the documents at issue are privileged. Rule 26(b)(5) sets out the initial requirements for establishing the privilege:

> (5) *Claiming Privilege or Protecting Trial-Preparation Materials*.
>
> > (A) Information Withheld. When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:
> >
> > > (i) expressly make the claim; and
> > >
> > > (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Compliance with the rule normally occurs through the use of a privilege log. However, when Waste Connections responded to Plaintiffs' discovery requests, it refused to provide a privilege log. All of this is addressed in the prior briefing. *See* Brief in Support of Plaintiffs' Motion to Enforce the Subpoena Issued to SCS Engineers [Rec. No. 381-2 in *Addison*] (hereinafter

---

[1] A number of courts have held that document requests, which is what is at issue here, are not governed by Rule 26(b)(4)(D) at all, because that rule refers only to interrogatories and depositions. *Davidson v. Alltrade Tools, LLC*, No. 4:18-CV-00891-O, 2019 WL 13194143, at *2 (N.D. Tex. May 10, 2019) (Rule 26(b)(4)(D) does not apply to Plaintiffs' production request because the plain text of the rule covers only "interrogatories or deposition" targeted at discovering "facts known or opinions held."); *Livingston v. City of Chicago*, No. 16 CV 10156, 2021 WL 3487347, at *4 (N.D. Ill. Aug. 9, 2021) ("The plain language of the Rule applies only to interrogatories or depositions and not to requests for documents." (cleaned up, citation omitted). These courts have concluded that the issue of whether documents may be withheld must be measured under the ordinary rules regarding discovery of attorney work product. Id. Under either standard, Waste Connections' privilege assertions should be overruled.

"Plaintiffs' Brief"). *See also* Brief in Support of Plaintiffs' Motion to Compel Discovery Against the Waste Connections Defendants, Rec. No. 380-1 in *Addison.* After being ordered by the Court to do so, Waste Connections provided a privilege log on November 13, 2023.

In large part, the November 13 Privilege Log confirms that the claimed privilege does not exist. The November 13 Privilege Log is notable for what it NOT contain. It cites to no agreement between SCS and Waste Connections or its attorneys for the rendition of services to the attorneys or setting out the scope of the work being done as a consulting expert. Many of the documents refer to attachments with no further explanation of what the attachments are or how they are subject to the claimed privilege.

Many of the documents are communications between non-lawyers with no explanation as to how a privilege could apply. Of the 101 documents appearing on the privilege log, 34 are communications entirely between non-lawyers,[2] and 23 are communications between non-lawyers where a lawyer shown as a copy recipient.[3] Thus, for more than half of the documents, the principal purpose was something other than communication with the lawyers.

Despite this Court's ruling, in this case, that "blanket assertions of work-product protection are insufficient to carry a party's burden," and "[s]imply labeling communications as 'legal advice" is conclusory and insufficient to satisfy the privilege-proponent's burden," Order dated May 26, 2023, [Rec. No. 402 in *Addison*] at 12, 15, the November 13 Privilege Log is replete with vague descriptions that make it impossible to assess the validity of Waste Connections' privilege claim. In addition, many of the entries cannot be reconciled with the known facts.

---

[2] Communications between non-lawyers – Entries 487, 500, 519, 520, 521, 524,525, 526, 528, 531, 532, 533, 534, 535, 536, 537, 539, 540, 541, 545, 546, 547, 548, 549, 550, 551, 557, 565, 569, 572, 574, 575, 580, and 581.

[3] Communications between non-lawyers on which lawyers were copied -- Entries 488, 490, 494, 495, 499, 501, 516, 517, 518, 542, 543, 544, 554, 558, 559, 560, 563, 564, 566, 567, 576, 577, and 578.

3

Plaintiffs have learned from experience that the descriptions used by Waste Connections in its privilege logs cannot be taken at face value. Because the prior privilege logs did not provide sufficient information to enable assessment of the privilege, the Court reviewed all of the documents at issue *in camera*. And after review of the documents, the Court found the majority of them not to be privileged. *See* Order dated May 26, 2023, [Rec. No. 402 in *Addison*].

In all of the prior privilege logs, one (and only one) document was referred to as being a report from SCS Engineers. *See* Rec No 380-7, entry for WC_JPLF_PRIV_198. That document was purportedly dated November 20, 2018, and was described as a "Report reflecting work performed at the direction of counsel concerning landfill systems prepared in anticipation of litigation." Because SCS was touted to be a "consulting expert," and because a "consulting expert" under Rule 26(b)(4)(D) is an expert hired to advise the lawyers in confidence so that the lawyers can be educated as to the science and technical issues, this entry implied that the withheld document was something akin to a primer on how landfills work in an effort to educate the lawyers (something that might actually fall with the privilege applicable to consulting experts). But that implication was completely wrong —a fact that became known to the Plaintiffs only after the Court reviewed the document *in camera*, found it not to be privileged at all and ordered it produced. Order dated May 26, 2023, Rec. No. 402 in *Addison*, at 10-11.

Once the actual document was produced, the prior privilege log entry was revealed to be grossly misleading. The report did not reflect any confidential advice given to the lawyers to enable them to prepare for trial. (The intended audience does not appear to have been the lawyers at all.). The "November 20, 2018" document was an SCS report of the condition at leachate pumps resulting from the work performed by SCS months earlier, in July 2018 and is referred to herein as the "Leachate Pump Report."

In contrast to the statement that the work was performed at the direction of counsel, SCS

4

had been asked to perform the work, and had completed the work, before its outside counsel was even hired, pursuant to the same Master Services Agreement that governed construction and engineering work done for Waste Connections by SCS across the country, and in the context of a cooperative effort by the Parish, River Birch and Waste Connections to assess the condition of the Landfill. (The facts surrounding this work were discussed in Plaintiffs' Brief [Rec. No. 381-2 in Addison] (at pages 3-5, which was written before the court ordered the document to be produced.) Because of the misleading nature of the previous entries, Plaintiffs cannot rely upon any of statements in the privilege log as being truthful.

In general, Plaintiffs have sought the drafts of and correspondence surrounding various reports prepared by SCS regrading the Jefferson Parish Landfill. Most of these reports have long been known to the Plaintiffs. One was the basis of Waste Connections' public relations campaign, and others were freely produced in discovery without any assertion of a privilege that SCS was a consulting expert providing advice to the lawyers in confidence. The objections below are organized with regard to these reports, although there are a number of entries that are too vague to be so categorized.

**II.     THE JULY 25-27 ASSESSMENT BY SCS ENGINEERS OF THE CONDITION OF THE LEACHATE COLLECTION SYSTEM AT THE LANDFILL (THE "LEACHATE PUMP REPORT")**

The first known task assigned to SCS was to perform an assessment of the leachate collection system at the Landfill and provide a report. The work was performed on July 25-27, 2018. The resulting report was promised to Jefferson Parish and River Birch, and the results of the assessment were provided by Waste Connections to the Parish and members of the press—facts that defeat the assertion of the consulting expert privilege. *See* Plaintiffs' Brief at 4-5. The documents produced in discovery indicated that a report existed, but the report itself was not given to the Plaintiffs until after the Court ruled it was not privileged.

5

In response to the Plaintiffs' Motions seeking discovery of the SCS documents, Waste Connections asserted that SCS was initially hired in July 2018 by Waste Connections Deputy General Counsel, John Perkey, pursuant to the pre-existing Master Services Agreement, and that SCS began working in July 2018 under his direction. Perkey Declaration, Rec. No.368-3 in *Addison*, at 2 ¶¶ 4-5. But the privilege log contains no entries corroborating those contentions. The privilege log sets forth no email or letter from Mr. Perkey engaging SCS, no response from SCS to him confirming the assignment, and no directions from Perkey to SCS to perform the work. Instead, the first entry is dated August 22, 2018, after Waste Connections hired its outside counsel and after SCS had already completed the work:

| 483 | 08/22/2018 | Email chain with attachment concerning SCS's proposal for leachate pump evaluation provided at the request of counsel in anticipation of litigation and in preparation for trial. |

According to this entry, the email was sent from SCS to Waste Connections' outside counsel (Mr. Slaughter) by Ryan Kuntz, and concerned "SCS's proposal for leachate pump evaluation." While the entry implies that the document involves a proposal for work yet to be done, by this date, SCS had already completed the work on this task. Indeed, on this same day, Waste Connections Vice President Nielsen discussed SCS's findings with reporter Jennifer Crockett. Plaintiffs' Brief, Exhibit 14, Rec. No. 381-16 in *Addison.*

Because the privilege log contradicts the known facts, the entries on the privilege log are insufficient to permit the Plaintiffs or the Court to assess the privilege claim, and Waste Connections has not met its burden.

Similarly, if the purpose of the report had been to advise the lawyers in confidence, then there would have been no need for the lawyers to edit the report. Yet that happened, repeatedly, over the course of several weeks.

6

| 503 | 10/25/2018 | Email chain concerning counsel comments on SCS's draft leachate pump evaluation report. |
|---|---|---|
| 504 | 10/29/2018 | Email chain with attachment containing client comments on SCS's draft leachate pump evaluation report at direction of counsel. |
| 505 | 10/29/2018 | Email chain concerning counsel comments on SCS's draft leachate pump evaluation report. . |
| 506 | 11/11/2018 | Email chain with attachment containing counsel comments on SCS's draft leachate pump evaluation report. |
| 508 | 11/16/2018 | Email chain attaching proposed final draft of SCS's leachate pump evaluation report addressing counsel comments. |
| 509 | 11/20/2018 | Email chain providing counsel comments with respect to SCS's draft leachate pump evaluation report.. |
| 510 | 11/20/2018 | Email chain attaching proposed final draft of SCS's leachate pump evaluation report addressing counsel comments. |
| 511 | 11/20/2018 | Email chain concerning counsel comments with respect to SCS's draft leachate pump evaluation report. |
| 512 | 11/20/2018 | Email chain attaching proposed final draft of SCS's leachate pump evaluation report addressing counsel comments. |

The timing of these entries, and all of the work by the attorneys to comment upon it, strongly suggests that the Leachate Pump Report was never intended to assist the lawyers in confidence for trial preparation purposes, but was instead prepared for potential use in the public relations effort, like the October 24, 2018 SCS Report, discussed in the next section, had been used. Public relations advice is not legal advice.

This likewise indicates that SCS was not acting as consulting expert, hired *only* to advise the lawyers, but SCS instead had another mission.

**Entries 488**, **489, 490**, **498, 507**, **513**, **514** concern invoices. **Entry 488** is an email sent by Ryan Kuntz to Brett O'Connor, neither of whom are lawyers, about an invoice for the leachate pump evaluation. There is nothing in this description that allows plaintiffs to evaluate the

7

defendants' privilege claim, and the fact that a lawyer is copied on the message does not make it so. **Entry 489** is an email from attorney Megan Brillault regarding the same invoice but there is no indication as to how this fit into the rendition of legal services.

**Entries 499** and **500** are emails between Ryan Kuntz and Matt Crockett, neither of whom are lawyers (Attorney Brillault is a copy recipient on Entry 499).

| 499 | 10/19/2018 | Email with attachment reflecting SCS's solicitation of information for leachate pump evaluation performed at the direction of counsel in anticipation of litigation and in preparation for trial. |
|---|---|---|
| 500 | 10/22/2018 | Email chain with attachments concerning SCS's draft leachate pump evaluation report, prepared at direction of counsel in anticipation of litigation and in preparation for trial. |

**Entry 502** is an email from Ryan Kuntz (SCS) to Megan Brillault with attachments providing information <u>to</u> SCS. No explanation of the attachment is given.

| 502 | 10/25/2018 | Email with attachments providing SCS with information for leachate pump evaluation performed at the direction of counsel in anticipation of litigation and in preparation for trial. |
|---|---|---|

In summary, entries on the privilege log relating to the Leachate Pump Report are not sufficient to show the existence of any privilege.

### III. WORK RELATING TO THE OCTOBER 24, 2018, SCS REPORT.

SCS's second known task was to prepare the October 24, 2018, Report that became the centerpiece of Waste Connections' public relations campaign to persuade the surrounding communities that there were no odors coming from the Landfill. As discussed in Plaintiffs' Brief, this Report was provided to the Parish, to the LDEQ and to members of the press, and in each of these communications, Waste Connections relied upon SCS's national presence, recognized expertise, *and supposed independent status*, as purported proof that the Landfill (and thus its

8

operator, Waste Connections) was not to blame for the pervasive odors plaguing the surrounding communities. With respect to the preparation of this Report, SCS was in no way a consulting expert providing information to the lawyers in confidence to assist the lawyers in preparing for trial. It was not acting to assist the lawyers in the rendition of legal services, because (as this Court has already ruled) public relations services are not legal services. *See* Order, Rec. No 402 in *Addison* at 17.

Given the importance of the October 24, 2018, Report in the Waste Connections public relations strategy, there should have been numerous communications between Waste Connections (or its lawyers) and SCS concerning the report, including the commissioning of the reports, decisions made on what the information was to be contained in the report, and discussions of the use of the report. There certainly would have been drafts of the report. In contrast to the number of emails surrounding the Leachate Pump Report, the Privilege Log contains only a single entry referring to this October 24, 2018 Report -- **Entry 501**, dated October 22, 2018, which purports to be an "email chain concerning comments on draft Jefferson Parish Landfill Site Evaluation with Respect to Odors, dated October 24, 2018." (Because the Report was part of the public relations effort, the comments on the draft are not legal advice.). The complete absence of such documents is not credible. (A number of entries preceding the date of the October 24, 2018, Report contain vague references to "consulting expert services" or "consulting expert work" without any further facts. *See* **Entries 484**, **485**, **486**, **487**, **491**, **492**, **493**, **494**, **495**. These vague descriptions are not sufficient.).

**Entries 496** and **497** refer to provision of information to SCS. Because some of the tasks performed by SCS at the Landfill were not within any privilege, the description is not sufficient to show a privilege.

Waste Connections has not met its burden to establish the privilege.

## IV. WORK RELATING TO THE EFFORT TO EXCLUDE THE *ADDISON* PLAINTIFFS' EXPERTS FROM OBTAINING ACCESS TO THE SITE.

SCS's third known task was to provide testimony in support of Defendants' effort to prevent the *Addison* Plaintiffs' experts from gaining access to site. The *Addison* Plaintiffs sought this relief from the state court on December 20, 2018, just a week after it filed suit. Waste Connections filed its response to this effort on January 16, 2019 (Rec. No. 1-6 in *Addison*, pages 1-22), supported by the affidavits of SCS President James Walsh, *id.* at 33-51 and SCS Vice President Thomas Rappolt, *id* at 52-81, and supported by the October 24, 2018, Report authored by Messrs. Walsh and Rappolt that had been provided to the press and the LDEQ as proof there were no odors emanating from the Landfill.

For this effort, where Messrs. Walsh and Rapport provided testimony and evidence for the state court to consider, Messrs. Walsh and Rappolt could not possibly be considered "consulting experts" hired *only* for trial *preparation.* The privilege log contains **no entries at all** between December 20, 2018, and January 16, 2019, when the SCS affidavits were filed—no emails, no drafts, nothing. This is not credible.

Waste Connections has not asserted that communications with Messrs. Walsh and Rappolt were protected because they were testifying experts. To the contrary, Waste Connections denied that these gentlemen even provided testimony at all. *See* Rec. No.368-1 (Brief in Support of Motion to Quash) at 5 (arguing that because the court did not hold a hearing, no witness testified). Affidavits are testimony, of course. If they were not acting as testifying experts, then the affidavits of Messrs. Walsh and Rappolt were presented as ordinary fact witnesses. If they were acting as testifying experts, then the compensation paid to them for this work, the facts or data provided to the expert and the assumptions provided to the report are fully discoverable under Rule 26(b)(4)(C). Yet none of these documents have been produced, and none have appeared on any privilege log.

The sole entry for this time period was a full week *after* the response was filed.

| 515 | 1/23/2019 | Email chain with attachment contanining [sic] atttorney-client [sic] communications, counsel's mental impressions, opinions, and legal strategy, and consulting expert analysis concerning opposition to Plaintiffs' motion to expedite discovery and discussions with SCS in their capacity as consulting experts regarding same. |
|---|---|---|

This purports to be an email from Megan Brillault to John Perkey (in-house counsel) with an attachment. No description of the attachment is provided.

Plaintiffs' Request No. 66 sought "Correspondence between you and Mr. James Walsh of Mr. Thomas Rappolt referring or relating to the Jefferson Parish Landfill or the Litigation." Given that both of these gentlemen provided detailed affidavits used to deny the *Addison* Plaintiffs access to the Landfill, the non-existence of the documents sought is not credible.

## V.  THE MEASUREMENTS TAKEN AT THE SITE IN MARCH AND JUNE 2019.

SCS's next known effort, just weeks after the *Addison* Plaintiffs were denied access to the Landfill, was to itself conduct measurements at the site.[4] At this point, SCS's supposed status as a consulting expert changed again, to that of a fact witness regarding the measurements taken at the site. The resulting reports were not addressed to the lawyers. Instead, they were freely provided in discovery, and were provided to the testifying defense experts for their use, all with no objection that the reports were the work product of a consulting expert.

Waste Connections effort to selectively disclose SCS's work, have the testifying experts rely upon that work, and then to hide the arrangement between Waste Connections and SCS behind the privilege is antithetical to the adversarial process and should not be permitted. As one court

---

[4] In his affidavit, Mr. Walsh asserted that "the Landfill would need to retain its own team to duplicate each of the measurements and observations taken by Plaintiffs' expert." Rec. No. 1-6 at 476, ¶ 43. The opposite is also true—when the Defendants' experts took measurements, the Plaintiffs' experts should be invited to come watch. Plaintiffs' experts were not so invited, with the result that the information cannot be obtained from any other source.

explained,

> It is troublesome, to say the least, for a party to engage a consulting, non-testifying expert; pay for that individual to conduct and publish a study, or otherwise affect or influence the study; engage a testifying expert who relies upon the study; and then cloak the details of the arrangement with the consulting expert in the confidentiality protections of Rule 26(b) in order to conceal it from a party opponent and the Court. The Court can see no valid reason to permit such an arrangement to avoid the light of discovery and the adversarial process.

*In re Zofran (Ondansetron) Prod. Liab. Litig.*, 392 F. Supp. 3d 179, 186 (D. Mass. 2019). In that case, the court ruled that the party seeking discovery was "entitled to a complete understanding" as to the relationship between the consulting expert and the counsel who hired him. Id. at 186-187. No less transparency is required in this case.

**Entries 516** and **517**, which are dated February 18, 2019, purport to discuss or concern "SCS's proposal for consulting expert work at the direction of counsel in anticipation of litigation and in preparation for trial." However, according to Waste Connections, SCS had already been engaged as a consulting expert, months earlier, in August 2018, so the February 2019 proposal was something different. These emails are between Matt Crockett (Waste Connections Region Engineer, not a lawyer) and SCS President Walsh (not a lawyer). If SCS were proposing to act as a consultant to the lawyers, then the discussion of the proposal would have been between SCS and the lawyers. (Attorney Megan Brillault was shown as a copy recipient on these entries, but merely sharing a document with a lawyer does not make it privileged.).

**Entries 518**, **522**, **523**, **527**, **528**, **529**, **530**, and **538** all involve the "strategy" for the initial field testing done by SCS in March 2019. "Strategy" entails the determination of what to measure, when, why, where, and other issues (such as what *not* to measure), all of which were important in evaluating the reliability and usefulness of the data collected. Thus, the information concerning the strategy is necessary to evaluate the data, and this information is unavailable from any other

source. [5] (Strategy for the measurement, of course, is not legal advice and making measurements is not the rendition of legal services).

**Entries 552**, **554**, **555**, **556** involve the "strategy" for supplemental testing performed in June 2019. This testing involved measurements of the landfill gas flowing through the top layer of the landfill, and the testing was postponed until after 22,000 cubic yards of additional clay soil (about 2 feet) was added to the top of Phase 4A of the Landfill, which necessarily meant that the emission measurements would be lower than measurements that could have been taken when the *Addison* experts wanted access to the site.

**Entries 558** and **561** refers to the work related to the July 10, 2019, SCS Report, which was not addressed to the lawyers and was freely produced in discovery with no claim of privilege.

**Entry 570** concerns "SCS's proposed strategy to conduct emissions sampling at Jefferson Parish Landfill." The resulting report, like the others, was freely produced in discovery.

**Entries 574**, **575**, **576**, **577**, **578**, **579**, **580**, **581** concern "equipment needed and strategy for Plaintiffs' November 2019 site visit and concurrent sampling effort."

**Entries 541** and **542** are emails from Dawn Thibodaux to Thomas Rappolt at SCS "providing sampling data" or "providing information for use" That means Ms. Thibodaux (Waste Connections) had the sampling data and information. The nature of the information and data is not identified. Neither Ms. Thibodaux nor Mr. Rappolt are lawyers. (Attorney Brillault is shown as merely a copy recipient on Entry 542).

**Entries 543** and **544** are likewise communications between Ms. Thibodaux and Mr. Rappolt, non-lawyers, regarding an off-site survey.

---

[5] In addition, as discussed during the General Causation phase of this case, in many instances, the SCS field data did not match the data in the report. When inquiry was made, it was reported that SCS had done a quality check review and the data in the report was correct (meaning the field data was wrong).

13

## VI. THE SEPTEMBER 19, 2019, SITE VISIT BY SCS EMPLOYEE DAVID FISHER.

On September 10, 2019, this Court directed that the Plaintiffs' experts be provided access to the site in October 2019. *See* Rec. No. 67 in *Addison.* David Fisher from SCS was on site just days later.

**Entry 568** purports to concern Mr. Fisher's visit to the site on September 18, 2018 (the privilege log says 2023, which is assumed to be a typo). According to the landfill visitors' log, however, Mr. Fisher was on site on September 16, 17, and 18—three days, not just one day—and the logs show arrival times of 8:00 am, 7:00 am and 6:00, with no departure times shown, so Mr. Fisher was there for an extended time period. **Exhibit 1.** The logs show that he was there to visit David Jones, the landfill manager, who is not an attorney. **Entry 569** is an email from Mr. Fisher to David Jones, the landfill manager, on which no lawyers were copied.

At that very time, as discussed in Plaintiffs' Brief (see Rec. No, 381-1 in *Addison*, at page 9), sections of the landfill had a significant build-up of leachate under the landfill cover, which Mr. Fisher's inspection would have seen, and Mr. Jones had days earlier reported an on-site measurement of hydrogen sulfide in excess of 100,000 parts per billion. (These conditions were not observed when Plaintiffs' experts were finally allowed access to the site in November 2019).

In a letter to the Parish dated September 26, 2019, **Exhibit 2** hereto, Waste Connections' Regional Vice President Rob Nielsen told the Parish in writing, "Our September 17 and 18, 2019, site assessment identified numerous areas where leachate has created bubbles under the landfill cap, indicating upwelling of leachate under hydraulic pressure," and contained other references to work done by Mr. Fisher.[6] Thus, once again Waste Connections had no problem disclosing the

---

[6] This document was not produced to the Plaintiffs prior to the hearing on General Causation, and contradicted the position taken by Defendants during the General Causation phase regarding the leachate issues at the Landfill.

14

work product of its so-called consulting expert.[7]

In any event, Mr. Fisher's "inspection" preceded that of the Plaintiffs' experts when the site displayed conditions different than those present when Plaintiffs' experts arrived on site. His observations must be provided both as a result of Waste Connections' waiver and because the information falls with the exception in Rule 26(b)(4)(D).

**Entry 582** relates to this effort. Facts observed by Mr. Fisher are not privileged. And even if they were, there is no other source for Plaintiffs to learn this information,

**Entry 569** is an email from Mr. Fisher (a non-lawyer) to David Jones (the landfill manager, also not a lawyer). No lawyers are copied. It purports to be "forwarding communications with counsel concerning observation of TRC sampling effort." TRC, of course, was the testifying expert in this case for Aptim Corporation. The TRC sampling effort occurred on October 2-3, 2018, and its report was provided in discovery. Plaintiffs were not invited to attend, and there is no explanation how Waste Connections' knowledge of this event was in any way privileged.

**VII. AIR MODELING AND THE OFF-SITE ODOR SURVEY**

**Entries 562**, **563**, **564**, **565**, **566**, **567**, **571, 572** and **573** all involve air dispersion modeling done by SCS. **Entry 572** is a communication between two lower-level management employees with whom the reports had been shared. The fact that the reports were provided to them dispels any notion that the reports were done to assist the lawyers in the lawyers' trial preparation work.

The record of this case reflects that Waste Connection never hired SCS *only* for trial preparation. Instead, the various reports appear to have been commissioned with the intent that reports useful to Waste Connections' public narrative would be disclosed while not-so-useful reports would be claimed as privileged. Thus, the October 24, 2018, Report was published to the press and the LDEQ, while the Leachate Pump Report and Mr. Marshall's initial report were not.

---

[7] This letter also described a 10' x 20' gas bubble under the synthetic liner at the northwest toe of Phase IVA. (page 4).

SCS personnel provided testimony in the state court. The reports of site measurements made in March and June 2019 were not even addressed to the lawyers and were provided to the testifying defense experts for their use. When the relationship between an attorney and an expert is ambiguous, the ambiguity is resolved against the attorney seeking to assert that the relationship is confidential and privileged. *Galsser v Hilton Grand Vacations Co*., 2017 US DIst. Lexis 182619 *7 (M.D. Fla. 2017) ("any substantial ambiguity regarding whether there is a confidential relationship between an attorney and an expert should be resolved against the attorney seeking to invoke the relationship.").

Under these circumstances, SCS was not hired *only* for trial preparation, so the protections in Rule 26(b)(4)(D) do not apply. *Positive Techs., Inc. v. Sony Elecs., Inc*., No. 11-CV-2226 SI KAW, 2013 WL 1402337, at *2 (N.D. Cal. Apr. 5, 2013) (expert who provide affidavit testimony "was not retained only for the purpose of trial preparation). *See In re Zofran*, *supra.*

Waste Connections has not shown or explained how the air modeling work done by SCS was assist in trial preparation and has not shown how the immunity for work product is applicable to it.

**Entries 559** and **560** refer to information provided to SCS for an off-site odor survey. The information provided to SCS is not and cannot be the work product of SCS.

**VIII.    JEFFREY MARSHALL.**

Mr. Marshall was the author of a 2017 white paper that explained the dangers of placing sulfur-containing coal combustion residues (like spent lime) into a municipal landfill and, based on Marshall's paper, the Parish concluded that the spent lime allowed into the landfill by Waste Connections was a likely source of the odors. Mr. Marshall worked for SCS. According to Waste Connections, it hired Mr. Marshall first as a consulting expert, and then his status changed to a testifying expert. Mr. Marshall provided an expert report and testified at the General Causation

hearing. In both roles, Mr. Marshall's mission was to determine whether materials disposed of the in the Landfill, and particularly the spent lime, could have been the source of the odors.

In the General Causation phase, the Case Management Order required Waste Connections to produce all documents and data considered by its experts in rendering their opinions. And, once Mr. Marshall donned the hat of a testifying expert, Waste Connections waived any protection over materials provided to Mr. Marshall, whether Mr. Marshall relied upon them or not. *See Yeda Research and Development Co., Ltd, v. Abbott GmbH & Co. KG*, 292 F.R.D. 97, 108-109, 115 (D.D.C 2013)(" The Court finds that Yeda waived the work product protection of Dr. Engelmann's work as a consultant in this case by designating him as a testifying expert witness. ").

The November 13 Privilege Log contains numerous documents that were withheld in the General Causation Phase (and were not placed on any privilege log at that time).

**Entries 519**, **520**, **521** are February 22, 2019, emails between Mr. Marshall and Matt Crockett and Nick Collins (neither of whom are lawyers) concerning information provided to Mr. Marshall. Mr. Crockett was the Waste Connections' Region Engineer, Mr. Collins was responsible for waste approvals. No lawyers were even copied.

**Entries 524**, **525**, and **526** added to the mix Dawn Thibodaux (the landfill office manager) and David Jones (the landfill manager) for communications with Mr. Marshall. Again, no lawyers were copied.

**Entries 531**, **532**, **533**, **534**, **535**, **536**, **537**, **539**, **540**, **545**, **546**, **547**, **548**, **549**, **550**, **551**, **557** are emails between Mr. Marshall and Dawn Thibodaux (with no lawyers being copied), more than a dozen communication in which Mr. Marshall was seeking information and Ms. Thibodaux was sending information to him (many of the entries refer to attachments), over the course of two months. Because Mr. Marshall was a testifying expert, all of these should have been provided in discovery in the General Causation Phase, and none were.

The privilege log discloses that nearly two dozen communications involving Mr. Marshall were improperly withheld. No lawyers were involved in any of these communications.

## IX. OTHER ISSUES.

If in fact SCS in fact had been a consulting expert, and if in fact Waste Connections' descriptions could be relied upon, then Plaintiffs likely would not contest the privilege claims on the following entries because the document sets out the attorneys' own analysis (which is what the privilege protects).

| 553 | 05/02/2019 | Email chain with attachment containing attorney-client communication concerning counsel's legal analysis and opinions on SCS's consulting expert work product on off-site survey of area odor sources performed at the direction of counsel in anticipation of litigation and in preparation for trial. |
|---|---|---|
| 583 | 11/05/2019 | Email chain containing attorney-client communication forwarding summary from Mr. Tom Rappolt of SCS concerning SCS's observations of Plaintiffs' site visit on November 4, 2019 and cocurrent [sic] sampling and discussing strategy regarding same. |

However, given the issues encountered, a proper assessment of the privilege cannot be done based on the privilege log. Indeed, the factual descriptions in the withheld documents may provide information that is unavailable to the Plaintiffs due to lack of access, even including during Plaintiffs' site visit.

## X. CONCLUSION.

For the foregoing reasons, the privilege log fails to demonstrate the existence of any privilege.

18

Dated: November 16, 2023

Respectfully submitted,

| | |
|---|---|
|       S. Eliza James<br>Byron M. Forrest (La. Bar No. 35480)<br>Nicholas V. Cressy (La. Bar No. 35725)<br>S. Eliza James (La. Bar No. 35182)<br>FORREST CRESSEY & JAMES, LLC<br>1222 Annunciation Street<br>New Orleans, Louisiana 70130<br>Tele:(504) 605.0777<br>Fax: (504) 322.3884<br>Email: byron@fcjlaw.com<br>nicholas@fcjlaw.com<br>eliza@fcjlaw.com |       /s/ Bruce C. Betzer<br>Bruce C. Betzer (Bar No. 26800)<br>THE LAW OFFICE OF BRUCE C. BETZER<br>3129 Bore Street<br>Metairie, LA 70001<br>Telephone: (504) 832-9942<br>Facsimile: (504) 304-9964<br>bruce@brucebetzer.com |

      /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Erik D. Bolog (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
ebolog@wtplaw.com
mchilders@wtplaw.com

*Counsel For Addison Plaintiffs*

      /s/ Douglas S. Hammel
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

      /s/ Jason Z. Landry
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, III (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

Hon. Max N. Tobias, Jr. (#12837)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
maxtobias504@aol.com

Anthony D. Irpino (#24727)

19

Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*Counsel for Ictech-Bendeck Plaintiffs*