**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ELIAS JORGE "GEORGE" ICTECH-BENDECK,     Plaintiff | CIVIL ACTION<br><br>NO. 18-7889<br>c/w 18-8071,<br>18-8218, 18-9312 |
| VERSUS | |
| WASTE CONNECTIONS BAYOU, INC., ET AL.,     Defendants | SECTION: "E" (5) |
| *Related Case:* | |
| FREDERICK ADDISON, ET AL.,     Plaintiffs | CIVIL ACTION<br><br>NO. 19-11133, c/w 19-14512 |
| VERSUS | SECTION: "E" (5) |
| LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,     Defendants | |
| *Applies to: Both Cases* | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |

**PLAINTIFFS' OPPOSITION TO THE WASTE CONNECTIONS
DEFENDANTS' MOTION TO UPHOLD EXPERT DESIGNATION OF
BISHOW SHAHA, PH.D**

**NOW INTO COURT**, through undersigned counsel, come the *Ictech-Bendeck* Class Plaintiffs and the *Addison* Plaintiffs who, in accordance with this Court's November 13, 2023 Order (18-7889, R. Doc. 384), hereby oppose the Motion to Uphold Expert Designation of Bishow Shaha, Ph.D filed by the Waste Connections Defendants on November 22, 2023 (18-7889, R. Doc. 388), to wit:

As explained in more detail below, the Court has previously and unequivocally directed the parties that new experts would not be permitted with respect to topics that were covered in the General Causation Trial. One of the topics covered in the General Causation Trial was Waste Connections' attempted rebuttal of the hydrogen sulfide generation estimates performed by Dr.

Jaana Pietari, one of Plaintiffs' experts.

In direct violation of the Court's instruction, Waste Connections has identified Dr. Shaha as a replacement expert on this issue. While Plaintiffs are sympathetic to the difficulties caused by an illness of a testifying expert, and in fact themselves found it necessary to replace one of their own experts for health reasons, Waste Connections has not established that the replacement of Jeffrey Marshall is required or necessary or that he will be replaced with an expert who will render precisely the same opinions, which were the requirements demanded by Waste Connections when Plaintiffs sought to replace their expert, Nestor Soler.

At this point, having already litigated Dr. Pietari's opinions, and having already determined Dr. Pietari's responses to all of Waste Connections' criticisms, and having taken their best shot at Dr. Pietari during the General Causation Trial, Waste Connections demands a new expert, who is asserted to have credentials and experience Mr. Marshall did not have, and who will offer new and different opinions in response to Dr. Pietari's hydrogen sulfide generation estimates. This "replacement-plus" upgrade should not be permitted.

For those reasons, and for the reasons further discussed below, the Waste Connections Defendants' Motion should be denied.

I.      **The Waste Connections Defendants' designation of Dr. Shaha as a substitute for Mr. Marshall directly defied this Honorable Court's instruction and should be stricken.**

The Waste Connections Defendants' Motion, from its title to its content (or lack thereof), exemplifies their penchant in this litigation to ignore, and even outright flout, the rulings, instructions, and orders of this Honorable Court when things do not go their way.

The Waste Connections Defendants styled their submission as a "Motion to Uphold Expert Designation" rather than a "Motion to Substitute Expert Witness" as ordered by the Court. See 18-7889, R. Doc. 384 at p. 4 ("the Court ordered Defendants to file a motion to substitute expert

witness on or before Wednesday, November 22, 2023"). Rather than ask for substitution, the Waste Connections Defendants treated the substitution of Jeffrey Marshall with Bishow Shaha as having already been done with the consent of the Plaintiffs and the Court. Of course, that could not be further from the truth.

As it relates to the motion to substitute that this Honorable Court ordered be filed, during the November 13, 2023 status conference, in addition to demanding that they explain why Mr. Marshall cannot testify and identify Mr. Marshall's area of testimony, this Honorable Court expressly told the Waste Connections Defendants to explain why their attempted substitution is not covered by the Court's prior instruction that if the parties already had an expert testify to an issue covered during General Causation, then no substitution would be allowed.

Rather than addressing that specific issue as ordered, the Waste Connections Defendants opted instead to *advise* the Court that no order or minute entry prohibited them from designating a new expert on a topic already addressed during General Causation. However, no amount of wordsmithing or semantics can save the Waste Connections Defendants from the truth.

As the Court will recall from the November 13, 2023, status conference, when it asked counsel for the Waste Connections Defendants something along the lines of "Didn't I say no new experts on topics already covered?" the Waste Connections response was not one of bewilderment or uncertainty, but rather a resolute "and we have objected to that."

Indeed, the Waste Connections Defendants have long-known they were prohibited from designating a new expert on a topic already addressed during the trial on General Causation.

For example, more than nine months ago, on February 2, 2023, when reciting the procedural background in their Memorandum in Support of their Motion to Bifurcate, the Waste Connections Defendants expressly acknowledged the Court's instruction they were ordered to address in the instant Motion:

> *The Court has also indicated that while Defendants may disclose new experts in the areas of expertise that were not relevant to general causation (e.g., a medical doctor to address causation), Defendants will be precluded from designating new expert witnesses for the areas of expertise that were addressed during the general causation trial*.

See 18-7889, R. Doc. 303-1 at p. 5 (Page 9 of 19) (emphasis added).

The Court's instruction, and the parties' clear understanding thereof, is further exemplified by the discussion that took place during the March 21, 2023 telephone status conference regarding the parties' disagreement "over whether *Daubert* motions would be allowed only for new opinions expressed by current experts and opinions expressed by new experts, or whether *Daubert* motions would be allowed for the testimony of experts already heard at the General Causation Trial." See April 6, 2023 minute entry, 17-889, R. Doc. 321 at p. 2. Read in its proper and correct context, it was understood that the Court's resolution of that dispute meant that the parties' current (i.e., existing) experts would proceed to handle the issues previously covered during the General Causation Trial and that only if they expressed new opinions based on new methodologies would the Court allow *Daubert* motions. It was further understood that "new experts" as used therein was a reference to experts who would be addressing topics that were not covered during General Causation, such as liability, allocation of fault, specific causation, and damages.

The Court's resolution of this *Daubert* dispute was soon memorialized in the 8th CMO. See 17-7889, R. Doc. 325 at p. 10 (Section VIII). Although they did not agree with the Court's decision, the Waste Connections Defendants certainly understood the role to be played by "newly designated experts" and "existing experts who offer new opinions" as used in the 8th CMO. Any claims that they believed they could use "newly designated experts" to render opinions on topics covered during General Causation are knowingly false.

Based on the above, there is no dispute that this Honorable Court instructed the parties that they were precluded from designating new expert witnesses for the areas of expertise that were addressed during the General Causation Trial, that the Waste Connections Defendants were aware

of that instruction, and that the Waste Connections Defendants knowingly defied that instruction when attempting to substitute Mr. Marshall with Dr. Shaha through a footnote in a witness list. See 18-7889, R. Doc. 384 at 3, n. 1; 19-11133, R. Doc. 418 at 3, n. 3.

Contrary to the Waste Connections Defendants' assertions, a designation that was prohibited by the Court's instruction cannot be considered timely. Accordingly, their attempted substitution should be stricken.

## II.    The Proposed Substitution Would Be Highly Prejudicial to Plaintiffs.

The Waste Connections Defendants' argument that no prejudice will follow from their attempted substitution should be flatly rejected. The attempted substitution would be highly prejudicial to the Plaintiffs.

As this Court is well aware, to date Plaintiffs have expended significant time, money, and effort litigating the issue of estimating hydrogen sulfide gas generation at the Landfill which was fully presented at the General Causation Trial. Contrary to the Waste Connections Defendants' insinuations, the specific causation phase of the litigation will not involve a brand-new battle as it relates to estimating hydrogen sulfide gas generation at the Landfill. That issue was already fully presented at the General Causation Trial. It is only the Waste Connections Defendants who would like to start back at square one.

As it relates to Mr. Marshall, Plaintiffs made considerable efforts to establish and lock down his rebuttal opinions criticizing the H2S generation estimation opinions and methodologies of their expert, Dr. Jaana Pietari, who in turn issued her own rebuttal report responding to such criticisms. Through expert discovery, which included Mr. Marshall's April 30, 2021, expert report and his two-day deposition in July 2021, Plaintiffs spent hundreds of attorney hours, and spent considerable amounts of money, formulating their cross-examination strategy including attacks on Mr. Marshall's credibility and methodologies. Plaintiffs and Dr. Pietari also expended

considerable efforts to respond to the criticisms lodged by Mr. Marshall. Those painstaking efforts culminated in the full presentation of the H2S generation estimation issue at the General Causation Trial through the testimony of Dr. Pietari and Mr. Marshall, which included Plaintiffs' rigorous cross-examination of Mr. Marshall at the General Causation Trial.

The Waste Connections Defendants' attempted substitution would effectively require Plaintiffs to go back to the drawing board and throw away years of hard work litigating this important issue that was already fully presented at the General Causation Trial. Rather than having the benefit of years of hard work, knowledge and familiarity of the opposing expert's opinions, having already worked with their own expert to respond to that opposing expert's opinions, and having already established and implemented a rigorous cross-examination strategy, it would also require Dr. Pietari to rebut Dr. Shaha's new and unknown opinions in just three weeks' time, despite the fact that the Waste Connections Defendants admit Dr. Shaha has been working since August 2023 to prepare his expert report.

Further, as deemed relevant by Judge Barbier in his *Vedros* decision, it is evident that the Waste Connections Defendants are using this attempted substitution merely to secure an advantage in this litigation. *Vedros v. Northrop Grumman Shipbuilding, Inc.*, No. CV 11-1198, 2015 WL 13540240, at *2 (E.D. La. May 28, 2015) ("Westinghouse's late request also does not seem to have been made merely to secure an advantage.").

As discussed during the November 13th status conference, the Waste Connections Defendants are trying to make a "replacement plus" by substituting Mr. Marshall with Dr. Shaha who is an author of one of the two papers that Dr. Pietari relied upon to produce her estimate of the H2S generated by the spent lime buried at the Landfill. A fact that they learned only through having Dr. Pietari's expert report before selecting the author of that paper as an expert.

As the Court will recall, the thrust of Mr. Marshall's attack on Dr. Pietari at trial was that

the lack of available data made it nearly impossible for her to estimate the H2S generated by the spent lime buried in Phase 4A of the Landfill. Of course, the lack of available data appears to have been by design. The Waste Connections Defendants were in complete control of the Landfill at all times, and they did not themselves capture the data that would have revealed the truth about the Landfill's H2S generation. This data was not captured despite the fact that Mr. Marshall himself testified that he considered estimating the H2S generated back in 2018/2019 but determined the requisite data was not available (nor did he make efforts to capture such necessary data or recommend that be done). On top of that, the Waste Connections Defendants kept the Plaintiffs off the landfill, claiming that it was unnecessary to take the measurements they now argue are necessary to prove causation. By selecting Dr. Shaha to replace Mr. Marshall, the Defendants have bolstered their manufactured defense to attack the limited data Dr. Pietari had to rely on. This is not a substitution. This is an upgrade.

But even more concerning, the Waste Connections Defendants already have the benefit of intimately knowing Dr. Pietari's H2S generation estimation opinions and methodologies, having spent over a year formulating Mr. Marshall's rebuttal of her opinions prior to the General Causation Trial, having seen exactly how the battle between Dr. Pietari and Mr. Marshall played out at the General Causation Trial, including seeing how those experts fared through their respective rigorous cross-examinations. Thus, the Waste Connections Defendants have months to do what effectively amounts to a complete do-over when it comes to attacking Dr. Pietari's H2S generation estimate. Allowing the Waste Connections Defendants to circumvent the natural timing of expert disclosures and reports to gain an unfair advantage under the guise of "substitution" creates an irreparable prejudice to the plaintiff's causation case.

While it is obvious that the Waste Connections Defendants would like to enjoy having that added weight of authority to their newly retained and improperly designated replacement expert,

it is also evident that the Waste Connections Defendants would like to free themselves of the baggage associated with Mr. Marshall.

As the Court will recall, Mr. Marshall was the author of a 2017 white paper that explained the dangers of placing sulfur-containing coal combustion residues (like spent lime) into a municipal solid waste landfill. Not only was Mr. Marshall's paper the basis upon which the Parish concluded that the spent lime allowed into the Landfill by Waste Connections was a likely source of the odors responsible for the deluge of complaints lodged by residents in the neighboring communities, it was also relied upon by Dr. Pietari to support her opinions that the seven factors necessary for H2S generation at a landfill were more likely than not present in Phase 4A where the spent lime was buried. The proposed substitution would allow the Waste Connections Defendants to side-step that attack and avoid those unfavorable facts.

Moreover, Mr. Marshall also drafted a "Secret Report" wherein he identified spent lime as the only potential source of waste accepted at the Landfill that could explain the H2S odor issues and calculated an H2S generation potential estimate that nearly mirrored the one done by Dr. Pietari nearly 2 years later in her expert report. See 18-7889, R. Doc. 171-2 at Page 6 of 55.

As mentioned above, he testified at trial that he considered using the Anderson model (upon which Dr. Shaha's model was based) in 2018 or 2019 to determine the H2S generation but concluded the landfill did not have the necessary data. Despite the odor issues plaguing the Landfill, despite his early conclusion in 2018 that it was likely the spent lime, despite his early consideration of the Anderson model to estimate H2S generation, and despite his conclusion that the necessary data was not available to run such a model, Mr. Marshall did not collect the necessary data nor did he recommend that his client collect the necessary data. This is important because his ultimate criticism of Dr. Pietari was that it was basically impossible for her to estimate H2S generation at the Landfill due to the lack of necessary data. Mr. Marshall's early personal

knowledge of the lack of what he considers necessary data clearly poses a credibility problem that Waste Connections would like to avoid. Dr. Shaha's substitution eliminates that problem.

Moreover, despite having been retained to critique Dr. Pietari's H2S generation estimate and despite having been tendered as an expert in H2S generation estimation (over Plaintiffs' objection), as of the General Causation Trial, Mr. Marshall had never himself run the relevant H2S generation model nor had he ever tried to estimate H2S generation in any way. The attempted substitution would allow the Waste Connections Defendants to avoid that attack as well.

These are just but a few of the credibility issues related to Mr. Marshall's continued retention that will likely cause problems for the Waste Connections Defendants. Moving on to Dr. Shaha conveniently wipes out these problems for the Waste Connections Defendants.

As set forth above, the prejudice that would befall Plaintiffs is significant, and indisputable. Mr. Marshall has already presented Waste Connections' best shot at critiquing Dr. Pietari's estimates of hydrogen sulfide generated at the Landfill. Respectfully, the Waste Connections Defendants are not entitled to a do-over.

For the reasons set forth above, the Waste Connections Defendants' defiance of the Court's clear instruction should not be rewarded, and its attempted designation of Dr. Shaha should be stricken as it would be highly prejudicial to Plaintiffs.

**III.    The Waste Connections Defendants have failed to establish good cause.**

Although Plaintiffs are sympathetic to Mr. Marshall's health issues, the Waste Connections Defendants have failed to show good cause to allow for a substitution that would require Plaintiffs to throw away years' worth of time, money, and effort and re-litigate the issue of H2S generation estimation that has already been fully developed and fully presented at the General Causation Trial.

The Waste Connections Defendants have failed to show that Mr. Marshall is unable to work due to his health following surgery related to prostate cancer treatment.  Absent from their

Motion or Mr. Marshall's declaration are any relevant medical records or a physician's prognosis supporting the conclusion that his health prevents him from continuing in his expert retention role. Nor does his declaration say he is not currently working. Rather, according to his November 20, 2023 declaration, he is a Project Director and Vice President with SCS and currently serves as the Practice Leader for the Environmental Services Practice in the Mid-Atlantic Region of the United States. 18-7889, Doc. 388-2.

To the extent Mr. Marshall experiences any health issues in the coming months, Plaintiffs will make every reasonable accommodation to ensure that the Court's deadlines for expert discovery are met. However, it is clear that Mr. Marshall is currently capable of working and his lack of confidence espoused in his declaration falls well short of establishing good cause to replace him with Dr. Shaha at this juncture, which would effectively mean going back to square one and allowing the Waste Connections Defendants to get a "do-over" when it comes to rebutting and critiquing Dr. Pietari's H2S generation estimate and corresponding opinions and methodologies.

Moreover, unlike the retained experts in *Vedros*, supra, and *Collins*[1] who died prior to trial, the Waste Connections Defendants have the benefit of Mr. Marshall's trial testimony which can be read to the jury should Mr. Marshall be unavailable for trial.  Or he can sit for a *de bene esse* deposition to be presented at trial (one of the alternatives the Waste Connections Defendants proposed for Mr. Nestor Soler before he was replaced by Mr. Sananes due to health concerns.) Further, at this juncture, Plaintiffs do not foresee Dr. Pietari producing any new H2S generation estimates.  As set forth above, Mr. Marshall has offered rebuttal testimony and opinions to all of Dr. Pietari's opinions rendered to date. Again, the Waste Connections Defendants have the trial testimony thus no substitution is warranted here.

Nevertheless, to the extent this Honorable Court is inclined to allow for a substitution,

---

[1] *Collins v. Nat'l Football League*, 566 F. Supp. 3d 586, 596–97 (E.D. Tex. 2021)

Plaintiffs respectfully submit that any new expert retained to rebut Dr. Pietari's H2S generation estimate be bound by the opinions and critiques rendered to date by Mr. Marshall. Such a limitation is in line with *Vedros* and *Collins* decisions relied upon by the Waste Connections Defendants. It is also important to recall when Plaintiffs' expert, Nestor Soler, was unable to participate in the General Causation Trial due to poor health, the defendants not only required medical proof of his condition and his inability to travel but also demanded that the opinions of Mr. Soler's replacement, Mr. Sananes, must be the exact same as those of Mr. Soler. In the substitution of Mr. Marshall, Plaintiffs would require the same. The defense motion does not have medical documentation of Mr. Marshall's condition nor his inability to participate in a trial that is seven months from now. And because this area of expertise (hydrogen sulfide generation) is not new to this case, the opinion of any substitute expert must be the same as the expert being replaced.

Should Dr. Pietari render entirely new opinions based on new methodologies, only then should any substitute be allowed to exceed the established scope of Mr. Marshall's expert opinions and in that event any such new opinions would have to be entirely limited to those new opinions rendered by Dr. Pietari. To hold otherwise would be highly prejudicial to Plaintiffs.

### IV.   The Waste Connections Defendants directly defied this Honorable Court's order to explain why no SCS personnel can serve as Mr. Marshall's substitute.

During November 13th status conference, this Honorable Court also asked the Waste Connections Defendants to explain what it is about Mr. Marshall's qualifications that separate him from others at SCS such that someone from SCS is not available to take his place.

SCS is a national engineering firm that most assuredly has people on staff that could testify regarding hydrogen sulfide generation in landfills. SCS has issued bulletins on the generation of hydrogen sulfide when coal combustion residual materials are disposed of in municipal landfills, (R. Doc. 375-34 in *Addison*) and one of the two principal scholarly papers relied upon by Dr. Pietari and Mr. Marshall was written by employees of SCS Engineers. Waste Connections knows

all of this and yet feigns ignorance as to whether anyone within SCS could step in Mr. Marshall's shoes if his health does not allow him to continue on in his role rebutting Dr. Pietari's H2S generation estimate.

Mr. Marshall's reports in this case prominently bear the logo of SCS Engineers on the first page, and every subsequent page of his reports contained the URL for SCS's website in the footer (www.scsengineers.com).

Waste Connections asserts that Mr. Marshall "did not rely on data collected by SCS, nor did it rely on opinions of any other employee of SCS." This is simply untrue. The last page of his April 30, 2021 report, under "Additional Documents Considered" identifies the following:

- E-mail from Greg McCarron (SCS) (April 21, 2021).
- James Walsh and Thomas Rappolt, Jefferson Parish Landfill Site Evaluation with Respect to Odors, SCS Engineers (Oct. 24, 2018).

19-11133, R. Doc. 215-6 at Page 44 of 44. Thus, Mr. Marshall himself states that he considered information from SCS about this specific case in formulating his opinions. In addition, the next to last page of the report identifies, under "References," the following:

- Russell Anderson, Jenna R. Jambeck, Ph.D., and Gregory P. McCarron, PE, Modeling of Hydrogen Sulfide Generation from Landfills Beneficially Utilizing Processed Construction and Demolition Materials, Prepared for the Environmental Research and Education Foundation, Alexandria, VA (Feb.2010).

Messrs. Anderson and McCarron, co-authors of this report, were both employed by SCS. Again, Mr. Marshall himself stated he relied on opinions of others at SCS.

But perhaps most importantly, the very issue in the Pietari Report that Mr. Marshall sought to rebut was the rate of hydrogen sulfide generation at the Jefferson Parish Landfill. In his prior (secret) report, which was concealed from the Plaintiffs until after Mr. Marshall was deposed in this case, Mr. Marshall relied specifically upon the October 2018 SCS Report (cited above) to

conclude that "'[t]he findings of the 2018 odor assessments indicate that the actual rate of sulfate biodegradation at the Landfill is not sufficient to result in hydrogen sulfide odors, if any, that would be of significance beyond the landfill boundary." 19-11133, R. Doc. 212-2 at page 7 of 55.[2] Thus, Mr. Marshall himself has stated, in writing, that his opinion regarding the rate of hydrogen sulfide generation was based upon work done by SCS.

The reason behind the Waste Connections Defendants' failure to address this issue appears obvious. As the Court will recall, during the November 13th status conference, counsel for the Waste Connections Defendants represented that the issue of H2S generation estimation involves a "unique area" that requires a "unique background" for an expert to be able to rebut Dr. Pietari's H2S generation estimate. But, of course, as we know through Mr. Marshall's trial testimony, he himself had never conducted an H2S generation estimate like the one completed by Dr. Pietari nor had he ever critiqued one before. When Plaintiffs objected to Mr. Marshall's tender as an expert in H2S generation estimation based on his complete lack of experience as to that issue, the Court's response was to advise Plaintiffs to attack his credibility on cross-examination, which they did.

Further defeating the Waste Connections Defendants' argument that highly specialized knowledge and unique background is required to critique Dr. Pietari's H2S generation estimate, Mr. Marshall testified that he was qualified to critique Dr. Pietari's efforts because her generation estimate involved a simple first order decay model that he had experience with since high school. Surely out of the hundreds of engineers within SCS there is one who also has had experience with first order decay models since high school (or at least college). However, because those other SCS engineers did not happen to author one of the literature papers upon which Dr. Pietari relied to complete her H2S generation estimation, the Waste Connections Defendants cannot secure an

---

[2] Note this document bears the confidential outside counsel only designation.  It appears in the record in redacted form.  19-11133, R. Doc. 212-2.

advantage via any such substitution.

**V.      Waste Connections' potential exposure in this case is not a new fact that requires employment of a new expert.**

Waste Connections' potential exposure in this case does not require employment of a new expert. Despite Waste Connections' feigned surprise regarding the potential recoveries sought by the *Addison* Plaintiffs, Waste Connections has itself contended from the beginning that damage awards could reach or exceed these levels.  In fact, when it removed this case from state court to federal court, *Waste Connections* had to prove that the amount in controversy exceeded $75,000 *per plaintiff.* And, to meet that burden, Waste Connections explained the following in its removal papers:

> 22. Comparable judgments and settlement awards in recent nuisance cases premised on noxious odors demonstrate that the aggregate amount and the award per plaintiff in such cases have the potential to be significant. *See, e.g.*, *Jacobs v. Murphy-Brown LLC.*, No. 7:14-CV-237-BR, 2018 WL 4186009 (E.D.N.C. Aug. 3, 2018) (six plaintiffs in odor nuisance case against hog farm each awarded between $3.5 million and $5 million in compensatory damages, in addition to punitive damages three times the actual damages); *Babb v. Lee Cnty. Landfill SC*, No. 3:10-cv-01724, 2012 WL 1227612 (D.S.C. March 30, 2012) (six plaintiffs in landfill odor nuisance case each received actual damage awards ranging from $77,500 to $100,000 and an additional $300,000 in punitive damages); *McKiver v. Murphy Brow*n, LLC No. 7:14-CV-00180-BR (E.D.N.C. Aug. 31, 2018) (ten plaintiffs in odor nuisance case against hog farm each received $325,000 award).

19-11133, R. Doc. 1 at page 9.  Having brought the case to federal court because the potential per plaintiff recoveries could reach hundreds of thousands or millions of dollars, Waste Connections cannot now be heard to say that it needs a new expert because it suddenly realized the *Addison* trial plaintiffs are seeking real damages. Indeed, the amounts the *Addison* Plaintiffs are seeking are less than awards in some of these cases Waste Connections relied upon—more than four years ago-- to prove that this case belongs in federal court.

**VI.      Conclusion**

For the foregoing reasons, Plaintiffs respectfully pray that this Honorable Court deny the Waste Connections Defendants' Motion to Uphold Expert Designation of Bishow Shaha, Ph.D.

Dated: November 29, 2023

Respectfully submitted,

_____S. Eliza James_____
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSEY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com

_____/s/ Eric C. Rowe_____
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Erik D. Bolog (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac
Vice)
WHITEFORD, TAYLOR & PRESTON,
L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
ebolog@wtplaw.com
mchilders@wtplaw.com

*Counsel For Addison Plaintiffs*

_____/s/ Bruce C. Betzer_____
Bruce C. Betzer (Bar No. 26800)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

_____/s/ Douglas S. Hammel_____
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

_____/s/ Jason Z. Landry_____
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, III (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

Hon. Max N. Tobias, Jr. (#12837)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
maxtobias504@aol.com

Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*Counsel for Ictech-Bendeck Plaintiffs*