**24th JUDICIAL DISTRICT COUR FOR THE PARISH OF JEFFERSON**

**STATE OF LOUISIANA**

SUIT NO.: 790-369                                                                 DIVISION: "J"

**FREDERICK ADDISON, et al.,**

**VERSUS**

**LOUISIANA REGIONAL LANDFILL COMPANY, et al.**

FILED: _____                                    _____

                                                                                                    **DEPUTY CLERK**

**SWORN AFFIDAVIT OF PAUL C. CHROSTOWSKI, Ph.D, QEP**

STATE OF MARYLAND
COUNTY OF MONTGOMERY

   **PAUL C. CHROSTOWSKI, Ph.D., QEP**, being first duly sworn, deposes and says:

### Professional Background

   1.   I am an environmental scientist and engineer with more than 40 years' experience in environmental work on behalf of government and private clients. My practice is currently focused on various areas of environmental impact assessment including human health and ecological risk assessment, environmental forensics, environmental chemistry and risk analyses. I have specialized experience in the scientific and technical aspects of federal, state and

Exhibit "A1-2"

international regulatory programs pertaining to environmental protection, including the regulation of solid waste landfills, waste management technologies and environmental assessments. I have directed numerous projects involving environmental chemistry, regulatory affairs and risk assessment, among many other topics. My research interests include the behavior of complex mixtures in the environment, application of quantitative tools of environmental health management and evaluation, and mathematical modeling for risk management decision making. I have performed human health risk assessments, public health evaluations and epidemiologic studies at a variety of municipal solid waste management operations including landfills. This work has included assessments of odor, and exposure to products of incomplete combustion of landfill gas. I developed and taught courses on exposure assessments and risk characterization to various government agencies including the U.S. Environmental Protection Agency, the U.S. Air Force and California Department of Health Services. I have presented numerous lectures on risk assessment to various groups including at the University of California, Rutgers University, Pace University Law School and George Mason University.

2. I earned a Bachelor of Science Degree in Chemistry from the University of California at Berkeley; a Masters in Science Degree in Environmental Science from Drexel University, and a Ph.D. in Environmental Engineering and Science from Drexel. As an Assistant Professor of Environmental Chemistry at Vassar College, I developed and taught classes in environmental chemistry. I have served in senior leadership/supervisory positions at several national recognized environmental consulting firms including as the Director of Environment, Health & Safety programs at The Weinberg Group; Vice President and Senior Science Advisor at

ICF Clement; and Senior Scientist at EA Engineering, Science & Technology. I am active in numerous professional societies and expert panels and have authored over 130 publications or presentations in the environmental field. I have also served and been qualified as an expert witness to testify about a range of environmental matters. A copy of my *curriculum vitae* is attached as Exhibit 1 hereto.

  **3.** Any analysis of the impacts that a potential source of contamination such as the Jefferson Parish Landfill has or may have on human health and the environment, involves four stages – hazard identification, exposure assessment, dose-response quantification, and risk characterization. A hazard is a property of a chemical substance that is associated with some type of adverse effect – toxicity, flammability, chemical reactivity, or odor. The hazard identification component of risk assessment involves detailed knowledge of chemical properties in addition to the use of measurements and mathematical modeling to determine the identity and amount of the hazardous chemical that may be present. Exposure assessment involves a qualitative and quantitative determination of a person's contact with a chemical hazard. Central to the field of environmental exposure assessment is an understanding of "environmental fate and transport" of chemical compounds – *i.e.,* how chemicals are released from a source, how chemicals behave, alone and in combination with each other, as they move through an environmental medium (air, water, or soil) once released into the environment from their original source, and how they come into contact with an exposed person. As chemicals are transported through the environment, they may undergo a variety of changes, including changes in their concentration, chemical structure

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

and toxicity. They may combine with other chemicals to form new compounds. They may become more or less concentrated.

**4.** Thus, to understand, for example, how the emissions of gases from a landfill might affect humans or the environment at other locations, it is necessary to have an understanding of (1) what and how much is being emitted directly from the landfill – the nature, composition, and concentrations of chemical compounds – (2) the environmental fate of those chemicals as they are transported through an environmental medium ( air, soil or water) to a particular receptor; and (3) the resulting levels of exposure and corresponding impacts/ risk of harm posed to that receptor. Human exposure to a given compound in the environment depends on a complex combination of factors including the nature of the chemical itself, the physical and chemical characteristics of the environmental medium and the complex chemical and physical interactions between the two.

### Landfill Gas

5. Landfill gases ("LFG") may consist of hundreds, if not thousands, of components. Some of these originate within the waste itself while others are products of complex biological and chemical processes that occur in a typical municipal solid waste ("MSW") landfill like the Jefferson Parish Landfill. Still other components may be products of incomplete combustion ("PICs") created by the flaring of landfill gases. The major constituents of landfill gas are methane, carbon monoxide, carbon dioxide, oxygen and nitrogen fixed gases. In addition, LFG typical includes potential toxicants and odorants that may be divided into several large chemical classes – volatile organic chemicals ("VOCs"), reduced sulfur compounds, reduced nitrogen compounds,

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

low molecular weight carboxylic acids, carbonyl compounds (aldehydes and ketones), metals/metalloids, terpenes and siloxanes among others[1]. PICs resulting from operation of a landfill gas flare may include hydrogen chloride, oxides of nitrogen and sulfur as well as polycyclic aromatic hydrocarbons ("PAHs") and polychlorinated dibenzodioxins and furans ("dioxin/furans")[2]. Toxic constituents may be found in LFG condensate and landfill leachate including semi-volatile organic compounds ("SVOCs") such as 1,4-dioxane. LFG condensate is formed from liquids that are carried by LFG and deposited usually due to pressure and temperature differentials. Leachate is the liquid that is generated by water in a landfill – either rainwater or water present in the waste. The Jefferson parish Landfill reportedly combines its LFG condensate and leachate.

6. LFG can be released into the ambient air through several different mechanisms, including: (a) directly from and across the surface of the landfill where landfill cover is either non-existent or does not completely suppress the gases; (b) pumps, piping, and related systems

---

[1] EPA 2007. Field Test Measurements at Five Municipal Solid Waste Landfills with Landfill Gas Control Technology. EPA/600/R-07/043; EPA 2008. Background Information for Updating AP42 Section 2.4 for Estimating Emissions from Municipal Solid Waste Landfills EPA/600/R-08-116; U.S. Army Corps of Engineers 2013 Landfill Gas Collection and Treatment Systems. EM 200-1-22; B.F. Staley et al. 2006. Release of Trace Organic Compounds during the Decomposition of Municipal Solid Waste Components. Environ. Sci. Technol. DOI10.102/es060786m. B. Eklund et al. 1998. Characterization of Landfill Gas Composition at the Fresh Kills Municipal Solid Waste Landfill Environ. Sci. technol. 32:2233; M. Schweigkofler & Reinhard Niessner. 1999. Determination of Siloxanes and VOC in Landfill Gas and Sewage Gas by Canister Sampling and GC-MS/AES Analysis. Environ Sci Technol. 33:3680.
[2] EPA 2007, op. cit.; EPA 2008 op. cit.;M. Palmiotto, et al. 2014.Influence of a municipal solid waste landfill in the surrounding environment: Toxicological risk and odor nuisance effects. Environ Intl. 68:16.

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

designed to capture and contain LFG may be inadequately designed, maintained or operated and thus allow uncontrolled releases of LFG from those LFG collection systems; (c) landfill gas may migrate outside of the landfill through the subsurface environment either in the vapor or dissolved phase; and (d) landfills may undertake controlled burning, or flaring, or other means of disposal of landfill gases which can result in releases to the environment

7. After its release from a landfill, and as it travels through the air, LFG will undergo changes in the concentrations, structure, identity and toxicity of its chemical constituents, as well as in its odor characteristics and strength. As noted, where the gases travel and how their composition changes over distance and time is a complex function of numerous factors including both the nature and concentration of the chemicals when they are emitted at the landfill but also atmospheric conditions including wind speed and direction, barometric pressure, precipitation, sunlight, temperature and the chemical composition of the ambient air itself.

8. I have reviewed a number of documents and reports concerning the Jefferson Parish Landfill (the "Landfill"), as well as the results of air quality sampling that has been conducted in the communities surrounding the Landfill by the Louisiana Department of Environmental Quality ("DEQ"). These include:

>	a. Carlson Environmental Consultants ("Carlson"), Aug. 15, 2018, prepared for Jefferson Parish.
>	b. Golder Associate, Jan. 20, 2017, prepared for Jefferson Parish.
>	c. SCS Engineers, Inc., Oct. 24, 2018, prepared for counsel for Waste Connections US, Inc.)

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

6

   d. DEQ Mobile Air Monitoring (February, April and July 2018).

   e. Louisiana Department of Health (Oct. 25, 2018).

   f. Various documents publicly available on DEQ's website.

  9. From the publicly available documentation that I have been able to review, it appears there has been no comprehensive analysis of the LFG generated at the Jefferson Parish Landfill, nor of the identity, concentrations or toxicity of the chemical compounds released by the Landfill to which community residents have been exposed in the past. In particular, I have been unable to find any measurements of chemicals in the landfill gas itself, the landfill gas condensate or leachate, or of emissions in the inlet or exhaust from the flare. The same is true with respect to the nature and intensity of odors released by the Landfill. According to the public reports:

   a. The DEQ conducted continuous hourly air sampling of a limited subset of chemical compounds typically found in LFG at a single location, the Riverside Baptist Church in River Ridge on three occasions: February 19 – 23, 2018; April 27-May 2, 2018; and July 20 – July 25, 2018.

   b. The DEQ collected continuous hourly air sample readings at a second location, at the corner of Dandelion Drive and River Road, in Waggaman, from July 25 – July 27, 2018, again, for a limited subset of chemicals.

   c. The DEQ also collected a total of 14 individual, one-time "grab" samples at locations in Harahan, River Ridge, Westwego, Waggaman, and inside the Jefferson parish Landfill during the period April through August 2018. These

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

        samples were likewise analyzed for a limited subset of chemical compounds typically found in LFG.

    d. The DEQ also collected air grab samples downwind of the JP Landfill flare and at adjoining properties in October 2018. These samples were analyzed for a limited subset of chemicals typically found in LFG.

    e. The DEQ obtained a single air grab sample on July 20, 2018 from the levee at Wood resources. This sample was analyzed for a small subset of common air pollutants.

10. This limited sampling and analysis conducted by the DEQ is not nearly sufficient to determine the historical exposures of LFG experienced by the people residing in the neighborhoods near the Landfill. In addition to limitations associated with the parameters analyzed, the number, locations, frequency, duration and types of samples obtained by the DEQ were insufficient. Further, the sampling was not informed by standard practice such as air dispersion meteorology or statistically-based sampling concepts. The data do, however, provide cause for concern and further study.

11. The U.S. Environmental Protection Agency ("EPA") has published screening levels for numerous chemical compounds. These screening levels are used to help the agency and decision makers assess environmental and human health risk when there have been releases of hazardous substances into the environment[3]. Exceedance of a screening level means that further

---

[3] EPA November 2018. Risk Screening Levels—Generic Tables
https://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables

action is required, whether additional investigation or some remedial measures (or both), in order to ensure adequate protection of human health and the environment.

12. The limited air sampling and analysis conducted by the DEQ to date indicates that certain toxic chemicals typically found in LFG have been detected in the surrounding neighborhoods at levels exceeding EPA's chronic screening levels. These include acrolein; 1,2-dichlorethane; benzene; carbon tetrachloride; naphthalene; and hydrogen sulfide. Several other toxic compounds, including chloroform, are present at borderline levels and warrant confirmatory analysis.

13. Hydrogen sulfide ("H2S") is a signature constituent of LFG. Human exposure to hydrogen sulfide is associated with a variety of health effects, depending on the concentration and dose. These include headache, nausea, nasal lesions resulting in nosebleeds, neurological effects (including reversible unconsciousness), respiratory effects (including difficulty in breathing, pulmonary edema and exacerbation of existing asthma), and ocular effects including conjunctivitis. Cardiovascular, metabolic, and reproductive effects have been observed in people exposed to hydrogen sulfide at different concentrations and for different periods of exposure. Sufficiently high concentrations have resulted in incapacitation and death.

14. The other noted compounds are all multimodal toxicants – they are both potential human carcinogens and have other toxic effects. For example, benzene causes leukemia (cancer) and also has a non-cancer effect of aplastic anemia. 1,2 dichloroethane causes hemangiosarcoma (cancer) and liver damage. Further, in assessing cancer risk, it is not sufficient simply to measure the concentration of individual carcinogenic compounds. These compounds may combine to have

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

aggregate impacts; thus, the toxicological and odor impacts of individual chemicals may depend not just on their individual concentrations, but how they combine with others.

15. Of broader concern, however, is the fact that many of the chemical compounds commonly found in LFG *have not been tested for at all* at the Landfill site or in the community (based, at least, on the publicly available data that I have seen) or have not been tested adequately. These include toxic and odorous compounds as well as compounds that may act as tracers for the transport of LFG into the community.[4]

16. In addition, we do know that hydrogen sulfide gas is present at very large concentrations from the Landfill. Jefferson Parish's own consultant has documented releases of gases on the Landfill site that contain hydrogen sulfide at concentrations exceeding 2000 parts per million[5]. Exposure to hydrogen sulfide gas at these concentrations is highly toxic and potentially lethal[6]. Short of death, it is known to cause severe eye and lung irritation, olfactory paralysis, pulmonary edema, and sudden unconsciousness[7] It is therefore not surprising that the consultant recommended that Jefferson Parish "train all personnel and contractors on the dangers of H2S and develop procedures and recommended equipment to ensure personnel safety working in these

---

[4] DEQ reported some of these as "tentatively identified compounds," or "TICs", but a complete analysis of TICs including confirmatory methods was not performed.

[5] The measuring equipment used by Carlson had a range of up to 2,000 ppm. The exact upper concentration of hydrogen sulfide in this LFG has not been determined.

[6] ATSDR 2016. Toxicological Profile for Hydrogen Sulfide and Carbonyl Sulfide. U.S. Department of Health and Human Services, Public Health Service; National Research Council 2010. Acute Exposure Guidelines for Selected Airborne Chemicals. Volume 9. National Academies Press; T.L. Guidotti 2010. Hydrogen Sulfide: Advances in Understanding Human Toxicity. Intl Jour Toxicology. DOI: 10.1177/1091581810384882.

[7] Guidotti, op. cit.

areas." [Carlson at Page 23] Moreover, the DEQ documented concentrations of hydrogen sulfide in the surrounding community at concentrations as high as 170 parts per billion, which is certainly high enough to trigger concern and the need for more comprehensive sampling and analysis to ensure protection of human health.

**17.** I am aware of and have read the recent report prepared for the defendant Waste Connections Inc., the private operator of the Landfill, by SCS Engineers[8]. This document presented the results of a very limited survey of the Landfill and some off-site locations. Contrary to the Carlson and LDEQ studies, it concluded that measured concentrations of hydrogen sulfide at the Jefferson Parish Landfill were minimal and not detectable at off-site locations. The report also concluded that another source of hydrogen sulfide exists in the region, that odors were well managed at the Landfill, and that it was unlikely that the working face of the Landfill has been a cause of any off-site nuisance odor. But SCS did not sample landfill gas, soil gas, condensate, leachate, or flare emissions from the landfill. In addition, SCS did not obtain any operating data from the landfill gas collection system. Its measurements were limited to the use of a hand-held field measuring device for hydrogen sulfide. No samples were taken anywhere for analysis by standard methods and protocols, which are necessary for characterizing chemical exposures and sources. No quality assured odor sampling or measurement was performed in this survey. There was no apparent quality assurance/quality control for this survey and the document even lacked a detailed description of how the instrument was used. The data collected and analyzed by SCS

---

[8] I have not been able to review the appendices to this report as of December 19, 2018.

have very limited utility for determining the potential for odors or health effects associated with emissions at the Landfill. In fact, the data presented in the report even fail to substantiate the conclusions made by SCS.[9]

### Need for Immediate On-Site Data Collection

18. I am aware that there have been numerous community complaints concerning odors suspected to emanate from the Landfill, along with reported physical and health impacts. Government authorities including the United States Agency for Toxic Substance Disease Registry ("ATSDR") have concluded that odor itself can cause a variety of health-related impacts, including the kinds of effects complained of by petitioners in this case[10]. And as noted above, there is also legitimate cause for concern that petitioners (and other community residents) may have experienced exposure to specific chemical compounds contained in the Landfill gases at concentrations and frequency that, individually or in combination, could cause harm.

19. Theoretically, the best possible evidence to determine whether such exposures and harm have occurred would be actual air samples taken on a regular basis at each of petitioners' homes. This would provide real-time, first hand data as to exposure levels experienced by each petitioner on an acute and chronic basis. To determine whether the chemical exposures experienced at a given location in the community were the result of releases from the Landfill (as

---

[9] Despite these shortcomings, SCS presented data showing that 6 of 10 hydrogen sulfide measurements made in the community exceeded either a toxicological screening level, odor threshold, or both strongly indicating the need for further investigation.

[10] ATSDR 2017. "Are Environmental Odors Toxic?" Division of Community Health Investigation. February 2017.

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

opposed to some other source), one would also ideally have collected real-time data over the same period at the Landfill site itself that would measure the identity and concentration of chemicals released by the Landfill. Established scientific methods could then be used to confirm whether the exposures to specific populations emanated from the Landfill

20. In this case, however, we do not have comprehensive air sampling that measures the concentrations of chemicals to which petitioners and other subject populations have been exposed, nor do we have contemporaneous historical site-specific Landfill data concerning source emissions.

21. The next best method to determine historical exposure levels in the surrounding communities would be to conduct air quality modeling using the most currently available data. This modeling requires reliable data concerning the nature and concentration of the chemicals emitted at the Landfill -- "source emissions" data – from which the fate and transport of those chemicals, and thus the exposure levels at specific locations, at specific times could be calculated.

22. If conditions at the Landfill remained constant over time, source emissions data collected at any time would be sufficiently representative of past conditions to provide a reliable basis on which to model past exposure levels in the community. But Landfill conditions are not static; they are changing and may change significantly in the not too distant future, largely because Jefferson Parish is taking measures that are intended to remedy the uncontrolled release of LFG. The more time that elapses, the less reliable a foundation on-site source emissions data will provide to calculate exposure levels experienced by petitioners in the past. Therefore, in my opinion petitioners should be allowed to obtain access to the Landfill site as promptly as possible in order

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

to secure the most reliable source data available. In addition, it goes without saying that the more improvements the Parish makes to the design, operation and maintenance of the Landfill gas collection systems, the less opportunity petitioners will have to view for themselves the state of those systems as they existed historically. In short, the most relevant and helpful evidence will, in effect, increasingly disappear over time.

### Contours of On-Site Inspection and Sampling Plan

23. In light of what I have discussed above, I have developed the contours of a sampling and analysis plan that in my opinion should be carried out on the Landfill site as soon as possible to permit the collection of the most relevant source data presently available for purposes of determining historical exposures to Landfill gases and chemicals experienced by petitioners and other residents in the affected communities. The plan is intended to be tailored as narrowly as possible to meet these data collection needs, while minimizing the amount of time required on the Landfill site itself and therefore the interference with day-to-day Landfill operations. I would expect the plan would entail approximately two days on the Landfill site – the first day mainly for inspection and equipment setup, and the second to conduct sampling. The details and extent of this plan necessarily may change depending on what is discovered once access to the site is obtained and conditions are examined first-hand. (Necessarily, this plan assumes that once on-site, petitioners will be given adequate access to inspect the Landfill operations.) In any event, based on the publicly available information, the plan involves the following components:

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

- A list of chemicals to be analyzed has been developed, and is presented in Table 1 below, based on the literature concerning typical LFG composition and the sampling previously conducted by the DEQ. These analytes have been selected as representative odorants, toxicants, and for utility in chemical fingerprinting and source tracing based on my experience and knowledge in these fields. Standard published regulatory methods or their equivalent will be used for sampling and analysis.
- In addition to these individual chemical compounds, air samples will be taken at each sampling location to analyze for odor strength and characteristics. Standard methods exist to collect and analyze for odor strength[11].
- It appears that LFG should be sampled promptly at locations in what is known as Phase IVA of the Landfill, given Carlson's findings of extremely elevated levels of hydrogen sulfide and methane in this area.[12] The working assumption is that these locations also would yield the highest total concentrations of other LFG compounds; the highest readings will provide a

---

[11] St Croix 2003. "A Detailed Assessment of The Science and Technology of Odor Measurement". St. Croix Sensory, Inc. June 30, 2003.

[12] It is anticipated that samples would be taken from GW-524, GW-512, GW-502, GW-519 and GW-516. (Figure 1). Quality assurance samples will include a duplicate gas sample selected at random a ground level ambient air sample, and a blank. As noted, sample locations may need to be altered upon site access considering ongoing changes to the LFG collection system being implemented by the Parish. Carlson documented elevated levels of H2S and methane in other segments of the Landfill besides Phase IVA, but it is sufficient for the purposes for this narrowly tailored, preliminary investigation to focus on Phase IVA.

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

representative sample of LFG in Phase IVA while avoiding unnecessary duplication. A gas sample should also be taken at the inlet to the flare.

- Various operating parameters identified by Carlson will also be measured and recorded in field logs. These include field gas composition (methane, carbon dioxide, carbon monoxide, oxygen and nitrogen), gas temperature and flow rate, as well as static and system pressure. Atmospheric pressure in self-consistent units should also be recorded. Sampling personnel should also make note of any odors observed at the site, optimally including taking measurements of odor strength using established odor measurement techniques. Field logs will also include a photographic record of the sampling activities at the site.

- In addition, samples of flare gas should be taken while the flare is operating. These samples should be analyzed for dioxins/furans, polycyclic aromatic hydrocarbons, hydrogen chloride, and nitrogen oxides. If it is not possible to obtain site access while the flare is operating, the Parish should be required to conduct flare sampling and analysis for these extremely toxic compounds.

- Samples should also be taken of other media that may be components of exposure pathways. These include condensate/leachate samples from the

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

collection system in Phase IVA.[13] Two soil gas samples should also be taken immediately outside the active Landfill area near the northwest corner of Phase IVA (Figure13). Soil gas will be subject to the same analysis as LFG.

24. In my professional opinion, the sampling and analysis plan outlined above is appropriate tailored to obtain the most useful and reliable source-emissions, site-specific data presently available to allow petitioners to evaluate the composition, characteristics, concentrations, frequency and duration of exposure to landfill gases to which petitioners have historically been exposed.

Paul Chrostowski, Ph.D., QEP

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES

---

[13] Condensate will be analyzed by SW-846 methods for volatile organic chemicals (EPA 8260 + TICs), semi-volatile organic compounds (EPA 8270-TICs), metals (EPA 6020A), sulfide (EPA 9031) and cyanide (EPA 6020A).

The foregoing Affidavit was acknowledged, sworn to and subscribed to before me, the undersigned notary, by Paul C. Chrostowski, Ph.D., QEP, this 19 day of December, 2018.

_____
Notary Public

Sandy Idalia Turcios Granados
Notary Public - Maryland
Montgomery County
My Commission Expires on
August 1, 2021

My commission expires: August 01, 2021

[SEAL]

24th E-Filed: 12/20/2018 08:59:04 Case: 790369 Div:J Atty:035182 ELIZA JAMES



