

Megan R. Brillault
825 Third Avenue, 16th Floor
New York, NY 10022
+1.212.702.5414
mbrillault@bdlaw.com

April 1, 2024

**VIA PDF EMAIL: efile-Morgan@laed.uscourts.gov**

Honorable Susie Morgan
United States District Court for the Eastern District of Louisiana
500 Poydras Street
Room C322
New Orleans, LA  70130

> Re:  *Elias Jorge "George" Ictech-Bendeck v. Waste Connections Bayou, Inc., et al.,* No. 18-7889; c/w No. 18-8071, No. 18-8218, and No. 18-9312, Section "E" 5, United States District Court for the Eastern District of Louisiana*; and*
>
> *Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.,* No. 19 11133, Section "E" 5, United States District Court for the Eastern District of Louisiana

Dear Judge Morgan:

    We are writing on behalf of the Waste Connections Defendants, Jefferson Parish, and Aptim ("Defendants") in response to Plaintiffs' March 28, 2024 letter requesting a status conference concerning the scope of expert discovery. As an initial matter, given that Plaintiffs seem intent on requesting some sort of relief from the Court at the April 2, 2024 status conference, Defendants respectfully request that the status conference be conducted on the record in the presence of a court reporter. If the Court is unable to secure a court reporter, Defendants respectfully request that they be allowed to supply one.

    Plaintiffs waited nearly three weeks to raise their improper and premature objections to the scope of Defendants' expert reports, and did not previously raise this issue with Defendants. Plaintiffs' request for "guidance" is in effect an untimely and unfiled motion in limine seeking an off-the-record directive to prejudice Defendants' defense. Plaintiffs' request misrepresents numerous items, which are further addressed below.

**I.  The Court's prior Rule 702/*Daubert* ruling does not limit subsequent motions.**

    Plaintiffs seek a directive barring unspecified motions by Defendants under Federal Rule of Evidence 702, adverting to the Court's decisions on *Daubert* motions made before the general causation bench trial. Plaintiffs overlook, however, that the Court's rulings during general causation rested on the grounds that the Court's gatekeeping role under Rule 702 was "diminished



April 1, 2024
Page 2

in a bench trial," and noted that the purpose of Rule 702 and *Daubert* was to protect jury trials by ensuring that "only reliable and relevant expert testimony is presented to the jury."[1] The Fifth Circuit and courts in this district have categorically adopted this principle, *i.e.* that Rule 702/*Daubert* motions are subject to heightened scrutiny in jury trials.[2] The Court's finding that Rule 702's safeguards were not essential during the general causation bench trial should therefore not bar subsequent motions for the *Addison* jury trial, particularly since all parties' experts have expanded their analyses and opinions to address specific causation to the 13 trial Plaintiffs.

## II. The Court's general causation ruling did not establish specific causation.

The Court's general causation ruling determined "whether odors and gases were being emitted by the Jefferson Parish Landfill during the relevant time period and whether any such odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs in this case."[3] The general causation inquiry was limited to whether emissions from the Jefferson Parish Landfill were *capable* of causing Plaintiffs' alleged injuries. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). In holding that "the exposure at which people generally are able to smell hydrogen sulfide and which is capable of causing a reaction in those exposed is an average exposure over a thirty-minute period of at least 5 ppb," the Court did not find that emissions from the Jefferson Parish Landfill in fact *caused* any particular Plaintiffs' injury.[4] Moreover, at Plaintiffs' urging, the Court found Plaintiffs had established general causation for any one Plaintiff without considering the geographic extent of the alleged impacts.[5]

While Defendants reserved their objections to the general causation determination, Defendants are not seeking to relitigate the ruling. In reaching the general causation determination, the Court did not adopt or rely on the opinions proffered by Plaintiffs' experts who estimated generation, emissions, and dispersion of gas from the Jefferson Parish Landfill: Dr. Pietari, Mr.

---

[1] *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, 2021 WL 5177827, at *3 (E.D. La. Nov. 8, 2021) (Morgan, J.) ("'[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.'").

[2] The Fifth Circuit recognizes that "the trial court's gatekeeper role is significantly diminished in bench trials … because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partn. v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Matter of Magnolia Fleet, LLC*, 2023 WL 6293979, at *2 (E.D. La. Sept. 27, 2023) (Fallon, J.) ("Courts recognize that *Daubert* factors may be less stringently applied in the non-jury trials and a judge sitting as trier of fact may consider expert evidence that it might not otherwise permit a jury to consider."); *Talley v. U.S.*, 2023 WL 2881293, at *3 (E.D. La. Mar. 16, 2023) (Morgan, J.) (same, quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).

[3] *Ictech-Bendeck*, 18-cv-07889, R. Doc. 285 at 4; *Addison*, 19-cv-11133, R. Doc. 323 at 4.

[4] *Id.* at 31.

[5] *Id.* at 42 ("General causation asks whether exposure to a substance causes harm to *anyone*") (emphasis added).



April 1, 2024
Page 3

Sananes, or Mr. Lape.[6] Likewise, the Court did not adopt the opinions of Defendants' experts on the same issues. Plaintiffs' letter obscures this fact by stating that "[i]mplicit in [the general causation] ruling was the fact that odors and gases were being emitted, and that ruling was based upon testimony of experts on both sides, whose qualifications and methodologies were found by the Court to be sufficient." Pls. Letter at 2. But the Court's findings regarding emissions were not based on expert testimony, but on the testimony of fact witnesses and exhibits prepared by LDEQ and non-testifying consultants to the Parish.[7]

Whether any particular Plaintiff was in fact exposed to emissions from the Jefferson Parish Landfill and whether the duration, frequency, and concentration of exposure was sufficient to cause their alleged injuries was left for specific causation for determination by the trier of fact. Plaintiffs therefore have no basis to seek to limit the defense experts' opinions with respect to specific causation, and any limitation on Defendants' ability to maintain a defense on these claims would be highly prejudicial.

### III. Defendants' expert reports are proper in scope.

While Plaintiffs seek to bar Defendants' Rule 702/*Daubert* motions for existing experts, Plaintiffs then ask the Court to informally exclude the opinions and analyses of almost every defense expert—grossly mischaracterizing the defense experts' opinions in the process.[8]

Plaintiffs misrepresent the opinions of Defendants' joint landfill engineering expert, Matthew Stutz. Plaintiffs erroneously claim that Mr. Stutz "has re-run the LandGEM" model, a topic on which "Mr. Stutz had previously opined." Pls. Letter at 2. In his general causation report and testimony, Mr. Stutz did **not** use the LandGEM model—rather, he explained errors in Plaintiffs' experts' use of the LandGEM model. In his specific causation report, for the first time, Mr. Stutz presents the results of the LandGEM model for the three adjacent landfills in Jefferson Parish: River Birch, Jefferson Parish, and Hwy-90 Construction & Demolition Debris landfills. Mr. Stutz does not contend that any new fact was the basis for this modeling.

Plaintiffs' letter also baldly misrepresents the results of Mr. Stutz's emissions modeling by saying he used "multiple different inputs that show minimal outputs of $H_2S$ emissions that could not travel off site." *Id.* This is false. In fact, Mr. Stutz's modeled emissions did travel off of the Jefferson Parish Landfill, as shown by Defendants' expert Dr. Paolo Zannetti. Dr. Zannetti modeled the dispersion of Mr. Stutz's estimated emissions to the Plaintiffs' residences. Mr.

---

[6] *Id.* at 5-42.

[7] *Id.* at 5-27.

[8] Plaintiffs omit that they have introduced two new experts—Dr. Michael Spodak and Dr. Robert DeLorenzo—in an attempt to back door physical injuries that were specifically precluded by the Court's general causation determination. Defendants' arguments with respect to these improper opinions will be raised in the proper forum—pre-trial motion practice.

Case 2:18-cv-07889-SM-MBN   Document 424   Filed 04/01/24   Page 4 of 7



April 1, 2024
Page 4

Zannetti showed when and how often $H_2S$ from the Jefferson Parish Landfill was modeled to exceed the Court's 5 ppb/30 minute reference level at the Plaintiffs' locations in voluminous charts appended to his report.

Plaintiffs next cherry pick language from the reports of defense experts John Kind (toxicologist) and Pam Dalton (psychology), misstating the conclusions they reach in their reports in an attempt to preclude Defendants from challenging specific causation. Drs. Kind and Dalton provide opinions as to each of 13 trial Plaintiffs by applying the Court's *general causation* ruling to the question of *specific causation* (and for the proposed class, assessing whether specific causation could be determined on a class-wide basis). The Court's general causation ruling determined that exposure to $H_2S$ at a 30-minute average concentration of 5 ppb was *capable* of causing injuries to at least one of the Plaintiffs. In contrast, the upcoming specific causation trial will address whether this exposure indeed occurred, and if so, whether it was the *likely* cause of any injuries suffered by the trial Plaintiffs. In addressing this question, it is certainly appropriate for the jury to weigh the evidence on the 5 ppb threshold, including whether exposure to $H_2S$ at that concentration is *likely* to cause injury. For example, the general causation testimony of Plaintiffs' expert Dr. Susan Schiffman was based, at least in part, on the WHO's reference level of an average 30-minute exposure of 5 ppb $H_2S$, and as explained in the reports, the WHO defined that annoyance level as one at which less than 5% of the population would be annoyed less than 2% of the time. In her January 28, 2024 report, Dr. Schiffman reiterates and expands on her opinions regarding the level at which $H_2S$ can cause annoyance and other impacts, and identifies the number of instances that the trial Plaintiffs were purportedly exposed to $H_2S$ at levels ranging from 0.7 ppb to 25 ppb. When Defendants present their defense on whether it is *likely* that 5 ppb of $H_2S$ (or the other levels that Dr. Schiffman discusses in her 2024 report) caused the trial Plaintiffs' injuries, certainly they will be entitled to inform the jury on what these levels do and do not represent and to rebut Dr. Schiffman's opinions.

Thus, in their specific causation reports, the defense experts discuss whether the evidence supports the notion that each of the trial Plaintiffs (and putative class members), more likely than not, could detect, recognize, and be annoyed by 5 ppb of $H_2S$. Dr. Kind and Dr. Dalton opine that, even if 5 ppb of $H_2S$ is *capable* of causing the complained-of injuries, it is not the most *likely* cause of any injuries suffered (and that such determination could not be made on a class-wide basis). Dr. Zannetti similarly reached an opinion on whether 5 ppb is a suitable reference level for the nuisance injuries Plaintiffs complain of. These opinions do not relitigate whether an average 30-minute exposure of 5 ppb $H_2S$ is *capable* of causing a nuisance for any one Plaintiff, and instead directly address whether specific causation has been established for, i.e., whether such exposure did in fact cause injuries of, the 13 trial Plaintiffs.[9] This case did not end with the general causation determination, and Defendants must be allowed to present a defense on specific causation—and

---

[9] Dr. Schiffman recognizes that $H_2S$ reference levels above 5 ppb are relevant to the specific causation inquiry, including a table of predicted impacts at several concentrations above 5 ppb in her expert report. Expert Report of Dr. Susan Schiffman, January 28, 2024, Tables 2a–2c.



April 1, 2024
Page 5

such defense must necessarily include a discussion on the *likelihood* that the alleged exposure caused injuries to the trial Plaintiffs.

Finally, Plaintiffs overstate the scope of Dr. Zannetti's criticisms of Mr. Lape's methodology in his 2021 report and at the general causation trial. Dr. Zannetti has never opined that the use of CALPUFF was inappropriate for this project and has previously testified that "I have no objection to other experts using another model like CALPUFF. They [AERMOD and CALPUFF] are both well accepted in the communities." Dr. Zannetti's criticisms of Mr. Lape in 2021 and in his specific causation report also primarily focus on criticizing the *results* of Mr. Lape's modeling, and the fact that his results are inconsistent with available real-world measurements. If anything, Dr. Zannetti's adoption of Mr. Lape's modeling methodology has streamlined the issues for both parties, the Court, and the jury—far from the "scorched earth" tactics Plaintiffs allege.

**IV.  Deposition of Chris Ruane.**

During his March 11, 2024 deposition, after approximately 30 minutes of gentle questioning by *Ictech-Bendeck* counsel Douglas Hammel on basic employment background, Mr. Ruane experienced a hypertensive emergency that potentially put his life at risk and required immediate adjournment of the deposition, after which Mr. Ruane presented to his cardiologist. Mr. Ruane is a former Waste Connections employee who retired in 2022 because of his chronic hypertension. It is disappointing that Mr. Rowe, who was not present in person at the deposition, has treated this frightening event so flippantly, writing to the Court that "we have not yet been provided with medical information to substantiate the claim" and writing that Plaintiffs "need" the deposition to be reconvened.

The substantiation of Mr. Ruane's "claim" is his personal blood pressure monitor which he utilized at the deposition. At 10:36 a.m. on March 11, immediately after adjourning for a break, Mr. Ruane's monitor gave a reading of 258/111. After a few minutes, his monitor gave a reading of 215/111. At 10:53 a.m., seventeen minutes into the break and after taking a walk outside, his monitor gave a reading of 219/107. According to Mr. Ruane, these are "stroke level" blood pressure readings, which is substantiated by the American Heart Association and numerous other authorities.[10]

---

[10] *See* American Heart Association, "Hypertensive Crisis: When You Should Call 911 for High Blood Pressure" ("A hypertensive, or high blood pressure, crisis is when blood pressure rises quickly and severely with readings of 180/120 mm Hg or greater. The consequences of uncontrolled blood pressure in this range can be severe and include [stroke, heart attack, etc.]." Available at: https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings/hypertensive-crisis-when-you-should-call-911-for-high-blood-pressure (accessed at March 30, 2024)



April 1, 2024
Page 6

Mr. Rowe is aware of these facts, because Mr. Mims recited them on the record at the deposition.[11] Prior to the deposition, Mr. Mims advised Plaintiffs that Mr. Ruane suffered from chronic hypertension and had been advised by his cardiologist to avoid stressful activities. While Mr. Ruane was willing to give the deposition a try, the resulting hypertensive emergency clearly indicated that was a mistake. Mr. Mims has repeatedly advised Plaintiffs that Mr. Ruane's cardiologist was in the process of writing a letter to Mr. Mims with guidance on safe, alternative methods by which Plaintiffs may obtain Mr. Ruane's testimony.

Today, April 1, 2024, Mr. Mims received a letter from Mr. Ruane's cardiologist, Jay Kalan M.D.[12] In the letter, Dr. Kalan notes that, even with medication, Mr. Ruane's hypertension is "poorly controlled" in stressful situations. Dr. Kalan "strongly recommend[s]" that Mr. Ruane avoid stressful situations, and he advises "it would be better for his health to be deposed by written questions, rather than in-person or video deposition." The Waste Connections Defendants have not yet had an opportunity to discuss Dr. Kalan's proposal with Plaintiffs, but will promptly do so. In any event, the Waste Connections Defendants will not agree to any deposition format for Mr. Ruane that would create an unreasonable risk of stroke or other significant injury.

**V. Designation of Bishow Shaha.**

Plaintiffs assert that Dr. Shaha's opinions "differ" from those offered by Mr. Marshall during the general causation phase, though Plaintiffs do not identify the opinions they believe are different. Both reports rebut the opinions in the reports of Plaintiffs' expert Dr. Pietari, and neither report advances affirmative opinions of modeled gas generation. In a status conference before Dr. Pietari's specific causation report was served, Defendants agreed that the scope of Dr. Shaha's report would not exceed the scope of Mr. Marshall's report. However, in the pending motion to uphold the designation of Dr. Shaha, Defendants also noted that they could not "guarantee that any expert of theirs will give the same scope of testimony as that given by Mr. Marshall during the general causation hearing," since Dr. Pietari's specific causation report had not been served.

After reviewing Dr. Pietari's specific causation report, Dr. Shaha independently reached the same conclusions and opinions as Mr. Marshall regarding the problems with Dr. Pietari's modeling. Defendants are not aware of any substantive difference between Mr. Shaha's opinions and the bases for those opinions, and those of Mr. Marshall. Dr. Shaha's opinions are organized differently than Mr. Marshall's, but it is not unexpected that two people would differently organize rebuttal opinions on a complicated modeling exercise. In addition, Dr. Pietari's specific causation report discusses new spent lime sampling results that she did not address in her general causation

---

[11] *See* Exhibit A, excerpts of deposition transcript of Chris Ruane.

[12] A copy of the letter will be separately provided to the Court and the parties. Although the letter is dated May 12, 2024, the Waste Connections Defendants did not receive the letter until today.

Case 2:18-cv-07889-SM-MBN   Document 424   Filed 04/01/24   Page 7 of 7



April 1, 2024
Page 7

report, and Dr. Shaha addresses that new discussion. Mr. Marshall addressed the issue of the lime's sulfate content, but obviously did not address the new data that Dr. Pietari raised.

Plaintiffs also question whether Mr. Marshall's health conditions warrant Defendants' designation of Dr. Shaha, asserting that he has co-authored two published articles. Mr. Marshall submitted a declaration with Defendants' motion to uphold Dr. Shaha's designation, explaining that he had experienced complications in treatment after surgery for prostate cancer, and that he was not confident that he could continue to serve as an expert witness. Serving as a co-author on an article is not as stressful nor demanding as preparing an expert report, submitting to deposition, and testifying at trial, all on the CMO's aggressive trial timetable. Moreover, experts in this case must be committed to appear at trials of the remaining *Addison* plaintiffs after the trial of the initial 13 trial Plaintiffs. Mr. Marshall was not confident he could commit to that role, and Defendants retained and designated Dr. Shaha within the Court's timelines. Plaintiffs' attempt to disrupt Defendants' designation of Dr. Shaha should not be entertained.[13]

## CONCLUSION

Plaintiffs' improper request for an informal directive to significantly limit the scope of Defendants' expert opinions is premature, would result in significant prejudice, and openly seeks to impair Defendants' defense. Plaintiffs will have the opportunity to challenge the defense experts in Rule 702/*Daubert* motions at the appropriate time; their current request is an effort to accomplish the same without briefing on the record. Defendants respectfully request the Court reject Plaintiffs' request and defer this issue to the agreed upon schedule for pre-trial motions.

Thank you for your attention to this matter and please do not hesitate to reach out with any questions.

Sincerely,

Megan R. Brillault
Counsel for the Waste Connections Defendants

---

[13] It is also worth noting that Plaintiffs did not provide, and Defendants did not demand, proof that Plaintiffs' expert Nestor Soler was unable to continue as Plaintiffs' landfill engineering expert for the general causation trial, when Plaintiffs substituted Mr. Jose Sananes. Mr. Soler apparently continues his vigorous engineering practice: https://www.ramboll.com/contact-us/people/6a57c447-7853-4d5d-b9c8-d67e7815238c.