Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ELIAS JORGE "GEORGE" ICTECH-BENDECK | CIVIL ACTION NO. 18-7889 c/w 18-8071, 18-8218, 18-9312 |
| VERSUS | SECTION: "E" (5) |
| WASTE CONNECTIONS BAYOU, INC., ET AL. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

GREG RIGAMER,

TAKEN AT THE LAW OFFICES OF LISKOW & LEWIS, APLC,

701 POYDRAS STREET, SUITE 5000, NEW ORLEANS, LOUISIANA

70139, ON WEDNESDAY, THE 17TH DAY OF APRIL, 2024,

COMMENCING AT 1:06 P.M.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

Reported by:

    YOLANDA J. PENA, Certified
    Court Reporter No. 2017002
    in and for the State of
    Louisiana

EXHIBIT 18

```
                                                              Page 2
 1                     A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4       HAMMEL LAW FIRM
         (BY:  DOUGLAS S. HAMMEL, ESQ.)
 5       3129 BORE STREET
         METAIRIE, LOUISIANA  70001
 6       (504) 304-9952
         douglashammel@gmail.com
 7
                 - AND -
 8
         LAW OFFICE OF BRUCE C. BETZER
 9       (BY:  BRUCE C. BETZER, ESQ.) [VIA ZOOM]
         3129 BORE STREET
10       METAIRIE, LOUISIANA  70001
         (504) 832-9942
11       bruce@brucebetzer.com

12
     FOR APTIM CORPORATION:
13
         GIEGER, LABORDE & LAPEROUSE, L.L.C.
14       (BY:  JOHN E. W. BAAY II, ESQ.) [VIA ZOOM]
         701 POYDRAS STREET, SUITE 4800
15       NEW ORLEANS, LOUISIANA  70139
         (504) 561-0400
16       jbaay@glllaw.com

17
     FOR JEFFERSON PARISH:
18
         CONNICK & CONNICK, LLC
19       (BY:  MICHAEL S. FUTRELL, ESQ.) [VIA ZOOM]
         (BY:  MATTHEW D. MOGHIS, ESQ.) [VIA ZOOM]
20       3421 N. CAUSEWAY BLVD., SUITE 408
         METAIRIE, LOUISIANA  70002
21       (504) 681-6663
         mfutrell@connicklaw.com
22       moghis@connicklaw.com

23

24

25
```

```
 1              A P P E A R A N C E S (Continued)

 2


 3    FOR THE WASTE CONNECTIONS DEFENDANTS:

 4        BEVERIDGE & DIAMOND, P.C.
          (BY:  KATRINA M. KREBS, ESQ.)
 5        825 THIRD AVENUE, 16TH FLOOR
          NEW YORK, NEW YORK  10022
 6        (212) 702-5400
          kkrebs@bdlaw.com
 7
                  - AND -
 8
          LISKOW & LEWIS, APLC
 9        (BY:  MICHAEL C. MIMS, ESQ.)
          (BY:  CHERRELL SIMMS TAPLIN, ESQ.) [VIA ZOOM]
10        701 POYDRAS STREET, SUITE 5000
          NEW ORLEANS, LOUISIANA  70139
11        (504) 581-7979
          mmims@liskow.com
12        cstaplin@liskow.com

13
      ALSO PRESENT:
14
          ALBERT BONGARD, VIDEOGRAPHER
15

16

17

18

19

20

21

22

23

24

25
```

```
                                                    Page 4
 1                      I N D E X
 2
                                                    PAGE
 3
      LIST OF EXHIBITS....................................5
 4
      STIPULATION.........................................6
 5
      EXAMINATION BY:
 6
           MS. KREBS......................................8
 7
           MR. HAMMEL....................................78
 8
      REPORTER'S PAGE....................................84
 9
      REPORTER'S CERTIFICATE.............................85
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                                  Page 5
 1                       LIST OF EXHIBITS

 2                                                                  PAGE

 3      Exhibit No. 1.................................... 9
            (Notice of deposition)
 4
        Exhibit No. 2....................................14
 5          (Resume of Mr. Rigamer)

 6      Exhibit No. 3....................................26
            (Expert Advisory Services
 7           Case List)

 8      Exhibit No. 4....................................46
            (Expert report of Mr. Rigamer)
 9
        Exhibit No. 5....................................50
10          (Resume of Mr. Poche)

11      Exhibit No. 6....................................56
            (Map of Class Definition
12           Area)

13      Exhibit No. 7....................................61
            (Map of Class Definition
14           Area)

15      Exhibit No. 8....................................62
            (2010 Census)
16
        Exhibit No. 9....................................64
17          (Map of Class Definition
             Area)
18
        Exhibit No. 10...................................66
19          (Map of Class Definition
             Area)
20

21

22

23

24

25

```
 1        A.   Did not.
 2        Q.   Okay.  Did you bring any documents with you
 3   today?
 4        A.   I brought my computer.
 5        Q.   Okay.  Okay.  I would like to now show you a
 6   document that was identified as Exhibit 1 to your
 7   expert reports.
 8             MS. KREBS:  And I am going to mark this
 9        as Rigamer 2.
10       (Rigamer No. 2 was marked for identification.)
11             MR. HAMMEL:  Thank you.
12   BY MS. KREBS:
13        Q.   Do you recognize this document?
14        A.   I do.
15        Q.   Okay.  Is this your resume?
16        A.   Yes.
17        Q.   Okay.  Is this the most recent version of your
18   resume?
19        A.   Yes.
20        Q.   Okay.  Is there anything that needs to be
21   updated?
22        A.   Not that I'm aware of.
23        Q.   Okay.  So you received a bachelor of arts
24   degree in philosophy from Louisiana State University in
25   1971, correct?
```

1       A.    Mid-January, end of January.

2       Q.    Okay.

3       A.    2024.

4             MS. KREBS:  All right.  I'm going to

5       mark this as Rigamer 4.

6    (Rigamer No. 4 was marked for identification.)

7    BY MS. KREBS:

8       Q.    Is this the expert report that you issued in

9    this litigation?

10      A.    I believe there's another page.

11      Q.    Sorry.  Double-sided.

12      A.    Excuse me.  Excuse me.  Yes.

13      Q.    All right.  So --

14      A.    This looks like it, yes.

15      Q.    Looking at the front and back --

16      A.    Yes.

17      Q.    -- is this the expert report that you issued?

18      A.    Yes.

19      Q.    Okay.  Roughly speaking, how long did you

20   personally spend preparing your expert report?

21      A.    Two days.

22      Q.    What was your understanding of your assignment

23   in this litigation?

24      A.    To quantify the number of people in housing

25   units within the class area.

Page 54

1    Q.   Okay.  In preparing your opinions and drafting
2    your report in this case, did you consult with any
3    other experts in this litigation?
4    A.   No.
5    Q.   Okay.  Did you confer with any other experts
6    in this litigation as they drafted their opinions or
7    prepared their opinions in this case?
8    A.   Did not.
9    Q.   Did you consult with anyone else, apart from
10   Mr. Poche and your counsel, in preparing your opinions?
11   A.   Did not.
12   Q.   Okay.  Are all of your opinions included in
13   your February 1st report?
14   A.   All of them.
15   Q.   Okay.  Have any of your opinions changed since
16   your February 1st report?
17   A.   No.  This is really pretty straightforward
18   because the census is unequivocally the most reliable
19   source for such information.  Census information is
20   organized by block, and using GIS, you put all the
21   blocks that were within the perimeter together.  And I
22   believe your expert commented that they have the same
23   thing.  Now, they used an Esri tool, Esri Business
24   Analyst, for reporting, which is built on the census
25   data.  The difference is we used the census data

1 directly.

2 Q. Okay. Do you intend to supplement or amend

3 any of your opinions?

4 A. No.

5 Q. Okay. Are all of the documents and other

6 information you considered in preparing your opinions

7 specifically identified in your February 1st report?

8 A. Everything.

9 Q. Okay. Did you review any other documents

10 related to the litigation but not consider them in

11 preparing your report?

12 A. Did not.

13 Q. Okay. And then we talked about the Phillips

14 report earlier. Have you reviewed any other documents

15 since completing your February 1st report?

16 A. Have not.

17 Q. Okay.

18         MS. KREBS: All right. We can take a

19     quick break now.

20         THE VIDEOGRAPHER: We're going off the

21     record at 2:08 p.m.

22             (Recess taken.)

23         THE VIDEOGRAPHER: We're back on the

24     record at 2:24 p.m.

25 BY MS. KREBS:

Page 56

1    Q.   All right.  Mr. Rigamer, I understand you have
2    a clarification?
3    A.   I do.  Thank you.
4         Earlier, I mentioned the Katrina litigation
5    and the fairness ruling, and I misstated the judge's
6    name whose court it was in.  And I believe I said
7    Judge Huval.  It's correct -- should be Stanwood R.
8    Duval, D-u-v-a-l.  And the case was in 2009.  I think I
9    said it was 2008.
10   Q.   Okay.  Thank you.  I appreciate that.  Okay.
11        So we started to get into this before the
12   break.  But why did you rely on the 2010 and 2020
13   census demographic and housing characteristic files for
14   your report?
15   A.   Best information available.  And using the
16   2010 helps put it in perspective.  When Richard sent
17   the 2020 information to me, I suggested that we also
18   incorporate 2010 just to demonstrate that the area is
19   pretty static.
20             MS. KREBS:  I'm going to introduce this
21        as Rigamer 6.
22        (Rigamer No. 6 was marked for identification.)
23             MS. KREBS:  And I will note for the
24        record that the file name for this document
25        that was provided to us was "1 Jeff Class

```
                                                           Page 57
 1              Areas_2010 and 2020 Census Data."
 2   BY MS. KREBS:
 3       Q.   Is this one of the documents that's referenced
 4   on the second page of your report?
 5       A.   It is.
 6       Q.   Okay.  And this is where the census data was
 7   tabulated, correct?
 8       A.   This is the area for the census data.
 9       Q.   Okay.
10       A.   All the blocks contained within that perimeter
11   were included and tabulated.
12       Q.   Okay.  And the tabulation is shown in the
13   right column?
14       A.   The summation, yes.
15       Q.   Okay.  Can you walk me through what
16   information is summarized here in the right side of
17   this -- of Rigamer 6?
18       A.   Okay.  In 2020, the census reported the
19   population within the defined area is 76,510 people.
20   That was tabulation of all the blocks.  The subprimary
21   demographic information, that is typically included
22   with the primary census file relative to ethnicity and
23   race, number of housing units, the number of occupied
24   housing units, and the number of vacant units at the
25   time of the census.  The same information is presented
```

```
 1   for 2010 as a point of comparison, and then there's the
 2   20 -- the difference between 2020 and 20 -- 2010 at the
 3   bottom.
 4        Q.   Okay.  And the dotted line shown in the map
 5   on the left of that indicates the proposed class
 6   boundaries --
 7        A.   Yes.
 8        Q.   -- correct?  Okay.
 9             And the proposed class boundaries are the
10   boundaries identified in your expert report?
11        A.   Yes.
12        Q.   Okay.  What is the red shape on the map?
13        A.   Oh, that's just where the landfill is.
14        Q.   Okay.  What is considered an occupied unit for
15   purposes of the census data?
16        A.   A unit that has an occupant in it or could be
17   occupied.
18        Q.   So does it include apartments, housing, and --
19        A.   Oh, yes.
20        Q.   Okay.
21        A.   Yes.  Resid- -- excuse me.  Residential units.
22        Q.   Okay.  And it would exclude things like hotels
23   and other temporary accommodations?
24        A.   It would.
25        Q.   Okay.  Does a unit need to be occupied for a
```

```
                                                              Page 63
 1              document that I'm marking as Rigamer 8 is only
 2              the first tab of the spreadsheet that was
 3              provided, and the tab was named "Population By
 4              Place."
 5   BY MS. KREBS:
 6        Q.    Can you walk me through the data presented in
 7   this document?
 8        A.    With every block and the definition of block,
 9   there's a lot of information.  And so just to put it
10   into perspective, we not only tabulated it for the
11   entire class area, but we broke it down by
12   Eastbank/Westbank and also by community within Eastbank
13   and Westbank areas.
14        Q.    And this also compares the data between 2010
15   and 2020?
16        A.    Yes.
17        Q.    Okay.  So when data is presented in this
18   document for Metairie, the data is limited to those
19   areas in Metairie that are within the proposed class
20   area?
21        A.    Solely within the bounds of the class area.
22        Q.    Okay.  And the same for the other areas; they
23   would just be what's in the proposed --
24        A.    Correct.
25        Q.    -- class area?
```

Page 68

```
 1   is limited to the proposed class area, correct?
 2       A.   Correct, it is.
 3       Q.   And then to create this map, did -- well, let
 4   me rephrase the question.
 5            Did Mr. Poche or did you create this map?
 6       A.   Mr. Poche created the map.
 7       Q.   Okay.  Okay.  You can set these aside for now.
 8   I would like to take a look at the statement of
 9   findings and opinions in your expert report, which was
10   marked as Rigamer 4.
11            What do you mean when you say that your
12   opinions are made to a reasonable degree of scientific
13   certainty?
14       A.   It's the simple tabulation of information
15   published -- of data, excuse me, published by the U.S.
16   census.  There's no opinion.  It's simply a tabulation.
17       Q.   Okay.  And so specifically for the phrase of
18   "reasonable degree of scientific certainty," what is
19   your understanding of that phrase as used in your
20   report?
21            MR. HAMMEL:  Object to form.
22       A.   It's as good as you're going to get.
23   BY MS. KREBS:
24       Q.   What is the basis for your statement that the
25   total population and number of residential housing
```

Page 69

1  units in 2020 is a reasonably reliable estimate of the
2  proposed class area between July 2017 and
3  December 2019?
4      A.   As I mentioned earlier, you haven't had a
5  significant change in the population of the area, and
6  therefore, it's a good estimate of what it was at that
7  time.
8      Q.   Okay.
9      A.   There is no comparable data at the block level
10 for the interim periods.
11     Q.   Okay.  And why is it important to look at the
12 block level?
13     A.   It's the most accurate information.  It's
14 based on a physical count versus the American Community
15 Survey, which is a rolling survey done annually of a
16 small percentage of the area and then extrapolated to
17 represent the whole.
18     Q.   Okay.
19            (Brief interruption.)
20            MR. HAMMEL:  Sorry.
21 BY MS. KREBS:
22     Q.   With respect to the number of occupied housing
23 units in the proposed class area that you calculated
24 here, is it fair to say that the owners of the housing
25 units may not necessarily live in the proposed class

```
                                                          Page 80
 1   BY MR. HAMMEL:
 2        Q.   Certainly.  Did you review Mr. Phillips'
 3   report in order to determine whether or not he refuted
 4   your estimate of the population within the proposed
 5   class area?
 6        A.   Upon receipt of the report, I just went
 7   through -- control F, looked through the document, any
 8   time that "Rig" was men- -- "Rigamer" was mentioned, to
 9   see, okay, what -- what is he really saying.  But I
10   noted that he said we're essentially the same on -- on
11   the count.  I skimmed through the report yesterday in
12   preparation for this, just for general background
13   information, but I did not evaluate the report.
14        Q.   Okay.  And the -- I believe it's on page 40 of
15   Mr. Phillips' report where he indicates the total
16   parcel count to be 34,312.  Is that very close to the
17   estimate that you made in this case?
18        A.   I did not count parcels.
19        Q.   Okay.
20        A.   I simply counted people in housing units.
21        Q.   And his -- his estimate of people in housing
22   units, was that extremely close to your estimate?
23        A.   Very.
24        Q.   Very close.
25                  MR. HAMMEL:  And on the record, at this
```

Page 81

```
 1              point, I would offer a stipulation to the
 2              defendants that the numerosity of the proposed
 3              class area is sufficient in this case based on
 4              the defendants' expert report and his
 5              estimates of the number of people in the class
 6              area as well as Mr. Rigamer's estimate, which
 7              is within, I think, 300 people.  I would offer
 8              that stipulation on the record.
 9                   MR. MIMS:  I think we'll address that at
10              the appropriate time, but --
11                   MS. KREBS:  Yeah.
12                   MR. MIMS:  -- not right now.
13                   MR. HAMMEL:  No problem.  Just want to
14              put on the record that it has been offered.
15                   MR. MIMS:  Thank you.
16                   MR. HAMMEL:  Certainly.
17   BY MR. HAMMEL:
18        Q.   Mr. Rigamer, you were also asked -- I believe
19   Ms. Krebs asked you, "Would you ever file a lawsuit
20   against Jefferson Parish for odors?"  And I think your
21   response was, "Well, I live in Orleans Parish."
22             Is that accurate to your memory?
23        A.   I think that was the question, and I think
24   that was my response.
25        Q.   And then she said, "Would that be a no?"  And
```

Page 85

1    REPORTER'S CERTIFICATE

2        I, YOLANDA J. PENA, Certified Court Reporter in
     and for the State of Louisiana, Registered
3    Professional Reporter, and as the officer before whom
     this testimony was taken, do hereby certify that GREG
4    RIGAMER, after having been duly sworn by me upon
     authority of R.S. 37:2554, did testify as set forth in
5    the foregoing 84 pages.
         I further certify that said testimony was reported
6    by me in the Stenotype reporting method, was prepared
     and transcribed by me or under my direction and
7    supervision, and is a true and correct transcript to
     the best of my ability and understanding.
8        I further certify that the transcript has been
     prepared in compliance with transcript format
9    guidelines required by statute or by rules of the
     board and that I have been informed about the complete
10   arrangement, financial or otherwise, with the person
     or entity making arrangements for deposition services.
11       I further certify that I have acted in compliance
     with the prohibition on contractual relationships, as
12   defined by Louisiana Code of Civil Procedure Article
     1434, and in rules and advisory opinions of the board.
13       I further certify that I am not an attorney or
     counsel for any of the parties, that I am neither
14   related to nor employed by any attorney or counsel
     connected with this action, and that I have no
15   financial interest in the outcome of this matter.
         This certificate is valid only for this
16   transcript, accompanied by my digital signature or
     original signature and original raised seal on this
17   page.

18       Prairieville, Louisiana, this 19th day of April,
     2024.
19

20

21

22

23   _____
     YOLANDA J. PENA, CCR, RPR
     CCR NO. 2017002, RPR NO. 907346
24

25