## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** Plaintiff | **CIVIL ACTION** <br><br> **NO. 18-7889** <br> **c/w 18-8071,** <br> **18-8218, 18-9312** |
| **VERSUS** | |
| **PROGRESSIVE WASTE SOLUTIONS OF LA, INC., ET AL.,** Defendants | **SECTION: "E" (5)** <br><br> **JUDGE: Morgan** <br> **MAGISTRATE JUDGE: North** |
| *Applies to: All Cases* | |

---

### MEMORANDUM IN SUPPORT OF
### PLAINTIFFS' AMENDED MOTION TO CERTIFY CLASS

**NOW INTO COURT**, through undersigned counsel, come the named Putative Class Plaintiffs and Class Representatives, Elias Jorge "George" Ictech-Bendeck, Nicole M. Landry-Boudreaux, and Larry Bernard, Sr. and Mona Bernard, and the additionally identified Class Representatives, Phil Adams, Robyn Crossman, Kayla Anne Steele, Ann Williams, and Ophelia Walker, individually and on behalf of similarly situated individuals (hereinafter "Plaintiffs" and/or "Class Representative(s)"), who file this Memorandum in Support of their Amended Motion to Certify Class, to wit:

**MAY IT PLEASE THE COURT:**

Class certification is proper and should be granted. The FRCP 23 requirements are met. For nearly two and a half years, the emissions of hydrogen sulfide gas and other noxious odors from the Jefferson Parish Landfill ("Landfill") impacted an entire community for which Defendants are responsible under the same theories of recovery based upon the same evidence. This is a common issue of fact and law. The putative Class Representatives' claims are typical of

1

the claims of members of the putative class as their claims are based on the same source of emissions, and they assert the same legal theories for recovery. The putative class is so numerous as to make mass joinder an ineffective tool. And the proposed Class Representatives will fairly and adequately protect the interests of absent class members.

Moreover, there are common questions that "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). namely (1) Defendants' liability for the Landfill's noxious emissions from July 1, 2017 until December 31, 2019, (2) the allocation of fault among the Defendants, and (3) the geographic scope, frequency, duration, and concentrations of the impact of the Landfill's noxious emissions on the surrounding communities. These common questions predominate over any individual issues that may exist and certification is the superior procedural device to manage this case.

Class certification would result in a single trial on the predominant, common, and complex issues concerning Defendants' liability, allocation of fault, and the geographic scope, frequency, duration, and concentration of the Landfill's noxious emissions over the course of thirty (30) months. The determination of specific causation and the quantum of damages caused by Defendants' liability can be addressed in Phase Two of the proposed bifurcated trial plan discussed below. This litigation has been before this Honorable Court for more than five years, and the proposed class action's bifurcated trial plan affords the Court the mechanism needed to bring this case to resolution.

In the interest of justice, efficiency, and judicial economy, this proposed class action should be certified pursuant to Rule 23(b)(3) and/or Rule 23(c)(4).

I.    **FACTS**

This consolidated class action seeks nuisance damages caused by the hydrogen sulfide gas and other noxious odors emanating from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019.

Plaintiffs, individually and on behalf of all other similarly situated individuals, bring claims for violations of the obligations of neighborhood (i.e., nuisance) under Louisiana Civil Code articles 667-669 arising from the emission of noxious odors from the Landfill caused by Defendants' failure to properly maintain and operate the Landfill.[1] Defendants' (in)actions created the complained of conditions – pervasive and persistent emissions of noxious odors and subsequent hovering stench that caused Plaintiffs' annoyance and inconvenience that decreased their quality of life and interfered with and deprived them of the use and enjoyment of their properties from July 1, 2017 through December 31, 2019.

On November 29, 2022, this Honorable Court issued its Findings of Fact and Conclusions of Law as to general causation,[2] determining that odors and gases were emitted by the Landfill,[3] those emissions migrated off the Landfill site and into the surrounding areas,[4] those emissions and odors occurred during the relevant time period,[5] and exposure to the odors and gases emitted by the Landfill at a level of five ppb for thirty minutes was capable of producing the injuries claimed

---

[1] For all pertinent times, the Landfill has been owned by Jefferson Parish. Between May 2013 to December 2020, pursuant to contracts with the Parish, the Landfill was operated by Louisiana Regional Landfill Company, Inc. (f/k/a IESI LA Landfill Corporation), Waste Connections Bayou, Inc. (f/k/a Progressive Waste Solutions of LA, Inc.), and Waste Connections US, Inc. (collectively, "Waste Connections Defendants"). Aptim Corporation managed the gas collection systems of the Landfill from July 2017 to May 2019. Doc. 285 at p. 2.
[2] For the sake of brevity, Plaintiffs adopt and incorporate by reference the Court's Findings of Fact and Conclusions of Law. Doc. 285.
[3] Doc. 285 at p. 5.
[4] Doc. 285 at p. 20.
[5] Doc. 285 at p. 26.

by any one or more of the plaintiffs,[6] and specifically the decrease in the quality of daily life (i.e., annoyance and inconvenience), loss of use and enjoyment of their properties, and various adverse symptoms caused by the nuisance odor impacts (e.g., headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry.[7]

***The Class Representatives' Complaints Mirror the Proposed Class Members' Complaints***

This Honorable Court found that during the relevant time period Jefferson Parish residents made myriad formal and informal odor complaints consistent with landfill odors.[8] This Honorable Court concluded that "[t]he citizens uniformly experienced a bad odor, and the odors reported were consistent with hydrogen sulfide emitted by a landfill.[9] The Class Representatives' similar experiences with the Landfill's noxious odors are set forth in detail below.

## Elias Jorge "George" Ictech-Bendeck

Mr. Ictech-Bendeck experienced persistent odors at his River Ridge home between 2017 and 2019.[10] In 2017, he smelled the odors "two times a week, maybe three."[11] The frequency of odors increased in summer of 2018 to approximately 3 to 4 times per week which remained consistent throughout 2019.[12] He experienced the odors both inside and outside his house.[13] The frequency that his wife burned candles increased because of odors.[14]

He described the odor as "rotten egg with some... strong chemical-like smell" that was "pretty bad."[15] The odor "was always stronger in the evenings" and would persist all night to where

---

[6] Doc. 285 at p. 27.
[7] Doc. 285 at p. 35-42.
[8] Doc. 285 at p. 28-29.
[9] Doc. 285 at p. 29.
[10] Exhibit 1, Elias "Jorge" Ictech-Bendeck Deposition p. 117:25-118:11.
[11] Exhibit 1, p. 122:7-18.
[12] Exhibit 1, p. 123:8-124:2.
[13] Exhibit 1, p. 126:1-14.
[14] Exhibit 1, p. 149:7-16.
[15] Exhibit 1, p. 118:14-21.

"you could still smell it in the morning.[16] He was familiar with odors from the Harahan wastewater treatment plant and confirmed that the persistent odor he experienced was a different smell.[17]

The odors would wake him up in the middle of the night leading to sleep deprivation.[18] He also suffered from anxiety due to concerns over the potential health impacts of the odors.[19] He also suffered from intense headaches, nausea, loss of appetite, and dizziness.[20] The odors impacted his quality of life and use and enjoyment of his home, leading to him to stop barbequing, not using the pool, not using the patio, not gardening as much, and turning outdoor days into indoor days.[21] During the relevant time period, he was embarrassed to have people over to his home because of the odors.[22] When the odors got bad enough inside, he and his family went to his mother's house in Metairie to escape, which occurred six times.[23]

## Nicole M. Landry-Boudreaux

Prior to mid-2017, she had only experienced infrequent garbage odors at her Waggaman home that would "come and go."[24] Ms. Landry-Boudreaux started to smell persistent "rotten egg" odors around mid-2017, which continued and intensified through 2018 and 2019 until she stopped smelling them around 2020 when Covid hit.[25] The garbage smell she noticed prior to 2017 was not as bad as the rotten egg smell she began experiencing in mid-2017, which she described as "constant"  - several times during the week – and more "potent" which would not go away with

---

[16] Exhibit 1, p. 124:5-125:2.
[17] Exhibit 1, p. 152:13-24.
[18] Exhibit 1, p. 119:25-120:6, 124:11-16, 139:11-140:22, 155:25-156:4.
[19] Exhibit 1, p. 124:8-19, 138:22-139:6, 139:11-140:4, 143:12-24.
[20] Exhibit 1, p. 153:22-156:13.
[21] Exhibit 1, p. 103:13-104:9, 126:15-129:8, 152:3-12.
[22] Exhibit 1, p. 149:25-150:6.
[23] Exhibit 1, p. 129:10-21.
[24] Exhibit 2, Landry-Boudreaux Deposition, p. 86:4-87:20, 88:2-7.
[25] Exhibit 2, p. 86:1-3, 90:9-24, 92:1-14, 93:9-20, 98:22-99:8.

the wind like a garbage smell could.[26] At some point the odors got so bad that she called the Parish to come out.[27] Burning candles to cover the odors did not help.[28]

The odors caused her to have problems with both falling asleep and staying asleep, including numerous instances where the odors awakened her.[29] She also suffered from anxiety due to the odors.[30] Ms. Landry-Boudreaux also suffered from headaches and loss of appetite.[31] The odors impacted her quality of life and use and enjoyment of her home, leading to her think about moving.[32] She stopped frequenting Live Oak Park to exercise and meditate.[33] Other activities that were impacted included reading, barbequing, and spending time with her husband in the garage.[34] She was also embarrassed to have people over to her home because of the odors.[35] She recounted a Friday night family meet-and-greet she hosted at her home wherein she disclosed the ongoing odor issues to her guests so they would not think the smells were due to her poor housekeeping.[36]

**Larry Bernard, Sr.**

Mr. Bernard testified that he first started noticing the "rotten eggs" odor at his home in Harahan in "about 2016."[37] The odor got progressively worse and stronger throughout the years 2017, 2018, and 2019 until the odor "went away" sometime in 2019 or 2020.[38] Beginning in 2016, and through 2019, he recalled experiencing the odor "pretty often" or "almost every day" –

---

[26] Exhibit 2, p. 90:9-91:4, 92:5-14.
[27] Exhibit 2, p. 93:3-20.
[28] Exhibit 2, p. 93:12-20.
[29] Exhibit 2, p. 121:16-122:6, 144:21-145:13.
[30] Exhibit 2, p. 146:11-147:5.
[31] Exhibit 2, p. 147:6-20.
[32] Exhibit 2, p. 75:24-76:12.
[33] Exhibit 2, p. 41:15-42:23.
[34] Exhibit 2, p. 100:24-102:25.
[35] Exhibit 2, p. 103:9-22.
[36] Exhibit 2, p. 112:9-115:3.
[37] Exhibit 3, Larry Bernard Deposition, p. 72:17-23.
[38] Exhibit 3, p. 73:3-74:1.

6

sometimes upwards of 5 to 6 times per week – "in the morning especially, and mainly late at night."[39] He experienced the odors both inside and outside the home.[40]

The odors caused him to feel nauseous, and he has not felt that way since the "smell went away in 2020."[41] As far as impacting his activities, when the odors were present, "the smell was, you know, horrific back then, so I didn't go outside that much."[42] As a result of the odors, he stopped going in the backyard as much and grilled with his family less frequently.[43] He and his wife also stopped their frequent walks and bike rides on the levee due to the odors.[44]

## Mona Bernard

She recalls smelling the "horrible" odors at her Harahan home starting in 2017 then progressing.[45] "It just smelled like rotten eggs. Very unpleasant… Kind of like a garbage sulfur smell. Something. It's very nasty."[46] This odor was different, and something she had never smelled in the 40 years she had been living in her neighborhood.[47] The odors were strong throughout 2018 and 2019, but "started getting a little better" toward the end of 2019.[48] The odors were worse in the early morning hours and late at night.[49] She experienced odors both inside and outside the home in 2018 and 2019.[50] She did not remember smelling the odors since 2020.[51]

The odors caused Ms. Bernard to suffer from headaches and nausea three or four times per week during the relevant time period, which experiences ceased when the odors started going away

---

[39] Exhibit 3, p. 74:24-77:5.
[40] Exhibit 3, p. 76:15-21.
[41] Exhibit 3, p. 92:1-3, 92:23-93:6.
[42] Exhibit 3, p. 66:10-12.
[43] Exhibit 3, p. 52:1-53:22.
[44] Exhibit 3, p. 77:9-78:23.
[45] Exhibit 4, Mona Bernard Deposition, p. 11:9-12:8.
[46] Exhibit 4, p. 66:6-16.
[47] Exhibit 4, p. 66:17-22.
[48] Exhibit 4, p. 68:2-69:19.
[49] Exhibit 4, p. 70:20-23.
[50] Exhibit 4, p. 73:3-9.
[51] Exhibit 4, p. 71:2-6.

in 2020.[52] The odors also caused her anxiety: "it was real stressful because you were constantly worried. You didn't know what you were breathing. And sometimes it made my throat kind of dry, and it was scary worrying about your family."[53] She confirmed that during 2018-2019 they rode their bikes "maybe once a week. And that's if the smell wasn't so bad" but 2020 saw improvement in the frequency of their bike riding.[54] She also confirmed that their walking ceased sometime during 2018 due to the odors.[55] The odors caused them to use the patio with less frequency until the odors improved in 2020.[56] They also had less family cookouts.[57]

**Phil Adams**

In the summer of 2017 Mr. Adams first started experiencing the "occasional unique odors that [he had] never experienced before…" at this South Kenner residence which "became stronger and for longer durations thereafter."[58] Like the other proposed class representatives, he "tended to notice it more in the mornings and early evenings."[59] He described the odor as having a "unique chemically component to it that we did not know - - it's not a smell that we had smelled before."[60] "As the months went on… it took on sort of a - - a rotten egg type of - - type of smell, which is weird… So the best way of - - of me describing it is sort of a chemically - - chemical, rotten egg, sulfuric, unnatural smell, a smell that we couldn't identify…."[61] He recalled that the "intensity seemed to increase as we were ending 2017 and getting into 2018."[62] The odor was a concern

---

[52] Exhibit 4, p. 79:6-80:4, 81:12-83:14.
[53] Exhibit 4, p. 80:17-25.
[54] Exhibit 4, p. 57:12-58:21.
[55] Exhibit 4, p. 59:4-60:15.
[56] Exhibit 4, p. 47:13-49:15.
[57] Exhibit 4, p. 77:10-78:6.
[58] Exhibit 5, Phil Adams Deposition, p. 130:25-132:12.
[59] Exhibit 5, p. 133:5-9.
[60] Exhibit 5, p. 132:16-18.
[61] Exhibit 5, p. 138:5-19.
[62] Exhibit 5, p. 140:18-24.

throughout 2018 and 2019 until it started to wane in the latter part of 2019 to where "it was still there, but it wasn't as frequent, wasn't as pungent."[63] "I didn't feel like there was any noticeable odors during that entire time of COVID."[64]

The odors caused Mr. Adams to suffer from annoying or irritating short-lived symptoms, including headaches.[65] As to how the odor impacted him, he explained "[f]or sure it was a nuisance and… it was quite annoying. It impacted my enjoyment of my property. It impacted my, you know, ability to - - to exercise, to enjoy, you know recreation. It was frustrating having that uncertainty of knowing the - - both the origins and the content of what was inside of whatever I was smelling. So it was sort of a worrisome, you know, fear at - - at points."[66] The odors impacted his ability to mow his lawn, his use of their pool, limited his frequency of barbequing, and his bike riding.[67]

## Kayla Anne Steele

Ms. Steele began experiencing "very strong, unpleasant, chemically, rotten eggs" odors at her home in Harahan in late 2017.[68] In late 2017, she smelled the odors "probably between two and three times a week" but then in 2018, "it got a lot worse."[69] The frequency of odors increased in 2018 to 3 to 4 times per week, maybe five times a week, which remained consistent throughout 2019 until it started getting better at the end of the year, decreasing back down to a couple times per week.[70] Whether they smelled it depended on if the wind was blowing from the Landfill.[71]

---

[63] Exhibit 5, p. 149:16-150:16.
[64] Exhibit 5, p. 150:17-25.
[65] Exhibit 5, p. 192:16-196:11.
[66] Exhibit 5, p. 165:10-25.
[67] Exhibit 5, p. 166:6-169:24.
[68] Exhibit 6, Steele Deposition, p. 36:4-7.
[69] Exhibit 6, p. 16:16-25.
[70] Exhibit 6, p. 17:1-23.
[71] Exhibit 6, p. 18:9-22.

Also, the warmer the weather, the worse it smelled.[72] She experienced the odors inside and outside the home.[73] She also lit candles and essential oils to cover the odors.[74]

The odors caused Ms. Steele to suffer from various symptoms of annoyance, including headaches, nausea, burning nose, sleeping issues, anxiety about the odor seeping to the house, loss of appetite, dizziness, and fatigue.[75] Her husband also experienced burning sensation in his nose, nausea, and lost sleep due to the odors.[76] As it relates to decrease in quality of life, she explained how with the exacerbation of her migraine headaches she could not function normally, she could not enjoy her kids, she could not go to work, she could not clean the house – "It would just decrease everything that I enjoy doing in life."[77] They bought the house in Harahan because it had a "really big backyard for our kids" but they were not able to be outdoors to use it when the smell was there.[78] Nor were they able to barbecue or walk their dog when the odor was present.[79] Their visits to her in-laws' camp on Lake Catherine increased to get away from the odor.[80]

**Ophelia Walker**

Beginning in late 2016 or 2017, Ms. Walker began experiencing odors at her Avondale home which she described as "[m]aybe like rotten garbage or stinky egg or - - it just was a bad smell… It smelled like a… rotten egg."[81] She testified that the odor persisted and got stronger in 2018.[82] As far as frequency of the odor in 2018, Ms. Walker explained that some weeks she would

---

[72] Exhibit 6, p. 19:10-16.
[73] Exhibit 6, p. 36:23-37:2.
[74] Exhibit 6, p. 58:20-59:12.
[75] Exhibit 6, p. 30:16-34:19, 35:21-36:24, 38:15-39:19.
[76] Exhibit 6, p.53:8-17.
[77] Exhibit 6, p. 39:20-40:2.
[78] Exhibit 6, p. 40:11-41:4.
[79] Exhibit 6, p. 59:13-60:15, 61:16-23.
[80] Exhibit 6, p. 63:9-18.
[81] Exhibit 7, Ophelia Walker Deposition, p. 45:23-46:24.
[82] Exhibit 7, p. 51:20-25.

smell it three to four times per week, and sometimes even more: "sometimes it didn't smell at all, and then sometimes you may have smelled it the whole week."[83] In 2019, Ms. Walker did not experience the odor as frequently as previous years and noticed that it was not as intense as previous years.[84] She stopped smelling the odor post-2019.[85] Ms. Walker experienced the odor both inside and outside her home.[86] From 2017 to 2019, she burned candles to cover the odors.[87]

The odors caused Ms. Walker to suffer from various symptoms of annoyance, including headaches, worsening anxiety, and sleep disruption.[88] When the odors started to go away, she noticed a decrease in her symptoms.[89] As far as impacting her activities, Ms. Walker did not go outside on the patio as frequently due to the smell.[90] The odor also impacted the time she spent with her nephews, moving their spades game from the patio to inside.[91] She also hosted events like barbeques and crawfish boils at her home but had to cut back on those activities because of the smell.[92] She also walked in her neighborhood less frequently because of the odors.[93]

**Ann Williams**

Ms. Williams first started experiencing a bad odor at her Avondale residence in the spring or summer of 2017 that would "come and go."[94] She described the odor as "like a rotten egg" and "rubber."[95] "They smell bad, both of them. Together, it's bad. Sulfur. It's a combination of the

---

[83] Exhibit 7, p. 52:2-8.
[84] Exhibit 7, p. 54:3-17.
[85] Exhibit 7, p. 59:2-5.
[86] Exhibit 7, p. 52:22-53:9.
[87] Exhibit 7, p. 106:8-13.
[88] Exhibit 7, p. 76:8-13, 92:25-93:4, 114:14-115:8.
[89] Exhibit 7, p. 115:17-25.
[90] Exhibit 7, p. 45:16-46:2, 52:14-21.
[91] Exhibit 7, p. 77:4-15.
[92] Exhibit 7, p. 77:16-79:1.
[93] Exhibit 7, p. 74:1-11.
[94] Exhibit 8, Ann Williams Deposition, p. 79:8-80:2.
[95] Exhibit 8, p. 80:3-10.

smell, the stench."[96] In 2017, she smelled the odor about three to four times per week, but in 2018 "it got really bad" including "more intense and more frequent" making it seem like it was every day.[97] The frequency for 2019 was about the same as 2018.[98] However, she made it clear that she did not experience odors every week as it ebbed and flowed.[99] By 2020, she stopped noticing the odors.[100] The odor was worse during summer and spring, and most noticeable early in the morning.[101] An early riser, the odor would often wake her up prior to her 4:30 am alarm.[102]

The odors caused Ms. Walker to suffer from various symptoms of annoyance, including anxiety, fatigue, nausea, sleep disruption, and headaches.[103] The odors also had a negative impact on her social life, making it embarrassing to have family over because of the smell.[104] The odors caused Ms. Williams to take walks around the neighborhood less frequently.[105] The odors also stopped her and her husband from sitting on the front porch after dinner to enjoy the evening.[106]

**Robyn Crossman**

Immediately upon moving into her newly constructed Waggaman home in January 2018, Ms. Crossman began experiencing a bad odor that permeated her home three to four times per week.[107] Within a month of moving in, she considered moving due to the odor.[108] She experienced odors at her home in 2019 with the same consistency as 2018.[109]

---

[96] Exhibit 8, p. 80:11-81:4.
[97] Exhibit 8, p. 82:21-83:6.
[98] Exhibit 8, p. 83:21-25.
[99] Exhibit 8, p. 136:21-137:7.
[100] Exhibit 8, p. 82:6-20, 135:6-13.
[101] Exhibit 8, p. 83:13-20.
[102] Exhibit 8, p. 84:6-85:8.
[103] Exhibit 8, p. 92:16-95:3, 121:24-122:3.
[104] Exhibit 8, p. 95:4-96:21.
[105] Exhibit 8, p. 32:12-23.
[106] Exhibit 8, p. 135:19-136:20.
[107] Exhibit 9, Robyn Crossman Deposition, p. 89:13- 90:22.
[108] Exhibit 9, p. 58:17-59:10.
[109] Exhibit 9, p. 95:13-22.

Ms. Crossman described the persistent odor from 2018 and 2019 as smelling like "burning tires." At the same time her husband and daughter smelled "sulfur, rotten eggs" she would have a "hint of that" but smelled more like "a petroleum, tire... I would say like if you'd ever had an electrical fire, it's that kind of odor. It's more of a - - like, a petrol odor than a sulfur odor to me."[110] Her husband, Corey Crossman, described the odor he experienced as "rotten egg, sulfury, but it also smelled like burning, rotten eggs. Burning, sulfury, if that makes any type of sense."[111] Notably, Mr. Crossman observed that the wind was mostly from the south, the direction of the JPLF, when they were experiencing the odor.[112] By early 2020, the odor was still present but not as bad and much less frequent, and as the year progressed, that odor went away and was replaced by a decomposition smell, "and so obviously, that's what a landfill should smell like," and these odors are less intense and less pervasive, and ultimately much easier to deal with.[113]

Between 2018 and 2019, the odor caused Ms. Crossman to experience various symptoms of annoyance, including exacerbated migraine headaches, anxiety/stress/worry, sleep disruption, nausea, loss of appetite, and anxiety/worry.[114] [115] As far as impacting her activities, she would use essential oils and candles two to three times per week to combat the odors inside the home.[116] The odors impacted their use of the pool and gardening.[117] They had to cancel their housewarming party due to the odors, and on one occasion the odors forced their crawfish boil to be moved

---

[110] Exhibit 9, p. 84:2-85:11, 126:19-127:5.
[111] Exhibit 10, Corey Crossman Deposition, p. 16:16-20.
[112] Exhibit 10, Corey Crossman Deposition, p. 36:23-37:8.
[113] Exhibit 9, p. 128:6-130:8.
[114] Exhibit 9, p. 138:15-141:3, 145:10-146:21, 147-148, 164-165; Exhibit 11, Crossman's Supplemental Answer to Interrogatory No. 6, attached as Exhibit 9 to her deposition, and her corresponding verification.
[115] Her husband confirmed that the odors caused Mrs. Crossman to suffer from headaches, nausea and dizziness. Exhibit 10, Corey Crossman Deposition, p. 18:8-20:2. He also suffered from headaches, nausea, and sleep disruption. Exhibit 10, p. 22:9-23:5.
[116] Exhibit 9, p. 57:1-23.
[117] Exhibit 9, p. 48:13-22, 105:20-106:18.

inside.[118] She confirmed that her daughter and husband were impacted the same as her.[119] She also knows that the neighborhood over from hers experienced the same odor.[120]

### Mr. Lape's Air Dispersion Modeling Results

Plaintiffs' air modeling expert, Mr. James Lape, conducted air dispersion modeling to demonstrate the fate and transport of the Landfill's emissions in terms of frequency, duration, and concentrations of exposures in the surrounding communities during the period from July 2017 to through December 2019.[121] Mr. Lape's air modeling was conducted using the EPA-approved CALPUFF model, which is often used in odor evaluations.[122] Despite prior criticisms during the General Causation phase of this litigation, Defendants' expert air modeler, Dr. Paolo Zannetti, has now conceded that CALPUFF is the superior model and has adopted that model in his work.

Similar to his prior modeling, Mr. Lape used estimates of H2S emissions from Phase IVA calculated by Ramboll as inputs to the model, including both estimates of fugitive H2S emissions generated from municipal solid waste buried in Phase IVA (as calculated by Plaintiffs' expert, Jose Sananes) and from spent lime (as calculated by Dr. Jaana Pietari).[123]

Mr. Lape's odor impact analysis was conducted for two sets of receptors: (1) the nine Proposed Class Representative locations and (2) a 20 km grid that spans the proposed class area.[124] He used air modeling "to estimate the potential odor impacts to the Proposed Class Representatives and surrounding residential areas during the period of exposure" based on the H2S 30-minute

---

[118] Exhibit 9, p. 106:19-107:14.
[119] Exhibit 9, p. 110:11-19.
[120] Exhibit 9, p. 109:16-21.
[121] Exhibit 12, Expert Report of James Lape (Ictech matter) at p. 6-1. Mr. Lape's report was attached as Exhibit 1574 to James Lape Deposition (Exhibit 13 at p. 44-45)
[122] Exhibit 12 at p. 7-5.
[123] Exhibit 12 at p. 6-1, 7-1, 7-2 and Table 1.
[124] Exhibit 12 at p. 7-2 and Figure 3.

average of 7 µg/m³ (5 ppb) threshold established by this Court.[125] Mr. Lape's air modeling results are presented in a series of tables:

- Table 3 provides the CALPUFF model estimates of total odor events at the Class Representative's respective locations for July 2017-December 2017, 2018, and 2019.

- Tables 4 through 6 provide the CALPUFF model estimates of monthly odor events at the Class Representative's respective locations for July 2017 through December 2019.

- Tables 7 through 9 provide an estimate of the number of days per month that CALPUFF predicts an odor event would occur for each of the 30 months.

"The model predicted that odor events typically occur during the night or early morning, during conditions of low wind and a stable atmosphere that minimizes dispersion."[126] It also predicted that the summer and fall months typically see the highest number of odor events.[127] Mr. Lape explained that the modeling results show the expected relationship between the number of impacts and distance of the Proposed Class Representative's location from Phase IVA.[128]

Appendix E to his report provides the grid contour plume modeling for each month from July 2017 to December 2019. "The grid modeling was used to evaluate how odor events per month varied over time and location. Contours of the number of odor events per month across the grid were developed to demonstrate how the impacts were distributed across the grid. The contours reflect the wind distribution during the month, with higher numbers of odor events seen in areas with more winds from the direction of JPL Phase IVA."[129] As he explained, ten events per month was selected as a baseline for the contour modeling because it provided a boundary that was still

---

[125] Exhibit 12 at p. 7-5.
[126] Exhibit 12 at p. 7-6.
[127] Exhibit 12 at p. 7-6.
[128] Exhibit 12 at p. 7-6.
[129] Exhibit 12 at p. 7-7.

relevant to the number of exposures that an individual would see which in turn provided resolution that would allow the contour modeling to show the distribution across the overall class area.[130]

He testified that his monthly contour modeling "is clearly showing that there are similarities amongst the named plaintiffs and the rest of the class area. There's variability that occurs on a month-by-month basis, but that variability is seen across the whole class area... and different representatives have similar exposures to the broader class area around them."[131] He is not opining that each individual named plaintiff is representative of every location in the class area (as that "would defy the logic and physics of air modeling"); however, in his opinion the proposed class representatives are representative of regions within the proposed class area.[132]

Mr. Lape testified that the contour maps could be used to define the sub-area (or sub-class) for which each representative would be representative because they "demonstrate how spatially the proposed named plaintiffs correspond to areas around them" in terms of similar kinds of exposures.[133] While Mr. Lape did not specifically define the geographic sub-areas around each representative for which each is representative, he explained that averaging out total exposures over the whole exposure period and using annular (concentric circles) based on distance from the Landfill would be one such way to do that.[134] However, Dr. Zannetti, created exactly such a sub-class map using Mr. Lape's modeling results. See Figure 56 from Dr. Zannetti's report.[135]

---

[130] Exhibit 13, Lape Deposition Excerpts at pp. 198:20-199:13.
[131] Exhibit 13, Lape Deposition Excerpts at pp. 201:24-202:16.
[132] Exhibit 13, Lape Deposition Excerpts at pp. 173:11-174:16.
[133] Exhibit 13, Lape Deposition Excerpts at pp. 205:6-21.
[134] Exhibit 13, Lape Deposition Excerpts at pp. 174:22-176:2, 206:2-207:18.
[135] Exhibit 14, Dr. Zannetti April 12, 2024 Revised Expert Report (Ictech), at p. 105, Figure 56. Dr. Zannetti's report was attached as Exhibit 1611 to Dr. Zannetti Deposition (Exhibit 15 at p. 146-147).



Above is a revised version of Dr. Zannetti's Figure 56[136] which displays consecutive concentric amoeba areas moving outward from the Landfill representing different frequencies of overall odor impacts throughout the entire 30-month exposure period. The frequencies for each shaded concentric amoeba area are based on a range of the total percentages of 30-minute events at the Court's determined threshold over the entire 30-month exposure period. The percentage indicators within Figure 56 demarcate each concentric amoeba's inner boundary (i.e., closest to the Landfill) and outer boundary (i.e., furthest away from the Landfill). For example, the concentric amoeba with inner boundary 2% and outer boundary of 1% indicates that individuals

---

[136] Plaintiffs have attached as Exhibit 16 a revised version of Dr. Zannetti's Figure 56 which better highlights the boundaries of the shaded concentric amoeba areas.

within that concentric circle received 30-minute odor impacts between 1-2% of the 30-minute periods during the total 30-month exposure period.

As Dr. Zannetti explained, there were approximately 43,000 total 30-minute periods within the 30-month exposure period such that 1% would equal approximately 430 30-minute periods during that time.[137] That 430 for 1% can then be extrapolated to determine the approximate number of odor impacts for the other percentages listed. For example, individuals within the 3-4% concentric circle received between 1,290 and 1,720 30-minute odor impacts at or above the Court's threshold whereas individuals within the 0.5-1% concentric circle received between 215 and 430 odor impacts throughout the 30-month period. Dr. Zannetti's Figure 30 provides a useful guide for locating each Class Representative's residence when analyzing Figure 56.



Figure 30. Nine Locations of ten proposed Class Representatives (Ictech litigation).

---

[137] Exhibit 15, Dr. Zannetti Deposition at p. 270-275.

Landry-Boudreaux falls within Figure 56's 4-5% concentric amoeba, which means she and other individuals within that shaded area received between 1,720 and 2,150 30-minute odor impacts during the 30-month period. Mr. Lape's Table 3 and Tables 7-9 confirm that she had a total of 2,042 odor impacts over 430 days during the entire 30-month exposure period.

Crossman falls within Figure 56's 3-4% concentric amoeba, which means she and other individuals within that shaded area received between 1,290 and 1,720 30-minute odor impacts during the 30-month period. Mr. Lape's Table 3 and Tables 7-9 confirm that Crossman had a total of 1,454 odor impacts over 332 days between 2018 and 2019.

Steele falls within the 2-3% concentric amoeba, which means she and other individuals within that shaded area received between 860 and 1,290 30-minute odor impacts during the 30-month period. Mr. Lape's Table 3 and Tables 7-9 confirm that Steele had a total of 825 over 243 days which is below the 2% number of 860 only because she did not live at that Harahan address for the months July 2017 through September 2017.

Ictech-Bendeck, Larry and Mona Bernard, and Williams fall within the 1-2% concentric amoeba, which means they received between 430 and 860 30-minute odor impacts during the 30-month period. Mr. Lape's Table 3 and Tables 7-9 confirm that during the 30-month exposure period Ictech-Bendeck had a total of 762 odor impacts (over 264 days), the Bernards had a total of 628 odor impacts (over 230 days), and Williams had a total of 666 odor impacts (over 254 days).

Adams and Walker fall within the 0.5-1% concentric amoeba, which means they and other individuals within that shaded area received between 215 and 430 30-minute odor impacts during the 30-month exposure period. Mr. Lape's Table 3 and Tables 7-9 confirm that Adams had a total of 420 odor impacts (over 181 days) and Walker had a total of 429 odor impacts (over 180 days)

during the 30-month exposure period, a quite similar number of total odor impacts over a similar number of days despite being located in areas at completely different directions from the Landfill.

In short, Dr. Zannetti's Figure 56 corroborates Mr. Lape's modeling, creates the boundaries of the sub-classes, and demonstrates that over the 30-month exposure period the Proposed Class Representatives received similar frequencies of odor impacts as other nearby residential areas based on distance from the Landfill, even locations in different directions from the Landfill.

## II. PROPOSED CLASS DEFINITION

Putative Class Representatives seek the certification of the following class:

(1) All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within the following enclosed geographical boundary within the Parish of Jefferson, State of Louisiana, starting at the intersection of Jerome S. Glazer Airport Access Rd. and West Napoleon Ave (including the canal extending westward from the intersection of West Napoleon Ave and Williams Blvd) then proceeding eastward along West Napoleon Avenue until its intersection with North Causeway Boulevard, then proceeding south along Causeway Boulevard until its intersection with River Road, then proceeding south across the Mississippi River until the intersection of Lapalco Boulevard and Bayou Segnette, then proceeding west until the southernmost end of S. Jamie Boulevard, then proceeding west until the southernmost end of Ruth Drive, then proceeding west/northwest to the intersection of Hwy 90 and the St. Charles Parish/Jefferson Parish line, then proceeding north along the St. Charles Parish/Jefferson Parish line to River Road, then proceeding north along the St. Charles Parish/Jefferson Parish line from River Road to Airline Hwy, then proceeding east along Airline Hwy until its intersection with Jerome S. Glazer Airport Access Rd., then proceeding north until the intersection of Jerome S. Glazer Airport Access Rd. and West Napoleon Ave (including the canal extending westward from the intersection of West Napoleon Ave and Williams Blvd).

a. Sub-Class 1 – All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within Figure 56's 4-5% concentric amoeba.

b. Sub-Class 2 - All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within Figure 56's 3-4% concentric amoeba.

     c.  Sub-Class 3- All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within Figure 56's 2-3% concentric amoeba.

     d.  Sub-Class 4 - All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within Figure 56's 1-2% concentric amoeba.

     e.  Sub-Class 5 - All natural persons who, at any time from July 1, 2017 through December 31, 2019, lived and/or resided within Figure 56's 0.5-1% concentric amoeba.

    (2)  This class expressly excludes all named plaintiffs in *Addison, et al. v. Louisiana Regional Landfill Company, et al.*, No. 19-11133 c/w 19-14512, as well as Defendants' employees and relevant court personnel.

A class definition with geographic boundaries is appropriate. As this Court previously noted, objective, non-individualized criteria such as distance from the Landfill can appropriately be used to define the class.[138] Moreover, "[t]here is no doubt there were hydrogen sulfide emissions at the Landfill during the relevant time period" and "[i]t is also clear emissions from the Landfill migrated off the Landfill site and into surrounding areas,"[139] including on the East Bank.[140]

While air dispersion modeling of Mr. Lape and Dr. Zannetti's Figure 56 further demonstrate where the Landfill's noxious emissions traveled, in what concentrations, and when over the course of the 30-month relevant time period,[141] the purpose for such a proposed

---

[138] *Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. CV 18-7889, 2019 WL 4111681, at *6 (E.D. La. Aug. 29, 2019) ("Once discovery is underway, it is entirely possible, based on the current allegations, that objective, non-individualized criteria (such as distance from the Landfill or results of air quality testing) will define the class."); see also *Id.* at n80 (acknowledging that in *Powell v. Tosh*, 280 F.R.D. 296, 306 (W.D. Ky. 2012), a class was established based on an expert report showing a barn as the source of a noxious odor for individuals surrounding 1.25 miles of the barn).

[139] Doc. 285 at p. 20.

[140] Doc. 285 at p. 20-25 (discussing MAML confirmation of exposures in Waggaman and River Ridge).

[141] Except for the revised northern boundary, the proposed geographic boundary reasonably mirrors the geographic boundary drawn by the Parish's expert, Pivotal Engineering, when recommending the creation of an odor monitoring station network in May 2019 to cover the relevant areas of Jefferson Parish surrounding the Landfill. See Doc. 366-2, Figure 17 (red polygon). It also encompasses nearly all residential complaints collected by the LDEQ between April 25, 2018 and July 20, 2018 and the approximately 1,000

geographic boundary is to ensure that the claims of all persons reasonably anticipated to be asserted, arising from the noxious and preventable hydrogen sulfide and landfill gas emissions that emanated from the Landfill, are brought before this Court in one manageable proceeding so as to avoid needless repetitive litigation of common issues of law and fact. Another purpose is to give potential class members enough information to ascertain whether they are in the class definition and to enable them to decide whether to opt out.[142] Those that do not choose exclusion will be bound, under principles of *res judicata*, by those decisions to be made on a class-wide basis.

Putative Class Plaintiffs and Class Representatives pray that the requested class be certified, and class representatives and class counsel be appointed.

### III.  **LAW**

Judicial efficiency and economy of litigation is a principal purpose of class action procedure.[143] The purpose is to conserve resources of both the courts and the parties by economically litigating issues that potentially affect every class member.[144] The class action device is designed to conserve the resources of both courts and parties by permitting issues potentially affecting numerous claimants to be litigated in an economical fashion.[145] A district court has great discretion in certifying and managing a class action.[146] This broad discretion allows "district courts [] to bifurcate a trial, trying some issues on a class basis and others individually."[147]

---

odor complaints received by the Landfill between July 28, 2018 and September 7, 2019, which were mapped previously by Dr. Zannetti. See Doc. 366-3 at p. 29-34, Fig. 21, Fig. 22, p. 35-36, Figure 26.
[142] As part of the notice plan, Putative Class Counsel envision a website wherein a Jefferson Parish resident can input their address to determine whether or not they are within the class definition.
[143] *American Pipe and Constr. Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766 38 L.Ed.2d 713 (1974).
[144] *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982).
[145] *General Telephone Co. of Southwest v Falcon*, 457 U.S. at 155.
[146] *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Circ. 1999).
[147] *Mullen*, 186 F.3d at 631.

"The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment."[148]  A district court's decision is essentially a factual inquiry.[149] The court's analysis and decision "should not reach the merits of the plaintiffs' claims."[150] In some cases, however, "it is necessary for a district court to go beyond the pleadings to understand the claims, defenses, substantive law, and relevant facts in order to make a meaningful certification decision."[151] In the end, the court "must make specific findings regarding how the case satisfies or fails to satisfy the requirements of Rule 23[.]"[152]

In addition to certification under Rule 23(b)(3), Rule 23(c)(4) permits a litigant to seek class certification on particular issues such as liability.[153] The proponents of such a class must nevertheless meet their burden to show that the six requirements of Rule 23(a) and 23(b)(3)—numerosity, commonality, typicality, adequacy, predominance, and superiority—are satisfied.[154]

IV.    **ARGUMENT**

Plaintiffs move this Honorable Court for Class Certification of these nuisance claims pursuant to Federal Rule of Civil Procedure Rule 23(b)(3). In the alternative, Plaintiffs move for Class Certification of common class-wide issues pursuant to Federal Rule of Civil Procedure Rule 23(c)(4) on behalf of all putative class members.

---

[148] *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 603 (E.D. La. 2006) citing *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n. 4 (5th Cir.2001).
[149] *Slocum*, 2019 WL 2192099, at *2 (citing *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502-03 (5th Cir. 2004); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)).
[150] *Turner, supra* (citing *Castano, supra*).
[151] *Id.*
[152] *Slocum, supra* (citing *Vizena*, 360 F.3d at 503).
[153] See Fed. R. Civ. P. 23(c)(4); *Mullen*, 186 F.3d at 631; *Slocum*, 2019 WL 2192099, at *2-11. The proponents of such a class must nevertheless meet their burden to show that the six requirements of Rule 23(a) and 23(b)(3)—numerosity, commonality, typicality, adequacy, predominance, and superiority—are satisfied.  See *Slocum*, 2019 WL 2192099, at *3.
[154] See *Slocum*, 2019 WL 2192099, at *3.

Whether certification is proper under Rule 23(b)(3) or Rule 23(c)(4), Plaintiffs propose bifurcation of the complex class-wide issues of Defendants' conduct (liability) for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the impact of those noxious odors to the communities at large in terms of the geographic scope, frequency, duration, and concentration of the Landfill's emissions at or above the Court's determined nuisance odor threshold, from the simpler issues of specific causation and compensatory damages.

The complex class-wide common issues concerning Defendants' liability for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the impact on the surrounding communities in terms of geographic scope, frequency, duration, and concentration of those noxious emissions are appropriate for class-wide adjudication under Rule 23(b)(3) as they are common substantive issues that not only drive the resolution of these nuisance claims but are also complex issues which predominate over any potential individualized issues.

The issues of specific causation as to these nuisance claims and the corresponding compensatory damages are also appropriate for class-wide adjudication under Rule 23(b)(3) given the similar nature of the complained of injuries (nuisance damages including annoyance and loss of use and enjoyment of property) and the consistency of emissions impacts upon the Class Representatives and individuals within their respective geographic sub-locations.

Nevertheless, to the extent specific causation and compensatory damages could be deemed as issues only affecting individual class members, an issues class would be appropriate under Rule 23(c)(4) as those issues do not predominate over the common, more complex issues concerning Defendants' conduct (liability) for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the impact to the surrounding communities in terms of the geographic scope, frequency, duration, and concentration of the Landfill's noxious emissions.

The adjudication of the issues of specific causation and compensatory damages could be handled through orderly "waves" or "flights" of trials based on the geographic sub-locations of the Class Representatives and nearby class members, as guided by the findings in Phase One as to where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined nuisance odor threshold during the liability phase of the litigation (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb).

The issue of specific causation of the nuisance injuries will be relatively straightforward given this Honorable Court's ruling as to the nuisance odor threshold (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb) and the Phase One findings as to where the emissions travelled, when, and in what concentrations for the 30-month period at issue.

Stated simply, these nuisance claims do not present individualized questions regarding medical causation for personal injuries caused by temporary transitory exposures over the course of one or a few days typically present in mass toxic tort actions. The claims here present common complaints of symptoms of annoyance and inconvenience based upon up to 30 months of exposures to noxious odors at the Class Representatives' and class members' respective homes.

As this Court found, "[t]he citizens uniformly experienced a bad odor, and the odors reported were consistent with hydrogen sulfide emitted by a landfill."[155] Important to the nuisance claims at issue, "[e]ffects from malodors occur at levels much lower than the level required to experience effects from toxic chemicals."[156] In making its determination as to the nuisance odor threshold of five ppb over a thirty-minute period, this Court found, "[t]he scientific literature and Dr. Schiffman's own studies have shown such a level of exposures 'always is a nuisance' to the

---

[155] Doc. 285 at p. 29.
[156] Doc. 285 at p. 29.

individuals exposed."[157] Thus, specific causation of the nuisance injuries because of the Landfill's noxious emissions cannot be said to be an overly complex, highly individualized inquiry.

The compensatory damages determination for these nuisance damages is not complex. Given the Court's findings discussed immediately above, the Class Representatives and putative class members had similar experiences as to the decrease in qualify of daily life (i.e., annoyance and inconvenience) and loss of use and enjoyment of their properties.

This Court should certify the proposed class. Not only because the prerequisites of Rule 23(a) are met, but proceeding as a class with respect to Phase One allows for the determinations of Defendants' liability and respective fault for the Landfill's noxious emissions during the relevant time period one time. Phase One will also determine the impact to the surrounding communities at large in terms of the geographic scope, frequency, duration, and concentration before then moving on to Phase Two for the adjudications of specific causation and damages. Proceeding this way "achieve[s] economies of time, effort, and expense, and promote[s]… uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results," thereby satisfying Rule 23(b)(3).[158]

Likewise, as Defendants previously agreed, the bifurcation of the complex issues involved in the determinations of liability, allocation of fault, and the geographic mapping of the Landfill's emissions from the simpler "basic" issues of specific causation and damages promotes judicial efficiency and is ultimately the superior method of managing this litigation. Ultimately, Plaintiffs agree with Defendants that the issues related to liability and allocation should be tried once by a

---

[157] Doc. 285 at p. 31.
[158] See *Slocum v. Int'l Paper Co.* 2019 WL 2192099, at *10 citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

single jury in order to promote judicial efficiency, fundamental fairness, and avoid the risk of inconsistent verdicts on those complex issues common to all plaintiffs.[159]

### A. Numerosity is Satisfied Because There Are Thousands of Class Members.

Rule 23(a)(1) simply requires that the class be so large that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Plaintiffs must merely demonstrate some evidence or reasonable estimate of the number of purported class members.[160] The Eastern District has recognized that, "There is no magic number when this cut off is reached."[161]

Generally, a potential class of over one hundred members is sufficient for numerosity and some courts have noted that any class consisting of more than forty should raise a presumption that joinder is impracticable.[162] Additionally, the Fifth Circuit has recognized that a putative class of 100 to 150 members "is within the range that generally satisfies the numerosity requirement."[163]

The requirements of numerosity are unquestionably met. As noted by this Honorable Court, Jefferson Parish received so many odor complaints during the relevant time period that it set up a dedicated hotline for Parish residents.[164] Moreover, the total number of complaints made to the Landfill's hotline and to the LDEQ in 2018 was 2,620, and residents in Harahan/River Ridge established an Air Quality Facebook group for the reporting of odor complaints.[165] The odor complaints were so ubiquitous that the Parish retained an engineering expert, Pivotal Engineering,

---

[159] See, generally, Doc. 303-1 (Memorandum in Support of Motion to Bifurcate) and Doc. 306-1 (Supplemental Memorandum in Support of Motion to Bifurcate).

[160] *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).

[161] *Kreger v. Gen. Steel Corp.*, Civ. A. No. 07-575, 2010 WL 2902773, at *4 (E.D. La. July 19, 2010).

[162] *Street v. Diamond Offshore Drilling*, 2001 WL 568111 (E.D.La. May 25, 2001, Duval, J.); see also *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999); *Slocum*, 2019 WL 2192099, at *3.

[163] See *Mullen*, *supra*.

[164] Doc. 285 at p.26.

[165] See Doc. 285 at p. 26. See also Doc. 52-3, p. 4, Exhibit 3 to Defendants' Motion to Dismiss, Compliance Order (Enforcement Tracking No. SE-C-18-00372, Agency Interest No. 6961), dated June 22, 2018 ("Since April 2018, a group of residents in Harahan/River Ridge has gathered more than 1,800 complaints about the stench.")

who in May 2019 recommended the creation of an odor monitoring station network to cover the relevant areas of Jefferson Parish surrounding the Landfill.[166]

During the relevant time period, the proposed Class Representatives each resided in the areas surrounding the Landfill. Ictech-Bendeck in River Ridge; Adams in South Kenner; the Bernards, and Steele in Harahan; Landry-Boudreaux and Crossman in Waggaman; and Williams and Walker in Avondale.

Plaintiffs' expert demographer Greg Rigamer estimates the population of the proposed class area to be 76,510 citizens living in 33,249 housing units.[167] In his report, he relies on United States Census Bureau data from 2010 and 2020 to estimate the population of the proposed class area. Mr. Rigamer stated, "the census is unequivocally the most reliable source for such information" and the population of the class area remained "stable" between 2010 and 2020 as shown by the difference in population of the class area between 2010 and 2020.[168] He testified that he conducted a block-by-block analysis of the proposed class area to accurately estimate the number of people living within the proposed class area.[169]

Defendants' expert appraiser, Trevor Phillips, estimates the population of the proposed class area to be 76,731.[170] He admitted that his and Mr. Rigamer's "respective counts are 'a reasonably reliable estimate' of the population and housing units in the Proposed Class Area during the Proposed Class Period."[171] The estimates of both experts make clear that joinder of all members is impracticable.  Thus, the proposed class meets the requirements of Fed. R. Civ. P. 23(a)(1).

---

[166] See Doc. 366-2 at Page 38 of 48, Figure 17 (red polygon).
[167] See Exhibit 17, Expert Report and CV of Greg Rigamer. Mr. Rigamer's report and CV were attached to his deposition as Exhibit Rigamer 4 and Rigamer 2, respectively (Exhibit 18, p. 14, 46)
[168] Exhibit 18, Rigamer Deposition Excerpts, p. 54:15-55:1, 56:11-19.
[169] Exhibit 18, Rigamer Deposition Excerpts, p. 57:3-58:11, 63:6-24, 68:24-69:17.
[170] Exhibit 19, excerpts of Trevor Phillips March 12, 2024 Expert Report, p. 9-10, ¶21.
[171] Exhibit 19, excerpts of Trevor Phillips March 12, 2024 Expert Report, p. 65, ¶133.

Likewise, counsel for Plaintiffs state that their firms collectively represent over 1,000 individuals who reside(d) within the proposed class area during the relevant time period. The size of this population makes joinder impracticable.

Further, individual litigation on the common issues as to these nuisance claims would impose a substantial burden on Plaintiffs, Defendants, and the Courts. As such, the number of impacted Plaintiffs meets the numerosity requirement.

**B. The Common Questions of Liability, Allocation of Fault, and the Determination of the Geographic Scope, Frequency, Duration, and Concentrations of the Landfill's Noxious Emissions Meet the Commonality Requirement.**

FRCP 23(a)(2) requires that a question or questions of law and/or fact common to the class exist. Rule 23(a)(2) merely requires that one issue's resolution will affect all or most of the potential class members. The Courts have noted that "the threshold of commonality is not high."[172] Not only is there a low threshold for commonality, but the fact that plaintiffs' claims require some individualized analysis does not defeat commonality.[173]

A common question is one that, when answered as to one class member, "will affect all or a significant number of the putative class members."[174] When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more elements of that cause of action will be common to all persons affected.[175]

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court held that class claims "must depend upon a common contention," and that this common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve

---

[172] *Bertulli v. Indep. Ass'n of Continental Pilots*, 242 F.2d 290, 296-97 (5th Cir. 2001) citing *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986); see also *Mullen*, 186 F.2d at 625.
[173] *James v. City of Dallas*, 254 F.3d at 570.
[174] *Forbush v. J C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *James v. City of Dallas*, 254 F.3d at 570.
[175] Hebert B. Newberg, *Newberg on Class Actions § 310 at 3-49* (4th ed. 2002).

an issue that is central to the validity of each one of the claims in one stroke."[176] "What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."[177] In short, there must be some "glue" holding the class claims together that will produce a common answer to the proposed common contention.[178]

As the Fifth Circuit interprets *Wal–Mart*, "[t]o satisfy the commonality requirement under Rule 23(a)(2), class members must raise <u>at least one contention that is central to the validity of each class member's claims</u>."[179] "[T]he principal requirement of Wal–Mart is <u>merely a single common contention that enables the class action 'to generate common answers apt to drive the resolution of the litigation.'</u>"[180] "These '<u>common answers</u>' may indeed relate to the injurious effects experienced by the class members, but they <u>may also relate to the defendant's injurious conduct</u>."[181] Thus, "the legal requirement that class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse."[182]

Moreover, "district courts do not err by failing to ascertain at the Rule 23 stage whether the class members include persons and entities who have suffered 'no injury at all.'"[183] Rather, a mere "'contention' regarding the class members' injury is sufficient to satisfy Rule 23, so long as

---

[176] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).
[177] *Id.* (citation omitted; emphasis in original).
[178] *Wal-Mart*, 564 U.S. at 352.
[179] *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014) (emphasis added).
[180] *Id.* at 811 (emphasis added).
[181] *Id.* (emphasis added).
[182] *Id.* at 810–11.
[183] *Deepwater Horizon*, 739 F.3d at 811.

the party seeking certification can show that this contention is 'common' to all the class members, is 'central' to the validity of their claims, and is 'capable' of classwide resolution."[184]

Here, commonality is clearly satisfied based on the common issues of law and fact surrounding Defendants' liability (and respective fault) as it relates to the noxious emissions emanating from the Landfill during the relevant time period. The issues pertaining to the geographic scope, frequency, duration, and concentrations of the Landfill's noxious emissions, the conduct of Defendants in creating and/or failing to prevent these noxious emissions from leaving the Landfill, and the apportionment of their respective fault affect all potential class members.

Critically, the claims of all class members will hinge on common questions regarding the geographic scope, frequency, duration, and concentrations of the Landfill's noxious emissions over the 30-month period at issue, the Defendants' liability for same, and the apportionment of fault among them. Once the common liability questions are determined as to the Landfill's noxious emissions, including who was responsible for causing 23,000 tons of sulfate-containing spent lime to be buried in Phase 4A, who was responsible for the leachate collection system failures, who was responsible for the gas collection system failures, and who was responsible for landfill cover issues, those common issues will be decided for all class members in "one stroke."

In short, there is a common source and a common cause for all putative class members. Thus, if these common questions are answered as to one plaintiff, they will necessarily be answered for all class members. Consequently, these questions clearly contain the "glue" necessary for the Plaintiffs to meet their burden to show commonality under Rule 23 since the claims of all putative class members hinge on these common questions of fact and law concerning Defendants' liability for the emissions that emanated from the Landfill for the 30-month period at issue.

---

[184] *Deepwater Horizon*, 739 F.3d at 811.

Accordingly, the commonality requirement has been met.

### C. *The Class Representatives Are Typical of The Class.*

Rule 23(a)(3) requires that the claims of the class representatives are typical of the class's claims or defenses as a whole. Fed. R. Civ. P. 23(a)(3). Typicality does not require a complete identity of claims but simply requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Like commonality, the test for typicality is not demanding. It exists when the claims of the named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories.[185] Here, the claims of the proposed class representatives and the putative class members arise from the same set of facts and they both seek the same relief through the same legal theories.

Plaintiffs have identified Class Representatives in various nearby geographic locations who allege to have been harmed by the Landfill's noxious emissions. The Class Representatives' claims and alleged damages are fairly similar, if not identical, to the claims of other plaintiffs and potential class members. Further, the theories of liability among the Class Representatives and potential class members are alike: they are suing Defendants for their violations of the obligations of neighborhood (i.e., nuisance) under Louisiana Civil Code articles 667-669 arising from the emission of noxious odors from the Landfill. In short, the claims of the class representatives are based upon the same source of emissions (pervasive and persistent emissions of noxious odors coming from the Landfill) caused by the same course of conduct (Defendants' actions/inactions in maintaining and operating the Landfill) over the same 30-month time period for which they seek relief under the same theories of liability. Thus, typicality is satisfied.

---

[185] *Mullen v. Treasure Chest Casino*, 186 F.2d at 625; *Turner*, 234 F.R.D. at 605 ("Typicality does not require that the claims of the class are identical, but rather that they share the same essential characteristics—a similar course of conduct, or the same legal theory.").

The Class Representatives acknowledge that there may be differences as to the dollar amount of compensatory damages; however, these differences do not relate to Plaintiffs' legal theories regarding liability and causation. Because the Class Representatives share the same legal theories and the same course of conduct with other potential class members, it should be clear that these Class Representatives and potential class members meet the typicality requirement.[186]

### D.   *The Adequacy of Representation Requirement is Satisfied.*

Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members. Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, the class representatives' interests must be aligned with, and not antagonistic to, unnamed class members.[187] Differences between the named plaintiffs and class members will render the named plaintiffs inadequate representatives "only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." [188]

The Supreme Court has recognized that the "adequacy-of-representation" requirement "tends to merge" with the commonality and typicality requirements, all of which "serve as guideposts for determining whether the maintenance of the class is economical and whether the named plaintiffs and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence."[189] The adequacy inquiry under Fed. R. Civ. P. 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to

---

[186] *See*, e.g., *Turner*, 234 F.R.D. at 605 (finding typicality in favor of land contamination plaintiffs seeking issues class on liability even though "[t]here may be differences in the types of damages, depending on the degree of contamination and depending upon whether the property was used as a residence or business" since "these differences do not relate to the Plaintiffs' legal theories regarding liability and causation.").
[187] *Mullen v. Treasure Chest Casino*, 186 F.2d at 625-626.
[188] *Id.*
[189] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

represent.[190] "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."[191]

In this case, the claims of the proposed class representatives are interrelated with the claims of the absent class members to such a degree that it is certain that the interests of the absent class members will be adequately and fairly protected. All claims of the proposed Class Representatives are based on exposures to the Landfill's noxious emissions due to Defendants' fault.

Likewise, Class Representatives and their counsel are aware of no conflicts of interest between the Class Representatives and absent class members and assert that no such conflicts of interest could be said to exist given that the Class Representatives and the absent class members all advance the same legal theories and pursue the same legal relief. Moreover, the Class Representatives are knowledgeable concerning the subject matter of this action, possess strong personal interests in the subject matter of the lawsuit, will assist counsel in the prosecution of this litigation, and are willing to see this case through to the end.[192]

The proposed Class Representatives have retained counsel familiar with these types of cases. Proposed Class Counsel represent that they satisfy the criteria set forth in Rule 23(g), having extensive experience in the prosecution of class actions, having the resources to ensure the adequate prosecution of same, and that they will adequately represent the interests of the class.[193]

### E. PREDOMINANCE AND SUPERIORITY

In order for a class to be certified, two requirements beyond and in addition to Rule 23(a) must be met: Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).

---

[190] *Id.* at 625.
[191] *Id.* at 625-626.
[192] Exhibit 1 at p. 162:1-163:18; Exhibit 2 at p. 149:8-150:3; Exhibit 3 at p. 107:9-108:16; Exhibit 4 at p. 23:14-24:6, 87:13-88:7; Exhibit 5 at p. 218:13-220:7, 239:23-240:16; Exhibit 6 at p. 9:1-14, 66:16-68:16; Exhibit 7 at p. 118:17-119:1; Exhibit 8 at p. 137:8-138:9; Exhibit 9 at p. 171:9-24.
[193] Exhibit 20, Proposed Class Counsel Resumes, *in globo*.

i.      **Predominance.**

The proposed bifurcated trial plan solves any potential issues surrounding predominance. Plaintiffs, as discussed below, propose a two-phase trial plan with Phase One deciding class-wide common issues concerning the Defendants' conduct and liability as it relates to the Landfill's noxious emissions that emanated therefrom, allocation of fault among Defendants for same, as well as drawing the geographic boundaries of where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined threshold for nuisance exposures during Phase One of the proposed trial plan (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb).[194] These issues are common to all class members. Phase Two would then decide specific causation and the compensatory damages for nuisance for the Class Representatives and putative class members.

The Court should only have to try the Defendants' liability for the Landfill's noxious emissions and percentages of fault amongst the Defendants one time. Once the class is certified, the results on allocation of fault at the one and only liability trial will apply to the entire class. Common liability issues, such as in this case, can and should be tried in a single class action trial with any individual issues of specific causation and damages reserved for Phase Two.[195]

Importantly, it cannot be reasonably disputed that the issue of liability predominates in the context of nuisance claims under Louisiana law.[196] The predominance analysis requires a "by

---

[194] *See Slocum* 2019 WL 2192099, at *10.
[195] See *Slocum*, 2019 WL 2192099, at *9-10; *Turner*, 234 F.R.D. at 606.
[196] See *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 608-609 (E.D. La. 2006); *Slocum v. Int'l Paper Co.*, No. CV 16-12563, 2019 WL 2192099, at *7 (E.D. La. May 21, 2019) (finding Louisiana nuisance claims supported predominance requirement for liability class for explosion at facility that released alleged hazardous waste into the atmosphere and surrounding community).

claim" by the court since the court must determine how the claims will be tried.[197] This "by claim" analysis shows the appropriateness of class treatment.

### a. Predominance of Overlapping Fact Issues

Plaintiffs' claims share large areas of common fact that predominate, such as a common source of the noxious emissions (i.e. the Landfill), the cause of the release of the noxious emissions from the Landfill (i.e. Defendants' conduct in owning, operating, and/or maintaining the Landfill), and the scope of the impact of the Landfill's noxious emissions that migrated from the Landfill to residents of the surrounding communities (including geographic scope, frequency, duration, and concentrations) between July 1, 2017 and December 31, 2019, and what steps Defendants have taken to prevent the noxious emissions.[198]

Notably, the fact that the noxious emissions at issue may not have spread uniformly throughout the area and different geographic sub-areas may have received differing degrees of noxious emissions does not preclude class treatment.[199]  The "central factual basis for all of Plaintiffs' claims" is the release of noxious emissions from the Landfill, including how much was emitted, how those emissions occurred, and where those emissions went, when, and in what concentrations.[200] Thus, "[t]here is a large area of factual overlap in the Plaintiffs' causes of action" that supports predominance.[201] There are also numerous issues that predominate concerning the Defendants' liability with respect to the legal theories asserted by the Plaintiffs.

---

[197] *Turner*, 234 F.R.D. at 606.
[198] *See Turner*, *supra* ("Plaintiffs' claims all have in common the circumstances surrounding the [crude oil] leak in Tank 250–2—how the leak physically occurred, what steps Murphy took or might have taken to contain the oil, and what steps Murphy took or might have taken to prevent the leak.").
[199] *See Turner*, 234 F.R.D. at 606.
[200] *Id.*
[201] *Id.*

### b.   *Predominance of Nuisance*

A party with an interest in immovable property may assert a nuisance claim against his

neighbor who deprives him of the use or enjoyment of his property or causes him damage.[202]

The term "neighbor" is determined on a case-by-case basis.[203]   While there is no rule of

law compelling a certain physical adjacency or proximity, there must be "some degree of

propinquity, so as to substantiate the allegation that activity on one property has caused damage

on another."[204]   "What qualifies as 'some propinquity,' however, is fact specific and may change

based on the harm alleged (for example, the radius of neighbors surrounding a loud manufacturing

plant may be much smaller than the radius of neighbors surrounding a nuclear waste facility)."[205]

Additionally, "[a] nuisance claim requires a showing that the neighbor [Defendants] (1)

'knew or, in the exercise of reasonable care, should have known that his works would cause

damage,' (2) 'the damage could have been prevented by the exercise of reasonable care,' and (3)

'he failed to exercise such reasonable care.'"[206]

Finally, a plaintiff must show that the neighbor's use caused damage to him or "'interfere[s]

substantially with the enjoyment of [his] property.'"[207]   With respect to the element requiring proof

of actual damages, this issue can be addressed in the proposed Phase Two of the bifurcated trial

---

[202] *See* La. C.C. art. 667; *Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. CV 18-7889, 2019 WL
4111681, at *3 (E.D. La. Aug. 29, 2019) ("'[A] plaintiff's interest in neighboring property can be an
ownership interest, leasehold interest, third-party interest, or more generally the interest of 'a person whose
right derives from the owner.'") (quoting *Yokum v. 615 Bourbon St., L.L.C.*, 2007-1785 (La. 2/26/08), 977
So. 2d 859, 874); *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 198
(5th Cir. 2018).
[203] *Ictech-Bendeck, supra.*
[204] *Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850
F.3d 714, 731 (5th Cir. 2017).
[205] *Ictech-Bendeck, supra.*
[206] *Cedar Lodge*, 753 F. App'x at 198 (quoting La. C.C. art. 667); *Ictech-Bendeck, supra.* (same).
[207] *See Cedar Lodge*, 753 F. App'x at 198 (quoting *Badke v. USA Speedway, LLC*, 49,060 (La. App. 2 Cir.
5/14/14), 139 So.3d 1117, 1126); *Ictech-Bendeck, supra* (quoting La. C.C. art. 667).

plan where representative and/or individual trials on specific causation and damages will proceed in "waves" or "flights" of homogenous groups of Plaintiffs/putative class members.[208]

The elements for a nuisance claim centers on Defendants' conduct, including their knowledge/constructive knowledge that their Landfill operations and maintenance activities would result in the noxious emissions at issue (i.e., co-disposal of sulfate-containing spent lime and solidification of liquid wastes using spent lime that had the obvious potential for creating excessive amounts of hydrogen sulfide gas and other odorous compounds), their knowledge/constructive knowledge that the noxious emissions could have been prevented by exercising reasonable care (i.e., by not burying sulfate-containing spent lime into a municipal solid waste landfill, by not solidifying liquid wastes using spent lime and burying that combined waste into a municipal solid waste landfill, by constructing, repairing, and/or adequately maintaining the leachate collection system, gas collection system, and landfill cover system), and Defendants' failures to do so.

Likewise, the issue concerning whether the Class Representatives and the proposed class members are "neighbors" for purposes of nuisance can be addressed in the Phase One liability phase since the fact-finder will determine the scope of the geographic area impacted by the noxious emissions that emanated from the Landfill during the relevant 30-month period as discussed *infra*. Thus, these issues predominate and can therefore be handled in the Phase One liability trial. The issue of damages would be addressed in Phase Two of the bifurcated trial plan as discussed *infra*.

      c.  *Predominance of Common, Complex Issues Over Any Individualized Issues.*

Under these facts and circumstances, the common complex issues as to Defendants' liability, apportionment of fault, and the determination of the Landfill's noxious emissions and the

---

[208] *See Slocum*, 2019 WL 2192099, at *6, *10 (approving class on issue of liability while permitting the damages element to be "resolved by individual trials" in a subsequent phase of the litigation "to determine specific causation and to award damages, if any.").

impact of those noxious emissions to the surrounding communities at large in terms of the geographic scope, frequency, duration, and concentrations for the 30-month period predominate over any individualized issues.

As demonstrated by the trial on General Causation, the determinations as to how much hydrogen sulfide gas was generated by the Landfill (including via degradation of the sulfate-containing spent lime buried in Phase 4A), how much hydrogen sulfide gas escaped from the Landfill, and where those noxious emissions traveled, when, and in what concentrations during the 30-month period at issue are complex issues which involve the consideration of detailed scientific evidence and the testimony and opinions of numerous experts. It cannot be reasonably disputed that these common and complex issues constitute a significant part of the individual claims. The same cannot be said for any issues that this Court may deem to be individualized, namely specific causation for the nuisance injuries and related compensatory damages.

In fact, Defendants' prior statements betray any arguments to the contrary. Defendants previously asserted that liability and allocation of fault "involve highly technical fact and expert evidence" on numerous complex sub-issues and that "[c]ombining these complex issues of liability in a trial with causation and damages risks significant juror confusion."[209] Defendants confirmed that the bifurcation of these issues "would result in little duplication of evidence or testimony between the two trials because the evidence and witnesses for causation and damages are distinct from those related to liability, which focus on internal landfill operations."[210]

Further supporting the conclusion that the proposed bifurcated trial plan best manages the complexities of this litigation and promotes judicial efficiency, Defendants also previously contended that the liability question posed here is so complex that Defendants consider it to be a

---

[209] Doc. 303-1 at p. 2 (Page 6 of 19).
[210] Doc. 303-1 at p. 2-3 (Page 6-7 of 19).

"trial within a trial" among these Defendants "requiring many more witnesses, trial time, and another set of technical and business issues that will overwhelm a jury."[211] Defendants provided a detailed description of the complex issues that must be considered when determining allocation of fault for Plaintiffs' nuisance claims, including evidence on landfill operations, the scope of responsibility for each Defendant, contractual obligations, each Defendant's decisions and actions, industry and regulatory standards, and breaches of the relevant standards of care, all of which Defendants assert require multiple fact and expert witnesses.[212]

Defendants have already admitted that the issues of specific causation and damages are the simpler issues associated with these nuisance claims by asserting that bifurcating these issues from liability and allocation "will promote efficiency, convenience, and clarity by simplifying the evidence for the jury."[213] These nuisance claims do not present complex questions regarding medical causation for personal injuries typically present in mass toxic tort actions involving temporary transitory exposures over the course of a few hours or days. The nuisance claims at issue herein do not involve symptoms of serious medical illness alleged to have occurred due to a temporally limited exposure event. Rather, the nuisance claims asserted herein involve symptoms of annoyance and inconvenience associated with up to 30 months of exposures to the Landfill's noxious emissions. As Defendants previously admitted, the emissions mapping adjudicated in

---

[211] Doc. 303-1 at p. 7 (Page 11 of 19); see also Doc. 303-1 at p. 11 (Page 16 of 19) (acknowledging liability and allocation of fault are "multiple complex issues" that must be tried).
[212] Doc. 303-1 at p. 8 (Page 12 of 19).
[213] Doc. 303-1 at p. 9 (Page 13 of 19) ("Reverse bifurcation would facilitate, not frustrate, the Court's goals as it will promote efficiency, convenience, and clarity by simplifying the evidence for the jury to focus on the discrete issues of causation and damages. The issues of causation and damages are sufficiently distinct that a separate trial on liability would not result in undue duplication of witnesses or evidence."); see also Doc. 303-1 at p. 11, fn. 14 (Page 16 of 19) (arguing that proceeding with specific causation and damages separately "will make the issues before the jury considerably less complex, enhancing Defendants' Seventh Amendment right-to-jury.")

Phase One will drive the determinations of specific causation and damages,[214] which Defendants

have previously described as "basic issues."[215]

    **ii.**       **Superiority.**

    FRCP 23(b)(3) requires that the class action be superior to other available methods for the

fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

    In mass nuisance actions such as this one, the legal and factual issues involving the

Defendants' liability for the Landfill's noxious emissions do not differ at all from one plaintiff to

the next and should be decided one time for judicial efficiency. A class action is the superior

method of adjudicating the common issues of liability for the Landfill's noxious emissions for

over 75,000 potential plaintiffs. As the Fifth Circuit stated in *Jenkins*, a bifurcated plan "is clearly

superior to the alternative of repeating, hundreds of times over, the litigation of [the same issues]

with ... days of the same witnesses, exhibits and issues from trial to trial."[216] Not only will it relieve

the court of having to try thousands of individual cases, but it will also limit the number of issues

to be litigated once Phase One of the proposed trial plan has been completed.

    The factors to be considered under Rule 23(b)(3)(A)-(D) also support this conclusion.

Class treatment of the issue of liability is a superior method to litigating these claims given the

judicial efficiency to be gained in not having to try this issue thousands of times. Further, this

litigation has been before the Court for over five (5) years. An issues class on liability, allocation

of fault, and the determination of the geographic extent of that liability affords the Court the

mechanism needed to bring these cases to resolution. Should any of the potential class members

---

[214] See Doc. 303-1 at p. 2 (Page 6 of 19) ("Causation and damages will require fact and expert evidence on air dispersion, calculations of hydrogen sulfide emission rates...").

[215] See Doc. 303-1, Defendants' Memorandum in Support of Motion to Bifurcate, at p. 1 (Page 5 of 19) (describing specific causation and damages as "basic issues").

[216] *Jenkins*, 782 F.2d at 473.

decide to go it alone, they can opt out. However, any such opt-outs would be unlikely given the difficulty inherent in finding attorneys to prosecute solely nuisance claims and the indisputable prohibitive costs associated with retaining experts to adjudicate the common, complex issues necessary to prosecute those claims.

## V.   PROPOSED TRIAL PLAN

### A.  BIFURCATION

Plaintiffs propose a Two-Phase bifurcated Trial Plan for resolution of this litigation on a class-wide basis. Rule 42(b) of the Federal Rules of Civil Procedure permits a court to order separate trials of separate claims or issues, when separate trials would further convenience, avoid prejudice, or expedite resolution of the dispute. See FRCP 42(b).

Plaintiffs propose that a Phase One trial related to Defendants' (in)actions be conducted which would promote judicial efficiency and expedite resolution of the dispute. Defendants' conduct to be tried in Phase One would include complex issues related to their liability for nuisance and apportionment of fault to be tried commonly. Phase One would also include common issues related to the Landfill's emissions including not only the amount of noxious emissions released from the Landfill during the relevant time period but also drawing the geographic boundaries of where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined nuisance odor threshold during Phase One.[217]

Plaintiffs' proposed Phase Two trial would include representative and/or individual trials on specific plaintiff causation and compensatory damages with Plaintiffs divided into "waves" or "flights" of homogenous groups based on geographic sub-locations.[218]

---

[217] See *Slocum*, 2019 WL 2192099, at *10.
[218] See *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—

The model being proposed by Plaintiffs is similar to that approved by the U.S. Fifth Circuit in *Watson* and the Honorable Eldon E. Fallon in *Turner v. Murphy Oil* and *Slocum*.[219]

In *Turner v. Murphy Oil*, for example, the court implemented a three-phase trial plan for a case involving an oil spill from a common source where Phase One concerned issues of liability for compensatory damages and the amount of damages for trial plaintiffs, Phase Two addressed common issues regarding punitive damages, and Phase Three involved separate trials for the remaining members of the class.[220] In *Slocum*, the court implemented a two-phase trial plan for a case involving a single source of environmental contamination where Phase One was a trial addressing all common issues related to the defendants' liability and determining the geographic scope of the plume radius, and Phase Two involved various flights of trials in groups of five plaintiffs with like claims to determine specific causation and to award damages, if any.[221]

As noted in *Turner v. Murphy Oil*, the U.S. Fifth Circuit has approved of the bifurcation of mass tort claims when individual issues such as specific causation and damages are left for a second trial.[222] Plaintiffs submit that similar to *Turner*, a Trial Plan can be fashioned in such a manner that a second jury will not be asked to re-examine the factual findings of the first jury. The

---

the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.")

[219] See *Watson v. Shell Oil Company*, 979 F.2d 1014, 1017-18 (5th Cir. 1992); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 601 (E.D. La. 2006); *Slocum*, 2019 WL 2192099, at *10.

[220] *Turner*, 234 F.R.D. at 606.

[221] *Slocum*, 2019 WL 2192099, at *9-10; see also, *Watson v. Shell Oil Company*, 979 F.2d 1014, 1017-18 (5th Cir. 1992) (implementing four-phase trial plan where common issues for liability and liability for punitive damages were addressed in Phases 1 and 2 in a jury trial, and quantum of damages was addressed in Phases 3 and 4 in separate jury trials in "waves of five" plaintiffs); *Deepwater Horizon*, 739 F.3d at n65 (noting prior approval of bifurcation of class-wide liability issues and issues of individual damages in mass tort class actions when district court has manageable trial plan).

[222] *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 606 (E.D. La. 2006) ("[T]he Court believes that the existence of a trial plan, and the potential for bifurcation of the issues of liability and damages, will address the Defendant's concern that individualized inquiries will be needed to determine damage amounts in these cases. The Fifth Circuit has repeatedly upheld the decisions of district courts to bifurcate class action trials into liability and damages phases. See *Mullen*, 186 F.3d at 628 (affirming a bifurcated plan and citing other instances of bifurcated class action trials).")

efficiency of a bifurcated proceeding greatly outweighs the potential risk that such a proceeding would violate the Seventh Amendment. As the Fifth Circuit stated in *Jenkins*, a bifurcated plan "is clearly superior to the alternative of repeating, hundreds of times over, the litigation of [the same issues] with ... days of the same witnesses, exhibits and issues from trial to trial."[223]

Such approval was again recently expressed by the U.S. Fifth Circuit in *Deepwater Horizon.*[224] There the court cited its decision in *Madison v. Chalmette Refining, LLC.*, 637 F.3d 551, 556 (5th Cir. 2011), reiterating that this has been accomplished successfully in many circuits "by means of multi-phase trials under Rule 23(c)(4), which permits district courts to limit class treatment to 'particular issues' and reserve other issues for individual determination."[225]

Plaintiffs' proposal herein is also consistent with Defendants' prior arguments in support of bifurcating the issues of liability and allocation of fault from specific causation and damages for the *Addison* initial trials. As Defendants made clear just a few months ago, adjudicating these distinct issues in separate phases promotes judicial efficiency, and is necessary to "ensure the manageability of the complex issues being presented to the jury..."[226] In fact, Defendants argued that "[f]undamental fairness and Seventh Amendment concerns dictate that liability underlying the 547 *Addison* Plaintiffs' claims be tried in a single trial."[227] Defendants then expressly admitted that "the Seventh Amendment prohibits[] multiple juries [from deciding] the same factual and legal arguments concerning liability and allocation of liability in the consolidated *Addison* action– with the potential to produce anomalous results."[228] Defendants expressly proposed that the Court

---

[223] *Jenkins*, 782 F.2d at 473.
[224] *In re Deepwater Horizon*, 739 F.3d 790, 806-807, fn. 65 (5th Cir. 2014) (noting prior approval of bifurcation of class wide liability issues and issues of individual damages).
[225] *In re Deepwater Horizon*, 739 F.3d at 816 citing *Madison*, supra.
[226] Doc. 306-1 at p. 4.
[227] Doc. 306-1 at p. 1-2.
[228] Doc. 306-1 at p. 2.

may want to try liability and allocation for all *Addison* plaintiffs in one "dedicated trial" rather than re-trying liability at each successive trial "because of the potential it would yield inconsistent verdicts."[229] "The bifurcation of liability avoids these issues by focusing the individual trials on Plaintiff-specific inquiries of specific causation and damages, and then having a single jury determine the common issues of liability and allocation among Defendants and third parties."[230]

The same reasoning holds true here in this nuisance class action.

### B. PHASE ONE: COMMON ISSUES OF LIABILITY, APPORTIONMENT OF FAULT, AND THE IMPACT OF THE LANDFILL'S EMISSIONS TO THE SURROUNDING COMMUNITIES

The jury's decisions in Phase One as to Defendants' respective liability, and subsequent apportionment of fault, for the noxious emissions that emanated from the Landfill during the relevant time period, and where those noxious emissions travelled and how often at levels at or above the determined nuisance odor threshold, shall be binding upon all plaintiff class members and trial Defendants.

The particular common issues related to Defendants' liability and the apportionment of fault for the noxious emissions from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019 include:

i.   What amount of emissions of hydrogen sulfide gas and other noxious odors emanated from the Landfill during the relevant time period;

ii.  Where the Landfill's emissions of hydrogen sulfide gas and other noxious odors that emanated from the Landfill went during the relevant time period, when, and in what concentrations above the Court's determined threshold for nuisance exposures (i.e., the Class Area);

---

[229] Doc. 303-1 at p. 9 (Page 13 of 19); see also Doc. 303-1 at p. 10 (Page 14 of 19) (highlighting the importance of trying liability and allocation one time to avoid "the possibility of divergent verdicts" on the same issues); see also Doc. 303-1 at p. 11, fn. 12 (Page 15 of 19) ("Even if the liability finding is not preclusive, the risk of divergent jury findings on the same issues further violates the Seventh Amendment.").

[230] Doc. 306-1 at p. 3.

iii.   Defendants' respective liability for the Landfill's noxious emissions that emanated therefrom during the relevant time period and apportionment of fault among them;

iv.   Whether Defendants knew, or in the exercise of reasonable care, should have known that their works would cause legally cognizable damages to the Class Representatives and the proposed Class they seek to represent;

v.   Whether the claimed damages could have been prevented by the exercise of reasonable care;

vi.   Whether Defendants failed to take reasonable care or take measures to prevent or otherwise minimize and contain the emission of noxious odors from the Landfill;

vii.   Whether the proposed Class Representatives and putative class members are "neighbors" of Defendants;

viii.   Whether Defendants collectively and/or individually owed a duty to the proposed Class Representatives and the Class they seek to represent to maintain the Landfill and operate the Landfill in a prudent manner so as to prevent the release/emission of noxious odors in and around the areas neighboring the Landfill;

ix.   Whether Defendants breached their respective duties owed to the proposed Class Representatives and the Class they seek to represent;

x.   Whether Defendants are strictly liable and/or at fault for the Landfill's noxious emissions that emanated from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019;

xi.   Which Defendants were responsible for the decision to bury (co-dispose) approximately 23,000 tons of sulfate-containing spent lime in Phase 4A;

xii.   What knowledge Defendants had or should have had regarding potential odor issues created by burying (co-disposing) sulfate-containing spent lime in a municipal solid waste landfill;

xiii.   When did Defendants acquire knowledge of the potential odor issues created by burying sulfate-containing spent lime in a municipal solid waste landfill and what they did after acquiring such knowledge;

xiv.   When did Defendants acquire knowledge of the potential odor issues created by solidifying liquid wastes with sulfate-containing spent lime in a municipal solid waste landfill and what they did after acquiring such knowledge;

xv.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish regarding the composition of the Rain Carbon spent lime;

xvi.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish regarding the potential odor issues posed by burying (co-disposing) sulfate-containing spent lime in a municipal solid waste landfill;

xvii.    Did the Waste Connections Defendants intentionally or negligently omit and/or conceal material facts from its communications and disclosures to Jefferson Parish regarding the potential odor issues posed by solidifying liquid wastes with sulfate-containing spent lime in a municipal solid waste landfill;

xviii.    What knowledge Defendants had regarding elevated emissions of hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period and when Defendants acquired such knowledge;

xix.    What knowledge Defendants had regarding deficiencies in the leachate collection system and when Defendants acquired such knowledge;

xx.    What knowledge Defendants had regarding deficiencies in the gas collection system and when Defendants acquired such knowledge;

xxi.    What knowledge Defendants had regarding deficiencies in the landfill cover system and when Defendants acquired such knowledge;

xxii.    Whether comparative fault for the hydrogen sulfide gas and other noxious odors from the Landfill during the relevant time period of July 1, 2017 through December 31, 2019 is attributable to Plaintiffs or to any third party.

**C. PHASE TWO: SUCCESSIVE TRIALS ON SPECIFIC CAUSATION AND COMPENSATORY DAMAGES BASED UPON THE SPECIFIC ISSUES OF DEFENDANTS' CONDUCT AND THE EMISSIONS' IMPACT TO THE SURROUNDING COMMUNITIES RESOLVED IN PHASE ONE.**

The proposed Class Representatives are representative of the nuisance injuries sustained by individuals in their respective neighborhoods and/or sub-areas within the class area, such that trials on their individual claims can adequately adjudicate specific causation for the nuisance injuries sustained by individual putative class members within each Class Representative's respective geographic sub-area and the quantum thereof. Nevertheless, to the extent this Honorable

Court concludes that the issues of specific causation and nuisance injuries are individualized, the Class Representatives' initial trials can serve as bellwether trials for individual putative class members within each Class Representative's respective geographic sub-area to assist with resolution of this action. Moreover, certain individual putative class members could be added as class representatives for the Trial in Phase Two to represent any geographic areas that Defendants contend are not represented.

All remaining issues shall be tried during Phase Two, including specific causation, the nature and extent of nuisance injuries suffered as a result of the Landfill's noxious emissions, and the amount of compensatory damages owed to the Class Representatives and putative class members. Plaintiffs may present evidence in Phase Two regarding class-wide valuation of nuisance damages. This Honorable Court would issue any and all orders necessary for the orderly "waves" or "flights" of trials to proceed on issues to be formulated by the Court. Judge Fallon in *Slocum* describes the practical application of such a bifurcated trial plan as follows:

> Assuming the finder of fact finds in favor of Plaintiffs in Phase One, the Court would then proceed to Phase Two. Phase Two shall consist of various trial flights of groups of five Plaintiffs with like claims to determine specific causation and to award damages, if any. [ ]. Many of the findings made in Phase One will likely limit the number of Plaintiffs' claims to be adjudicated in Phase Two—for example, some Plaintiffs may fall outside of the geographic scope established by the fact finder in Phase One.[231]

Plaintiffs submit that any such orderly "waves" or "flights" of trials be based on geographic location, as guided by the findings in Phase One as to where the Landfill's emissions went during the relevant time period, when, and in what concentrations above the Court's determined threshold

---

[231] *Slocum*, 2019 WL 2192099, at *10 (internal citations omitted).

for nuisance exposures during the liability phase of the litigation (hydrogen sulfide at average exposures over a thirty-minute period of at least 5 ppb). Proceeding in this geographically driven manner would allow for the streamlined adjudication of the issues of specific causation for the alleged nuisance injuries and compensatory damages for those with like claims.

## VI.   PROPOSED CLASS COUNSEL

Proposed Class Counsel are Scott R. Bickford, Lawrence J. Centola, III, and Jason Z. Landry of Martzell, Bickford & Centola, APC, Bruce C. Betzer of the Law Office of Bruce C. Betzer, Douglas S. Hammel of Hammel Law Firm, LLC, Anthony D. Irpino, Louise C. Higgins, Pearl Robertson, and Kacie F. Gray of Irpino, Avin & Hawkins, John D. Sileo of the Law Office of John D. Sileo, and Seth H. Schaumburg of Favret Demarest Russo Lutkewitte & Schaumburg.

Further, proposed Class Counsel represent that they have and will continue to invest significant time and resources in this case, including reviewing documents, meeting with clients, drafting pleadings, engaging in discovery, and participating in court hearings. Proposed Class Counsel are also qualified based upon extensive experience litigating major class actions and multi-district litigation cases.

## VII.   PROPOSED CLASS REPRESENTATIVES

The proposed Class Representatives are Elias Jorge "George" Ictech-Bendeck, Nicole M. Landry-Boudreaux, Larry Bernard, Sr., Mona Bernard, Phil Adams, Robyn Crossman, Kayla Anne Steele, Ann Williams, and Ophelia Walker. The proposed Class Representatives have been involved in fact development in this putative class action, provided relevant information, answered discovery, have been kept apprised of the litigation, are knowledgeable of the facts of this case, have given deposition testimony, and are willing to testify at trial. They understand their role as

class representatives and have the desire and motivation to see this litigation through to the end on behalf of all others similarly situated.

## VIII.   CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Putative Class Representatives respectfully request that their motion be granted.

Date: May 15, 2024

Respectfully Submitted:

*/s/ Lawrence J. Centola, III*
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, Iii (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

*/s/ Bruce C. Betzer*
Bruce C. Betzer (Bar No. 26800)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

*/s/ Douglas S. Hammel*
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

*/s/ Kacie F. Gray*
Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street

New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

*/s/ John D. Sileo*
John D. Sileo (La Bar No. 17797)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*/s/ Seth H. Schaumburg*
Seth H. Schaumburg (La Bar No. 24636)
Favret Demarest Russo Lutkewitte & Schaumburg
1555 Poydras Street, Suite 1600
New Orleans, LA 70112
P: (504) 562-1006
F: (504) 523-0699
seth@favretlaw.com
*Counsel for Ictech-Bendeck Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of

record.

*/s/ Lawrence J. Centola, III*