## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** Plaintiff | **CIVIL ACTION** |
| | **NO. 18-7889** **c/w 18-8071,** |
| **VERSUS** | **18-8218, 18-9312** |
| **WASTE CONNECTIONS BAYOU, INC., ET AL.,** Defendants | **SECTION: "E" (5)** |
| *Applies to: All Cases* | **JUDGE: Morgan** **MAGISTRATE JUDGE: North** |

## DEFENDANTS' OPPOSITION TO MOTION TO CERTIFY CLASS

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

List of Other Documents .................................................................................................. vii

Introduction ........................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

   I. The JPLF is located within a mixed residential, industrial, and commercial area.................. 4

   II. Plaintiffs seek certification of an expansive class covering approximately 46 square miles. 5

LEGAL STANDARD .......................................................................................................... 6

Argument ............................................................................................................................ 7

   I. Individual issues as to liability, causation, and damages predominate over any common
      questions. ................................................................................................................... 7

     A. Individual inquiries are needed to determine exposure to odors from the JPLF. ............. 10

     B. No class-wide methodology exists for determining impacts from odors or the
        reasonableness of the alleged interference. ................................................................. 16

     C. Individualized assessment is required into the source of odors. ........................................ 21

     D. Person-specific inquiries are needed to determine the cause of alleged symptoms. ........ 27

     E. Plaintiffs do not offer any means for calculating damages on a class-wide basis. .......... 28

   II. A class action is not the superior method of adjudicating Plaintiffs' claims. ..................... 29

   III. Bifurcation and the certification of issue classes is not warranted given the prevalence of
       individual issues. ......................................................................................................... 32

   IV. The proposed class representatives' claims are not typical because exposures to and
       impacts from odors (if any) vary widely among putative class members. ......................... 34

   V. The proposed class representatives are not adequate representatives. ................................ 37

   VI. Plaintiffs' proposed class and subclasses are not ascertainable because they are overly
       broad and are not supported by reliable evidence of exposure. ........................................ 39

     A. The proposed class and subclasses include a great many people without viable nuisance
        claims........................................................................................................................ 40

     B. Plaintiffs' modeling results do not reliably predict exposures to odors and cannot offer an
        objective basis for the proposed class and subclass boundaries................................. 40

     C. Plaintiffs' class and subclass boundaries are not tied to their modeling results. ............. 48

   VII. Plaintiffs do not propose a workable trial plan. ............................................................. 50

CONCLUSION.................................................................................................................... 51

i

# TABLE OF AUTHORITIES

**Cases**

*A to Z Paper Co., Inc. v. Carlo Ditta, Inc.*,
No. 1999-1189 (La. App. 4 Cir. 10/4/00), 775 So.2d 42 .................................................... 8, 19

*Akeem v. Dasmen Residential, LLC*,
2021 WL 4804049, (E.D. La. Oct. 14, 2021) ..................................................................... 21, 34

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ............................................................................................... 30, 32

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................................................... 37

*Ardoin v. Stine Lumber Co.*,
220 F.R.D. 459 (W.D. La. 2004) .............................................................................................. 38

*Barnes v. Dresser, LLC*,
2023 WL 4980240 (W.D. La. Aug. 3, 2023) .................................................. 9, 11, 21, 31, 33

*Barrett v. T.L. James & Co.*,
28,170 (La. App. 2 Cir. 4/3/96), 671 So. 2d 1186 .............................................................. 8

*Bell v. Foster Wheeler Energy Corp.*,
2017 WL 876983 (E.D. La. Mar. 6, 2017) ............................................................................ 17

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ................................................................................................... 37

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ................................................................................................... 48

*Braidwood Mgmt., Inc. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) .................................................................................................... 39

*Braud v. Transp. Servs. of Ill.*,
2009 WL 2208524 (E.D. La. July 23, 2009) .................................................................... 28, 30

*Burleson v. Tex. Dep't of Criminal Justice*,
393 F.3d 577 (5th Cir. 2004) ................................................................................................... 10

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ..................................................................................................... 32

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................... 6

*Contromano v. United Technologies Corp.*,
  2018 WL 2047468 (S.D. Fla. May 2, 2018) ............................................ 39

*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020)............................................................... 7, 29

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
  829 F.3d 370 (5th Cir. 2016)............................................ 14, 22, 32, 33

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ............................................................................... 41

*DeBremaecker v. Short*,
  433 F.2d 733 (5th Cir. 1970)................................................................. 39

*Duffin v. Exelon Corp.*,
  2007 WL 845336 (N.D. Ill. Mar. 19, 2007) ......................................... 49

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014)................................................................. 39

*Ford v. Murphy Oil U.S.A., Inc.*,
  96-2913 (La. 9/9/97), 703 So. 2d 542 ............................................. 15, 16

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011)................................................................... 16

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)..................................................... 39

*Guidry v. Dow Chemical Co.*,
  No. 19-cv-12233, R. Doc. 260 (E.D. La. May 24, 2022)................... 9, 14, 15, 17, 28

*Ictech-Bendeck v. Progressive Waste Sols. of La., Inc.*,
  2019 WL 4111681 (E.D. La. Aug. 29, 2019)................................. 6, 8, 11

*Ictech-Bendeck v. Waste Connections Bayou, Inc.*,
  2020 WL 2037185 (E.D. La. Apr. 28, 2020) ........................................ 22

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
  2019 WL 2924135 (E.D. La. July 8, 2019)............................................ 38

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014)................................................................. 33

*In re FIRSTPLUS Fin., Inc.*,
  248 B.R. 60 (N.D. Tex. 2000) .................................................................. 31

*In re Katrina Canal Breaches Consol. Litig.*,
  2007 WL 2363135 (E.D. La. Aug. 16, 2007) ........................................ 32

*In re Katrina Canal Breaches Consol. Litig.*,
  258 F.R.D. 128 (E.D. La. 2009) ...................................................... 22, 33

*In re Omnicom ERISA Litig.*,
  2022 WL 18957200 (S.D.N.Y. Aug. 11, 2022) .................................... 39

*In re Vioxx Prods. Liab. Litig.*,
  239 F.R.D. 450 (E.D. La. 2006) ........................................................ 8, 38

*Johnson v. Am. Credit Co.*,
  581 F.2d 526 (5th Cir. 1978) .............................................................. 38

*Johnson v. Orleans Par. Sch. Bd.*,
  2005-1488 (La. App. 4 Cir. 8/9/06), 938 So. 2d 219 ......................... 40

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................... 41

*Lloyd v. Covanta Plymouth Renewable Energy, LLC*,
  585 F. Supp. 3d 646 (E.D. Pa. 2022) ...................................... 11, 22, 32

*Madison v. Chalmette Ref., LLC*,
  637 F.3d 551 (5th Cir. 2011) ................................................................ 7

*McNabney v. Lab. Corp. of Am.*,
  153 Fed. App'x 293 (5th Cir. 2005) .................................................... 27

*Moore v. Ashland Chem., Inc.*,
  151 F.3d 269 (5th Cir. 1998) .............................................................. 41

*Moore v. Livingston*,
  2016 WL 922218 (E.D. Tex. Jan. 11, 2016) ........................................ 35

*Mullen v. Treasure Chest Casino, LLC*,
  186 F.3d 620 (5th Cir. 1999) .............................................................. 33

*Nola v. Exxon Mobil Corp.*,
  2015 WL 2338336 (M.D. La. May 13, 2015) ...................................... 33

iv

*Prantil v. Arkema Inc.*,
  986 F.3d 570 (5th Cir. 2021) ........................................................................ 7, 41

*Price v. Martin*,
  2011-0853 (La. 12/6/11), 79 So. 3d 960 .............................. 8, 9, 21, 22, 31

*Rivera v. Wyeth-Ayerst Labs.*,
  283 F.3d 315 (5th Cir. 2002) ........................................................................ 38

*Roberts v. Cardinal Servs., Inc.*,
  266 F.3d 368 (5th Cir. 2001) .................................................................. 38, 40

*Slocum v. International Paper Co.*,
  2019 WL 2192099 (E.D. La. May 21, 2019) .............................................. 33

*Steering Comm. v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ............................................ 1, 9, 28, 29, 6, 7

*Thornburg v. Ford Motor Co.*,
  2022 WL 4348475 (W.D. Mo. Sept. 19, 2022) .......................................... 38

*Ticknor v. Rouse's Enters., LLC*,
  2014 WL 1764738 (E.D. La. May 2, 2014) ................................................ 30

*Trevino v. Holly Sugar Corp.*,
  811 F.2d 896 (5th Cir. 1987) ........................................................................ 35

*Turner v. Murphy Oil USA, Inc.*,
  234 F.R.D. 597 (E.D. La. 2006) .................................................................. 33

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) .......................................................................... 6

*Wagner v. Cent. La. Elec. Co., Inc.*,
  99 F.R.D. 279 (E.D. La. 1983) .................................................................... 40

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ..................................................................................... 6, 7

*Watson v. Shell Oil Co.*,
  979 F.2d 1014 (5th Cir. 1992) ...................................................................... 33

**Statutes**

La. Civil Code art. 669...............................................................................................8
La. R.S. 13:4231 ......................................................................................................37
La. R.S. 13:4231 cmts. .............................................................................................37

**Rules**

Fed. R. Civ. P. 23 .............................................................................. 7, 29, 31, 34, 37
Fed. R. Civ. P. 23 advisory committee notes............................................................ 1
Fed. R. Evid. 702 .....................................................................................................41

**Regulations**
40 C.F.R. § 98.343(c), Table HH-3 .........................................................................46

**Other Authorities**

2 Toxic Torts Guide § 13.03, *Disadvantages of Class Actions* ...................................31
Eldon E. Fallon et. al., Bellwether Trials in Multidistrict Litigation,
    82 Tul. L. Rev. 2323, 2324 (2008)......................................................................32
Manual for Complex Litigation §§ 21.142, 21.15 (4th ed. ......................................32

# LIST OF OTHER DOCUMENTS

**Plaintiffs' Briefing and Exhibits**

| Brief or Exhibit No. | ECF No. | Brief or Exhibit Name |
|---|---|---|
| Pls. Br. | 438-21 | Memorandum in Support of Plaintiffs' Amended Motion to Certify Class |
| Pls. Ex. 12 | 438-12 | Expert Report of James Lape |
| Pls. Ex. 16 | 438-16 | Revised Version of Figure 56 (depicting Mr. Lape's modeling results) |

**Defendants' Exhibits**

| Exhibit Letter | Exhibit Name |
|---|---|
| A | Declaration of Matthew Stutz |
| A-1 | Addendum to Expert Report of Matthew Stutz (Apr. 2024) |
| B | Declaration of Dr. John Kind |
| B-1 | Expert Report of Dr. John Kind (Apr. 2021) |
| B-2 | Supplemental Expert Report of Dr. John Kind (Mar. 2024) |
| C | Declaration of Dr. Paolo Zannetti |
| C-1 | Expert Report of Dr. Paolo Zannetti (Apr. 2024) |
| C-2 | Memorandum of Dr. Paolo Zannetti (Apr. 2024) |
| C-3 | Revised Memorandum of Dr. Paolo Zannetti (June 2024) |
| D | Declaration of Michael Corn |
| D-1 | Expert Report of Michael Corn (Mar. 2024) |
| E | Declaration of Dr. Pamela Dalton |
| E-1 | Expert Report of Dr. Pamela Dalton (Mar. 2024) |
| F | Declaration of Trevor Phillips |
| F-1 | Expert Report of Trevor Phillips (Mar. 2024) |
| G | Declaration of Dr. Bishow Shaha |
| G-1 | Expert Report of Dr. Bishow Shaha (Mar. 2024) |
| H | Rebuttal Report of James Lape (Mar. 2024) |
| I | Expert Report of Dr. Jaana Pietari (Feb. 2024) |
| J | Expert Report of Jose Sananes (Feb. 2024) |
| K | Shaha, B.N. and D.E. Meeroff, Prediction of $H_2S$ Concentration in Landfill Gas Resulting from Construction and Demolition Debris and the Selection of Treatment Method (2020) |
| L | Anderson, R., J.R. Jambeck, and G.P. McCarron, Modeling of Hydrogen Sulfide Generation from Landfills Beneficially Utilizing Processed Construction and Demolition Materials (2010) |
| M | Malmir, T, D. Lagos, and U. Eicker, Optimization of Landfill Gas Generation Based on a Modified First-Order Decay Model: A Case Study in the Province of Quebec, Canada (2023) |
| N | Excerpts from the Deposition Transcript of James Lape (Apr. 2024) |

| O | Excerpts from the Deposition Transcript of Dr. Susan Schiffman (Aug. 2021) |
|---|---|
| P | Excerpts from the Deposition Transcript of Dr. Susan Schiffman (Apr. 2024) |
| Q | Excerpts from the Deposition Transcript of Michael Corn (Apr. 2024) |
| R | Excerpts from the Deposition Transcript of Phil Adams (Jan. 2024) |
| S | Excerpts from the Deposition Transcript of John Kind (May 2024) |
| T | Excerpts from the Deposition Transcript of Dr. Jaana Pietari (July 2021) |
| U | Excerpts from the Deposition Transcript of Dr. Jaana Pietari (Apr. 2024) |
| V | Excerpts from the Deposition Transcript of Jose Sananes (Apr. 2024) |
| W | Excerpts from the Deposition Transcript of Nestor Soler (June 2021) |
| X | Excerpts from the Deposition Transcript of Elias Ictech-Bendeck (Jan. 2024) |
| Y | Excerpts from the Deposition Transcript of Kayla Steele (Jan. 2024) |
| Z | Excerpts from the Deposition Transcript of Larry Bernard (Dec. 2023) |
| AA | Excerpts from the Deposition Transcript of Mona Bernard (Dec. 2023) |
| BB | Excerpts from the Deposition Transcript of Nicole Landry-Boudreaux (Dec. 2023) |
| CC | Excerpts from the Deposition Transcript of Robyn Crossman (Dec. 2023) |
| DD | Excerpts from the Deposition Transcript of Ann Williams (Nov. 2023) |
| EE | Excerpts from the Deposition Transcript of Savannah Thompson (Jan. 2024) |
| FF | Excerpts from the Deposition Transcript of Douglas Brown (Jan. 2024) |
| GG | Excerpts from the Deposition Transcript of Kris Carlson (Jan. 2024) |
| HH | Declarations of Putative Class Members |
| II | *Arceneaux v. Louisiana Regional Landfill Co.* Plaintiff Fact Sheets |
| JJ | Appendix E from the Expert Report of James Lape (Feb. 2024) |
| KK | Louisiana Department of Environmental Quality, Mobile Air Monitoring Lab Report for River Ridge and Harahan, LA (July 2018) |
| LL | Louisiana Department of Health Report (Jan. 2019) |
| MM | Louisiana Department of Environmental Quality, Field Interview Form for Jefferson Parish Landfill (Apr. 2019) (WC_JPLF_00223436) |
| NN | Louisiana Department of Environmental Quality, Field Interview Form for River Birch Landfill (Dec. 2018) (RIVER_BIRCH_0003897) |
| OO | World Health Organization Regional Office for Europe, Air Quality Guidelines for Europe (2000) |
| PP | Facebook Posts from Harahan/River Ridge Air Quality Group (Apr. 2018) (WC_JPLF_HERBERT_00010227) |
| QQ | Facebook Posts from Harahan/River Ridge Air Quality Group (July 2018) (WC_JPLF_HERBERT_00009437) |
| RR | Facebook Posts from Harahan/River Ridge Air Quality Group (Jan. 2019) (WC_JPLF_HERBERT_00005124) |
| SS | Resident Email to City of Harahan (Aug. 2017) (WC_JPLF_00538088) |
| TT | Email Chain Between Proposed Class Counsel Seth Schaumburg and City of Harahan (Aug. 2017) (WC_JPLF_00538083) |

| UU | *Addison v. Louisiana Regional Landfill Co.* Plaintiffs' Rule 26(a) Initial Disclosures |
|----|----|
| VV | Capture from the Website of the Law Office of Bruce C. Betzer (taken Dec. 2023) |
| WW | Capture from Shanna LaGarde and Bruce Betzer's Wedding Website on the Knot (taken May 2024) |
| XX | Excerpts from the Deposition Transcript of Holly Hermann (Dec. 2023) |
| YY | Louisiana Department of Environmental Quality, Inspection Report for the Jefferson Parish Landfill (Feb. 2024) |
| ZZ | Excerpts from the Deposition Transcript of Dr. Jaana Pietari (Sept. 2021) |

## INTRODUCTION

This is not the rare mass tort warranting class certification under the Fifth Circuit's demanding standards.[1] Citing their unreliable and inflated modeling results (which the Court has not adopted), Plaintiffs seek to certify a class of anyone living in a 46-square-mile area surrounding the Jefferson Parish Landfill ("JPLF") at any time over a 2.5-year period. Despite the substantial evidence of other odor sources, and their own expert's admissions that people do not respond to odors in the same manner, Plaintiffs assert that class treatment is warranted based on the notion that thousands of putative class members had common exposures to odors and common injuries caused by a single facility. No such uniformity exists. Liability, causation, and damages cannot be resolved without conducting innumerable individual inquiries into these issues, and certification should be denied.

Plaintiffs have not established that common questions predominate, a Rule 23 requirement, because the putative class members' exposures and responses to odors cannot be determined without assessing their unique circumstances. While Plaintiffs rely on modeling of hydrogen sulfide ("$H_2S$") emissions by their expert James Lape to try to establish class-wide odor impacts from the JPLF, the modeling results demonstrate that the geographic reach and frequency of emissions varied significantly across the proposed class and subclass areas over the 30-month period. Mr. Lape's modeling results do not consider indoor $H_2S$ concentrations or whether putative class members were present and outside when their properties were predicted to be exposed to $H_2S$ emissions—critical individualized inquiries that this Court has previously found preclude a finding of predominance.

---

[1] *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006) (mass torts are "'ordinarily not appropriate for a class action'" (quoting Fed. R. Civ. P. 23 advisory committee notes)).

Further, the Court will need to conduct individual inquiries into the type, extent, and reasonableness of any impacts claimed by putative class members—inquiries that go to liability under Louisiana nuisance law, not damages as Plaintiffs argue. Plaintiffs' modeling of 5 ppb of $H_2S$ is not sufficient to establish injury-in-fact. At general causation, the Court only held that exposure to this $H_2S$ concentration is *capable* of causing impacts, and Plaintiffs' general causation expert Dr. Susan Schiffman admitted that not everyone is impacted at this level. The World Health Organization Regional Office of Europe ("WHO") authority the Court relied on confirms that exposure to 5 ppb of $H_2S$ does not equate to injury for all: less than 5% of the population experiences annoyance less than 2% of the time at this level. The Court's general causation decision also did not address the degree of inconvenience, the individual characteristics influencing odor perception, the character of the neighborhoods, or other factors informing the reasonableness of the harm—individual factors which all must be assessed in determining the *liability* question for claims under Louisiana Civil Code articles 667-669.

Plaintiffs do not account for the impacts of other potential odor sources or causes of health complaints. They dismiss alternative causes as relevant only to affirmative defenses and damages. But the Louisiana Supreme Court and the Fifth Circuit have held that they go directly to causation, a burden that lies with Plaintiffs in the first instance. The Court will thus need to conduct individual inquiries into the source of any odors experienced by putative class members to decide causation. And it will need to examine each resident's medical history and other confounders to determine the cause or causes of the nonspecific symptoms alleged, including what *portion* of those symptoms are attributable to JPLF emissions. These substantial and complex inquiries predominate over any common questions.[2]

---

[2] Compare proposed class representative Phil Adams, who alleges occasional sinus issues and headaches but explained none were debilitating (and rather more of an annoyance), with proposed class representative

Plaintiffs likewise have not shown that a class action is the superior means of adjudicating their claims given that individual inquiries greatly outnumber any common questions. Plaintiffs' proposed liability class, if certified, would still require causation and damages trials for potentially more than 75,000 individuals, severely compromising the purported usefulness of employing a class procedure. That is especially so given the claims of the over 540 mass action plaintiffs in the *Addison v. Louisiana Regional Landfill Co.* action, who will proceed to individual trials regardless of the outcome of this motion. Rather than employ a class procedure whose usefulness will be dubious, the Court can use common case management tools, as it has already done in *Addison*, to effectively manage additional individual claims (which Plaintiffs' counsel has already indicated they are prepared to pursue, Pls. Br. 29).

Having failed to establish the Rule 23(b)(3) requirements, Plaintiffs cannot rely on bifurcation or issue classes to obscure the individual issues and justify class certification. The Fifth Circuit has held that these tools are only available where predominance and superiority are first met. Plaintiffs have not satisfied this burden given the dissimilarity of their individual claims, the many potential odor sources, the lengthy period of alleged impacts, and other individual issues with which they fail to contend—distinguishing this case from those relied on by Plaintiffs.

Plaintiffs fare no better on the additional Rule 23 requirements—typicality, adequacy of representation, and ascertainability. As Defendants' evidence establishes, the proposed class representatives' experiences with odors are markedly different from other putative class members given the individual factors at issue, meaning they have not shown that their claims are similar to

---

Mona Bernard, who alleged headaches and nausea three to four times per week. Defs. Ex. R 193:22-194:1; Defs. Ex. AA 81:12-82:1. Other putative class members alleged hospitalization due to dizziness, headaches, insomnia, autoimmune disorder, nausea, vomiting, throat pain, sleep apnea, sinus problems, breathing problems, nosebleeds, skin rash and lesion, and conjunctivitis. *See, e.g.*, Defs. Ex. II PDF p. at 22.

the class as a whole. Nor are the proposed class representatives adequate given that their claims differ from those of other class members, creating a conflict between the two groups. Additionally, Plaintiffs' proposed class and subclasses are not ascertainable because they (i) impermissibly include a great number of people who do not have an adequate ownership interest in property and therefore do not have viable nuisance claims, (ii) are informed by modeling that overpredicted exposures due to the unreliability of the methods and inputs, and (iii) exclude large areas where Plaintiffs' modeling predicted exposures occurred.

The Fifth Circuit and other courts regularly deny certification in similar environmental torts when individual inquiries predominate the Rule 23 criteria. The same result is warranted here. The putative class members have an adequate remedy through individual tort claims that are now proceeding to trial, which is plainly the superior method of adjudicating nuisance claims.

## BACKGROUND

### I.  The JPLF is located within a mixed residential, industrial, and commercial area.

The Court is well versed in the history geography, and operations of the JPLF and this section summarizes the facts most pertinent to class certification. The JPLF is just one of three active landfills located on the West Bank. The River Birch Landfill, abutting the JPLF to the northwest, disposes of residential, commercial, municipal, and industrial non-hazardous solid waste. Defs. Ex. A-1 at 9. It accepts approximately three times more waste than the JPLF. *Id.* at 18-19. The Highway 90 Construction & Demolition Debris ("C&D") Landfill ("Hwy 90 C&D Landfill"), located directly to the southeast of the JPLF, disposes of wood waste and C&D waste. *Id.* at 9. C&D landfills have fewer required environmental controls, so unlike municipal solid waste landfills, they typically are not mandated to install gas collection and control systems. *Id.*

In addition to the three landfills, Jefferson Parish contains numerous other facilities that have been recognized by LDEQ and the Louisiana Department of Health ("LDH") as known or

suspected odor sources. These include the chemical plants at the Cornerstone Chemical Complex ("Cornerstone Complex") (formerly known as the Fortier Manufacturing Complex), wastewater treatment plants, tank terminals, a wood treatment plant, and barge and grain operations along the Mississippi River. Defs. Ex. KK at 4; Defs. Ex. LL at 2-3; Defs. Ex. B-1 at 30 (map of sources).

## II.  Plaintiffs seek certification of an expansive class covering approximately 46 square miles.

This case does not involve a one-time spill or contamination event, rendering the predominance of common questions even more unattainable. Plaintiffs assert that the acceptance of an industrial waste called "spent lime," as well as operational issues at the JPLF, resulted in intermittent emissions of odors into the surrounding community over 2.5 years. Pls. Br. 31, 38. Specifically, Plaintiffs allege that odors impacted the area between July 1, 2017, and December 31, 2019. Plaintiffs bring a single cause of action for nuisance under Louisiana Civil Code articles 667-669. R. Doc. 285 at 2. They allege that odors interfered with their use and enjoyment of property, decreased their quality of life, and caused numerous health effects. Pls. Br. 3-14. Plaintiffs have withdrawn their claims for property value diminution. R. Doc. 417 at 5 n.8.

On November 29, 2022, the Court determined that Plaintiffs established general causation for certain injuries. Specifically, the Court held that exposure to 5 ppb of $H_2S$ over 30 minutes is "capable of producing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property." R. Doc. 285 at 44. The Court did not determine that exposure to 5 ppb of $H_2S$ over 30 minutes *in fact* caused those injuries, or even that such an exposure was *likely* to cause those injuries. Nor did the Court determine the geographic extent of emissions from the JPLF. R. Doc. 285 at 45-46.

On May 15, 2024, Plaintiffs filed an amended motion for class certification. R. Doc. 438. They ask the Court to designate nine class representatives, five of whom are not named Plaintiffs. Plaintiff Savannah Thompson is not offered as a class representative. Pls. Br. 49. Plaintiffs seek

5

certification of an expansive class that includes everyone who "lived and/or resided" within certain geographic boundaries "at any time" between July 1, 2017, and December 31, 2019. *Id.* 20. Plaintiffs propose five subclasses based on modeling results by their expert Mr. Lape, and a depiction of Mr. Lape's modeling results from the defense expert reports—both of which rely on overestimated and unreliable emission rates. *Id.* at 20-21. Plaintiffs expressly exclude the more than 540 mass action plaintiffs in the *Addison* action from their proposed class and subclass definitions, meaning the *Addison* actions will proceed on an individual basis regardless of the outcome of class certification.

## LEGAL STANDARD

This Court has recognized that the "requirements to obtain class certification in a mass tort case are demanding." *Ictech-Bendeck v. Progressive Waste Sols. of La., Inc.*, 2019 WL 4111681, at *6 (E.D. La. Aug. 29, 2019). Certification is rarely granted in such actions. *See Steering Comm.*, 461 F.3d at 604 (action alleging injury from smoke plume did not have "any exceptional features" that warranted "departing from the general rule" that mass actions do not warrant class treatment).

Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). Plaintiffs must "affirmatively demonstrate," with reliable and admissible *evidence*, that they have satisfied the Rule 23 requirements: ascertainability, numerosity, typicality, adequacy of representation, commonality, predominance of common questions, and superiority. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011) (evidence insufficient to establish commonality); *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005) (vacating certification; court should have based its ruling on "admissible evidence," not "bare allegations, one-sided affidavits, and unexplained Internet printouts").

Courts are required to conduct a "rigorous analysis" to ensure that plaintiffs have "*in fact*" met all Rule 23 elements. *Dukes*, 564 U.S. at 350-51 (emphasis in original). Courts must examine

the "parties' claims and evidence," and make factual findings supporting class certification. *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 554-57 (5th Cir. 2011) (quotation omitted) (reversing "conclusory" class certification decision that did not identify the substantive controlling issues, assess the issues that predominate, and "determine whether the issues were common"). This analysis frequently requires consideration of merits issues. *See Dukes*, 564 U.S. at 351-52.

## ARGUMENT

### I. Individual issues as to liability, causation, and damages predominate over any common questions.

Given the prevalence of individual issues as to the cause, extent, and impact of odors, among other issues of liability, causation, and damages, Plaintiffs fail the predominance of common questions element for class certification. Rule 23(b)(3), which Plaintiffs invoke, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Steering Comm.*, 461 F.3d at 604 (common questions did not predominate over "significant individual issues" of causation, injury, and damages). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 253 (5th Cir. 2020) (quotation omitted). The predominance inquiry is "far more demanding" than the Rule 23 commonality requirement, as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Prantil v. Arkema Inc.*, 986 F.3d 570, 576-77 (5th Cir. 2021)

(quotation omitted) (in assessing predominance, district court did not adequately consider impact of alternative sources or plaintiffs' movements in proposed class area).[3]

Individual issues pervade Plaintiffs' nuisance claim under Louisiana civil code articles 667-669—their sole cause of action. *Ictech-Bendeck*, 2019 WL 4111681, at *2. To establish their nuisance claim, Plaintiffs must demonstrate that each Defendant negligently caused either "real damage" to or substantial interference with the enjoyment of its neighbors' properties. La. Civil Code arts. 667-669. Mere inconvenience is not enough. *See Barrett v. T.L. James & Co.*, 28,170 (La. App. 2 Cir. 4/3/96), 671 So. 2d 1186, 1190–91, 1193 (concrete recycling operation not a nuisance where its operations were not continuous, and noise and dust levels were not "inordinate"). Assessing the degree of injury "requires consideration of such [individual] factors as the character of the neighborhood, the degree of intrusion, and the effect of the activity on the health and safety of the neighbors." *Price v. Martin*, 2011-0853 (La. 12/6/11), 79 So. 3d 960, 965, 969, 972–74 (denying certification in nuisance action concerning contamination from wood treating facility). Further, when the alleged nuisance relates to odors, "whether an inconvenience is excessive . . . is to be determined in the light of local ordinance or customs." *A to Z Paper Co., Inc. v. Carlo Ditta, Inc.*, No. 1999-1189 (La. App. 4 Cir. 10/4/00), 775 So.2d 42, 48 (concrete batching plant not a nuisance based on the industrial nature of the neighborhood, the presence of other manufacturing operations, and heavy truck traffic); La. Civil Code art. 669.

Louisiana state and federal courts, including this Court in its 2022 *Guidry v. Dow Chemical Co.* decision, regularly find that nuisance and other environmental class actions do not satisfy the predominance requirement because allegations of widespread exposure to odors and emissions

---

[3] The commonality requirement is satisfied if "at least one issue's resolution will affect all or a significant number of class members," whereas predominance requires that common issues "form a significant part of individual cases." *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 459-62 (E.D. La. 2006) (finding commonality but not predominance as specific causation was an individualized issue).

invariably require individual inquiries. *See, e.g.*, *Steering Committee*, 461 F.3d at 602-03; *Barnes v. Dresser, LLC*, 2023 WL 4980240, at *6, n.13 (W.D. La. Aug. 3, 2023) (certification denied; nuisance claim required assessing the utility and location of each putative class member's property, the degree of interference, and the cause of the alleged injury); *Guidry v. Dow Chemical Co.*, No. 19-cv-12233, R. Doc. 260, at 15-18 (E.D. La. May 24, 2022) (Morgan, J.) (appended hereto) (decertifying class alleging harm from chemical release given variability in location and concentration of emissions, and differing impact thresholds); *Price*, 79 So. 3d at 977.

This case is no different. Individual inquiries are required to resolve significant and complex issues of liability, causation, and damages, and Plaintiffs have no reliable class-wide methodologies suggesting otherwise. These individual issues are summarized below:

- The geographic reach and frequency of emissions significantly varied across the proposed class and subclass areas over the 2.5-year period, as demonstrated by the modeling results of Plaintiffs' expert Mr. Lape. Exposure could vary from one block to the next within a 15-minute period. Given this variation, Plaintiffs will need to offer individual evidence regarding the putative class members' locations when exposures were predicted at their properties (i.e., establishing that the class members, not just their properties, were exposed to odors), as well as their distance from the JPLF and wind speed and direction.

- Some amount of odor is always a reality of modern life. Modeling potential exposures to 5 ppb of $H_2S$ for 30 minutes does not demonstrate that the "substantial interference" requirement is met. WHO has explained that only a small percentage of the population may be annoyed by $H_2S$ for less than 2% of the time at the 5-ppb concentration modeled by Plaintiffs—and even Plaintiffs' general causation odor expert Dr. Schiffman agreed that not all individuals would be annoyed by that level—and odor detection and response depends on numerous individual factors. The extent and reasonableness of any interference claimed by putative class members (a liability issue) demands individual assessment, including of the character of the neighborhood and other factors.

- Louisiana agencies, the defense experts, and residents have identified numerous potential alternative odor sources in and near the proposed class area, requiring property-by-property inquiry into the source of any odors experienced by putative class members (a causation issue).

- Person-specific inquiries are necessary to determine the type and cause of the symptoms alleged by the putative class members, as they do not share common health complaints or medical histories.

- Plaintiffs have not offered any methodology for calculating class-wide damages, nor does such a methodology exist.

Because these individual issues overwhelm any common questions, Plaintiffs have not met the demanding standard for establishing predominance in a mass tort. Nor can Plaintiffs cure this failure by bifurcating this case into multiple phases or seeking certification of issue classes. *See infra* § III. The Court should deny class certification.

**A. Individual inquiries are needed to determine exposure to odors from the JPLF.**

To start, Plaintiffs have not met their burden in establishing predominance because their modeling is not the reliable, class-wide proof of exposure to odors that the Fifth Circuit requires on a class certification motion. Plaintiffs acknowledge that to succeed on their claim, they must first demonstrate the "geographic scope, frequency, duration, and concentration" of odors emitted from the JPLF.[4] Pls. Br. 24. Plaintiffs offer Mr. Lape's modeling of estimated emissions of a single chemical, $H_2S$, from the JPLF (and depictions of Mr. Lape's modeling results by the defense experts), incorrectly asserting that its results are evidence of "odor impacts" across the proposed class and subclass areas. *Id*. 14, 20. However, modeling only predicts *locations* with *potential* exposures, not measured concentrations or whether putative class members were actually impacted.[5] Defs. Ex. N 156:10-21 (opinions based on predicted exposures and not on any person's actual experience); *see also* Defs. Ex. C-1 at 7-8; Defs. Ex. Q 306:21-307:5. Regardless, Mr. Lape's modeling predicts that $H_2S$ emissions from the JPLF were constantly changing across the

---

[4] To the extent that Plaintiffs allege that volatile organic compounds ("VOCs") contributed to odors, Plaintiffs offer no modeling or other evidence demonstrating the dispersion of VOCs from the JPLF; therefore, any allegations regarding VOCs should not be considered in the Rule 23 analysis. Pls. Ex. 12 at 7-1-7-2; *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 586-87 (5th Cir. 2004) ("[S]cientific knowledge of the harmful level of exposure to a chemical, and knowledge that the plaintiff was exposed to such quantities are minimal facts necessary to sustain the plaintiffs' burden" (quotation omitted)).

[5] Plaintiffs have no $H_2S$ measurements (or any odor measurements) taken at the putative class members' residences despite filing their lawsuit 17 months before the end of the alleged odor period.

proposed class and subclass areas over the 30-month period. Given this variability, the putative class members' locations at the time of the predicted exposures and other individual factors, ignored by Plaintiffs' experts, are critical to deciding their nuisance claims.[6]

The location of each putative class member is clearly an individual issue and not subject to class treatment. Air modeling expert Dr. Paolo Zannetti, environmental engineer and fate and transport expert Michael Corn, and toxicologist and odor scientist Dr. John Kind explained that each of the putative class members' properties has unique potential for exposure to odors based on its proximity to a source and wind direction and speed, among other factors. Defs. Ex. C-1 at 40; Defs. Ex. D-1 at 4-7, 116; Defs. Ex. B-1 at 27-29; *see also Lloyd v. Covanta Plymouth Renewable Energy, LLC*, 585 F. Supp. 3d 646, 658-60 (E.D. Pa. 2022) (predominance not established in odor nuisance class action; due to the role of "proximity, wind, and topography" on odor dispersion, individual inquiry was needed to determine whether putative class members were injured and their damages). Odors disperse and dilute with distance, meaning properties closer to a source are potentially exposed to higher concentrations of emissions than those farther away. Defs. Ex. B-1 at 28; Defs. Ex. C-1 at 40; Defs. Ex. N 50:21-51:2; Defs. Ex. D-1 at 4-7. Odors also travel downwind from a source, so a person typically could not experience odors from the JPLF unless they were located downwind from it. Defs. Ex. B-1 at 33; *see also* Defs. Ex. N 53:1-14; Defs. Ex. D-1 at 27, 116. Wind direction and speed fluctuate constantly, adding to the variability in potential odor exposure. Zanetti Rpt. at 40; Defs. Ex. D-1 at 27-30; Defs. Ex. B-1 at 33-37; Defs. Ex. N 50:17-20, 51:3-10, 186:17-187:15.

---

[6] Mr. Lape's modeling depended on overestimated and unsupported emission rates, providing another basis for holding that it is not reliable evidence of odor exposures or that putative class members are a "neighbor" of the JPLF under article 667. *See infra* § VI.B; *see also Barnes*, 2023 WL 4980240, at *6 n.13 (neighbor element of nuisance claim decided on "'case-by-case'" basis (quoting *Ictech-Bendeck*, 2019 WL 4111681, at *3-4 (article 667 requires "some propinquity" or "a causal connection" for a property to be a neighbor)).

Plaintiffs' air modeler showed that the location and density of the modeled plume was highly variable. Mr. Lape agreed that distance and meteorological conditions created "a range of predicted exposures in terms of the frequency and intensity of $H_2S$ impacts in the proposed" class area. Defs. Ex. H at 2-9. Mr. Lape testified that the geographic reach of odors varied by month or day. Defs. Ex. N 101:11-16; 102:23–106:15; 107:5-15, 202:2-7-205:4. A difference of 15 minutes could even be the difference between exposure in a particular location and no exposure at all. *Id*. 107:5-23. Within the same month, residents two blocks from one another may have had different predicted exposures. *Id*. 208:12-24. These variations created differing potentials for, and frequency of, exposures even between residences at similar distances and directions from the JPLF, or different residences in the same neighborhoods.

A comparison of Mr. Lape's modeling results from February 2018 and June 2018, shown below, confirms this considerable variation within even the proposed subclass areas.[7] His model predicted that in February 2018, large portions of the proposed class and subclasses to the east and northeast of the JPLF—including the properties of Ms. Walker and Ms. Steele—were exposed fewer than nine times to 5 ppb of $H_2S$ over 30 minutes (i.e., less than nine of the 1,344 30-minute periods in February). That same month, Mr. Adams' residence (in the same subclass as Ms. Walker) was predicted to have had up to 30 exposures to 5 ppb of $H_2S$, and other areas to the north and northwest of the JPLF on the East Bank were predicted to have experienced between 10 and 50 exposures. The boundaries of the modeled plume shifted in June 2018, so that the model now

---

[7] Figure E-8 (February 2018) and Figure E-12 (June 2018) below are from Mr. Lape's report, with the outline of Plaintiffs' original proposed class area (from their August 2023 class certification motion) shown in pink and their revised proposed class area (from their amended motion) added in red. Each colored ring represents a different frequency of predicted exposures to at least 5 ppb of $H_2S$ over 30 minutes. For example, the outermost purple ring represents an estimated 10 to 30 exposures per month, and the next dark blue ring represents an estimated 30 to 50 exposures per month. Defs. Ex. JJ. Mr. Lape testified that an area outside the boundaries of his modeling may have experienced no exposures. *Id.*; Defs. Ex. N 182:5-12.

predicted that those same areas to the east and northeast of the JPLF were exposed to 5 ppb of $H_2S$ on between 10 and 300 occasions. Ms. Steele's residence was estimated to have experienced between 50 and 80 exposures, and Ms. Walker's residence between 10 and 30 exposures (a statistically significant difference). Mr. Adams' residence and the areas to the north and northwest of the JPLF on the East Bank were predicted to have experienced zero to 10 exposures that month.



Likewise, Mr. Ictech-Bendeck, the Bernards, and Ms. Williams, who are all in the same proposed subclass, were predicted to have varying exposures at their properties in many months. Defs. Ex. JJ. In November 2017, for example, Mr. Ictech-Bendeck's property was predicted to have had 30-50 exposures, the Bernards' property was predicted to have had 10-30 exposures, and Ms. Williams' property was predicted to have had 0-10 exposures. *Id.* at Fig. E-5.

The testimony of the proposed class representatives and other individuals further demonstrate the changing geographic reach and frequency of emissions. Numerous proposed class representatives and Ms. Thompson stated that they did not notice odors in other areas of the proposed class. *See, e.g.*, Defs. Ex. EE 31:24-32:3 (only experienced odors at home); Defs. Ex. DD 76:7-21, 92:6-12 (noticed odor during commute but at no other locations); Defs. Ex. Y 28:20-29:1, 55:2-6 (could not identify other areas where smelled odor); Defs. Ex. BB 85:22-25, 96:4-

98:13 (noticed odors at discrete locations on West Bank). Douglas Brown, who owned several rental properties and businesses in the proposed class area and managed day-to-day responsibilities for one of those businesses, similarly testified that he did not personally experience odors. Defs. Ex. FF 18:18-23, 37:21-39:12. He only received one complaint about odors related to a plumbing issue in an apartment building. *Id.* 15:17-16:20.

Because emissions varied wildly over the 2.5-year period at issue, evidence of putative class members' locations at particular dates and times, and their habits and schedules, is required to determine (i) whether they (not just their properties) were exposed to odors at their homes, and (ii) at what frequency and concentration they experienced and were impacted by JPLF emissions while at home.[8] Defs. Ex. B-1 at 38; Defs. Ex. E-1 at 6-7. Mr. Lape did not consider this "significant and probative fact" in his modeling, or whether putative class members were outdoors at their properties, or the concentrations of $H_2S$ indoors.[9] *Guidry*, R. Doc. 260 at 16 (need to determine location of class members barred finding of predominance where "the location and density of the plume was highly variable"); Defs. Ex. N 15:9-11, 16:3-20, 68:8-21, 82:16-84:4. Nor is it possible to do so because this is an inherently individual inquiry that hinges on putative class members' dates of residency, whether they had one or multiple homes, work schedules, deployment, vacation, and activities, among many other factors. Defs. Ex. E-1 at 6-7. For example, Mr. Ictech-Bendeck was deployed overseas for three months in 2018; Ms. Landry-Boudreaux was

---

[8] This evidence is also important because Defendant Aptim Corp. only operated the gas and leachate collection systems until May 2019. R. Doc. 285 at 2; *see Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016) (individual proof required due to the different times defendants' activities were performed).

[9] During sweltering summer months—when odors were allegedly at their worst, Pls. Br. 15—many residents seek to minimize time spent outdoors, regardless of whether odor is present. And Plaintiffs have offered insufficient proof that the putative class members would have uniformly been able to detect odors *inside* their homes, which would hinge on individual features unique to each class member and his or her home (e.g., ventilation and the presence of low-lying areas). Defs. Ex. B-2 at 47-48.

generally not home from early morning until the evening; and Ms. Crossman moved to Waggaman in January 2018. Defs. Ex. X 29:2-14; Defs. Ex. BB 99:17-25; Defs. Ex. CC 13:6-11.[10]

Plaintiffs also concede that Mr. Lape presented no analysis to support their contention that the proposed class representatives had similar experiences to other subclass members. Pls. Br. 16; *see also* Defs. Ex. N 207:11-18. Indeed, because the location of the plume fluctuated, and putative class members were not present at their properties during the entire 30-month period (and even those exposed to 5 ppb of $H_2S$ likely responded differently, including not at all, *see infra* § I.B), adjudicating specific causation for the proposed class representatives would not, as Plaintiffs argue, resolve specific causation for all other subclass members. Pls. Br. 47; *see also Ford v. Murphy Oil U.S.A., Inc.*, 96-2913 (La. 9/9/97), 703 So. 2d 542, 549 (in case involving claims of continuous odorous emissions from plants over a four-year period, one plaintiff could not prove individual causation and damages based on evidence of the exposure of a different plaintiff).[11]

Plaintiffs attempt to camouflage the variation in predicted exposures by relying on Figure 56 from Dr. Zannetti's report, which superimposes Mr. Lape's unreliable modeling results over the proposed class area. Pls. Br. 17. Figure 56 shows an average of the total predicted exposure to JPLF emissions over the *full 30-month period*. It was intended to show the wide variation in Mr. Lape's predicted exposures, and in no way demonstrates uniformity of impacts. Defs. Ex. C-1 at 105-06 (Mr. Lape's predicted exposures across the proposed class area varied by a factor of 10). Moreover, by Mr. Lape's admission, looking at the full 2.5-year period does not adequately capture

---

[10] This Court has previously rejected the use of claim forms to resolve these individual issues, explaining that the "special master process would be inappropriate" because it would "deprive defendants of the chance to challenge individuals on essential elements of their claim." *Guidry*, R. Doc. 260 at 18.

[11] Plaintiffs assert that they could add class representatives "to represent any geographic areas that Defendants contend are not represented." Pls. Br. 48. But no number of class representatives or subclasses could overcome the need for individual inquiry with respect to exposure, and Plaintiffs offer no methodology for identifying other unspecified geographic areas requiring representation.

month-to-month or other temporal variation in odor exposures. *See* Defs. Ex. N 175:18-25; 203:22-204:6; 186:17-187:15; 176:6-177:6; 54:18-55:7; *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 267 (3d Cir. 2011) (denial of class certification affirmed; air model impermissibly "assume[d] away relevant variations between the hundreds of residents within the same [contour] lines that would result in exposure to different concentrations of vinyl chloride").

Mr. Lape's modeling results, and Dr. Zannetti's depiction of Mr. Lape's results in his Figure 56, do not show consistent class-wide impacts from odor. They instead reinforce the variability of emissions by time and location within the proposed class and subclass areas, and the need for individual inquiry in assessing exposure to odors. Plaintiffs have not and cannot show that assessment of putative class members' exposure to odors involves a common question, let alone common questions that predominate over the individual issues involved.

**B. No class-wide methodology exists for determining impacts from odors or the reasonableness of the alleged interference.**

Plaintiffs do not meaningfully address how they will prove on a class-wide basis actual damage or substantial interference with the enjoyment of property, a critical element of their nuisance claim. Plaintiffs suggest that this requirement is a damages issue, and propose deferring it to a second phase where "specific causation and damages" will somehow be resolved through "'waves' or 'flights'" of trials. Pls. Br. 37-38. However, the Louisiana Supreme Court has stated that the nature and extent of the inconvenience is "not merely an issue of quantum of damages"—it "is a substantive element of liability." *Ford*, 703 So.2d at 549, n.11 (given the size of the geographic area, length of time involved, and nature of the claims, the "degree of inconvenience or damage suffered will vary greatly as to the individual plaintiffs").[12]

---

[12] The extent of damage or interference, which depends on various individual factors discussed below, is key to deciding whether Defendants knew or should have known that their activities would cause damage,

In any event, Plaintiffs do not offer a reliable class-wide methodology for determining whether putative class members were in fact impacted by odors, or whether the interference was substantial. Plaintiffs indicate that to establish this element, they intend to (i) rely on Mr. Lape's modeling of $H_2S$ from the JPLF at an average concentration of 5 ppb over 30 minutes, and (ii) assume that all exposures to this concentration of $H_2S$ caused nuisance injuries. Pls. Br. 25, 48-49. However, in its general causation opinion, the Court only held that exposure to 5 ppb of $H_2S$ over 30 minutes "is capable of producing" loss of enjoyment or use of property, a decrease in quality of life, and certain physical or mental impacts—not that every person exposed in fact experienced one or more of those injuries. R. Doc. 285 at 44. As this Court has previously explained, "capacity is not sufficient to show causation." *Guidry*, R. Doc. 260 at 17 (modeling showing level of emissions that was "capable" of causing injuries not sufficient to establish causation); *see also Bell v. Foster Wheeler Energy Corp.*, 2017 WL 876983, at *2 (E.D. La. Mar. 6, 2017) (causation not established where specific causation opinions were "untethered" to the individual and "based only on generalized studies of the effects that certain exposure levels can have on the population"). Modeling $H_2S$ emissions is insufficient, on its own, to demonstrate that putative class members experienced annoyance and health effects. Defs. Ex. B-1 at 25-26; Defs. Ex. E-1 at 17-18.

Guidelines issued by the WHO, which the Court relied on for its general causation decision, R. Doc. 285 at 31, reinforce this conclusion that modeling is not enough. WHO explained that in setting a nuisance threshold level, it considered the concentration "at which not more than a small proportion of the population (less than 5%) experiences annoyance for a small part of the time (less than 2%)." Defs. Ex. OO at 20; *see also* WHO, Environmental Health Criteria – Hydrogen Sulfide § 1.1.6 (1981), https://tinyurl.com/2stu8cj6 ("[A] level of . . . 0.005 ppm [or 5 ppb of $H_2S$]

---

and whether that damage (if any) could have been prevented by the exercise of reasonable care, acknowledged by Plaintiffs as elements of their nuisance claim. Pls. Br. 37.

averaged over 30 min should not produce odour nuisance in most situations."); Defs. Ex. B-1 at 25; Defs. Ex. S 156:11-22.[13]

The WHO guidelines also recognized that "a nuisance threshold level cannot be defined on the basis of concentration alone," as annoyance is "influenced by a number of psychological and socioeconomic factors." Defs. Ex. OO at 20; *see also* Defs. Ex. O 33:2-9, 75:16-76:11, 258:2-15 (Dr. Schiffman stated that "people don't agree at all" in the field of olfaction). Indeed, odor psychologist Dr. Pam Dalton and Dr. Kind explained that a person's ability to detect odor and their response to that odor depends on the following:

- <u>Biological characteristics</u>, including age, sex, genetics, and anatomy of the nasal passages. Defs. Ex. E-1 at 7-9; Defs. Ex. B-1 at 38-40. For example, people over 65 years of age "have a markedly reduced sense of smell." Defs. Ex. E-1 at 9.

- <u>Health conditions</u> that impact the ability to detect odors (e.g., allergies or nasal-sinus disease that causes congestion or inflammation). Defs. Ex. E-1 at 9-10; Defs. Ex. B-1 at 41.

- <u>Smoking</u> can negatively affect odor perception. Defs. Ex. B-1 at 40.

- <u>Prior experience with odors</u>. Defs. Ex. E-1 at 11. For instance, an individual who grew up in a rural area may find the smell of agricultural operations pleasant, whereas a person who just moved to that area may be offended by the odor. *Id.* at 11.

- <u>Beliefs about an odor or an odor source</u> can cause "a person to perceive an odor when none is present, to misattribute an odor to a source, or to perceive the odor as stronger or more persistent than it objectively is." Defs. Ex. E-1 at 12; Defs. Ex. B-1 at 41-43.

- <u>Exposure to media and social media concerning odors</u>, which can influence the perception of an odor and its intensity, and whether the odor is characterized as pleasant or unpleasant. Defs. Ex. E-1 at 12-13.

---

[13] The Court also relied on Dr. Schiffman's statement that 5 ppb of $H_2S$ has been used by people all over the world, including in Japan and China. R. Doc. 285 at 31-32. During Dr. Schiffman's most recent deposition, she stated that Japan and China do not consider this threshold a "standard" and have not incorporated it into laws. Defs. Ex. P 88:23-91:21 ("Do the laws say that that's what the level is for a state or for a country or -- they don't, okay? I completely agree with you. That's the problem, is the discrepancy between what is allowed and what is the reality of people's perception. And the reason why the levels are higher is because industries which pollute are sometimes necessary for that country.").

These characteristics necessarily differed among putative class members and resulted in differing potentials to detect and be impacted by odors, even assuming uniform exposure to 5 ppb of $H_2S$.[14]

Furthermore, the reasonableness of the interference depends on the character of the neighborhood under Louisiana law. *See A to Z Paper*, 775 So.2d at 48. As Defendants' real estate expert Trevor Phillips explained, properties in the proposed class and subclass areas vary with respect to their land use, zoning, and distance to potential odor sources. Defs. Ex. F-1 at 34-37, 39-46, 52. For example, large portions of the proposed class area are zoned industrial and commercial, *id.* at 40, meaning residents located in or adjacent to those areas may have different expectations about odors than people in more suburban areas. Other property-specific factors like the physical characteristics of the home, property conditions, safety, noise, amenities, and proximity to schools, playgrounds, busy roads, the levee, and railroad tracks likewise affect residents' experiences at their properties. The determination of whether any odor impacts rise to the level of actual damage or substantial interference must account for a neighborhood's particular characteristics. *Id.* at 46-47, 49-59.

Declarations of 39 residents throughout the proposed class area demonstrate the variability in the detection of and responses to odors, as these residents stated they did not notice odors at their properties, or they either were not affected by odors or were impacted on only a handful of occasions. Defs. Ex. B-1 at 26; Defs. Ex. HH. For example, two residents in Harahan (who live about 0.3 and 0.6 miles from proposed class representatives Mona and Larry Bernard) stated that while they were familiar with media reports about the JPLF, they did not notice odors at their property or in other parts of Jefferson Parish. Defs. Ex. HH at PDF pp. 26, 32. A Westwego resident (who lives about 0.3 miles from proposed class representative Ms. Crossman) noticed a "sour

---

[14] Plaintiffs' reliance on the WHO threshold necessarily means many people who have not been impacted will be swept into the class if it is certified.

smell" at his property for at least 10 years. *Id.* at PDF p. 35; Defs. Ex. B-1 at 26. He explained that while he would sometimes go inside when odors were stronger "a long time ago," odors no longer affected the use of his property. Defs. Ex. HH at PDF p. 35. A River Ridge resident noticed rotten odors that did not change how she used her property, *Id.* at PDF p. 34, and another River Ridge resident experienced an infrequent odor that did not impact his activities even though he spent over five hours outside every day, *id.* at PDF p. 19.[15] Similarly, LDEQ odor inspector and River Ridge resident Holly Herrmann (who lived less than a mile from Mr. Ictech-Bendeck) testified that she was intimately familiar with landfill odors due to her job, and indeed smelled the same odors at her home during the relevant time period—but she said odors never caused any health impacts, never prevented her from doing her usual recreational activities, and never affected the quality of her life in any way (other than increasing her work responsibilities).[16]

Rather than contend with this unrebutted evidence, Plaintiffs argue Dr. Schiffman's statement that exposure to 5 ppb of $H_2S$ is "always" a nuisance—which differs from the WHO guidelines and Dr. Schiffman's actual testimony—is binding on and applicable to all putative class members for purposes of specific causation. Pls. Br. 25-26. Dr. Schiffman's full statement at trial, which was cited by the Court, was that "5 ppb in the field *where you have other compounds along with it* always is a nuisance . . . for [a] lot more than 5 percent of the population." R. Doc. 272 at 671:7-19 (emphasis added) (cited at R. Doc. 285 at 31); *see also* R. Doc. 272 at 723:2-19 (Dr. Schiffman testified that 5 ppb is "when you start getting your problems"). According to Dr. Schiffman, 5 ppb of $H_2S$ is a nuisance to some portion of the population, not everyone, when combined with other unidentified compounds for which Mr. Lape's modeling does not account.

---

[15] Further demonstrating that exposure does not equate to impacts, Ms. Thompson did not experience any symptoms due to odors, Defs. Ex. EE 41:22-42:15, and the health complaints alleged by the class representatives varied, Pls. Br. 4-14.
[16] Defs. Ex. XX 47:12-25, 49:9-20, 56:1-7, 103:11-104:23, 111:21-114:15.

Plaintiffs' proposition that 5 ppb of $H_2S$ is "always" a nuisance is also contrary to both the Court's ruling that this is the concentration "capable of causing a reaction," R. Doc. 285 at 31, 35, 43, and with Louisiana law. Because the reasonableness of the impact depends on the "character of the neighborhood, the degree of intrusion, and the effect of the activity on the health and safety of the neighbors, factors which do not lend themselves to resolution on a common, class-wide basis," a nuisance finding cannot be based on exposure alone. *See Price*, 79 So. 3d at 974.

Modeling $H_2S$ at the Court's general causation level of 5 ppb is not sufficient to establish the actual damage or substantial interference element of Plaintiffs' nuisance claim. Individual inquiry is required to determine whether putative class members in fact detected odors and were excessively impacted by those odors, barring a finding of predominance. *See Barnes*, 2023 WL 4980240, at *6, *6 n.13; *see also Akeem v. Dasmen Residential, LLC*, 2021 WL 4804049, at *8 (E.D. La. Oct. 14, 2021) (certification denied; liability and damages required individual inquiry into whether and to what extent each apartment unit was impacted by mold, water intrusion, and maintenance problems, and the "exact nature of each person's alleged injuries").

**C. Individualized assessment is required into the source of odors.**

Emissions from the adjacent landfills, as well as the many other industrial, commercial, residential, and natural sources of odors in Jefferson Parish, add to the complexity of the causation analysis, preclude a finding of predominance, and demonstrate that bifurcation and issue classes cannot overcome these barriers to certification. *See infra* § III. This is not a case involving "a common source [of odors] and a common cause" of injuries, as Plaintiffs assert. Pls. Br. 31, 36. Louisiana government agencies and the defense experts have identified numerous potential odor sources within or near the proposed class area. And area residents have confirmed that they experienced odors from those sources. Plaintiffs offer no class-wide methodology that can account

for the impacts of these other odor sources. Assessing the source of any odors observed by putative class members requires property- and date-specific inquiries.

Courts consistently hold that common questions do not predominate where there are multiple potential causes of plaintiffs' injuries. *See, e.g.*, *Crutchfield*, 829 F.3d at 377 (certification denied; individual inquiries needed into causation, as damages could be the result of preexisting conditions or unrelated causes); *In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 140 (E.D. La. 2009) (no predominance; case involved "multiple sources of flooding that would have to be individually parsed out to determine" causation). The presence of other odor sources requires individual inquiry into "causation and liability," not just affirmative defenses and damages as Plaintiffs suggest.[17] *Price*, 79 So.3d at 973-75; *Lloyd*, 585 F. Supp. 3d at 658 (rejecting plaintiffs' contention that alternative odor sources are an issue of contributory negligence, and explaining that other sources require "individualized inquiries into causation"); *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, 2020 WL 2037185, at *4-5 (E.D. La. Apr. 28, 2020) (survey responses potentially identifying other odor sources pertained to "specific, not general, causation").

LDEQ and LDH identified the River Birch Landfill and the Hwy 90 C&D Landfill as potential odor sources. Defs. Ex. KK at 4; Defs. Ex. LL at 2-3; *see, e.g.*, Defs. Exs. MM, NN (LDEQ identified musky, chemical, and other odors from the River Birch Landfill and gas plant during inspections). Defendants' expert Dr. Zannetti modeled $H_2S$ emissions from the River Birch and Hwy 90 C&D Landfills, as well as the JPLF, using emission rates provided by landfill engineering expert Matthew Stutz. Defs. Ex. C-1 at 46-50; Defs. Ex. A-1 at 25-27. Collectively, they determined that $H_2S$ emissions from the Hwy 90 C&D Landfill were approximately three

---

[17] Regardless, courts have found common questions do not predominate where there is a "real possibility of affirmative defenses being raised." *In re Katrina*, 258 F.R.D. at 136-37. Indeed, Plaintiffs' reliance on affirmative defenses in this manner is an admission that there are unavoidable individualized issues with which to grapple.

times higher, and reached the proposed class representatives' properties more frequently, than emissions from the JPLF. Defs. Ex. A-1 at 25-28; Defs. Ex. C-1 at 46-50. And for most 30-minute periods with an average $H_2S$ concentration above 5 ppb, the River Birch and Hwy 90 C&D Landfills, not the JPLF, were predicted to cause the exceedance at the proposed class representatives' properties. Defs. Ex. C-1 at 55-58 (Tables 8-11); 73 (Table 14).[18] Dr. Zannetti concluded that when winds blew from the south or southwest toward the proposed class area, the emissions of the landfills commingled (i.e., the plumes overlapped) due to their proximity to each other. *Id*. at 34-35 (Figures 21 and 22); *see also* Defs. Ex. N 51:11-19. Mr. Lape agreed that $H_2S$ emissions from the River Birch Landfill and Highway 90 C&D Landfill could impact Plaintiffs but did not account for this in his modeling. Defs. Ex. N 110:7-111:5, 219:22-220:23, 216:10-217:21; 108:10-109:3.

In addition to the River Birch and Hwy 90 C&D Landfills, LDEQ and LDH identified numerous other potential industrial odor sources in Jefferson Parish. Defs. Ex. KK at 4; Defs. Ex. LL at 2-3. These sources include the Harahan Wastewater Treatment Plant, tank terminals, barge loading operations, and chemical plants located at the Cornerstone Complex—the largest area source for chemical releases. *Id.*; Defs. Ex. D-1 at 31-32.

After assessing emissions from these and other facilities, Mr. Corn concurred that non-landfill sources likely contributed odors to the proposed class area. Defs. Ex. D-1 at 19, 30-31. While a number of these facilities operate pursuant to air permits, LDEQ does not consider odor thresholds (only air quality standards) in setting emission limits. Defs. Ex. Q 307:6-11. Mr. Corn explained that a facility meeting its permit's emission limits could still be a source of offsite odors.

---

[18] There are 43,870 thirty-minute periods over the 30-month period. For Ms. Landry-Boudreaux, the JPLF was predicted to have partially contributed to 68 thirty-minute intervals above 5 ppb, compared to 128 from the Hwy 90 C&D Landfill alone. The JPLF was predicted to have independently caused a 5-ppb exceedance for only 21 thirty-minute intervals—0.048% of the total intervals. Defs. Ex. C-1 at 58 (Table 11).

*Id.* 307:12-17; Defs. Ex. D-1 at 32-33. Moreover, certain operations at the facilities are not regulated by LDEQ (i.e., they do not have permits or emission limits). Defs. Ex. D-1 at 32. For example, the molten sulfur tank at the Cornerstone Complex is not regulated under a permit. Yet it produces $H_2S$ as a byproduct, and that $H_2S$ was released untreated into the putative class area every day of the year during the relevant time period. *Id.* at 43-45, 48; Defs. Ex. Q 182:23-84:4.

Mr. Corn further found that many of the sources had unpermitted chemical releases (i.e., releases in violation of the LDEQ permits). As examples, numerous leaks were reported at the Cornerstone Complex chemical plants, resulting in releases of ammonia and other chemicals. Defs. Ex. D-1 at 35-36, 39, 48-51, 54-55, 60-61. One leak from 2017 and 2018 lasted over eight months, causing continuous emissions of compounds with a pungent odor. *Id.* at 48. American River Transportation Company operates the largest fleeting operation in New Orleans, and its loading of soybean meal on the Mississippi River, which can generate $H_2S$ in storage, created an odor in Harahan. *Id.* at 64, 66. Raw sewage was released during overflows into a canal running northwest through the proposed class area, resulting in at least one lawsuit for "fetid and vile effluent running onto plaintiffs' property." *Id.* at 79-80, 83-85. The Harahan Wastewater Treatment Plant accepted wastewater from the Chalmette Veolia Plant between December 2016 and June 2017 that resulted in odors while the waste was treated during the relevant period. *Id.* at 82.[19]

Confirming that individual inquiry is needed into the cause of odors, many residents identified odors that they attributed to other sources. For example, 20 putative class members— some of whom lived near the proposed class representatives—signed declarations stating that they attributed odors to wastewater treatment plants or sewer pump stations. Defs. Ex. HH at PDF pp. 2-3, 5-7, 9-10, 20, 22, 27, 30-31, 33-35, 37-38, 40, 42, 44; Defs. Ex. E-1 at 15; Defs. Ex. B-1 at

---

[19] Mr. Corn explained that wetlands produce chemicals, such as ammonia and $H_2S$, and are a "potentially significant source" of odors in the proposed class area. Defs. Ex. D-1 at 101.

32. At least six residents in Harahan and River Ridge asserted that they noticed rotten egg, chemical, or other odors they sourced to the barge operations on the Mississippi River. Defs. Ex. HH at PDF pp. 6, 16-18, 27, 30. A Harahan resident detected a chemical odor that he thought came from chemical plants; a River Ridge resident believed a grain elevator caused the odor she experienced; and an Avondale resident still smells a garbage odor that he attributes to the River Birch Landfill. *Id.* at PDF pp. 25, 40, 46. An additional 12 fact sheets completed by putative class members stated they were exposed to other odor sources sometime since 2015, including chemical plants, oil refineries, wastewater treatment plants, barge operations, and the River Birch and Hwy 90 C&D Landfills. Defs. Ex. II at PDF p. 26, 61, 113, 156, 166, 241, 249, 265, 288, 296, 342-43.[20]

Moreover, Dr. Kind explained that many odor complaints described petroleum, chemical, sewer, or other odors attributable to non-JPLF sources. Defs. Ex. B-2 at 23-24, 40; Defs. Ex. B-1 at 32; *see also* Defs. Ex. D-1 at 103-106 (identifying sources with which odors may be associated).[21] Odor complaints have continued after December 2019, when Plaintiffs allege any odors issues at the JPLF ceased. Defs. Ex. YY at 1 (85 odor complaints received in Harahan, River Ridge, and Waggaman areas between February 2023 and February 2024). Residents also emailed the City of Harahan in August 2017, reporting odors due to the Harahan Wastewater Treatment Plant's acceptance of wastewater from the Chalmette Veolia Plant. *See, e.g.*, Defs. Exs. SS, TT. Proposed class counsel Seth Schaumburg stated that he smelled a "noxious odor" every day at his home in River Ridge, and threatened the City that he would "be filing a class action on behalf of all the affected residents of Harahan and River Ridge" if the Harahan Wastewater Treatment Plant did not stop processing the Veolia wastewater. Defs. Ex. TT.

---

[20] These fact sheets were filed in *Arceneaux v. Louisiana Regional Landfill Co.*, No. 23-cv-7349 (E.D. La.), which was voluntarily dismissed without prejudice.
[21] *See also* Defs. Ex. PP, QQ, RR (Facebook posts identifying the Hwy 90 C&D Landfill, chemical plants, and barge operations as potential odor sources).

The proposed class representatives' odor experiences further show that other odor sources exist, as the description of their odor experiences are inconsistent with Mr. Lape's modeling results and the variability in wind direction. For example, Ms. Bernard testified that she experienced daily odors in 2018 and in early 2019. Defs. Ex. AA 68:19-21. However, during the relevant time period, Ms. Bernard was downwind from the JPLF only 3.74% of the time but was downwind from the Harahan Wastewater Treatment Plant 20.80% of the time and the tank terminals 10.57% of the time. Defs. Ex. B-1 at 34. Even Mr. Lape's modeling did not predict that Ms. Bernard's home was frequently exposed daily to 5 ppb of $H_2S$ from the JPLF in 2018: only four days with exposures of an average of 5 ppb or more of $H_2S$ were predicted between January and March 2018, and 18 to 25 days per month were predicted to have such exposures in June, July, and August 2018. *Id.* at 31-32.[22] Thus, Ms. Bernard's testimony of daily exposure to odors (or anything remotely approaching such frequency) can only be accounted for through sources other than the JPLF.

Significant evidence exists of alternative odor sources around the proposed class area, which Plaintiffs' experts have not challenged. Due to presence of the River Birch Landfill (including the gas plant), Hwy 90 C&D Landfill, chemical plants, tank terminals, wastewater treatment plants, barge operations, and other odor sources—to which many putative class members are closer than the JPLF, or are downwind of more frequently—person-specific inquiries are needed into the source of any odors experienced by putative class members. *See supra* § I.A.1; Defs. Ex. B-1 at 33-37; Defs. Ex. E-1 at 5-6; Defs. Ex. C-1 at 102-03 (Figure 54) (based on Dr. Zannetti's modeling of emissions from all three landfills, the predicted frequency of exposure

---

[22] Dr. Zannetti's analysis of $H_2S$ measurements collected at LDEQ's Waggaman air monitoring station further demonstrates that other odor sources exist. Dr. Zannetti found at least 2 ppb to 6 ppb of $H_2S$ was being emitted from all directions. Defs. Ex. C-1 at 30, 59 (Figures 18 and 32). The highest concentrations of $H_2S$, in the range or 10 ppb to 11 ppb, were coming from the direction of the River Birch Landfill and gas plant and the Hwy 90 C&D Landfill. *Id.* Mr. Lape's analysis also supports background concentrations of $H_2S$ in the range of 2 ppb to 4 ppb. Pls. Ex. 12 at 8-1-8-2; Defs. Ex. N 92:17-94:22.

above 5 ppb varied across the proposed class area by a factor greater than 160). Predominance of common questions relating to causation has not been shown, and certification should be denied.

**D.  Person-specific inquiries are needed to determine the cause of alleged symptoms.**

In addition to the source of the alleged odors, determining specific causation requires individual inquiry into the cause of Plaintiffs' symptoms. Plaintiffs incorrectly assert that their "nuisance claims do not present individualized questions regarding medical causation for personal injuries caused by temporary transitory exposures," only "common complaints of symptoms of annoyance and inconvenience." Pls. Br. 25, 40. But the proposed class representatives testified that they experienced varying physical impacts due to odors, *Id*. 4-14, and certain representatives said the symptoms were preexisting or continued to occur past the relevant time period, *see, e.g.*, Defs. Ex. AA 79:21-80:4 (last experienced nausea at the end of 2020, when the odors "[s]tarted going away"); Defs. Ex. BB 121:20-122:11; Defs. Ex. CC 138:15-139:7. Plaintiff Savannah Thompson did not report symptoms from odors. Defs. Ex. EE 41:22-42:15.

Not only must the type and duration of each putative class members' symptoms (if any) be determined, but the Court must evaluate for each person the cause of those physical impacts. Defs. Ex. B-1 at 23-24, 48-49; *see McNabney v. Lab. Corp. of Am.*, 153 Fed. App'x 293, 295 (5th Cir. 2005) (causation expert must "consider and exclude other potential causes" of injury). Dr. Kind explained that the symptoms reported by the proposed class representatives that fall within the injuries in the Court's general causation decision are common and can occur for numerous reasons unrelated to $H_2S$ exposure. Defs. Ex. B-1 at 45-49. The symptoms cannot be attributed to odors from the JPLF unless other causes are ruled out through expert testimony. *Id*. at 49. The same is true where Plaintiffs allege a preexisting condition was exacerbated by odors. Demonstrating the importance of this analysis, while one proposed class representative attributed sleep disruption to JPLF odors, he was diagnosed with sleep apnea before the relevant time period. *Id*. Another

proposed class representative was diagnosed with anxiety disorder over 15 years ago, and yet another saw a doctor for headaches in March 2017 who found lesions on her brain. *Id.*[23]

Even to the extent that Plaintiffs argue that expert evidence is not required on these issues, Pls. Br. 25, 40, Plaintiffs will have to instead meet their burden on establishing specific causation for these symptoms through the testimony of each putative class member.

Because individual inquiry is needed into the cause (or exacerbation) of any symptoms, Plaintiffs have not met their burden on predominance. *See Steering Comm.*, 461 F.3d at 602-03 ("individual issues of medical causation," including "issues of exposure, susceptibility to illness, and types of physical injuries," precluded finding of predominance); *Braud v. Transp. Servs. of Ill.*, 2009 WL 2208524, at *1, *11 (E.D. La. July 23, 2009) (no predominance in case involving chemical spill; headaches, nausea, and other ailments were "common maladies" that "may be caused by any number of factors other than the individuals' varying degree of exposure").

## E.  Plaintiffs do not offer any means for calculating damages on a class-wide basis.

Plaintiffs summarily claim, without identifying a damages methodology or other expert analysis, that damages can be adjudicated on a class-wide basis due to the "similar nature" of the alleged injuries and the "consistency of emissions impacts." Pls. Br. 24, 26. Not so. The putative class members lived in the class area at different times, had different sensitivities to and experiences with odors, had different medical histories making them more or less susceptible to odor-related physical impacts, and allege different symptoms and impacts, as evidenced by the testimony of the proposed class representatives. *Id*. 4-14; *see supra* §§ I.C., I.D. Further

---

[23] To the extent Plaintiffs assert that exposure to 5 ppb of $H_2S$ (the level at which the Court held $H_2S$ was *capable* of causing these symptoms) is enough to establish causation for these health effects, that argument is incorrect and fails due to the variation in exposures. Defs. Ex. B-1 at 44-49; *see supra* § I.A; *see infra* § I.D; *Guidry*, R. Doc. 260 at 17-18 ("[t]hat something is possible does not suffice to demonstrate causation," and assessing exposure is a necessary individual inquiry to determine cause of health effects that is "not susceptible to class treatment").

complicating the damages analysis is that some putative class members allege that JPLF emissions were wholly responsible for their medical symptoms, while others allege only exacerbation of preexisting conditions—and certainly an understanding of individual class members' pre-2017 baseline condition is needed to determine the value of any exacerbation. The geographic reach, frequency of, and exposure to emissions also varied wildly across the proposed class and subclass areas. *See supra* § I.A. Damages require individual assessment. *See Steering Comm.*, 461 F.3d at 602 (damages not subject to "mathematical or formulaic calculation" and predominated over common issues where plaintiffs experienced "different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result").

Plaintiffs suggest that they "may" try to remedy their failure to offer a damages methodology by presenting "evidence . . . regarding class-wide valuation of nuisance damages" during a second phase of the case. Pls. Br. 24, 48. However, the Fifth Circuit has held that plaintiffs "must" present this evidence on a class certification motion, even where they are arguing that common questions as to liability predominate. *Cruson*, 954 F.3d at 258. Where, as here, plaintiffs do not make this showing, "damages may defeat predominance." *Id.* (vacating certification where expert did not explain how damages would be calculated). Because Plaintiffs have not provided any class-wide damages methodology, and no such methodology exists given the variation in sources, exposures, and impacts, the Court should find that individual issues of damages (as well as issues of liability and causation) overwhelm any common questions.

## II.  A class action is not the superior method of adjudicating Plaintiffs' claims.

Because individual issues predominate and a parallel mass action is ongoing, a class action is not the "superior" method for "fairly and efficiently" trying this case. Fed. R. Civ. P. 23(b)(3). The Fifth Circuit has explained that the predominance of individual issues "detracts from the superiority of the class action device." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419-20,

425 (5th Cir. 1998) (no superiority as claims required "individualized proof and determinations"); *see also Ticknor v. Rouse's Enters., LLC*, 2014 WL 1764738, *8, *10 (E.D. La. May 2, 2014) (Morgan, J.) (individual questions predominated over common issues of liability and precluded finding of superiority), *aff'd*, 592 Fed. App'x 276 (5th Cir. 2014). Plaintiffs' failure to establish predominance weighs against superiority, as the Court would face numerous case management challenges and expend significant resources to address the substantial individual questions.

For example, to assess whether putative class members were exposed to odors and are "neighbors" of Defendants, the Court would need to examine, over 2.5 years, the class members' locations and the substantial variation in the extent and frequency of exposures. Louisiana government agencies and Defendants' experts have confirmed potential alternative odor sources exist in or near the proposed class area, including two landfills adjacent to the JPLF, tank terminals, chemical plants, and wastewater treatment plants, and residents have confirmed that they experienced odors that they attribute to these sources. Specific causation requires individual inquiries into the source of odors experienced by putative class members. Significant questions as to medical causation, the nature, extent, and reasonableness of any odor impacts, and damages also require individual resolution. Because Plaintiffs have not offered reliable class-wide proof or a workable trial plan to address these issues class-wide (and it cannot be done), the parties would need to present individual evidence and the Court would need to preside over many jury trials to answer these questions across the class—exactly the outcome Plaintiffs wrongly claim a class action would prevent. *See Braud*, 2009 WL 2208524, at *13; *see infra* Section § VII.

Moreover, Plaintiffs' argument that class certification will "relieve the [C]ourt of having to try thousands of individual cases," Pls. Br. 41, is undercut by the fact the proposed class definition excludes the more than 540 mass action plaintiffs in *Addison*. *Id*. 21. In other words,

regardless of the outcome of class certification, individual trials on these related claims are inevitable. *See Barnes*, 2023 WL 4980240, *7 (superiority not met where claims in other actions would remain pending); *Price*, 79 So. 3d at 976 ("[M]ilitating against class certification is the fact that over 500 putative class members have already brought individual claims against these same defendants."). The existence of the *Addison* mass tort, and class counsel's representation that they represent over 1,000 putative class members, similarly subverts Plaintiffs' claim that potential class members are unlikely to pursue their own actions. Pls. Br. 29, 42.[24] And as the Court is well aware, as a practical matter in mass tort practice, a handful of trials of individual claims often gives the parties a basis for global resolution.

Plaintiffs also argue, without any case citation, that certification is warranted because this litigation has been proceeding for over five years. *Id.* 41. Delay in a ruling on a class certification is not a consideration under Rule 23(b)(3). Fed. R. Civ. P. 23; *see also In re FIRSTPLUS Fin., Inc.*, 248 B.R. 60, 78 (N.D. Tex. 2000) (denying untimely certification motion; considering prejudice *to defendants* of delay in filing motion under Rule 23(c)(1)). And it is a well-recognized disadvantage that accompanies class actions. *See* 2 Toxic Torts Guide § 13.03, *Disadvantages of Class Actions* (a disadvantage of class actions "is the expense and delay of the certification battle").

Plaintiffs have not shown that a class action, which would inevitably devolve into individual trials, is superior to alternative methods of managing lawsuits, such as consolidation, coordinated pretrial proceedings, and test cases—methods already being employed in the *Addison* action, and which have become standard operating procedure in the modern "MDL era." *See*

---

[24] Reinforcing this, each of the *Addison* plaintiffs seek hundreds of thousands of dollars in damages for similar nuisance claims. Defs. Ex. UU at 26-27. In support of these substantial damages, the *Addison* Trial Plaintiffs allege substantial medical impacts, including plaintiffs who claim frequent vomiting for 2.5 years. *See* No. 19-cv-11133, R. Doc. 580 n.12 and exhibits thereto. In *Ictech-Bendeck*, it is not difficult to envision large numbers of opt-outs from individuals who allege substantial medical impacts, beyond the typical annoyance damages that class counsel suggests they are seeking.

Manual for Complex Litigation §§ 21.142, 21.15 (4th ed.); *Lloyd*, 585 F. Supp. 3d at 660; Eldon E. Fallon et. al., Bellwether Trials in Multidistrict Litigation, 82 Tul. L. Rev. 2323, 2324 (2008) ("In an age of increasing skepticism regarding the use of class actions in our legal regime, the modern multidistrict litigation (MDL) process . . . is emerging as the primary vehicle for the resolution of complex civil cases.").

## III. Bifurcation and the certification of issue classes is not warranted given the prevalence of individual issues.

Plaintiffs cannot "solve[] any potential issues surrounding predominance" by proposing to bifurcate this case into two phases—with the first phase addressing liability, allocation of fault, and the dispersion of emissions, and the second phase concerning specific causation and damages—or seeking certification of issue classes. Pls. Br. 35, 42. The Fifth Circuit has explained that while district courts may bifurcate proceedings "once a case is certified," courts must first find that common questions predominate. *Crutchfield*, 829 F.3d at 378. The Fifth Circuit has also rejected attempts to "manufacture predominance" through Rule 23(c)(4), which permits in appropriate circumstances the maintenance of a class action as to particular issues. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 739, 745 n.21 (5th Cir. 1996) (vacating certification of issue classes); *Allison*, 151 F.3d at 422. Similar to bifurcation, the "cause of action, as a whole," must first satisfy predominance and superiority under Rule 23(b)(3) to warrant certification of (c)(4) issue classes. *Castano*, 84 F.3d at 745 n.21; *In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 2363135, at *1-2 (E.D. La. Aug. 16, 2007); *see also* Pls. Br. 23.[25]

Neither the predominance nor superiority requirements are met here, as individual issues pervade even the questions that Plaintiffs propose for class treatment. *See supra* §§ I-II; *see also*

---

[25] The Fifth Circuit has cautioned that certifying issue classes where predominance has not been met would "eviscerate" the Rule 23(b)(3) requirement and result in "automatic certification in every case where there is a common issue, a result that could not have been intended." *Castano*, 84 F.3d at 745 n.21.

*Nola v. Exxon Mobil Corp.*, 2015 WL 2338336, at *1, *7 (M.D. La. May 13, 2015) (could not rely on bifurcation to remedy predominance problems where leaks of $H_2S$ and other chemicals allegedly caused physical and nuisance injuries; individual inquiry needed into cause of symptoms, "location, exposure, dose, and susceptibility to illness" (quotation omitted)).

This case is distinguishable from *Watson v. Shell Oil Co.*, *Mullen v. Treasure Chest Casino, LLC*, and *In re Deepwater Horizon*, cited by Plaintiffs, because this case does not involve a "single episode[] of tortious conduct . . . committed by a single defendant," and also due to the sheer number of individual questions. *Crutchfield*, 829 F.3d at 378 (distinguishing *Watson, Mullen,* and *Deepwater Horizon* on this basis and declining to bifurcate case). *Watson* concerned an explosion at a manufacturing facility and did not involve "varying types of injury at different times and through different causal mechanisms." 979 F.2d 1014, 1016-17, 1023 (5th Cir. 1992). The *Mullen* plaintiffs were former casino employees, and alleged that the casino's defective air ventilation system caused their respiratory problems. 186 F.3d 620, 623, 626-27 (5th Cir. 1999). And *In re Deepwater Horizon* addressed the certification of a *settlement class* for claims arising out of an explosion on an offshore drilling rig and an oil spill. 739 F.3d 790, 795 (5th Cir. 2014).

*Slocum v. International Paper Co.* and *Turner v. Murphy Oil USA, Inc.*, also cited by Plaintiffs, are distinguishable for this same reason. *Slocum* involved an emissions release from a paper mill on a single day, 2019 WL 2192099, at *1, *4 (E.D. La. May 21, 2019), and *Turner* concerned an oil storage tank spill, 234 F.R.D. 597, 601-02, 606 (E.D. La. 2006). Courts have distinguished these cases for that reason. *Barnes*, 2023 WL 4980240, at *5 n.12 (rejecting use of issue classes and noting that *Slocum* involved a "one-time dispersion of a contaminate"); *In re Katrina*, 258 F.R.D. at 140 (distinguishing *Turner* due to the "multiple sources of flooding" that needed to be assessed for causation).

In contrast to these cases, the putative class members here have alleged varying injuries (with some claiming only interference with use of property and others alleging a range of medical impacts) from JPLF emissions that varied in their geographic reach and frequency over 2.5 years. And the evidence demonstrates that other odor sources throughout the 46-square-mile proposed class area likely contributed to any alleged injuries, and that putative class members' experiences with odors are highly subjective. These are individual issues, which go to elements of liability, causation, and damages, cannot be effectively managed through bifurcation or issue classes.

Plaintiffs' reliance on Defendants' motion to bifurcate the trial of the first set of *Addison* plaintiffs as support for certification is disingenuous because they opposed that motion. R. Doc. 307. Regardless, Defendants did not concede in that motion that specific causation and damages are "simpler issues." *See* Pls. Br. 40. Defendants argued that these issues are "complex" and "require fact and expert evidence on air dispersion, calculations of [$H_2S$] emission rates, odor toxicology and psychology, other industrial sources of odor in the Plaintiffs' areas, and individual impacts" for the mass action plaintiffs with "varying alleged injuries." R. Doc. 303-1 at 2. The amount of evidence and number of individual inquiries needed to resolve specific causation and damages, as well as other elements of a nuisance claim, increase exponentially in the class action context, as Plaintiffs here are seeking to certify a class of over 75,000 people compared to the roughly 540 mass action *Addison* plaintiffs. Pls. Br. 28.

## IV. The proposed class representatives' claims are not typical because exposures to and impacts from odors (if any) vary widely among putative class members.

These same individual inquiries bar the proposed class representatives from establishing that their claims and defenses are typical of the putative class. Fed. R. Civ. P. 23(a)(3). Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Akeem*, 2021 WL 4804049, at *5 (quotation

omitted). The "requirement for individualized proof of differing circumstances" defeats typicality. *Moore v. Livingston*, 2016 WL 922218, at *2 (E.D. Tex. Jan. 11, 2016) (citing *Trevino v. Holly Sugar Corp.*, 811 F.2d 896 (5th Cir. 1987)), *adopted*, 2016 WL 899937 (E.D. Tex. Mar. 8, 2016). Each putative class member here experienced different exposures and impacts (if any) from odors, and the cause of odors and any symptoms depended on their unique circumstances. As individual proof is required to establish their claims, typicality is not met.

As demonstrated by Plaintiffs' own modeling results, the predicted dispersion of 5 ppb of $H_2S$ from the JPLF varied each month and even each day across the class and subclass areas. *See supra* § I.A. The proposed class representatives resided at different distances and directions from the JPLF, and their potential exposure to odors depended on their locations over the 30-month period.[26] The representatives' circumstances and proof of exposure are markedly different from other members of both the class and subclasses. *See* Defs. Ex. C-1 at 106 ("no proposed class representatives . . . have exposures that are representative of other putative class members"). Mr. Lape did not analyze whether the subclasses sufficiently represent the individuals in each region.[27]

The proposed class representatives and class members also lived at varying distances and directions from the numerous odor sources and had differing potentials to experience odors from

---

[26] As explained in Section I.A, Plaintiffs cannot rely on Dr. Zannetti's Figure 56 (depicting Mr. Lape's modeling results) to show uniformity of impacts. Mr. Lape admitted that dividing the proposed class into subregions conceals monthly variations in predicted exposures, and that putative class members in the same ring (or concentric amoeba, in Plaintiffs' terms) could still have varying frequency of exposure each month based on shifting wind direction and wind speed, among other factors. Defs. Ex. N 107:5-23.

[27] While Mr. Lape performed a statistical evaluation of whether the frequency of exposures for the proposed class representatives are similar to the proposed class as a whole, he did not delineate subclasses or compare the frequency of exposure for each proposed class representative to any defined area around them. Pls. Ex. 12 at 9-1, G-1-G-8 (Appx. G). Mr. Lape's statistical evaluation is also riddled with mathematical errors that raise accuracy questions. Defs. Ex. C-2 at 1-3. Mr. Lape incorrectly defined the grid for the proposed class area in the statistical evaluation—an error that impairs all of his calculations concerning "representativeness." *Id.*; Defs. Ex. N 178:11-181:21. Defendants advised Mr. Lape of this error, but Mr. Lape did not issue a correction and Plaintiffs did not rely on Mr. Lape's statistical evaluation in their motion. Mr. Lape's error is even larger with the revised proposed class area. Defs. Ex. C-3 at 1-3.

these sources—meaning the claims of the representatives are not based on the "same source of emissions" as other class members. Pls. Br. 32; Defs. Ex. B-1 at 33-37 (showing differing percentages of time that representatives were downwind of other sources); Defs. Ex. D-1 at 107-114 (showing differing distances from facilities). Illustrating this, Mr. Ictech-Bendeck resided about 2.75 miles to the northeast of JPLF, 0.6 miles to the west of the Harahan Wastewater Treatment Plant, and 4.3 miles to the east of the Cornerstone Complex. *Id.* at 107-08. In comparison, Ms. Williams (a member of the same proposed subclass) lived about 1.9 miles to the east of JPLF, 2.25 miles to the south of the Harahan Wastewater Treatment Plant, and 1.7 miles to the southeast of the Cornerstone Complex. *Id.* at 112. Other properties in this same subclass varied widely in their proximity to other odor sources.

Moreover, the proposed class representatives' claims and alleged damages are not "fairly similar, if not identical," to other class members' claims. Pls. Br. 32. Given that, according to WHO, only 5% of the population experiences annoyance for less than 2% of the time when exposed to 5 ppb of $H_2S$, and due to the individual factors influencing odor perception, the proposed class representatives' experiences with odors are not comparable to those of other class members. *See supra* § I.B. Indeed, they differed in whether they noticed and were affected by odors, the extent of any impacts, and the types of symptoms they attributed to odors (if any, as some class members did not allege health complaints). Pls. Br. 4-14; Defs. Ex. HH; Defs. Ex. EE 41:22-42:15. Because the reasonableness of impacts depends on the character of the neighborhood, and the representatives' properties are not typical of other class members' properties, this inquiry too depends on different proof. Defs. Ex. F-1 at 59-65. Certain class members have also identified personal injury, property value diminution, and other claims not asserted by the representatives. *See, e.g.*, Defs. Ex. II at PDF pp. 2-9, 19-26, 45-53, 200-209, 266-273, 289-96, 360-67.

**V. The proposed class representatives are not adequate representatives.**

Because the proposed class representatives are pursuing limited claims, and certain representatives are not named Plaintiffs, do not have a claim, or have a close relationship with proposed class counsel, they cannot "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "[B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 480 (5th Cir. 2001). That is especially true here, as the claims of the proposed class representatives and class members are not aligned.

The proposed class representatives have limited the potential recovery to nuisance injuries between July 1, 2017, and December 31, 2019. They do not seek damages for property value diminution, personal injuries (beyond the symptoms they characterize as nuisance impacts), or other claims. *See* R. Doc. 417 at 5 n.8; Pls. Br. 40. Yet numerous putative class members have identified possible claims for personal injury, property value diminution, physical damage to property, and lost wages or earning capacity, and injuries outside of the 2.5-year period. *See, e.g.*, Defs. Ex. II at PDF pp. 2-53, 70-78, 89-96, 106-48, 169-201, 226-41, 250-73, 289-96, 302-34, 360-93, 419-33. The proposed class representatives' failure to assert those claims would result in their waiver by all class members. La. R.S. 13:4231 (at judgment, "all causes of action existing at [that] time . . . arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished"); La. R.S. 13:4231 cmts. (claims not asserted "are extinguished and barred"). Due to the preclusive effect of proceeding as a class, a conflict exists between the proposed class representatives and those class members who might have other claims, meaning adequacy is not

met. *See In re Vioxx*, 239 F.R.D. at 460 (no adequacy due to factual and legal differences among claims); *Ardoin v. Stine Lumber Co.*, 220 F.R.D. 459, 466-67 (W.D. La. 2004) (no adequacy where class representative waived personal injury, property value diminution, and other claims).[28]

Certain proposed class representatives have not satisfied adequacy on three additional grounds. Mr. Adams, Ms. Crossman, Ms. Steele, Ms. Williams, and Ms. Walker are not named Plaintiffs in this action, a requirement to serve as a proposed class representative. R. Doc. 48; *see In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2019 WL 2924135, *5 (E.D. La. July 8, 2019) (individual was not a named plaintiff and could "not serve as a class representative" (citing *Johnson v. Am. Credit Co.*, 581 F.2d 526, 533 n.13 (5th Cir. 1978)). They have not sought to intervene or amend the complaint despite being identified as proposed class representatives for at least nine months. Ms. Williams also cannot serve as a proposed class representative because she is merely a resident, not an owner or lessee, of the property and does not have the necessary "ownership interest" for a viable nuisance claim. *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 386-87 (5th Cir. 2001); Defs. Ex. DD 14:24-15:6; *see also Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319-20 (5th Cir. 2002) (standing required for class certification).

Mona and Larry Bernard are inadequate representatives because their daughter Shanna Bernard LeGarde is engaged to proposed class counsel Bruce Betzer, with a wedding planned in November 2024, and works at his law firm. Defs. Ex. WW; Defs. Ex. Z 15:21-16:12. Ms. LeGarde serves as the firm's office manager and bookkeeper and approached her parents about joining the suit. Defs. Ex. VV; Defs. Ex. Z 17:22-18:22. The Bernards have gone on vacations with Mr. Betzer. Defs. Ex. AA 13:17-14:7. This relationship creates, at the very least, the appearance of

---

[28] *See also Thornburg v. Ford Motor Co.*, 2022 WL 4348475, at *7-8 (W.D. Mo. Sept. 19, 2022) (certification denied in odor nuisance action; adequacy not met where data sheets indicated some putative class members "may have" personal injury claims, and plaintiff's failure to assert those claims would result in their waiver).

impropriety, and adequacy is not met as to the Bernards. *See Eubank v. Pella Corp.*, 753 F.3d 718, 722-24 (7th Cir. 2014) (improper for son-in-law of class representative to serve as class counsel); *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 198-201 (S.D.N.Y. 2015) (no adequacy due to involvement of class representative's cousin by marriage).[29]

## VI.  Plaintiffs' proposed class and subclasses are not ascertainable because they are overly broad and are not supported by reliable evidence of exposure.

Plaintiffs have failed to propose a class that is "adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (overly broad class not ascertainable). As is the case here, proposed class definitions that are "too broad," "ill-defined," or not based on objective criteria do not satisfy this requirement. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 933-35 (5th Cir. 2023) (reversing certification of overbroad and vague classes); *Contromano v. United Technologies Corp.*, 2018 WL 2047468, at *1, *10, *22 (S.D. Fla. May 2, 2018) (rejecting a proposed class definition consisting of all residential property owners within arbitrary geographic boundaries that were "not tied to exposure contours demonstrated to be dangerous to human life").

Plaintiffs' putative class and subclasses fail the ascertainability requirement on multiple grounds. As the proposed class definitions are not limited to people with property interests, they include many people without viable nuisance claims. Adding to the overbreadth of the proposed class and subclasses, Plaintiffs purportedly based the class and subclass boundaries on Mr. Lape's modeling results. Pls. Br. 20-22. But the modeling results rely on inflated emission rates calculated by Plaintiffs' experts Dr. Jaana Pietari (hydrogen sulfide generation) and Jose Sananes (landfill

---

[29] With respect to the adequacy of the proposed class counsel, courts are reluctant to appoint more than one lead counsel for a class action—let alone the 11 attorneys or six firms proposed here. *See e.g.*, *In re Omnicom ERISA Litig.*, 2022 WL 18957200, *13 (S.D.N.Y. Aug. 11, 2022) (declining to appoint two firms as class counsel because it increases fees and results in duplicate work).

engineering) using unaccepted methodologies. Regardless, the class and subclass boundaries are not even aligned to Mr. Lape's modeling results or depictions of those modeling results by the defense experts, meaning they are not "tied to" objective or reliable evidence.

### A. The proposed class and subclasses include a great many people without viable nuisance claims.

Plaintiffs' proposed class and subclasses include all people who, "at any time," between July 1, 2017, and December 31, 2019, "lived and/or resided" within certain boundaries. Pls. Br. 20. However, as explained above, Louisiana law requires a person to have "some type of ownership interest in immovable property" to recover under article 667's nuisance theory. *Roberts*, 266 F.3d at 386-87; *see also Johnson v. Orleans Par. Sch. Bd.*, 2005-1488 (La. App. 4 Cir. 8/9/06), 938 So. 2d 219, 227 (affirming dismissal; no cause of action under article 667 without showing that class plaintiffs were "landowners"). Because the proposed class and subclasses necessarily include people who lived or resided in the area and did not have the requisite property interest, they are impermissibly overbroad. *See Wagner v. Cent. La. Elec. Co., Inc.*, 99 F.R.D. 279, 282 (E.D. La. 1983) (class overbroad because it was not "limited to those individuals" with potential claims).

### B. Plaintiffs' modeling results do not reliably predict exposures to odors and cannot offer an objective basis for the proposed class and subclass boundaries.

The proposed class and subclasses are overbroad and are not based on reliable evidence because the inputs to Mr. Lape's modeling (cited by Plaintiffs as support for the class boundaries) were significantly overestimated. Mr. Lape's modeling depends on emission rates provided by Dr. Pietari and Mr. Sananes. But neither followed accepted methodologies for quantifying $H_2S$ generation or landfill emission rates, nor did they base their estimates on adequate data—falling

well short of what is required for expert evidence on a motion for class certification.[30] *See Prantil*, 986 F.3d at 575-76 (class certification requires full *Daubert* analysis).

Rule 702 requires the proponent to show it is more likely than not that expert opinions are based on "sufficient facts or data," are the "product of reliable principles and methods," and reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In assessing reliability, courts consider whether an expert's methodology has been generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 594 (1993); *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). An expert must apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Expert opinions must also "'be supported by appropriate validation—i.e., "good grounds," based on what is known.'" *Moore*, 151 F.3d at 275 (quoting *Daubert*, 509 U.S. at 589-90).

The emission rates estimated by Dr. Pietari and Mr. Sananes do not pass muster under Rule 702.[31] To estimate $H_2S$ generation from spent lime at the JPLF, Dr. Pietari relied on a methodology developed by defense expert Dr. Bishow Shaha. But Dr. Shaha's methodology was developed specifically for C&D waste, and it has never been used for Dr. Pietari's purpose of estimating $H_2S$ generation from spent lime. Dr. Pietari also admitted she was unable to apply the final critical step of model validation. The problem was exacerbated by Mr. Sananes in several ways. First, he used Dr. Pietari's faulty $H_2S$ generation calculation to estimate $H_2S$ emissions. Second, he applied a method that he made up to determine his estimates. Lastly, he ignored relevant data for two critical

---

[30] In its general causation decision, the Court did not make any factual findings regarding Mr. Sananes' and Dr. Pietari's methodologies or emission rates and did not rely on their opinions in reaching the general causation determination.

[31] The unreliability of Dr. Pietari and Mr. Sananes' opinions are discussed in detail at R. Doc. 166-18 and R. Doc. 196.

steps in his process: selecting a gas generation rate and estimating collection efficiency. Dr. Pietari and Mr. Sananes consequently overestimated emission rates for the JPLF, and Mr. Lape in turn overpredicted exposures of putative class members' properties to emissions. This domino effect renders Mr. Lape's modeling results unsuitable for class certification purposes.

### 1.   Dr. Pietari's estimate of H2S generated from spent lime is unreliable.

Dr. Pietari estimated the amount of $H_2S$ generated from spent lime at the JPLF using a novel methodology developed by Dr. Shaha. Defs. Ex. I at 11; R. Doc. 270 412:10-413:14. Critically, Dr. Shaha explained that the methodology he developed to estimate $H_2S$ generation *from C&D waste* cannot be reliably applied at the JPLF to estimate $H_2S$ generation from *spent lime*—a chemically and physically different waste type. Defs. Ex. G-1 at 7, 11-13, 22, 30-31. And the site-specific $H_2S$ data necessary to apply Dr. Shaha's methodology do not exist for the JPLF. *Id.* at 7-8, 13-14, 23-25, 31. Dr. Pietari's application of Dr. Shaha's methodology without these data badly compromised the calibration needed for the model and precluded any validation of the model results, rendering her generation estimate unreliable. *Id.*

Dr. Pietari's testimony and reports, standing alone, demonstrate the unreliability of her $H_2S$ generation estimate. Dr. Pietari acknowledged that it has never been tested whether Dr. Shaha's methodology for estimating $H_2S$ generation from C&D waste can be reliably used for spent lime. R. Doc. 270 at 413:12-414:8. She further admitted that, except for this current litigation, she is unaware of whether Dr. Shaha's methodology has ever been used by anyone else. *Id.* The methodology Dr. Pietari followed is not generally accepted in the solid waste industry, or any other industry, for estimating $H_2S$ generation from spent lime. This litigation should not be the test-case.

But even if Dr. Shaha's methodology could be applied to spent lime, it cannot be reliably applied *in this case* due to the absence of data necessary to validate the modeling results. Although Dr. Pietari purports to apply the methodology outlined in the Shaha and Meeroff (2020) paper, she

also cites two other field-scale studies of $H_2S$ generation from C&D waste: Anderson (2010) and Malmir (2023). Defs. Ex. I at 25. While the three studies use different modeling methodologies to estimate $H_2S$ generation, they all validated the reliability of their models through the same regression analysis applied to measured data—comparing the $H_2S$ generation amounts predicted by their models against actual $H_2S$ measurements collected at each studied landfill. Defs. Ex. L at 20; Defs. Ex. K at 04020045-4 to -5; Defs. Ex. M at 11-12.

These validated studies stand in stark contrast to the method used by Dr. Pietari. She did not conduct this regression analysis to validate her $H_2S$ generation model because the necessary site-specific data—routine measurements of $H_2S$ concentrations in the landfill gas and landfill gas flow rates collected over several years—do not exist for the JPLF. Defs. Ex. ZZ. 35:19-36:25. Dr. Pietari therefore cannot complete the final crucial step in Dr. Shaha's methodology she purports to follow: testing the reliability of her $H_2S$ generation model. In other words, Dr. Pietari cannot tell the Court whether her model is a good predictor of $H_2S$ generation at the JPLF. Defs. Ex. T 185:21-186:6. She further admits that she is unable to even determine the rate of error. Defs. Ex. U 71:21-72:12. This missing step renders Dr. Pietari's $H_2S$ generation estimate unreliable, including as an input for Mr. Lape's model.

### 2. Mr. Sananes overestimated emission rates.

Mr. Sananes followed three steps in estimating $H_2S$ emissions from the JPLF: (i) estimating the amount of landfill gas generated, (ii) estimating the amount of landfill gas collected, and (iii) subtracting the amount of collected landfill gas from the amount of generated landfill gas to estimate the amount emitted into the air. R. Doc. 268 167:11–168:15. For each step, Mr. Sananes deviated significantly from established methodologies and ignored relevant, contrary data.

*Mr. Sananes' over-estimate of gas generated (Step 1).* To estimate the amount of landfill gas generated in the JPLF, Mr. Sananes used a model developed by the EPA: LandGEM. However,

Mr. Sananes nearly tripled the rate of gas generation—called the "k factor"—that EPA directs for use in LandGEM unless the modeler has site-specific data to justify this deviation. Mr. Sananes admitted that he did not have site-specific data that would warrant using a different k factor under EPA's methodology. R. Doc. 269 318:22-319:13.

Instead, Mr. Sananes used a k factor that a 2005 EPA paper had calculated, based on site-specific data, for an unlined and unidentified landfill in Florida that was flooded with water from an aquifer beneath it. *Id*. 316:8-11. Mr. Sananes was unable to say that his method of selecting a k factor for an unknown landfill from another state was generally accepted in the solid waste industry. *Id*. 317:2-25. This method of setting up the LandGEM model inflated his results, diverged from EPA's directions for using LandGEM, and was not otherwise an accepted method in the industry. Defs. Ex. A-1 at 38-43.

Mr. Sananes could only explain his choice of a k factor from the Florida landfill by claiming that that the JPLF is a "wet" rather than "conventional" landfill. R. Doc. 269 321:8-14. To reach this conclusion, Mr. Sananes improperly assumed that leachate flooded up from the bottom of the JPLF to 51% of the depth of the waste (meaning the leachate would have been approximately 30 feet deep). *Id*. 307:3-6; Defs. Ex. A-1 at 38-39. He used liquid measurements from the gas extraction wells to make that determination.[32] But he made up that approach for this case. Mr. Sananes could not identify any studies validating his use of gas wells to estimate waste saturation. *Id*. 308:22-309:6. Nor could he say that the method is generally accepted. *Id*. 310:23-311:10. To reach an average depth, Mr. Sananes had to extrapolate many disparate measurements of well liquids. The liquid measurements in the gas wells were not all the same height, some of the gas

---

[32] This method of selecting a k factor—estimating leachate depth, deciding it renders a landfill "wet," and adopting a k factor from a "wet" landfill in another state studied by someone else—is also not accepted by EPA nor by the solid waste industry. *See* R. Doc. 269. 316:16-317:12.

wells were dry, and the gas wells did not extend all the way to the bottom of the landfill, undermining his conclusion. *Id.* 307:7-308:6.

Mr. Sananes also failed to consider hundreds of reliable daily measurements of the depth of leachate that demonstrated that the JPLF was not "flooded" like the other unidentified landfill. *Id.* 311:13-19. Compared to Mr. Sananes' assumption that leachate was 30 feet deep, these data showed the leachate was on average three to four feet deep. Defs. Ex. A-1 at 38-39. Mr. Sananes admitted that these routine measurements, taken with transducers, generally give a more accurate measurement of leachate than liquid depth in gas wells (the approach he used). R. Doc. 269. 312:3-313:11.[33] Mr. Sananes ultimately offered no credible basis for tripling the k factor in the LandGEM model, which resulted in an overestimated gas generation estimate for the JPLF.

In addition to using the LandGEM model in a manner that contravened accepted methodologies, Mr. Sananes incorporated into his estimate of gas generation Dr. Pietari's calculation of $H_2S$ generated from spent lime.[34] Defs. Ex. J at 11-12. Mr. Sananes' dependence on Dr. Pietari's unreliable estimate further compromises (and inflates) his gas generation estimate.

*Mr. Sananes' baseless estimate of gas collected (Step 2).* Mr. Sananes made up a method of calculating collection efficiency that likewise has never been used to support a landfill emission estimate and is based solely on a pre-construction design drawing that does not provide an accurate and reliable basis for his calculation. Specifically, Mr. Sananes used a drawing in a report by a JPLF consultant, Carlson Environmental Consultants ("CEC"). R. Doc. 269. 326:15-17; 327:3-5. Mr. Sananes copied circles from the CEC drawing that showed a "theoretical" Radius of Influence ("ROI") around each gas extraction well. *Id.* 326:18-21. He assumed that any gas generated within

---

[33] Defs. Ex. W 191:17-192:20, 193:23-194:6, 199:18-200:4 (Mr. Soler agreed transducers "would be a more accurate way to measure leachate depth from the bottom liner than liquid measurements in the gas wells.").

[34] Dr. Pietari in turn incorporated into her mathematical formulas and methodology Mr. Sananes' unreliable estimate of the amount of landfill gas generated at the JPLF. Defs. Ex. I at 32.

the circles was collected, and any gas generated outside of them was emitted into the air. But Kris Carlson of CEC, who authored the report and was responsible for the pre-construction drawings, has testified—and Mr. Sananes has admitted—that the ROI drawing was created for the purpose of *designing* a landfill gas system, *not* for estimating emissions from the surface of a constructed landfill. Defs. Ex. GG 257:19-24; R. doc. 269. 336:14-338:4.

That is important because, according to Mr. Carlson, the theoretical ROIs do not reflect the actual reach of the gas extraction wells, and other factors would need to be considered to determine the actual ROI (i.e., the actual gas capture zone). Defs. Ex. GG 246:5-247:12; 255:1-257:7. Yet Mr. Sananes assumed all gas generated outside the theoretical ROIs escaped, an assumption that is not only unique to this case but is contrary to the facts. For example, the amount of vacuum applied to each gas well and the existence and depth of cover (which has the effect of preventing gas from freely reaching ambient air) are two factors that need to be considered, and both can increase the amount of gas collected by a gas system. Defs. Ex. GG 238:17-239:7; 255:17-256:1. Mr. Sananes did not consider vacuum or cover in using Mr. Carlson's ROIs to estimate gas collection, rendering his emission rates an unreliable overprediction. R. Doc. 269. 335:23-336:11.

Mr. Sananes has never used this method to estimate an ROI before, nor to estimate emissions from a landfill surface. *Id.* 330:16-19. And he could not identify any studies that describe or support his methodology for estimating gas collection. *Id.* 338:5-24. His method is not generally accepted by regulatory agencies or the industry for purposes of estimating emissions.[35]

*Mr. Sananes' unsupported estimate of gas emitted (Step 3)*. Mr. Sananes estimated JPLF gas emissions by assuming that all gas generated outside of CEC's theoretical ROIs escaped

---

[35] There are accepted methods that are routinely used for estimating emissions, which Mr. Sananes disregarded. The EPA has regulations governing the calculation of collection efficiency at municipal solid waste landfills, such as the JPLF. 40 C.F.R. § 98.343(c), Table HH-3; Defs. Ex. V 129:10-130:9.

through the landfill surface. R. Doc. 269. 331:16-332:8. Mr. Sananes added up the total area of his theoretical ROI circles and divided that sum by the total surface area of Phase 4A of the JPLF; the result was his collection efficiency percentage. He then multiplied his estimate of total gas generated inside the JPLF by his estimated collection efficiency percentage, and subtracted that "collected" percentage from his total estimate of gas generation for a final emissions estimate.

In using this novel approach, Mr. Sananes ignored factors present at the JPLF that increased the amount of gas collected or prevented gas from escaping through the surface. Chief among these was the presence of between one and two feet of clay cover on the surface of the landfill from 2018 into 2019, during the estimated emissions period. Defs. Ex. V 139:7-148:9. But Mr. Sananes deemed the total effect of the cover soils "negligible" and did not consider the reports documenting the depth and type of cover materials. *Id*. 137:19-25; *see also* Defs. Ex. J at 12.

After estimating surface emissions, Mr. Sananes did not try to validate his results by comparing his calculations to actual measurements. R. Doc. 269. 339:25-340:25. Mr. Sananes admitted surface concentrations of $H_2S$ were measured many times during his modeling period, including five days of onsite sampling in 2019 that he helped direct. *Id*. 339:3-15. Defendants provided Mr. Sananes the parallel samples they took during the 2019 site investigation. *Id*. 339:21-24. The JPLF performed and reported quarterly surface emissions monitoring. *Id*. 339:25-340:25. Most of those measurements showed zero or very low concentrations of $H_2S$ or landfill gas, dramatically at odds with Mr. Sananes' estimates. Yet Mr. Sananes ignored all this measured data.

### 3.  Mr. Lape overpredicted potential exposures.

Dr. Pietari and Mr. Sananes made up methodologies for their testimony in this case that are not generally accepted, causing them to significantly overestimate $H_2S$ generation and

ultimately $H_2S$ emission rates at the JPLF. The faulty emission rates in turn render Mr. Lape's modeling results unreliable, as shown by defense experts Mr. Stutz and Dr. Zannetti.[36]

Mr. Stutz estimated emission rates for the JPLF using methods accepted and routinely applied by the solid waste industry and regulatory agencies.[37] Mr. Sananes' emission rates were approximately 20 to 21 times higher than those estimated by Mr. Stutz, which inflated Mr. Lape's modeling results by the same degree. Defs. Ex. C-1 at 82 (Figure 45). Mr. Lape consequently overestimated the geographic reach of emissions from the JPLF and the frequency of exposures. Dr. Zannetti demonstrated this by modeling $H_2S$ emissions from the JPLF using Mr. Stutz's corrected emission rates.[38] *See, e.g.*, *id* at 83 (Figure 46).

Plaintiffs' emission rates and modeling results are unreliable and overpredict exposures to $H_2S$ emissions, therefore, the Court should give the modeling no weight in deciding class certification and find that the ascertainability requirement has not been met. *See Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005) (affirming denial of class certification where district court "considered all expert testimony offered by both sides in support of or in opposition to class certification" and "afforded that testimony such weight as [it] deemed appropriate")

### C.  Plaintiffs' class and subclass boundaries are not tied to their modeling results.

Setting aside the unreliability of Mr. Lape's modeling results, the boundaries of the proposed class and subclasses are arbitrarily defined. Plaintiffs' proposed class area (shown

---

[36] Plaintiffs appear to acknowledge the limitations of Mr. Lape's modeling, as they also identify the "geographic scope, frequency, duration, and concentration" of emissions as an issue for class-wide resolution during a "phase one" trial. Pls. Br. 24, 26, 45.

[37] Mr. Stutz used these accepted methods to estimate the total amount of $H_2S$ generated at JPLF; estimate the amount of $H_2S$ collected by the gas collection and control system; and estimate the emissions of $H_2S$ from the landfill surface. Defs. Ex. A-1 at 10-29. Where possible, Mr. Stutz used the same data as Plaintiffs' experts, mainly the total waste volume and the concentration of $H_2S$ in the landfill. *Id.* at 26 (Table 10).

[38] Dr. Zannetti extended his modeling into 2020 to compare his results to the only continuous monitoring data in the proposed class area and concluded the data corroborated his modeling. Defs. Ex. C-1 at 74-80.

below)[39] is both underinclusive and overinclusive—it includes only a portion of the area where

Mr. Lape predicted emissions would disperse, and it encompasses other locations outside of the

modeled area. *See Duffin v. Exelon Corp.,* 2007 WL 845336, at *3-4 (N.D. Ill. Mar. 19, 2007)

(certification denied; modeling did "not coincide" with geographic boundaries of proposed class

area as 26% was outside contamination area). Plaintiffs do not explain how this class boundary

was selected, or why certain areas were or were not included. Mr. Lape was not involved in the

determination of the putative class area. Defs. Ex. N 152:21-153:18.[40]



Plaintiffs' proposed subclasses in turn exclude large portions of the proposed class area,

including the residential areas closest to the JPLF that Mr. Lape predicted to have the highest

frequency of exposure (i.e., the residents in the innermost orange shape, closest to the JPLF). None

---

[39] Plaintiffs' Exhibit 16 incorrectly identified the boundaries of the proposed class, as Plaintiffs increased the size of the proposed class area in their May 2024 motion to include the northerly area outlined in red.
[40] Pivotal Engineering's recommended odor monitoring network and Dr. Zannetti's odor complaint analysis do not support the proposed class boundary. Pls. Br. 21-22 n.141. Pivotal recommended (but did not install) monitoring locations based on odor complaints, but these complaints did not solely concern JPLF, as the descriptions pointed to other sources. Defs. Ex. B-2 at 23-24, 40; Defs. Ex. B-1 at 44. Dr. Zannetti's analysis confirmed that many complaints were not downwind of the JPLF. Defs. Ex. C-1 at 41-42; Att. A at 29-36.

of the proposed class representatives reside in this area.[41] Even based on Plaintiffs' own evidence, the proposed class and subclasses fail the ascertainability requirement.

## VII.  Plaintiffs do not propose a workable trial plan.

Plaintiffs' trial plan reinforces that class certification is not warranted due to the substantial individual issues that must be adjudicated to resolve the putative class members' nuisance claims. Plaintiffs propose to bifurcate the litigation into two phases: a first phase focused on "liability for nuisance," "apportionment of fault," and the dispersion of $H_2S$ emissions from the JPLF, and a second phase that would address specific causation and damages. This proposal is not feasible.

Plaintiffs incorrectly characterize the issues to be addressed in their proposed first phase as "common" and assert that they will be "binding upon all [putative] class members." Pls. Br. 42, 45. However, Plaintiffs' proposed common issues include those requiring individual proof—e.g., determining exposures and apportioning contribution of other odor sources. Any value gained by trying these issues in a single proceeding would be vastly outweighed by the complexities of deciding other liability issues, specific causation, and damages for the thousands of class members.

With respect to their proposed second phase, Plaintiffs equivocate between arguing that specific causation and damages can be decided on a "representative" basis, or through individual trials. *Id*. 42, 45, 47-48. To the extent Plaintiffs intend to try these issues through "'waves' or 'flights' of homogenous groups based on geographic sub-locations," *id.* 42, they provide scant details on that plan and do not address how they will deal with the individual inquiries needed into the putative class members' claims.

---

[41] Mr. Lape's modeling results, as depicted in Figure 56, also does not provide a reliable evidentiary basis for Plaintiffs' proposed subclasses because it creates the illusion of common impacts when the subclasses in fact encompass significant monthly variations in predicted exposures.

As explained above, and as demonstrated by *Addison*, the class representatives cannot stand in for all putative class members because the extent and frequency of predicted emissions varied across and within the subclasses. Class members were present at their properties at different times, requiring individual proof that they (not just their properties) were exposed to odors. The putative class members had differing exposures to odors from other sources, distinguishing this case from those relied on by Plaintiffs and contradicting their claim that this approach would "expedite resolution" or otherwise fall within the scope of Rule 42(b). Pls. Br. 42. The types of injuries alleged (if any), the reasonableness of those impacts, and the amount of damages likewise will not be the same for the putative class members as the proposed class representatives.

Any purported benefits of a class procedure would be wholly undone by the need for thousands of causation and damages trials. If any putative class members have a viable nuisance claim, they can bring that claim through individual actions and rely on the many case management tools that have become routine in modern mass tort litigation.

## CONCLUSION

The Fifth Circuit, other federal courts, and this Court have established exacting standards that must be met before a class can be certified in odor nuisance and other environmental class actions. Those standards are not met here because the types of inquiries that the Court must contend with—nature of exposures, other potential sources, other medical and health causes, and the extent and reasonableness of impacts—must be determined on an individual basis. Plaintiffs have not offered reliable, admissible evidence proving otherwise. Plaintiffs have not met their burden on predominance, superiority, or other Rule 23 requirements, and the Court should deny class certification. All putative class members with genuine claims have an adequate remedy demonstrated by the mass torts that are currently proceeding to trial.

Respectfully submitted,

LISKOW & LEWIS, APLC

By:   /s/ Michael C. Mims

Michael Cash (#31655)
Cherrell Simms Taplin (#28227)
Michael C. Mims (#33991)
Brady M. Hadden (#37708)
J. Hunter Curtis (#39150)
Alec Andrade (#38659)
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

BEVERIDGE & DIAMOND, P.C.

Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

52

CONNICK AND CONNICK, LLC

By:    /s/ Michael S. Futrell
        William P. Connick, La. Bar No. 14158
        Michael S. Futrell, La. Bar. No. 20819
        Matthew D. Moghis, La. Bar. No. 33994
        3421 N. Causeway Blvd., Suite 408
        Metairie, Louisiana 70002
        Telephone: (504) 681-6658
        Facsimile: (504) 838-9903
        E-mail: moghis@connicklaw.com

        *Counsel for Defendant Jefferson Parish*

GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:    /s/ J. Michael DiGiglia
        Ernest P. Gieger, Jr. (6154)
        John E. W. Baay (22928)
        J. Michael DiGiglia (24378)
        Nicholas S. Bergeron (37585)
        Gieger, Laborde & Laperouse, L.L.C.
        Hancock Whitney Center
        701 Poydras Street, Suite 4800
        New Orleans, Louisiana 70139
        Telephone: (504) 561-0400
        Facsimile: (504) 561-1011

        *Attorneys for Defendant Aptim Corp.*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 19, 2024, I electronically filed this document with the Clerk of the Court using CM/ECF system. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.


By: <u>/s/ Michael C. Mims    </u>
        Of Counsel