## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** | **CIVIL ACTION** |
| **Plaintiff** | **NO. 18-7889** |
| | **c/w 18-8071,** |
| **VERSUS** | **18-8218, 18-9312** |
| **PROGRESSIVE WASTE SOLUTIONS OF LA, INC., ET AL.,** | **SECTION: "E" (5)** |
| **Defendants** | |
| | **JUDGE: Morgan** |
| *Applies to: All Cases* | **MAGISTRATE JUDGE: North** |

### REPLY MEMORANDUM IN SUPPORT OF
### PLAINTIFFS' AMENDED MOTION TO CERTIFY CLASS

**NOW INTO COURT**, through undersigned counsel, come the Proposed Class Representatives who file this Reply Memorandum in Support of their Amended Motion to Certify Class, to wit:

**I.    PREDOMINANCE AND SUPERIORITY HAVE BEEN MET.**

Defendants offer no alternative to the trial plan outlined by Plaintiffs and instead expect this Court to try thousands of individual cases when the Class Action mechanism is appropriate to steer this litigation to a resolution.  Offering no meaningful rebuttal as to the Plaintiffs' contention that the complex class-wide common issues concerning Defendants' liability for the Landfill's noxious emissions, allocation of fault among Defendants for those emissions, and the impact on the surrounding communities in terms of geographic scope, frequency, duration, and concentration are appropriate for class-wide adjudication under Rule 23(b)(3) and Rule 23(c)(4) as they are not only common substantive questions that "generate common answers apt to drive the resolution of

the litigation,"[1] but are also complex issues which predominate over any potential and less complex individualized issues.

Resolving these common issues for all does not require any individualized proof from any one putative class member. In fact, the predominant issues here are remarkably similar to those the Louisiana Supreme Court found predominated in *McCastle*,[2] a nuisance class action under Articles 667-669, thereby warranting the conclusion that a "common nucleus of operative facts" exists to certify this class action.

Moreover, contrary to Defendants' contentions, the issue concerning whether the proposed class members are "neighbors" for purposes of nuisance[3] will be attended to during Phase One since the factfinder will determine the scope of the geographic area impacted by the noxious emissions during the relevant 30-month period. The same conclusion is warranted for all nuisance liability issues save for determining damages (which will be determined during proposed Phase Two). Given Defendants' prior arguments that "fundamental fairness" and judicial efficiency require that their nuisance liability for all 547 *Addison* Plaintiffs be tried in one single trial and given Defendants' prior admission that "the issues of specific causation and damages should be held for the individual Plaintiffs as those issues are unique to each Plaintiff," Defendants' argument that nuisance liability requires individual proof is dubious.[4]

---

[1] As the Fifth Circuit interprets Wal-Mart Stores, Inc. V. Dukes, 564 U.S. 338, 350 (2011) "[t]hese 'common answers' may indeed relate to the injurious effects experienced by the class members, but they may also relate to the defendant's injurious conduct."

[2] *McCastle v. Rollins Env't Servs. of Louisiana, Inc.*, 456 So. 2d 612, 619–20 (La. 1984).

[3] See 2019 WL 4111681 Ictech-Bendeck v. Progressive Waste Solutions of La., inc., et. al. where this Honorable Court previously addressed the meaning of "neighbor" under La. Civ. Code art. 667.

[4] See Doc. 306-1 at p. 1-2 ("Fundamental fairness and Seventh Amendment concerns dictate that liability underlying the 547 Addison Plaintiff's claims be tried in a single trial. *A separate trial on the issues of specific causation and damages should be held for the individual Plaintiffs as those*

Plaintiffs recognize that individual evaluation will be necessary for specific causation and damages; however, on balance, the common issues predominate individual issues, regardless of the Defendants' attempt to manufacture their complexity.[5]

The transient nature of the plaintiffs' symptoms further mitigates the weight assigned to individualized issues. Since Plaintiffs seek compensation for transitory symptoms associated with nuisance odor impacts, evaluating the difference between individuals who experienced symptoms of watery eyes and those who experienced nausea is not complicated when balanced with the common issues of liability, allocation of fault, and geographic dispersion of the JPLF's emissions. Ultimately, after presiding over the initial fourteen Addison plaintiffs' trial in August, this Court will have a first-hand perspective to weigh the common issues against individual ones.

Defendants have also failed to meaningfully rebut the Plaintiffs' contention that the class action procedure is the superior method, which promotes judicial efficiency and avoids conflicting rulings on these common complex issues that predominate. Class treatment of liability, allocation, and geographic dispersion is a superior method to litigating these claims, given the judicial efficiency to be gained in not having to try these common issues thousands of times.

Notably, Defendants have not meaningfully addressed their prior admission that the common issues that Plaintiffs assert predominate should be tried only once to promote judicial

---

issues are unique to each Plaintiff, and are most likely to provide meaningful information for settlement.").

[5] *Marshall ex rel. minor children v. Air Liquide-Big Three, Inc.*, 2008-0668 (La. App. 4 Cir. 12/17/08), 2 So. 3d 541, 550, *writ denied sub nom. Marshall v. Air Liquide--Big Three Inc.*, 2009-0105 (La. 3/13/09), 5 So. 3d 125, and *writ denied sub nom. Marshall v. Air Liquide--Big Three Inc.*, 2009-0111 (La. 3/13/09), 5 So. 3d 125 (distinguishing *Ford v. Murphy Oil U.S.A., Inc.* and finding "although each plaintiff will have different medical issues, and that other factors such as smoking, length of exposure, etc., exist, in this case plaintiffs are only suing one facility, and the contractors, subcontractors, and insurance companies directly involved with that facility. Further, plaintiffs are only seeking monetary damages.").

efficiency and avoid inconsistent rulings on these common issues. As with the Defendants' prior proposal in the Addison case, the Plaintiffs' proposed two-phase trial plan achieves those goals.

The difficulties that may be encountered in handling this class action do not outweigh the economies to be derived from the unitary adjudication of Defendants' liability for the JPLF's emission, allocation of fault for same, and the geographic dispersion of the JPLF's emissions over the 30-month period. Using the class action procedure achieves economy of time, effort, and expense and avoids inconsistent rulings on common issues.[6]

## II.   DEFENDANTS SHOULD NOT BE ALLOWED TO RE-LITIGATE DAUBERT RULINGS.

Defendants' argument that predominance is not met because Mr. Lape's modeling results are alleged to be an overprediction due to the purported unreliability of methods and inputs is nothing more than Defendants' latest attempt (of many) to re-do the *Daubert* hearings conducted during the General Causation trial. This Honorable Court correctly decided Defendants' *Daubert* motions and General Causation, and Plaintiffs respectfully reject Defendants' invitation to re-litigate same.[7]

However, Plaintiffs must note that Defendants' initial *Daubert* challenge of Dr. Pietari was limited to the argument that her estimate of the sulfate content of the Rain Carbon spent lime was based on two purportedly unreliable Safety Data Sheets. Doc. 166-18 at p. 4-9. After that attempt failed, and now employing a new expert, Dr. Bishow Shaha (a replacement retention which with

---

[6] See *Doerr v. Mobil Oil Corp.*, 2001-0775 (La. App. 4 Cir. 2/27/02), 811 So. 2d 1135, 1145, writ denied sub nom. *Doerr v. Mobile Oil Corp.*, 2002-0920 (La. 5/31/02), 817 So. 2d 105, and writ denied sub nom. *Doerr v. Mobile Oil Corp.*, 2002-0938 (La. 5/31/02), 817 So. 2d 106.

[7] In an abundance of caution, pursuant to FRCP 10(c) Plaintiffs adopt and incorporate by reference the arguments within the *Addison* Plaintiffs' Opposition to Defendants Motion in Limine to Exclude the H2S Emissions Opinions of Jose Sananes, Case 2:19-cv-11133, Doc. 592, also attached as **Exhibit A**.

4

each passing day confirms to have been strategic), Defendants claim her H2S generation estimate from the spent lime is unreliable because she lacks the data necessary to validate the modeling results. Defendants fail to acknowledge[8] (1) that validation is not a requirement (**Exhibit B**, Rebuttal Report of Dr. Pietari at p. 23-24) and (2) that the data they contend is necessary for validation (and determining the rate of error) does not exist because they failed to capture it (both of which were discussed at length during the General Causation trial) (**Exhibit B**, Rebuttal Report of Dr. Pietari at p. 10-12, **Exhibit C** at p. 49:14-50:3, 71:8-72:12). Finally, as to Defendants' argument that Dr. Pietari cannot tell the Court her model is a good predictor of H2S generation at the JPLF, as she explained in her most recent deposition, and as she explained at trial, she is confident her H2S generation estimate from the spent lime is a reasonable underestimate to a reasonable degree of scientific certainty. **Exhibit C** at p.66:24-72:12.

As this Court did not determine the geographic extent of emissions from the JPLF during General Causation, that determination is for the trier of fact at trial. Doc. 285 at 45-56. Moreover, as Defendants previously admitted, the emissions mapping to be adjudicated in proposed Phase One will drive the later determinations of specific causation and damages.[9] Accordingly, the Plaintiffs have proposed that the geographic extent of the emissions be decided during Phase One (not because of any purported limitations of Mr. Lape's modeling, as Defendants suggest). The ability to determine common complex issues one time in one trial, like the geographic extent to which the JPLF's odors traveled during the 30-month time period and in what concentration and duration, is a testament to the efficiency and fairness that will be achieved by using the class

---

[8] Defendants also conveniently fail to acknowledge that their strategic replacement expert has only estimated hydrogen sulfide generation one time. **Exhibit D**, Excerpts of Dr. Shaha Deposition at p. 12:9-23.

[9] See Doc. 303-1 at p. 2 (Page 6 of 19) ("Causation and damages will require fact and expert evidence on air dispersion, calculations of hydrogen sulfide emission rates…").

procedure here. *American Pipe and Constr. Co. V. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974).[10]

Conspicuously absent from the Defendants' argument regarding the purported limitations of Mr. Lape's modeling is the consistency that Mr. Lape's modeling displays with the 1,997 contemporaneous citizen odor complaints documented by the LDEQ from April to July 2018.

Further unavailing is the Defendants' claim that Mr. Lape's modeling results fail to show uniformity of impact. The alleged differences among monthly predicted impacts at the proposed Class Representatives' homes do not prove inconsistency. While showing uniformity of impacts over geographic subregions may not have been Defendants' and Dr. Zannetti's intent, Figure 56 corroborates Mr. Lape's modeling, creates the boundaries of the sub-classes, and undeniably demonstrates that over the 30-month exposure period, the Proposed Class Representatives received similar frequencies of odor impacts as other nearby residential areas based on distance from the Landfill, even locations in different directions from the Landfill. While variation certainly existed hour-by-hour, day-by-day, or month-by-month, the modeling results show consistency in the number, duration, and concentration of impacts within the proposed class area over the course of the 30-month relevant time period. Mr. Lape's modeling is sufficient to support predominance.[11]

---

[10] Defendants' argument that this Court's ruling of 5 ppb for 30 minutes was based solely on the World Health Organization guidelines is antiquated and inaccurate.

[11] The argument that Mr. Lape only modeled H2S emissions such that the JPLF's emitted VOCs should not be considered as it is disingenuous. This Honorable Court recognized that other odorous compounds from the JPLF, including VOCs, "enhanced the intensity of the bad odor." Doc. 285 at p. 34-35. Moreover, Mr. Lape clearly stated that "H2S was selected as a surrogate for odors from the Landfill" and that his "model estimates underestimate the odor impacts from JPL." Doc. 438-12 at 7-1 (H2S as surrogate) and 6-2, 7-2, 8-4 (modeling underestimates odor impacts from JPLF); see also Doc. 447-8 at p. 12 (2-5) (other odorous compounds not considered leading to underestimation). Accordingly, Defendants lack any basis to prevent this Honorable Court from considering VOCs and other odorous compounds in the Rule 23 analysis.

Notably, the fact the JPLF's emissions may have impacted putative class members at different times and locations over the course of 30 months does not preclude a finding of predominance because Plaintiffs attribute their nuisance claims to a single source.[12]

### III. NO EVIDENCE EXISTS OF ODOR EMISSIONS FROM OTHER POTENTIAL SOURCES

Contrary to Defendants' misrepresentations, Plaintiffs have indeed challenged Defendants' purported evidence of alternative odor sources. In fact, Plaintiffs established through Defendants' own expert, Mr. Corn, that Defendants have no evidence that any odors from any alleged alternative non-landfill odor sources impacted any one individual within the proposed class area at any location, on any given day, at any specific concentration and duration sufficient to cause the complained of injuries here (odor nuisance).[13] Notably, Mr. Corn admitted that he could have modeled purported emissions from these alleged non-landfill odor sources; however, he stated that he was not asked to do so by his clients.[14] Demonstrating the stark insufficiency (and irrelevancy)

---

[12] *McCastle v. Rollins Environmental Services of Louisiana, Inc.,* 456 So.2d 612, 619-620 (La.1984) (citations omitted) ("That individuals may have been injured or unreasonably inconvenienced by noxious gases on varying dates by the defendant's land farm operations does not constitute a material variation in the elements of the class members' claims. With respect to the question of damages, individual questions of quantum do not preclude a class action when predominant liability issues are common to the class.").See *West v. G & H Seed Co.*, 2001-1453 (La. App. 3 Cir. 8/28/02), 832 So. 2d 274, 289 citing *Scott v. American Tobacco Co.*, 98–0452, pp. 4–5 (La.App. 4 Cir.1998); 725 So.2d 10, 13, writ denied, 98–3016 (La.2/26/99) (finding that under *McCastle* it did not matter that each class member was not harmed on the same date or sustained the same injury because the complaints derived from a single source); see also *Marshall ex rel. minor children v. Air Liquide-Big Three, Inc.*, 22 So. 3d at 551 (noting *McCastle* is still good law).

[13] **Exhibit E**, Excerpts from the Deposition of Michael Corn at p. 61:12-20, 75:23-76:8, 77:6-78:18, 86:17-88:17, 141:23-142:3, 208:8-210:16, 213:10-216:10, 217:10-220:8. Remarkably, Mr. Corn did not seem to understand the difference between possibility and probability. **Exhibit E** at p. 78:20-79:16.

[14] **Exhibit E**, Excerpts from the Deposition of Michael Corn at p. 71:14-22, 105:20-106:13, 302:23-303:10.

of Mr. Corn's opinions, Dr. Zannetti attempted to model purported emissions from Cornerstone but found "there was no exceedance of odor based on my modeling run of these emissions."[15]

Plaintiffs do not need an expert to prove that Defendants' experts failed to provide sufficient evidence of likely actual emissions from alternative odor sources within the proposed class area during the relevant 30-month period. Rather, it is apparent that Defendants are attempting to use Mr. Corn's testimony to manufacture alleged individualized issues to defeat predominance. Mr. Corn's carefully worded opinions were intended to hide the fact that Defendants do not have any evidence of likely odorous emissions from alleged alternative non-landfill other sources having impacted any single individual at any concentration and duration at any time. Defendants' fabrication as to purported alternative non-landfill odor sources does not defeat a finding of predominance.

As to other alleged landfill odor sources, Plaintiffs' experts have challenged Defendants' purported evidence of alternative landfill odor sources. Specifically, both Dr. Pietari and Mr. Lape challenged the reliability and accuracy of Mr. Stutz's Hwy 90 emissions estimate. See **Exhibit B**, Rebuttal Report of Dr. Pietari at p. 27-29, attached to her deposition (**Exhibit C** at p. 43:10-21, 62:9-14); Doc. 447-8 at p. 8-9 (2-1 thru 2-2), p. 9 (2-2) (Lape Rebuttal). In fact, just one of Dr. Pietari's critiques resulted in an amended report by Mr. Stutz, which reduced his estimated emissions from Hwy 90 by over 15% for 2017, 24% for 2018, and 23% for 2019. **Exhibit F**, P. 131 L. 16 – P. 133 L. 9 of Mr. Stutz Deposition.  Defendants' own expert, Dr. Shaha, testified that using LandGEM, which is what Mr. Stutz used to estimate H2S generation at Hwy 90, is

---

[15] **Exhibit G**, Excerpts from the Deposition of Dr. Paolo Zannetti at p. 31:5-32:16, 36:1-38:19 and Rec Doc 285 p. 22 (LDEQ also ruled out the Cornerstone Chemical plant in Waggaman on the West Bank as being a possible source for the odor event because "this facility is highly unlikely to be capable of being the source of a combined hydrogen sulfide and methane plume").

inappropriate to accurately predict future H2S concentrations in the landfill gas from the C&D waste. **Exhibit D** at p. 15:12-16:16. As he stated, if LandGEM could accurately and reliably estimate hydrogen sulfide gas generated from a specific sulfur-containing waste (such as spent lime), then his modeling approach would be obsolete. **Exhibit D** at p. 151:23-153:19.

## IV.   WHETHER THE PUTATIVE CLASS SUFFERED NUISANCE DAMAGES IS NOT A LIABILITY DETERMINATION.

Defendants, relying on a footnote within the Louisiana Supreme Court's decision in *Ford v. Murphy Oil U.S.A., Inc.*, 96-2913 (La. 9/9/97), 703 So.2d 542, 549, n. 11, which itself is dicta, contends that whether putative class members sustained actual damage or substantial interference with the enjoyment of their property is a liability issue as opposed to a specific causation or damages issue. However, that is not accurate. The Louisiana Supreme Court merely recognized that there must be damages to prove nuisance liability under Louisiana law. Nonetheless, the damages element for nuisance, which confirms the Defendants' liability for nuisance, can be handled through the Plaintiffs' proposed Phase Two, as previously suggested.

Defendants' interpretation of this footnote conflates liability with specific causation and damages because they now want to try liability thousands of times despite previously agreeing that nuisance liability should only be tried once to promote judicial efficiency and avoid inconsistent results. Defendants' prior admission defeats any argument that nuisance liability is not common.

## V.    CLASS REPRESENTATIVES' CLAIMS ARE TYPICAL OF PUTATIVE CLASS MEMBERS

Defendants' argument that the proposed Class Representatives' experiences are markedly different from other putative class members is based on evidence lacking credibility.

The declarations lack credibility given the unknowns regarding what defense counsel asked those individuals, how they responded to those questions, what information was omitted from the

affidavits, and whether defense counsel informed those individuals of their status (and rights) as putative class members. For example, a declarant stating that the odors he experienced did not affect his outdoor activities does not foreclose the fact that the odors annoyed him. It is apparent that defense counsel manufactured these self-serving declarations.

Douglas Brown's testimony has no probative value or credibility given that there is no indication that he was asked what time of day he went to those properties, how many times, or the locations of those properties. When asked if any tenants complained about odors, he simply testified he did not remember. He also testified that he did not have reason to spend time in the Waggaman area from 2017 to 2020 other than when "passing through it." Defendants' Ex. FF at p. 37:1-16. Also, he only visited the Avondale area maybe once a year to see a friend who lived there. Ex. FF at 37:25 -38:9. Accordingly, given his rare visits to Waggaman, his alleged lack of smelling odors should not impact the truth and facts stated by residents in the class area. Ex. FF at p. 38:10-12. Mr. Brown's Kenner property, located at 3141 Hunstville Street, is not inside the proposed class area.

The plaintiff fact sheets filled out by the *Arceneaux* plaintiffs warrants a similar conclusion. Defendants' assertion that the 12 individual putative class members who signed these fact sheets "stated they were exposed to other odor sources sometime since 2015" is misleading. Those 12 individuals did not expressly say that they believe they were exposed to odors from those potential other sources during the relevant time period, given the broad nature of "Emissions" as defined by the fact sheets and the fact that they were not filled out until sometime in 2023. Moreover, the claim that the *Arceneaux* plaintiffs assert additional claims beyond nuisance is specious. For example, the one individual who claimed property value diminution admitted there was no attempt to sell the home to realize any such damage. Defs. Ex. II at PDF p. 295-296. To the extent these

individuals claim personal injuries (as opposed to symptoms of nuisance odor impacts), those claims are foreclosed by the Court's General Causation ruling. Not to mention, the *Arceneaux* plaintiffs dismissed their lawsuit (ostensibly because they recognized their interests are represented by the proposed Class Representatives in this matter). Notwithstanding, the handful of *Arceneaux* plaintiffs do not dictate a finding that the proposed Class Representatives are not representative of the tens of thousands of putative class members.

## VI.     THE PROPOSED CLASS REPRESENTATIVES ARE ADEQUATE

As to the non-named plaintiff proposed Class Representatives, leave should be allowed to amend to formally add those individuals as named Plaintiffs in accordance with *Johnson v. Am. Credit Co. of Georgia*, 581 F.2d 526, 533 n.13 (5th Cir. 1978). Allowing Plaintiffs leave to amend to add these individuals formally would serve the interests of justice and judicial economy and would not cause undue delay, considering no hearing or argument has been scheduled to date.

Defendants' argument that Ann Williams has no property interest lacks merit. Defendants are fully aware that Ms. Williams paid her mother-in-law monthly rent in the amount of $500 from October 2016 through December 2020. Her rent payments pursuant to an oral lease[16] are sufficient to conclude that she has a property interest to support a nuisance claim and is thus adequate to serve as a class representative.[17]

---

[16] *Bridges v. Anderson*, 2016-0432 (La. App. 4 Cir. 12/7/16), 204 So. 3d 1079, 1081, *writ denied,* 2017-0194 (La. 3/24/17), 216 So. 3d 817 ("We first note that oral leases are generally valid under Louisiana law.")

[17] See **Exhibit H**, Ms. Williams' Supplemental Answer to Interrogatory No. 1 and attached Verification.

## VII.   PLAINTIFFS' PROPOSED CLASS AND SUBCLASSES ARE ASCERTAINABLE.

**1.   No Property Interest is Necessary for Nuisance Claims Arising under Article 669.**

The very case cited by Defendants, *Roberts v. Cardinal Servs., Inc.*, 266 F.3d 368, 387 (5th Cir. 2001), provides that a propriety interest is not required under Article 669.[18] Specifically, the Fifth Circuit noted that "Persons that do not qualify as proprietors, such as guests, contractors, and members of the public, may have a variety of remedies against a landowner under the law of delictual obligations *or under Article 669*, but not for violation of obligations established by Articles 667 and 668." *Id.* (emphasis added). Further, Defendants' reliance on *Johnson v. Orleans Par. Sch. Bd.*, 2005-1488 (La. App. 4 Cir. 8/9/06), 938 So. 2d 219, 227, is misplaced as that case did not involve nauseous odors and thus did not involve Article 669. Accordingly, no property interest is required because the nuisance claims at issue arise under Article 669.

Notwithstanding, to the extent this Honorable Court finds that such a property interest is required,[19] the Plaintiffs' class definition can be amended accordingly to limit class members to those who owned or leased properties or had rights derived from the owners of properties within the proposed class area during the relevant time period.

---

[18] See R. Doc. 48 at p. 6, paragraph 15(f)-(g); *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, No. CV 18-7889, 2022 WL 17324430, at *1 (E.D. La. Nov. 29, 2022) (noting that Plaintiffs "seek damages for violations of the obligations of neighborhood under Louisiana Civil Code articles 667-669.").

[19] As this Honorable Court previously noted, "[u]nder Article 667, "a plaintiff's interest in neighboring property can be an ownership interest, leasehold interest, third-party interest, or more generally the interest of "a person whose right derives from the owner." *Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. CV 18-7889, 2019 WL 4111681, at *3 (E.D. La. Aug. 29, 2019) (citation omitted).

## 2. Plaintiffs Should Be Allowed Leave to Locate and Add a Proposed Class Representative for the Concentric Circle Closest to the JPLF.

The exclusion of the concentric circle closest to the JPLF as a subclass was an unintended oversight due in part to the relatively small number of homes within that area (as opposed to the landfills and businesses occupying that footprint). See Doc. 438-16 (Dr. Zannetti's Revised Figure 56). In the interests of justice and judicial economy, and to the extent this Honorable Court finds that Proposed Class Representative Landry-Boudreaux is not adequate to represent the interests of that subclass despite Mr. Lape's modeling supporting the conclusion that she received more than 2,000 odor impacts during the 30-month period, Plaintiffs should be allowed leave to locate an additional proposed class representative for that subclass area and amend accordingly.[20]

## 3. The Proposed Class Area Encompasses All Locations within Jefferson Parish that were Part of the Modeled Area.

First, to dispel any confusion,[21] as set forth in Plaintiffs' Memorandum in Support of their original Motion to Certify Class, the initial proposed class boundary was selected by counsel based on the geographic boundary drawn by the Parish's expert, Pivotal Engineering, when recommending the creation of an odor monitoring network and the geographic spread of the 1,997 residential complaints collected by the LDEQ between April 25, 2018 and July 20, 2018. Doc. 368-1 at p. 4-6. As further stated therein, the forthcoming air modeling of Mr. Lape would then be used to refine the proposed geographic boundary. Doc. 368-1 at p. 7. Plaintiffs did just that, and revised the geographic boundary to comport with Mr. Lape's modeling in their amended motion.

---

[20] See *Johnson*, 581 F.2d at 533 n.13 ("When faced with a situation when no named plaintiff can represent a subclass, a trial court should consider whether it is in the interests of justice and judicial economy to postpone dismissal as to the subclass for a specified period in which members of the subclass could become plaintiffs by amendment of the Complaint or by intervention and thereby save the subclass action.")

[21] Unsurprisingly, Defendants' footnote 40 reveals they knew exactly how the class boundary was originally selected before Mr. Lape conducted his modeling. Doc. 447 at p. 49.

The basis of Defendants' argument that the proposed class area encompasses other locations outside the modeled area is unclear, as the proposed class boundaries are within the area that Mr. Lape modeled. Nevertheless, to the extent Defendants are referring to the small area exceeding the revised northern boundary, Plaintiffs should be allowed to amend the geographic description to include that minimal area. The basis of Defendants' argument that the proposed class area includes only a portion of the area where Mr. Lape predicted emissions would disperse is similarly unclear. However, to the extent Defendants are referring to areas outside the proposed geographic boundary, those locations are either outside of Jefferson Parish or include areas without homes/residences, such as the MSY airport (old and new).

## VIII.   PLAINTIFFS HAVE PROPOSED A WORKABLE TRIAL PLAN

The proposed bifurcation plan is workable because it would result in a single trial on the predominant, common, and complex issues of liability for the JPLF's emissions, allocation of fault among Defendants for those emissions, and the geographic scope, frequency, concentration and duration of JPLF's emissions over 30 months which would promote judicial efficiency, avoid inconsistent rulings on these common issues, and expedite resolution of the dispute.

The determination of specific causation and the quantum of damages caused by Defendants' liability can be addressed in Phase Two through individual trials. The determination of whether individual plaintiffs suffered nuisance damages, as opposed to mere inconvenience, will be addressed during Phase Two as part of the damages analysis as previously proposed.[22]

---

[22] As previously asserted, "[a]ll remaining issues shall be tried during Phase Two, including specific causation, *the nature and extent of nuisance injuries suffered as a result of the Landfill's noxious emissions*, and the amount of compensatory damages owed to the Class Representatives and putative class members." Doc. 438-21 at p. 48 (emphasis added).

14

Defendants fail to illustrate the "common case management tools for handling mass actions" that would be a viable alternative to Putative Class Plaintiffs' proposals. Regardless, any "common case management tools for handling mass actions" are not superior to the class action procedure as they cannot achieve the resolution of the common issues that predominate every class member's claim in one stroke through one trial.

In the interest of justice, efficiency, and judicial economy, as well as fundamental fairness, this proposed class action should be certified pursuant to Rule 23(b)(3) and/or Rule 23(c)(4).

## IX.    CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Putative Class Representatives respectfully request that their motion be granted.

Date: June 26, 2024

Respectfully Submitted:

*/s/ Lawrence J. Centola, III*
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, Iii (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

*/s/ Bruce C. Betzer*
Bruce C. Betzer (Bar No. 26800)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

*/s/ Douglas S. Hammel*
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001

Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

*/s/ Kacie F. Gray*
Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

*/s/ John D. Sileo*
John D. Sileo (La Bar No. 17797)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*/s/ Seth H. Schaumburg*
Seth H. Schaumburg (La Bar No. 24636)
Favret Demarest Russo Lutkewitte & Schaumburg
1555 Poydras Street, Suite 1600
New Orleans, LA 70112
P: (504) 562-1006
F: (504) 523-0699
seth@favretlaw.com
*Counsel for Ictech-Bendeck Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Lawrence J. Centola, III*